IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No.  10-cv-02103-PAB-KLM

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

> Plaintiff,

and

IRAQ ABADE, et al.,

> Plaintiffs-Intervenors,

v.

JBS USA, LLC,
d/b/a JBS Swift & Company,

> Defendant.

---

## ORDER ON MOTION TO BIFURCATE

---

JBS USA, LLC ("JBS") owns and operates a meat packing plant in Greeley, Colorado at which a large number of Somali, Muslim, and black persons work.  The EEOC filed this suit alleging that JBS has discriminated against these workers based on their national origin, religion, and ethnicity.  The matter is currently before the Court on the EEOC's motion to bifurcate the trial [Docket No. 28].  The motion is fully briefed and ripe for disposition.  For the reasons stated below, the motion to bifurcate is granted in part and denied in part.

## I.  BACKGROUND

The EEOC filed suit in this case alleging several violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and Title I of the Civil Rights Act of

1991, 42 U.S.C. § 1981a.  *See* Docket No. 1 (EEOC Complaint).  The EEOC brings

several pattern or practice claims alleging discriminatory harassment, disparate

treatment, denial of religious accommodation, retaliation, and discipline and discharge.

The EEOC also brings individual claims on behalf of charging parties for failure to

accommodate religion, retaliation for requesting accommodation, hostile work

environment, and discriminatory discipline and discharge.  After the EEOC filed its

complaint, three groups of intervenors successfully intervened in the action asserting

similar claims.  This case presently involves over 100 individual plaintiffs.  The EEOC

estimates that 250 individuals were affected by defendant's alleged discriminatory

practices and may seek relief in this case.

The EEOC's pattern or practice religious accommodation claim alleges that

defendant violated workers' rights to religious accommodation in four ways: (1) it denied

Muslim workers the ability to pray at or near sundown during the holy month of

Ramadan; (2) it did not allow Muslim workers to break their fast after sundown during

Ramadan; (3) it denied Muslim workers bathroom breaks and the ability to pray during

those bathroom breaks; and (4) it did not provide Muslim workers a space in which to

pray, forcing them to pray on bathroom floors.  The EEOC also alleges that during

Ramadan 2008 Muslim employees requested that their evening break be moved from

9:15 p.m. to 7:30 p.m. so that they could pray and break their fast within fifteen minutes

of sunset.  For two days, defendant accommodated this request, but on the third day, a

Friday, it decided to move the break to 8:00 p.m.  On Friday, management stationed

employees at the doors to prevent Muslims from leaving the facility at 7:30 p.m. and

shut off water fountains or tagged them with red tags and yellow tape, preventing

2

Muslim workers from drinking water at the end of their daily fast or washing up for their prayers.  At 8:00 p.m., management told Muslim employees to leave the facility, but when the employees attempted to re-enter after their breaks, management told them they could not return to work.  The following Monday defendant advised the employees' union that those workers who left the plant had engaged in an unauthorized work stoppage and would be placed on an indefinite suspension.  On Tuesday, defendant decided to allow these workers to return to work with a final written warning, provided they returned that day.  But defendant did not contact each worker to tell him or her about this decision and, therefore, several Muslim employees were terminated for not returning to work on Tuesday.

The EEOC's pattern or practice hostile work environment claim alleges a variety of forms of harassment against defendant's Muslim, Somali, and/or black employees. These employees were allegedly subject to harassing comments on the basis of their race, national origin, and/or religion.  Other employees allegedly threw blood, meat, and bones at these employees and called them offensive names.  Muslim employees were harassed when they attempted to pray during scheduled breaks and were discriminatorily denied bathroom breaks.  The bathrooms at defendant's facility also allegedly bore anti-Muslim, anti-Somali, and anti-black graffiti.  In its briefing on its motion to bifurcate, the EEOC states that its theory of defendant's liability for this harassment is one of employer negligence.

The EEOC also alleges a retaliation pattern or practice claim, asserting that Muslim workers were retaliated against for requesting religious accommodation.  It further alleges a discriminatory discipline and discharge claim, alleging that Muslim,

Somali, and/or black workers were disciplined or fired because of their religion, national origin, and/or race.[1]

## II.  ANALYSIS

### A.  Rule 42

Federal Rule of Civil Procedure 42 allows courts to order separate trials in a single action "[f]or convenience, to avoid prejudice, or to expedite and economize." Fed. R. Civ. P. 42(b).  "It is the interest of efficient judicial administration that is to be controlling under the rule, rather than the wishes of the parties."  Charles A. Wright, et. al, Federal Practice & Procedure § 2388.  "District courts have broad discretion in deciding whether to sever issues for trial."  *Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1285 (10th Cir. 1999).

### B.  Pattern or Practice Claims and Title VII

Pattern or practice suits originated with § 707 of Title VII, 42 U.S.C. § 2000e-6. The seminal pattern or practice case is *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977), in which the Supreme Court laid out the framework for analyzing claims where the government seeks to remedy an employer's systematic practice of discrimination.  Pattern or practice claims require the EEOC to "prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." *Teamsters*, 431 U.S. at 336.  To recover under a pattern or practice theory,

---

[1] The EEOC also appears to bring a disparate treatment pattern or practice claim separate from the foregoing pattern or practice claims.  *See* Docket No. 1 at 8, ¶ 46. However, it is unclear what sort of disparate treatment the EEOC is alleging pursuant to this claim, as all of the disparate treatment otherwise alleged in the complaint is covered by its four other pattern or practice claims.

discrimination must be "the company's standard operating procedure the regular rather than the unusual practice." *Id.*  Pattern or practice claims can take a number of different forms, depending on the unlawful employment practice in which the EEOC alleges the employer systematically engaged.

"Pattern-or-practice cases differ significantly from the far more common cases involving one or more claims of individualized discrimination," *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1106 (10th Cir. 2001), and proceed under a different burden shifting framework than the traditional *McDonnell Douglas* framework applicable to individual claims.  In a pattern or practice claim, the EEOC must first establish a prima facie case of pattern or practice by "demonstrat[ing] that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers." *Teamsters*, 431 U.S. at 360.  If the plaintiff carries this burden, the employer may defend against liability by challenging plaintiff's proof or providing nondiscriminatory explanations for the procedure.  *Id.* at 360-61.  If the employer fails to carry this burden, "a trial court may then conclude that a violation has occurred and determine" whether prospective relief is appropriate on a class wide basis.  *Id.* at 361.  If the EEOC also seeks individual relief for the victims of the discriminatory practice, "a district court must usually conduct additional proceedings after the liability phase of the trial to determine the scope of individual relief."  *Id.*  During this stage, the EEOC is entitled to a presumption that the adverse employment action suffered by any individual worker was a result of the discriminatory policy.  The employer may then rebut this presumption with evidence that the employment decision was made for lawful reasons.  *Id.* at 362.

Pattern-or-practice cases are typically tried in two or more stages.  During the first stage of the trial the EEOC must demonstrate the existence of a discriminatory policy or practice, but is "not required to offer evidence that each person from whom [it] will ultimately seek relief was a victim of the employer's discriminatory policy." *Thiessen*, 267 F.3d at 1106 (quoting *Teamsters*, 431 U.S. at 360).  If the EEOC prevails during the liability phase, the court proceeds to a second phase regarding damages.  In the damages phase, "it must be determined whether each individual plaintiff was a victim of the discriminatory practice" with the benefit of a presumption that the employer discriminated against the individual employee.  *Id.*  But, if the EEOC does not prevail "during the first stage of a pattern-or-practice trial, [individual plaintiffs] are nevertheless entitled to proceed on their individual claims of discrimination . . . Naturally, however, they are left to proceed under the normal *McDonnell Douglas* framework, rather than benefitting from a presumption of discrimination."  *Id.* at 1106 n.8 (internal citations omitted).

### C.  EEOC's Bifurcation Proposal

The EEOC moves to bifurcate the trial and discovery in this case.  In the first phase of the trial ("Phase I" or "the liability phase"), the EEOC proposes that the jury consider all of the EEOC's pattern or practice claims.  The EEOC would introduce limited evidence necessary to prove such claims, which would proceed under the *Teamsters* burden-shifting framework.  The EEOC would bear the burden of establishing that the defendant engaged in the various alleged patterns or practices of discrimination.  During this phase, the EEOC also proposes that the jury make a finding

as to defendant's liability for punitive damages.  The EEOC anticipates that Phase I would last three to four weeks and could be tried to a single jury.

In the second phase ("Phase II" or "the individual damages phase"), the jury would focus on individual plaintiffs' entitlement to relief pursuant to the EEOC's pattern or practice claims as well as each plaintiff's individual claims that do not overlap with the pattern or practice claims.  Phase II would be necessary regardless of the result in Phase I because, even if the EEOC does not prevail on its pattern or practice claims, individual plaintiffs can still bring their individual claims of discrimination.  Pursuant to the *Teamsters* model, if the EEOC prevails on its pattern or practice claims in Phase I, individual plaintiffs would be entitled to a presumption during Phase II that the adverse employment action they suffered was a result of the discriminatory policy.  *See Thiessen*, 267 F.3d at 1106.  Defendant could then rebut this presumption with evidence that the employment decision was made for lawful reasons.  *See Teamsters*, 431 U.S. at 361-62.  Individual claims for relief that did not overlap with the pattern or practice claims would be decided under the traditional *McDonnell Douglas* framework.  The EEOC anticipates that Phase II will take significantly longer than Phase I and proposes that Phase II be tried to a different jury.  The EEOC also suggests that, given the large number of individual plaintiffs involved, Phase II be split into multiple trials, with different juries considering the claims of smaller groups of plaintiffs.

## D.  Defendant's Objections to Bifurcation as a General Matter

### 1.  Section 706 and 707 of Title VII

Defendant argues that bifurcation exceeds the EEOC's statutory authority by

allowing the EEOC to recover punitive and compensatory damages for individuals pursuant to a pattern or practice claim.  Defendant's argument is premised on the distinction between § 706 and § 707 of Title VII.  Section 706 allows the EEOC to sue an employer on behalf of individuals who file charges with the agency alleging that the employer engaged in an unlawful employment practice.  *See* 42 U.S.C. § 2000e-5.  In a § 706 case, the EEOC stands in the shoes of the individual who filed the charge, and can only bring claims which that individual might have brought himself.  Section 707, on the other hand, authorizes the EEOC to sue where it "has reasonable cause to believe that [an employer] is engaged in a pattern or practice" of discrimination and does not require the filing of any individual charge.  *See* 42 U.S.C. § 2000e-6.

Two important distinctions between these statutory sections are relevant to the EEOC's motion.  First, claims under each section are entitled to different damages.  The 1991 amendments to Title VII expanded the remedies available for § 706 claims from purely equitable remedies, including backpay, to include punitive and compensatory damages, without similarly expanding the damages available for claims brought pursuant to § 707.  *See* 42 U.S.C. 1981a(a)(1); *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 287 (2002).  Second, as discussed above, the *Teamsters* framework generally applies to pattern or practice claims brought under § 707, whereas the *McDonnell Douglas* framework applies to individual claims brought under § 706.  *See Serrano v. Cintas Corp.*, 711 F. Supp. 2d 782, 794 (E.D. Mich. 2010) (describing the Teamsters framework as "designed for § 707 claims").  These distinctions, however, do not necessarily prohibit bifurcation in this case because the EEOC has brought claims

8

pursuant to both § 706 and § 707.  *See* Docket No. 1 at 2, ¶ 1; *compare Serrano*, 711

F. Supp. 2d at 794 (EEOC could not use *Teamsters* framework where it brought claims

solely pursuant to § 706); *EEOC v. CRST Van Expedited, Inc.*, 611 F. Supp. 2d 918,

933 (N.D. Iowa 2009) (EEOC did not plead § 707 claim).

### 2.  Seventh Amendment

        In its response brief, defendant objected to Phase I of the trial being tried to a

jury on Seventh Amendment grounds; however, at oral argument on June 14, 2011,

defendant conceded that it would not violate defendant's Seventh Amendment rights to

have a jury find the facts necessary to a finding of liability in Phase I given that there is

no Seventh Amendment right to a trial to the Court.  *See Beacon Theatres, Inc. v.*

*Westover*, 359 U.S. 500, 510 (1959) ("the right to a jury trial is a constitutional one,

however, while no similar requirement protects trials to the court").  Despite this

concession, defendant did raise a different Seventh Amendment issue at oral

argument, claiming that having different juries decide Phase I and Phase II would

violate the Seventh Amendment's re-examination clause.  This clause provides that "no

fact tried by a jury shall be otherwise re-examined."  U.S. Const. Amend VII.  However,

the re-examination clause "does not prohibit two juries from reviewing the same

evidence, but only from deciding the same factual issues."  *Taylor v. District of*

*Columbia Water & Sewer Auth.*, 205 F.R.D. 43, 51 (D.D.C. 2002).  Thus, as *Taylor*

concluded, multiple juries in bifurcated pattern or practice cases may hear overlapping

evidence, so long as they decide distinct factual issues.  During the first phase, the jury

determines the existence of a pattern or practice.  During the second phase, the jury

determines whether individuals were victims of that discriminatory pattern or practice.
"While evidence regarding individual adverse actions may enter at both stages, it is
used to prove different issues in each stage: in the liability stage, it serves to illustrate a
general policy of discrimination; in the damages phase, it demonstrates causation and
harm with regards to a specific individual." *Id.* at 52. Moreover, the Phase II jury can
be specifically instructed not to re-examine the factual findings of the Phase I jury. The
Court finds *Taylor* persuasive and rejects defendant's argument that having different
juries try each phase would violate its Seventh Amendment rights.

### E. Appropriateness of Claims for Bifurcation

The Court finds that the EEOC's pattern or practice claims should proceed
pursuant to the *Teamsters* burden-shifting framework. The question then becomes
whether the bifurcation of each pattern or practice claim would be an efficient method of
resolving that claim. *See* Fed. R. Civ. P. 42(b) (allowing separate trials "[f]or
convenience, to avoid prejudice, or to expedite and economize"). The Court examines
each of the EEOC's pattern or practice claims below to determine if efficiency can be
gained by having the claim tried in two phases.

### 1. Hostile Work Environment

The most problematic claim that the EEOC seeks to bifurcate is its hostile work
environment pattern or practice claim. Defendant argues that this sort of claim presents
too many individualized issues to be efficiently tried in two phases. The Court agrees.
To prevail on a hostile work environment claim, a plaintiff must show that his workplace
was "permeated with discriminatory intimidation, ridicule, and insult . . . sufficiently

severe or pervasive to alter the conditions of the [plaintiff's] employment" and that plaintiffs suffered this abusive environment because of their membership in a protected class. *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1170 (10th Cir. 2007) (quoting *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007)).  Although the existence of a hostile work environment is determined from the point of view of a "reasonable person in the plaintiff's position . . . the victim must also 'subjectively perceive the environment to be abusive' because without such a belief, 'the conduct has not actually altered the conditions of the victim's employment.'"  *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993)).

It is this subjective element that makes hostile work environment claims difficult to adjudicate under a bifurcated framework.  *See EEOC v. CRST Van Expedited*, 611 F. Supp. 2d 918, 934 (N.D. Iowa 2009) ("As several district courts have recognized over the last two decades, the *Teamsters* pattern or practice model 'breaks down' when the unlawful employment practice at issue is sexual harassment based on a hostile work environment.").  Individualized issues are particularly evident in this case.  The EEOC clarified in its reply brief that it is proceeding under a theory that defendant negligently allowed a work environment that was hostile towards Muslim, Somali, and/or black employees.  *See* Docket No. 62 at 8.  As defendant points out, the aggrieved individuals possess varying levels of fluency in English and their perceptions of verbal or written insults may vary accordingly and, in some cases, may be based on what other aggrieved individuals told them.  The alleged harassers also may have spoken either English or Spanish, further complicating the matter.  Moreover, the EEOC has

alleged that the aggrieved individuals consist of Muslim, Somali, and black employees, meaning that the hostile work environment may differ as to each of these groups (unless each individual falls within all three groups).  Thus, a showing that the environment at the plant was generally "permeated with discriminatory intimidation, ridicule, and insult" may do little to show that an individual plaintiff actually experienced harassment "sufficiently severe or pervasive to alter the conditions of [that plaintiff's] employment."  *See Montes*, 497 F.3d at 1170.  Little would be gained from having the Phase I jury decide the first question and the Phase II jury decide the second; rather, the Phase II jury will more efficiently consider both.  Therefore, the Court declines to bifurcate the EEOC's pattern or practice hostile work environment claim.

In deciding that bifurcation would be inefficient for this claim, the Court does not determine what burden-shifting framework will be appropriate for the Phase II jury to apply.  Instead, the Court will reserve the question for determination closer to the second phase of the trial.  The Court notes that several district courts have examined this issue and reached different results.  *See, e.g.*, *EEOC v. Mitsubishi Motor Mfg.*, 990 F. Supp. 1059, 1078-79 (C.D. Ill. 1998) (holding that during Phase II, only the burden of production would shift to the employer to demonstrate that individual plaintiffs did not subjectively perceive the environment as hostile, instead of the burden of persuasion); *EEOC v. Dial Corp.*, 259 F. Supp. 2d 710, 713-14 (N.D. Ill. 2003) (following the *Mitsubishi* approach); *EEOC v. CRST Van Expedited, Inc.*, 611 F. Supp. 2d 918, 935-37 (N.D. Iowa 2009) (during Phase II, burden remains on the plaintiffs to show they were affected by the hostile work environment); *EEOC v. Int'l Profit Assocs., Inc.*, 2007 WL 3120069 at *14 (N.D. Ill. Oct. 23, 2007) (burden remains on plaintiff as to all issues

except employer negligence).

### 2.  Religious Accommodation

Defendant argues that the EEOC's religious accommodation pattern or practice claim presents individualized issues making it inappropriate for bifurcation.  The Court disagrees.  Title VII imposes an obligation on an employer "to reasonably accommodate the religious practices of an employee or prospective employee, unless the employer demonstrates that accommodation would result in undue hardship on the conduct of its business."  29 C.F.R. § 1605.2(b)(1), (2).  Although it is the employer's burden to accommodate an employee's religion, the employee must engage in an interactive process with the employer to determine an appropriate accommodation. *See Thomas v. Nat'l Ass'n of Letter Carriers*, 225 F.3d 1149, 1155 (10th Cir. 2000).

The EEOC claims that defendant denied four different religious accommodations to its Muslim employees: (1) it denied Muslim workers the ability to pray at or near sundown during the holy month of Ramadan; (2) it did not allow Muslim workers to break their fast after sundown during Ramadan; (3) it denied Muslim workers bathroom breaks and the ability to pray during those bathroom breaks; and (4) it did not provide Muslim workers a space in which to pray, forcing them to pray on bathroom floors.  The EEOC's pattern or practice claim arising from these requests for accommodation can be efficiently bifurcated.  In Phase I, the jury will consider whether groups of Muslim workers made these requests and whether defendant routinely and unlawfully denied them.  The jury will also consider whether the accommodations posed an undue hardship to defendant.  In Phase II, the jury will consider whether any particular worker held a particular religious belief and suffered damages as a result of defendant's

13

unlawful denial of its accommodation.

Defendant claims that proving these failures to accommodate will involve highly individualized proof because of the widely variant religious beliefs of the Muslim workers at the plant and the differing accommodation requests it received.  This argument fails for two reasons.  First, defendant presents little reason for the Court to believe that the Sunni Muslim workers' beliefs truly vary in significant ways.  Second, to the extent their beliefs do vary, defendant can present this evidence during Phase I of the trial as part of proving its hardship defense.  Defendant need not examine the religious beliefs of each individual Muslim employed at the facility during Phase I, but can demonstrate the beliefs of broader groups of individuals and detail what types of requests defendant received.  The Court notes, however, that the EEOC's accommodation claim related to the denial of bathroom breaks may present more individualized issues.  It is likely that a supervisor's grant or denial of a particular worker's request for a bathroom break depended on a number of factors individual to the particular request, such as the time of the request, the worker's duties, when the request was made, the supervisor, etc.  However, as the other components of the EEOC's religious accommodation pattern or practice claim do not present similarly individualized issues, the Court will order bifurcation of this claim.  If later in the proceedings it becomes apparent that it is less efficient to split the request for bathroom breaks into two phases, the Court may reconsider bifurcation.

### 3.  Retaliation, Discriminatory Discipline and Discharge

The EEOC brings both a retaliation and discriminatory discipline and discharge pattern or practice claim.  The scope of these claims is currently unclear.  These two

14

pattern or practice claims appear to overlap, at least in part, as the EEOC alleges that Muslim, Somali, and/or black employees were terminated or disciplined for leaving the plant during Ramadan 2008, both as retaliation for their requests for religious accommodation and as discrimination based on their national origin, religion, and/or race.  It is also unclear to what extent the EEOC is alleging a pattern or practice of discriminatory discipline and discharge that extends beyond the termination and discipline of employees during Ramadan 2008 and covers later allegedly discriminatory discipline and discharge.

At the present time, the Court finds that the EEOC's retaliation and discriminatory discipline and discharge pattern or practice claims are appropriate for bifurcation only insofar as they are based on the Ramadan 2008 events.  During Ramadan 2008, defendant allegedly disciplined or discharged a large group of individuals either as retaliation for religious requests or because of their membership in a protected class.  Other instances of retaliation, discipline, or discharge unrelated to the Ramadan 2008 events are likely to present issues that are too individualized for efficient bifurcation, as the EEOC does not allege defendant had any facility-wide disciplinary or termination policy relevant to all Somali, Muslim, and/or black employees or that it otherwise fired or disciplined large groups of these employees at a different time.  However, the Court may reconsider what issues are appropriately decided during Phase I related to this claim as the claim's scope is clarified through discovery.

## F.  Compensatory and Punitive Damages

For those claims the Court has bifurcated, at the end of Phase I, the Court may award prospective relief based on these claims as contemplated by *Teamsters* if the

EEOC prevails.  *See Teamsters*, 431 U.S. at 361 ("a court's finding of a pattern or

practice justifies an award of prospective relief").  In Phase II, individual plaintiffs may

then make use of the presumption that they were victims of defendant's discriminatory

practices to argue in favor of equitable relief.  However, the Court finds, based on the

plain language of the Civil Rights Act of 1991, that the EEOC may not seek punitive or

compensatory damages for individuals pursuant to its pattern or practice claims.  *See*

*EEOC v. CRST Van Expedited, Inc.*, 611 F. Supp. 2d 918, 930 (N.D. Iowa 2009)

("Unlike § 706, however, the EEOC is not authorized to seek compensatory or punitive

damages under § 707; the relevant portion of 42 U.S.C. § 1981a only authorizes

recovery of compensatory and punitive damages "[i]n an action brought by a

complaining party under [§ 706]. 42 U.S.C. § 1981(a)(1).").  Accordingly, individual

claims for compensatory and punitive damages must be decided entirely during Phase

II.  Moreover, because compensatory and punitive damages are only available pursuant

to the EEOC's § 706 claims, during Phase II, the EEOC must proceed under the

traditional *McDonnell Douglas* burden-shifting framework to argue in favor of these

damages for individual claimants.  Therefore, the Court will deny the EEOC's request to

have the Phase I jury consider the issue of punitive damages.

### G.  Bifurcation of Discovery

The Court will grant the EEOC's request to bifurcate discovery, using the

EEOC's agreement with JBS in a related case as a model.  *See EEOC v. JBS USA*,

Dist. of NE Case No. 8:10-cv-00318-LSC-FG3, Docket No. 76-1.  JBS submitted this

agreement as an exhibit during oral argument.  *See* Docket No. 100-1.  Accordingly,

discovery will be bifurcated as follows:

During Phase I discovery, defendant may depose aggrieved employees that plaintiffs identify as those upon whom they will rely to prove their bifurcated pattern or practice claims.  Defendant may also depose 10 aggrieved employees selected by defendant and defendant may depose any combination of up to 10 of the following additional non-expert witnesses: non-aggrieved Somali, Muslim, or black employees who worked at the Greeley plant during the relevant time period, non-employee witnesses, union, co-worker witnesses, management (corporate and Greeley) and/or Rule 30(b)(6) witnesses.  Plaintiffs may depose the witnesses defendant identifies as its Phase I witnesses and any combination of up to 20 non-expert witnesses, including, non-aggrieved Somali, Muslim, or black employees who worked at the Greeley plant during the relevant time period, non-employee witnesses, union, co-worker witnesses, management (corporate and Greeley), and/or Rule 30(b)(6) witnesses.  Additional depositions may be taken upon leave of Court upon a showing of good cause.  Any party may seek leave of Court to depose the affiants of statements submitted in support of or opposition to a dispositive motion.  The scope of deposition questioning may include questions related to plaintiffs' claims of harassment/hostile work environment or individual plaintiffs' alleged damages.  The assigned magistrate judge may set an appropriate schedule for Phase I depositions and the schedule and parameters of Phase I expert discovery.

After Phase I, the parties will commence discovery on pattern or practice claims that were not bifurcated, on individual claims for punitive and compensatory damages, and on other non-overlapping discrimination claims, according to a discovery schedule

that will be established at that time.

## III.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that the trial of this case shall be bifurcated into two phases as follows.  During Phase I of the trial, the EEOC shall present its claim that the defendant engaged in a pattern or practice of denial of religious accommodation, retaliation, and discipline and discharge.  Phase I shall be tried to a jury, with the Court determining whether it is appropriate to order any prospective relief based upon the jury's findings.  During Phase II, the EEOC may present its pattern or practice claim for hostile work environment, pursue individual damages for its pattern or practice claims presented in Phase I, and pursue individual claims for compensatory and punitive damages.  Individual intervenors' claims not covered by the EEOC's claims will also be determined in Phase II.

DATED August 8, 2011.

BY THE COURT:

_s/Philip A. Brimmer_____
PHILIP A. BRIMMER
United States District Judge