# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** | |
| **Plaintiff,** | **8:10CV318** |
| **vs.** | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| **JBS USA, LLC,** | |
| **Defendant.** | |

This matter is before the Court on the oral motion for judgment on partial findings, made by Defendant JBS USA, LLC ("JBS" or the "Company") under Federal Rule of Civil Procedure 52(c). Phase I of this matter was tried to the Court on May 7, 2013, through May 17, 2013. On July 1, 2013, the Plaintiff Equal Employment Opportunity Commission ("EEOC") submitted additional deposition designations in support of, and in addition to, testimony and evidence presented at the Phase I Trial. Based upon all testimony and evidence presented, the Court makes the following findings of fact[1] and conclusions of law:

## FINDINGS OF FACT

### A.    Parties and Jurisdiction

1.     JBS is a Delaware limited liability company doing business in the State of Nebraska, and has continuously employed at least 15 people. (Filing Nos. 99 ¶ 4; 107 ¶ 4; 479 at 2-4.) Its headquarters are in Greeley, Colorado. (Filing No. 478 at 2.) In July

---

[1] Most facts are stated in the past tense. Unless otherwise specified, however, facts are presumed to be continuing in nature.

2007, JBS acquired Swift & Company ("Swift"), including a beef plant located in Grand Island, Nebraska. (Filing No. 478, p. 2; Tr. 39:20-40:2 (Schult)[2].)

2.     In December 2006, U.S. Immigration and Customs Enforcement ("ICE") raided several beef plants operated by Swift, including plants in Cactus, Texas; Worthington, Texas; Grand Island, Nebraska; and Greeley, Colorado. The Grand Island plant lost approximately 350-450 employees of Hispanic descent. (Tr. 67:25-68:13 (Schult).)  As a result of the raids, Somali refugees were recruited to work at the Grand Island plant. There was no specific corporate initiative to determine the religious or cultural practices of the refugees, and any such efforts were left to managers of the individual locations.   (Tr. 70:12-18, 71:9-72:4 (Schult).)   Somali refugees began employment at the Grand Island plant at the beginning of 2007. At some point in 2007, about 200 Somalis out of a total of 2800 employees worked at the Grand Island plant. (Tr. 72:5-73:1 (Schult).)

3.     In July 2007, JBS took over operation of a number of meat processing plants, including the beef plant located in Grand Island (the "Plant"). Other facilities included beef plants located in Greeley, Colorado, Hyrum, Utah, and Cactus, Texas; three pork plants located in Worthington, Minnesota, Marshalltown, Iowa, and Louisville, Kentucky; a small processing plant located in Santa Fe Springs, California; and a lamb processing plant located in Greeley, Colorado. (Tr. 43:4-14 (Schult).)

---

[2] The consecutively paginated Transcript of Proceedings encompasses volumes I through VII and is cited in these Findings of Fact and Conclusions of Law as "Tr." followed by the page and line number. A parenthetical may be included to reference the last name of the witness whose testimony is cited.

4.    The EEOC is the agency of the United States charged with the administration, interpretation and enforcement of Title VII, 42 U.S.C. § 2000e-6, as amended.  (Filing Nos. 99 ¶ 3; 107 ¶ 3; 479 at 2-4.)

5.    The parties invoked the jurisdiction of this Court pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345. (Filing Nos. 99 ¶ 1; 107 ¶ 1; 479 at 2-4.)  This Court has jurisdiction over Phase I of these proceedings under Section 707 of Title VII. (Filing Nos. 296, 338; 479 at 2-4.)

**B.    JBS Corporate Policies and Training**

6.    JBS's corporate office set broad policy for its plants, but local issues and policies were left to each plant. JBS's corporate Human Resources ("HR") department was involved with compliance issues regarding discrimination, harassment, and retaliation, as well as HR issues, retention, absenteeism, and policies. (Tr. 40:20-23, 45:8-12 (Schult).) Each plant had a human resources manager who reported to the plant general manager, and to the corporate HR generalist. (Tr. 41:11-22 (Schult).) During the relevant time period, Mary Chmelka was the HR manager of the Plant, reporting to the Plant's general manager, Dennis Sydow. Doug Schult was the head of labor relations for the JBS corporate office. (Tr. 44:5-9, 46:3-11 (Schult); 427:21-428:1 (Chmelka).)

7.    The JBS corporate office developed EEO compliance training for its plants, and reviewed and approved the plants' employee handbooks. (Tr. 57:25-58:24 (Schult).)  JBS also provided EEO and anti-discrimination training to all employees upon hire and on an annual basis thereafter. This training was known for a period of time as "Best Work Environment" training and included information on prohibited discrimination

3

and avenues to report and address complaints. Training provided to managers and supervisors also included training on JBS's obligations to accommodate employees; how to identify requests for accommodation; and how to request help from HR in handling such requests. (Tr. 60:1-61:16, 64:21-65:14, 66:6-15 (Schult); 219:23-220:7 (Helzer); 428:19-24 (Chmelka); 545:22-24, 564:5-7 (Prado); 789:21-790:23, 825:8-826:3 (Ibrahim); 887:24-889:1 (Omar Mohamed); 1018:16-1019:2 (Naima Mohamed); Ex. 344; Ex. 350; Ex. 354.[3])

**C.      Labor Union and Collective Bargaining Agreement**

8.      The United Food and Commercial Worker ("UFCW"), Local 22, was the exclusive bargaining agent for production and maintenance workers at the Grand Island plant and could make requests to accommodate employees' religious practices. (Filing No. 479, pp. 2-4.) Local 293 (the "Union"), which represented production workers at the Grand Island plant, was created by the merger of Local 22 and Local 291. Local 22 represented plant workers in 2007 and 2008. (Tr. 580:15-581:2 (Mostek).)  JBS and the Union jointly arranged for interpreters for employees who did not speak or understand English. (Trial Tr. 477:13-478:8, 518:21-519:7 (Chmelka); 585:17-586:2 (Mostek); 788:19-789:1, 822:25-823:8 (Ibrahim); 887:24-888:4 (Omar Mohamed); 1018:6-15 (Naima Mohamed).)

9.      The terms and conditions of employment for production and maintenance workers at the Plant were contained in a collective bargaining agreement ("CBA"), negotiated between JBS and the Union. (Tr. 165:4-9 (Schult); Ex. 4).  Any negotiated

---

[3] The abbreviation "Ex." Refers to Trial Exhibits with the corresponding exhibit number.

changes in the terms and conditions of employment typically was communicated to employees by the Union. (Tr. 190:18-191:10 (Schult).)

10.    During the relevant time period, work at the Plant was divided into two shifts.  The A shift operated from 6:00 a.m. to 2:30 p.m., and B shift operated from 3:00 p.m. to 11:30 p.m. Beginning at midnight, a third-party contractor performed clean-up and sanitation. (Filing 478 at 3; Tr. 35:21-36:1 (Schult); 265:22- 266:12 (Helzer); 291:16-24 (Sydow); Trial Ex. 328.)  The workforce of 2800-3000 employees was evenly split between the A shift and B shift. Plant operations were primarily divided between the slaughter and fabrication departments. About three times as many employees worked in the fabrication department, as compared to the slaughter department. In 2007, approximately 1,400 employees worked on B shift. (Filing No. 479 at 2-4.)

11.    Article 6 of the CBA covered Meal and Rest Periods. Section 1 provided that employees would receive one paid rest period of 15 minutes, approximately 2½ hours after the start of each shift. JBS could vary the start of the rest period by up to 30 minutes to adjust for production needs or emergencies. For B shift, that meant the rest period could occur between 5:00 and 6:00 p.m. (Ex. 4, at 8; Tr. 86:4-11, 165:10-18 (Schult); 222:9-15 (Helzer); 292:2-293:4 (Sydow); 431:22-432:6 (Chmelka).)

12.    Article 6, Section 2, of the CBA provided that employees would receive a 30-minute unpaid meal break approximately five hours after the start of each shift. JBS could vary the start of the meal break by up to 30 minutes to adjust for production needs or emergencies. For B shift, that meant the meal break could occur between 7:30 and 8:30 p.m. (Ex. 4, p. 8; Tr. 86:12-17 (Schult); 222:9-17 (Helzer); 292:10-293:7 (Sydow);

432:7-16 (Chmelka).)   The break could be moved for meat grade changes and for mechanical issues with the production line. (Tr. 293:8-22 (Sydow).).

13.     Article 6, Section 3, of the CBA mandated that employees would receive a second paid rest period of 15 minutes if the day's work schedule exceeded 8 hours and 15 minutes. (Ex. 4, p. 9; Tr. 564:18-23 (Prado).)

14.     Article 6, Section 5, of the CBA provided that employees would not be required to work in excess of 3½ hours without a meal break or rest period. (Tr. 432:17-20 (Chmelka); Ex. 4, p. 9.)

15.     Article 8 of the CBA was a "No Strike, No Lockout" provision, that prohibited any form of strike or work stoppage during the term of the CBA. This Article also reserved to JBS the right to determine the level of discipline given to employees who violated the provision. (Tr. 165:22-166:21 (Schult); Trial Ex. 4, pp. 9-10.)

16.     Article 14, Section 1, of the CBA provided that JBS and the Union would appoint a committee to meet at least quarterly for the purpose of recommending communication, translation and education improvements. In 2007 and 2008, the committee did not meet. (Tr. 435:19-436:8 (Chmelka); Ex.4.)

17.     Article 15, Section 6, of the CBA stated that JBS and the Union would provide reasonable accommodations to employees based on their religious tenets, and that the extent of such accommodations would be determined by JBS in accordance with its interpretation of the requirements of Title VII. (Ex. 4 at 20, 22; Tr. 57:18-24, 167:8-13 (Schult); 433:9- 434:23 (Chmelka); 591:22-593:4 (Mostek).)

**D.    General Plant Operations**

18.    Production work at the Plant was physically demanding and repetitive. Many production employees worked with knives--trimming and deboning product weighing 40 pounds or more.  Employees were required to wear safety equipment including hard hats, hair nets, ear protection, safety glasses, frocks, gloves, boots, and various metal-mesh guards, such as gloves, arm-guards and aprons.  Much of this safety equipment had to be removed before an employee left the production floor, and had to be put back on when the employee returned. (Tr. 196:11-197:17 (Schult); 403:25-404:24 (Sydow).)

19.    Production operations were divided into two separate areas–slaughter and fabrication.  Both areas operated as "disassembly lines," where chains and conveyors moved the beef in one direction from slaughter to cooler, then from cooler through fabrication and into packaging. As the beef moved through slaughter and fabrication, a series of employees performed specific jobs along the line. (Filing No. 478 at 3; Tr. 35:14-16 (Schult).)

20.    In 2007, approximately 120-130 Somali Muslims worked on the B shift fabrication side, and a total of approximately 200 Somali Muslim employees worked at the plant, within a workforce of approximately 2800. (Filing No. 479 at 2-4.)  In 2008, there were slightly fewer than 3000 employees at the Plant, with slightly fewer than 1500 employees working on B shift.  In 2008, there were 200-300 Somali Muslims working on the B shift fabrication side. (Filing No. 479 at 2-4.)

21.    In September 2008, the Plant's production goal was 5800-6000 head of cattle per day, and 3000 head of cattle per shift. (Tr. 394:1-8 (Sydow).)

22.     Cattle arrived at the plant by truck throughout the day and night and were unloaded into the cattle pens, or yards, where they were weighed and inspected by a USDA veterinarian. Once approved by the USDA, the cattle went through a chute into a restraining area where they were stunned and killed. The carcasses were shackled and hung from chains that moved through the slaughter floor, consisting of seven zones, in which different functions were performed. The carcasses then went to a holding cooler for 48 hours. (Tr. 276:10- 280:19 (Sydow); Ex. 332, p. 19.)

23.     From the holding cooler, carcasses were graded by USDA graders, then sent to the sales cooler. There they were sorted by grade, yield grade, and customer program. Still on the chain, carcasses proceeded to the fabrication floor where different portions were cut off and sent down various lines and tables to be deboned and trimmed to specifications. There were twelve different lines or areas on the fabrication floor. Trimmed and deboned pieces of meat then proceeded to two packaging lines where they were bagged, sealed and boxed. The boxes then went to the box cooler for storage and shipping. (Tr. 286:24-290:16, 388:14-18 (Sydow); Ex. 332, p. 12.)   The temperature in the fabrication side was typically 42 to 44 degrees Fahrenheit. (Tr. 263:24-263:25 (Helzer).)

24.     Plant operations were highly interconnected, and a problem in one area of the plant had the potential to affect the entire plant. (Tr. 392:6-21 (Sydow).)  The chain could be set to move at varying speeds, calculated on a head-per-hour basis. The USDA regulated the maximum chain speed on the slaughter floor. As a practical matter, however, chain speed was determined by the number of people available to work. (Filing No. 478 at 3; Tr. 35:17-20 (Schult); 281:3-10 (Sydow).)

8

25.     Before carcasses moved from the cooler to the fabrication floor, they were sorted by grade and customer program. The highest grade cattle were processed first, when employees were fresh, because those carcasses contained more fat and were more difficult to trim. The leanest cattle were processed last, because they were easier to trim and employees were tired by the end of the shift. (Tr. 224:22- 225:6 (Helzer).) Only one grade or program was fabricated at a time, and the USDA required that there be a "gap in the chain" between grades and programs. This was referred to as a "grade change." There were anywhere from six to ten grade changes on every shift, and each one necessitated two to four minutes of "downtime." (Tr. 223:12-224:1 (Helzer); 293:11- 25, 294:9-15 (Sydow).)   "Downtime" meant any time production was stopped, either because the chain was not moving or because there were no cattle being placed on the chain. Downtime was costly to JBS, because it incurred labor costs without production. Downtime could also affect product quality and, ultimately, customer service and customer relationships. (Tr. 225:7- 14, 258:16-25 (Helzer).)

26.     In July 2007, the Plant controller, Don Willnerd, calculated that downtime cost the plant, in labor costs alone, $100 per minute on the slaughter side and $225 per minute on the fabrication side. (Tr. 181:23-182:8 (Schult); 258:11-15 (Helzer); 408:13- 409:9 (Sydow); Trial Ex. 306.)   In September 2008, at the request of Doug Schult, corporate controller Heather Skinner calculated the cost of an additional 10-minute break. Skinner calculated the average cost of a 10-minute break at $18,180 per day per plant. (Tr. 187:21-188:12; Ex. 316.) To minimize downtime and save money, scheduled breaks were routinely coordinated with grade changes. (Tr. 212:16-18, 224:2-16 (Helzer); 293:20-22 (Sydow).)

9

27.    "Yield" is a measure of profit and refers to the amount of product that can be obtained and sold from each carcass. Carcasses are broken down into "primals," each with a specific yield standard or target. Yield standards are achieved by boning, sawing and cutting products to precise specifications, which requires proper crewing levels and employees who are adequately trained in their particular jobs. If employees trim too much or not enough, yield standards are not met, causing a monetary loss to a meat-plant owner such as JBS.  (Tr. 248:16-249:2 (Helzer); 339:15-24, 390:20-391:13 (Sydow).) If a chain-speed goal was not met, JBS referred to the differential as "lost head." The chain could stop for a number of reasons, including mechanical failures or a cattle grade change. (Tr. 212:3-212:8 (Helzer).)

E.    "Crewing" Practices and Effect of Breaks

28.    Typically, there was one supervisor and one lead person for each slaughter area, fabrication line, and packaging line, and some lines had assigned trainers. (Trial Tr. 172:20-25 (Schult); Ex. 332, at 12, 19.)  "Crewing" referred to the number of employees needed to do a particular job at a particular chain speed. Each production job had a pre-determined crewing level which was required to run at a particular chain speed. Operating without sufficient crewing had a negative effect on yields and employee safety. (Tr. 391:19-24 (Sydow); 480:2-481:8 (Chmelka); 535:9-16 (Cooper); Ex. 311.)  The Plant over-crewed by approximately 8-9 percent to account for absenteeism, vacations and leaves of absence. Over-crewing did not typically result in extra employees available to fill in for employees taking unscheduled breaks, because the extra employees generally were used to fill in for employees on vacation or other absences authorized by the CBA.  (Tr. 393:16-25 (Sydow); 532:1-5 (Cooper).)

10

29.    In 2007 and 2008, JBS had no written break policy other than what was contained in the CBA. (Tr. 93:2-9 (Schult); 222:6-8, 226:3-5 (Helzer).) Regularly scheduled rest and meal breaks normally occurred on a "rolling" or staggered basis. That was facilitated by halting the placement of meat product on the production chain for a 15 or 30-minute period, resulting in a 15 or 30-minute product gap in the chain. After processing the last piece of meat to pass his or her station, an employee was permitted to leave the line to begin the break. Thus, employees at the beginning of the production process left for break first and returned from break first. Employees at the beginning of the production process would be returning from break as employees at the end of the process were leaving for break. (Tr. 88:6-14 (Schult); 223:1-11 (Helzer); 351:4-7 (Sydow); 563:2-5 (Prado).)

30.    The exact timing of scheduled rest and meal breaks varied from day to day depending on production issues, including grade changes and unplanned stoppages caused by mechanical failures, equipment breakdowns, sanitation issues such as a meat abscess, or packaging issues. Scheduled break times were affected by such unplanned stoppages as much as 25 percent of the time. (Tr. 133:17-19, 184:11-185:2 (Schult); 222:18-22 (Helzer); 293:8-19 (Sydow); Ex. 308.)

31.    Occasionally, due to equipment breakdowns or sanitation issues, employees were permitted to go on a "mass" break, where the chain simply stopped with meat remaining on the line and all employees left for break at the same time. (Trial Tr. 133:20-24 (Schult); 225:15-21 (Helzer); 351:8-12 (Sydow).)   Mass breaks were unpopular with employees because locker rooms, restrooms and cafeteria facilities were not large enough to handle such a large influx of people at once. During a mass

11

break, there was insufficient time for all employees to take care of their personal needs. (Tr. 201:19-202:5 (Schult).) Mass breaks also posed food safety concerns. On the slaughter floor, there was a time limit of 45 minutes that a carcass could remain on the floor. If a carcass remained on the kill floor longer than 45 minutes, it had to be classified as "distressed cattle." Distressed cattle lost about half their value. A 30-minute mass break would result in approximately 50-60 head of cattle not moving off the floor within the 45-minute time limit and being downgraded to "distressed." (Tr. 259:20-260:10, 267:8-23 (Helzer).) On the fabrication floor, mass breaks caused meat to be left on the tables for up to 30 minutes, allowing bacteria to grow. During a normal rolling break, tables were cleaned and sanitized as they were emptied of product. A mass break prevented such clean-up from occurring. (Trial Tr. 259:1-19, 266:24-267:7 (Helzer); 797:19-798:1 (Ibrahim).)

32.    In addition to scheduled rest and meal breaks, production employees could request permission to take unscheduled or "extra" breaks to use the restroom. Employees did not need permission to leave the line in order to get a drink of water, because there were water fountains on the lines. (Tr. 193:17-23, 194:11-22 (Schult); 226:6-8 (Helzer); 341:3-7, 397:9-11 (Sydow); 465:7-11 (Chmelka); 546:9-13, 564:18-23 (Prado); 595:19-25 (Mostek); 798:16-24 (Ibrahim); 1021:25-1022:3 (Naima Mohamed); 1185:13-15 (Adan).)

33.    In 2007 and 2008, corporate guidance to all JBS facilities, including the Plant, was to the effect that "extra," unscheduled breaks were for restroom purposes only. The policy was not written.   (Tr. 93:10-22, 179:3-11 (Schult); 213:25-214:3 (Helzer); 301:8-10 (Sydow).) Whether or not a request for an extra break was granted

was within each supervisor's discretion. (Tr. 398:5-7 (Sydow); 596:1-3 (Mostek); 798:16-19 (Ibrahim); 919:4-16 (Abdi); 1022:2-20, 1066:5-8 (Naima Mohamed); 1106:14-23 (Sharif); 1157:2-13, 1159:24- 1160:3 (Ali); 1185:13-15 (Adan).)  Employees were generally expected to use the restroom before or after their shifts, or on scheduled break times. Extra breaks to use the restroom were intended for emergencies and were considered by JBS management to be the exception rather than the rule. Only a small fraction of employees requested extra restroom breaks during any given shift. (Tr. 226:9-20 (Helzer); 341:8-12, 397:18-24 (Sydow); 568:5- 8 (Prado); 947:8-25 (Abdi).)

34.    Employees were routinely disciplined for "walking off," or leaving their lines or work stations without notice or permission, regardless of the reason or excuse given. If an employee left his or her position without notice or permission, it caused problems such as product progressing down the production chain without being trimmed or deboned; product stacking up; or even product falling on the floor. (Tr. 179:23-180:5 (Schult); 230:10-23, 231:14-232:1 (Helzer); 466:6-20, 483:18- 484:18, 501:4-9, 516:20-23 (Chmelka); 570:18-571:2 (Prado); 605:23-606:6, 613:2-614:4 (Mostek); Ex. 223 at 5; Ex. 314.)

35.    At no time did JBS discipline or discharge any of its Muslim employees for praying, but some were disciplined for walking off their lines without permission. (Tr. 179:23-180:5 (Schult); 400:21-25 (Sydow); 466:6-11, 501:1-3 (Chmelka); 615:1-4 (Mostek).) Many JBS Muslim employees requested restroom breaks in order to pray. (Tr. 465:7-14 (Chmelka); 527:23-528:2 (Cooper); 574:7-10 (Prado); 602:20-603:2, 618:1-8 (Mostek); 798:16-24 (Ibrahim); 878:5-15, 898:7-9 (Omar Mohamed); 925:5-7 (Abdi); 1027:20- 1028:6, 1067:21-23, 1068:13-17 (Naima Mohamed); 1103:12-17,

1105:3-10 (Sharif).) Some JBS supervisors allowed employees to use "extra" restroom breaks for prayer. (Tr. 179:12-17 (Schult); 232:2-6 (Helzer); 301:11-15 (Sydow); 465:7-21 (Chmelka); 530:1-7 (Cooper); 552:18-22, 571:3-25 (Prado); 800:3-9, 801:5-11 (Ibrahim); 1065:15-21, 1067:9-20 (Naima Mohamed); 1103:12-21 (Sharif); 1158:13-1159:3, 1175:2-15 (Ali); 1189:6-1190:2 (Adan).)

36.     According to Muslim prayer practices, as explained below, Muslim employees required one to three extra breaks per day, in addition to regular restroom breaks. (Filing No. 478 at 4; Trial Tr. 36:21-37:2 (Schult); 924:19-925:4, 961:21-962:5 (Abdi); 1063:4-1064:15 (Naima Mohamed).)   Such extra breaks imposed a cost or burden on JBS in several ways.   First, extra breaks jeopardized food safety.   For example, an employee on the slaughter side of the Plant attempting to handle the work of an absent coworker could be rushed and unable to keep up with the required sterilization of knives between carcasses, risking cross-contamination. (Tr. 260:11-24 (Helzer).)   Second, extra breaks also affected employee safety by forcing remaining employees on the line to work harder and faster to keep up with the movement of product. (Tr. 260:25-261:7 (Helzer); 390:1-6 (Sydow); 905:10-25 (Omar Mohamed).) Third, extra breaks affected operational efficiency, because employees working faster to compensate for absent coworkers were less likely to be able to trim product with precision to meet specifications or yield standards. (Tr. 261:8-18 (Helzer); 340:8-13, 390:1-6 (Sydow).)   Fourth, unscheduled breaks could cause additional overtime expenses if employees were required to stay late to catch up on product that was not completed while they or their coworkers were away from their positions. (Tr. 261:19-262:3 (Helzer).) Fifth, extra unscheduled breaks had a negative impact on employee

morale when employees felt they were forced to work harder and faster so that other employees could take extra breaks. (Tr. 262:4-10 (Helzer); 484:24-485:25 (Chmelka); Ex. 318; Ex. 320.)

## F.    Religious Beliefs of Somali Muslim Employees

37.    Prayer is a very important tenet of the Muslim religion. It is the second of the pillars of Islam, second in importance to testimony to the belief in one God and to the status of the Prophet Muhammad as the final seal of the prophets. (Tr. 856:21-856:25 (Moore).)   Islam requires five prayers each day at appointed times[4]. These include the dawn (Fajr) prayer, the noon (Dhuhr) prayer, an afternoon (Asr) prayer, the sunset (Maghrib) prayer, and the evening or night (Isha) prayer. (Tr. 857:4-857:13 (Moore); Tr. 875:1-875:13 (Mohamed); Tr. 773:15-18, 774:15-22 (Ibraham); Tr. 1150:5-20(Ali); Tr. 1102:4-7 (Sharif); Tr. 910:20-23 (Abdi); Tr. 743:8-12 (Council); Tr. 875:1-13 (Mohamed).)

38.    Prayer times are fixed by the solar clock, but some Muslims accept a window of time in which prayers may occur. Testimony of Muslim witnesses demonstrated various individual and cultural beliefs about the permissible windows of time for prayer. (Tr. 857:14-859:14 (Moore); Tr. 875:14-875:25 (Mohamed).) Many Muslims believe they must pray as close as possible to the designated time in accordance with the solar clock, or they will suffer severe consequences, including condemnation to Hell.   (Tr. 1107:13-1108:18 (Sharif); Tr. 914:6 (Abdi); Tr. 778:21-779:11, 829:19-24 (Ibrahim); Tr. 875:1-13 (Mohamed).)

---

[4] Women who are menstruating or who are recovering from childbirth are not permitted to pray.

39.    The time needed for each prayer typically ranges from five to ten minutes. Ablution or cleansing is also required in connection with each prayer, and may add about five minutes to the required prayer time.  (Tr. 778:10-17 (Ibrahim); Tr. 876:5-876:11 (Mohamed); Tr. 1013:16-1014:1 (Mohamed).) The cleansing can occur well before prayer as long as one stays clean, and has not engaged in any bodily functions considered to be unclean.    (Tr. 777:17-778:9 (Ibrahim); Tr. 1012:25-1013:15 (Mohamed).)

40.    There are different sects within Islam. The two major groups are Sunni and Shiite. Sunnis and Shiites have varying practices, including varied prayer practices. The majority of Somalis are Sunni. (Tr. 859:15-860:6 (Moore).) Sunni Muslims may combine prayers only if there is something extraordinary to prevent prayer, like illness, travel, or sleeping through morning prayer time, but missing prayer as a regular practice is prohibited. (Tr. 861:24-862:5 (Moore); Tr. 743:20-744:9 (Council).)

41.    During the holy month of Ramadan, Muslims fast all day and break the fast at the time of the sunset prayer by drinking water and eating a date. (Tr. 1015:4:18-1015:14 (Mohamed).)

G.    **2007 Events at the Grand Island Plant**

42.    In May 2007, 80 to 100 Somali Muslim employees, primarily working on the B shift fabrication side of the Plant, walked off the job in protest of JBS's refusal to provide them an extra break for their sunset prayer. (Tr. 73:9-74:25 (Schult); 436:9-18, 444:15-20 (Chmelka); 804:19-23, 844:21-23 (Ibrahim); 1110:17-1112:7 (Sharif); Ex. 304.)    Doug Schult, and other JBS executives at corporate and Plant levels of management, participated in internal discussions from May through October 2007,

16

concerning proposed prayer accommodations. Schult also consulted with Dan Hoppes, president of UFCW Local 22, concerning such accommodations. (Tr. 83:11-19, 84:1-16, 194:23-195:5 (Schult).)

43.    From June through October 2007, JBS also engaged in negotiations with the Chicago Chapter of the Council on American-Islamic Relations ("CAIR") concerning prayer accommodations for Muslim employees. (Tr. 79:1-81:19 (Schult); 445:12-446:1 (Chmelka); 1128:14-25 (Sharif); Ex. 5.)  During these negotiations, CAIR staff attorneys told JBS managers that Muslim employees had a 45-minute window in which to pray and that prayers should take only 10 minutes. (Trial Ex. 5 at 5; Trial Tr. 87:14-21 (Schult); 445:12-446:1 (Chmelka).)

44.    JBS representatives considered various proposed accommodations and determined that the most feasible option was moving scheduled break times to coincide with the 45-minute Muslim prayer window. JBS's analysis included spreadsheet calculations of how many days per year the sunset prayer could be accommodated using this 45-minute sunset prayer window and sliding the break times within time periods mandated by the CBA. (Tr. 87:14-88:2, 89:11-90:10, 186:3-19, 194:23-195:10 (Schult); Ex. 10; Ex. 309.)

45.    All Muslim employees who walked off the job were offered the opportunity to return to work. (Tr. 298:5-9 (Sydow); 436:23-437:6, 445:12-17, 478:9-15 (Chmelka); 844:21-845:3 (Ibrahim); 1112:12-18 (Sharif); Trial Ex. 304.) Muslim employees were also offered the opportunity to transfer to A shift as an accommodation, although only six employees accepted that offer. The Somali culture generally does not embrace early

17

rising.  (Ex. 5 at 7; Tr. 440:10-12, 441:23-25, 474:7-16, 479:1-14 (Chmelka); 1113:15-1114:4 (Sharif); Ex. 310.)

46.    Ultimately, no agreement was reached with CAIR or the Muslim employee advocates in 2007 concerning prayer accommodations, and discussions stopped in October 2007. (Tr.  84:23-85:3,  91:7-18,  176:11-13  (Schult).)  JBS  attempted  to accommodate  the  sunset  prayer  by  moving  the  scheduled  breaks,  when  necessary, inside  the  windows  of  time  permitted  by  the  CBA  and  using  the  45-minute  prayer window as communicated to JBS during negotiations with CAIR. (Tr. 85:8-15; 86:18-87:5, 176:14-177:7 (Schult); 446:2-447:9, 509:14-18 (Chmelka).)  No significant Muslim prayer issues arose at the Plant during Ramadan 2007. (Tr. 177:8-10 (Schult); 446:21-447:9 (Chmelka).)

47.    In 2007 and 2008, JBS did not have a policy allowing a person to take an unscheduled break to pray. JBS's standard practice or procedure at all of its plants was that unscheduled breaks were for restroom use only. (Tr. 93:2-22 (Schult).)  In 2007 and 2008,  employees  were  not  permitted  to  take  unscheduled  breaks  to  pray,  except  as specific supervisors acted in their own discretion. (Tr. 596:4-7 (Mostek).)

H.    Events of Ramadan 2008 at the Grand Island Plant

48.    In 2008, the Muslim holy month of Ramadan began on September 1. On September 2, 2008, a group of Muslim employees approached management at the JBS Greeley,  Colorado,  plant  regarding  the  issue  of  sunset  prayer  time.  (Tr.  110:3-12 (Schult); Ex. 52.)  On September 4, 2008, Doug Schult requested that the HR directors of each of the four JBS beef plants complete a spreadsheet, the same used in 2007, to determine when the sunset prayer could be accommodated by sliding scheduled break

18

times within the applicable CBA break windows and assuming a 45-minute prayer window. (Tr. 167:14-170:4, 177:11-15 (Schult); 447:13-448:1 (Chmelka); Ex. 10.)  JBS corporate executives met on Saturday, September 6, 2008, at the corporate office in Greeley, Colorado, to discuss options for accommodating Muslim employees' requests for prayer time. Although centered on the Greeley plant, the discussion was intended to cover anticipated prayer issues potentially arising at the Grand Island and Cactus plants. (Tr. 110:25-112:22 (Schult).)

49.    On Wednesday, September 10, 2008, an incident occurred in a storage room at the Plant involving a group of female Somali Muslim employees, their supervisor Cindy Davis, and management employees Roger Cooper and Mike Helzer. The women were praying during the employees' regular break and perceived that their prayers had not been respected by Cooper and Helzer. Specifically, the women stated that Helzer and Cooper yelled at them and interrupted the prayers, and that Cooper grabbed one of their improvised cardboard prayer mats.  Chmelka listened to the complaints; told the women she would investigate; and told the women to return to work on Friday.  (Tr. 216:4-14, 232:20- 235:4 (Helzer); 475:25-476:13 (Chmelka); 536:18-542:20 (Cooper); 1080:17-1082:11 (Naima Mohamed); Ex. 11; Ex. 52.)

50.    On Thursday, September 11, 2008, a group of Somali Muslim employees approached Plant general manager Dennis Sydow and Mary Chmelka to request prayer time. The Muslim employees told the JBS managers that the Muslims had only a 10-minute window in which to pray. (Tr. 177:16-21 (Schult); 305:9-11, 310:18-21, 401:12-15 (Sydow); 448:8-449:4, 450:19-22, 503:11-23 (Chmelka); Ex. 11.)

51.    On Friday, September 12, the Somali Muslim women returned to the Plant as instructed and asked Chmelka whether they would be able to leave the line when they needed to pray. Chmelka explained that Plant management would be meeting with the Muslims' representatives to address prayer issues. The women said that they would return to work on Monday once they knew whether they would have prayer time. Chmelka told them to call in to avoid being considered a no-call, no-show. (Ex. 11 at 2; Naima Mohamed Tr. 1082:8-23.)

52.    JBS and Union representatives met with the Muslim employee representatives on Friday, September 12, 2008. (Tr. 238:16-239:3 (Helzer); 306:11-16 (Sydow); 449:8-10 (Chmelka); 1082:12-19 (Mohamed); Ex. 12; Ex. 52.) The Muslim employee representatives told JBS managers that they spoke for all Muslim employees in the plant. (Trial Tr. 239:4-7 (Helzer); 401:8-11 (Sydow); 1082:20-23 (Naima Mohamed).)

53.    The Muslim employee representatives expressed that Muslim employees wanted a break at sunset in order to pray, explaining "[t]he issue today is about going to pray on time and that varies . . . . The issue today is will be allowed to go break when the prayer time comes." (Tr. 401:22-402:1 (Sydow); 450:3-18 (Chmelka); Ex. 12 at 1.) In response, Mary Chmelka stated, "[l]ast year we were told by the representatives (who are no longer here) that we had a 45 minute window for prayer time and that it would give you plenty of time because it would be right around the break time." (Ex. 12 at 3.) The Muslim employee representatives stated that they were seeking a year-round solution, "[i]f we don't pray the other 11 months, then Ramadan isn't any good. We pray 365 days per year. Also, our prayer time changes." (Tr. 121:7-17, 122:11-17 (Schult);

326:25-327:4, 402:2-6 (Sydow); 451:9-15 (Chmelka); Ex. 12 at 3.)  A number of prayer accommodations were proposed and discussed during this meeting, including the changing of break times to coincide with prayer times, and allowing Muslim employees to spell other Muslim employees at prayer times. (Tr. 239:8-16 (Helzer); 308:15-313:13 (Sydow); Ex. 12.)  Sydow told them that the meal break had to occur between 7:30 pm and 8:30 p.m. under the CBA, so he could not accommodate this request. (Tr. 312:17-313:17 (Sydow); Tr. 217:4- 217:7 (Helzer).)

54.    On Monday, September 15, 2008, JBS managers, Union representatives, and Muslim employee representatives met again. (Tr. 238:16-239:3 (Helzer); 333:22-334:1 (Sydow); 452:24- 453:1 (Chmelka); Ex. 16; Ex. 52.)  JBS inquired why the 45-minute sunset prayer window no longer applied. The Muslim representatives stated that the 45-minute window was "not correct" and that the Muslim employees "have to pray within 10 minutes of sunset and at the most 15 minutes after sunset." (Tr. 316:16- 21, 329:22-330:1, 334:6-15 (Sydow); 452:15-21 (Chmelka); Ex. 16, at 1.) The Muslim representatives stated that the prayer issue was not limited to the sunset prayer but extended to other daily prayers that occurred during work hours. (Tr. 239:17-19 (Helzer); 403:1-6 (Sydow); Ex. 16 at 3.) The Muslim representatives inquired whether the Muslim employees could leave the line to pray one by one while others covered for them. Mary Chmelka stated that it would not be possible for 200 employees to be relieved within a 10-minute window, and Dennis Sydow explained JBS's position regarding the safety and quality concerns created by such an accommodation. (Tr. 314:5-8, 337:21-339:24 (Sydow); 451:15-452:11 (Chmelka); Ex. 16 at 2.)  JBS's position was that it was not possible to accommodate the sunset prayer year-round by

21

moving the break times within the CBA-mandated break windows because sunset occurred outside the CBA window during parts of the year. Sunset occurred earlier than 7:30 p.m. beginning September 23, 2008, eight days prior to the end of Ramadan. (Tr. 123:6-17 (Schult); 451:5-8 (Chmelka); Ex. 10 at 2-4; Trial Ex. 52.)  During the meetings, JBS reiterated to the Muslim employees that they were free to pray on their break times in any safe area of the plant with no one bothering them. (Ex. 12, p. 3; Ex. 16 at 3.)

55.    Following the September 15 meeting, a group of approximately 150 Somali Muslim employees gathered outside the facility to protest and refused to report for work. (Tr. 125:2-5 (Schult); 240:7-15 (Helzer); 345:8-24 (Sydow); 453:20-25, 496:20-25 (Chmelka); 882:21-24, 901:13-20 (Omar Mohamed); 954:10-14, 969:15-18 (Abdi); 1030:21-1031:25, 1083:10-17 (Naima Mohamed); 1191:18-1192:2 (Adan); Ex. 355.) Late on September 15, Doug Schult drafted a letter that was faxed to the Union stating that the striking employees were in violation of the CBA, and that JBS expected the Union to fulfill its obligation to instruct the employees to return to work and to inform them that they could be terminated for their actions. (Tr. 173:1-19 (Schult); Ex. 17.)

56.    On September 16, 2008, a group of Somali Muslim employees again failed to report to work. (Tr. 125:12-19 (Schult); 348:4-6 (Sydow); 454:14-16 (Chmelka); 882:21-24 (Omar Mohamed); 971:5-7 (Abdi); 1030:21-1031:1 (Naima Mohamed); 1191:18-1192:11 (Adan); Ex. 355; Ex. 370.) On the afternoon of September 16, 2008, JBS officials, Union representatives, and the Muslim employee representatives met again at the Union's office. An agreement was reached that, for the remainder of Ramadan, the B-shift meal break would be a rigid mass break at 7:45 p.m.; the shift would be shortened by 15 minutes to 7¾ hours; and the employees who failed to report

22

for work on September 15 and 16 would have a letter placed in their files. The agreement was approved by Sergio Sampaio, head of JBS beef operations. (Tr. 126:11-13, 128:7-129:17 (Schult); 352:17-355:12, 356:6-11 (Sydow); 437:17-21, 454:17-455:19 (Chmelka); 931:14-22 (Abdi); 1029:24-1030:1 (Naima Mohamed); Ex. 20; Ex. 52.)   The stated rationale for shortening the shift by 15 minutes was to keep the last period of the work day the same length as the other periods. (Tr. 195:22-196:10 (Schult); 354:7-22 (Sydow); 443:11-20, 513:15-514:2 (Chmelka).)

57.    At the end of B shift on the night of September 16, or in the early morning hours of September 17, signs handwritten in Spanish were posted throughout the plant. These signs referenced the 7:45 p.m. meal break time, and encouraged employees to meet at the personnel office at 3:00 p.m. to "fight for their rights." (Tr. 410:15-411:19 (Sydow); 457:6-458:2 (Chmelka); Ex. 18.) 127.

58.    On Wednesday, September 17, 2008, a large group of non-Muslim employees gathered and refused to go to work. The non-Muslim employees were upset after hearing of the agreement to move the meal break to 7:45 p.m. and cut 15 minutes off the end of the shift, and also because they heard rumors that the Somali Muslim employees had been paid when they refused to work and had received a dollar raise. (Tr. 131:17-132:2 (Schult); 249:23-251:7, 251:25-252:6 (Helzer); 359:14-17, 360:11-14, 361:16-362:4 (Sydow); 458:8-459:22 (Chmelka); 881:25-882:20 (Omar Mohamed); 1032:10-20, 1083:18-1084:2 (Naima Mohamed); 1193:8-19 (Adan).)   The Somali Muslim employees in fact had not been paid when they refused to work earlier in the week, nor had they received or been promised a raise. (Tr. 132:8-12 (Schult); 362:5-6 (Sydow); 459:23-460:4, 460:24-461:4 (Chmelka).)   B-shift operations were canceled

that evening because there were not enough employees present to work. (Trial Tr. 199:10-13 (Schult); 251:3-7 (Helzer); 367:20-368:1 (Sydow); 461:24-25 (Chmelka); 904:14-20 (Omar Mohamed); 1035:2-6, 1084:3-5 (Naima Mohamed).)

     59.    On Thursday, September 18, 2008, several hundred non-Muslim employees gathered outside the plant and refused to work. (Trial Tr. 134:10-11, 200:11-18 (Schult); 251:8-13 (Helzer); 368:11-25 (Sydow); 462:4-8, 463:8-10 (Chmelka); Trial Ex. 52.) To avoid a plant shutdown, JBS decided not to implement the agreement for the 7:45 p.m. mass break and to return the meal break to its original time. The Union did not oppose this decision. (Tr. 138:19-25, 147:16-148:3, 199:4-9 (Schult); 253:13-19 (Helzer); 371:5-14, 412:1-7 (Sydow); 462:9-19 (Chmelka).) The non-Muslim employees demanded that JBS provide proof that the Muslim employees had not been paid when absent, nor received a raise, and confirm in writing that the meal break would remain at its normal time. After this documentation was provided, the employees returned to work and B shift resumed operations. (Tr. 139:1-8, 140:8-11 (Schult); 252:13-253:7 (Helzer); 373:17-19 (Sydow); 464:21-24 (Chmelka); Ex. 21.)

     60.    During the September 18, 2008, B shift, JBS rescinded the 7:45 p.m. meal time agreement and returned the meal break to its "normal" time. The non-Muslim protestors then returned to work. The non-Muslim protesters were not disciplined or terminated. (Tr. 140:3-11 (Schult); Tr. 512:13-513:10 (Chmelka); Ex. 21).) The decision to rescind the break time agreement was communicated to the Union and to the Somali Muslim employee representatives, as well as to plant managers and supervisors, all of whom were responsible for communicating it, and did communicate it, to the production

employees. (Trial Tr. 145:23-146:13, 207:7-208:17 (Schult); 253:20-254:5 (Helzer); 371:10-12 (Sydow); 466:21-467:19 (Chmelka); 810:5-12 (Ibrahim).)

61.    Around 7:45 p.m. on September 18, 2008, ten to fifteen Somali Muslim employees left their positions without permission prior to break time and while the lines were operating. These employees were sent to the personnel office to speak to Chmelka. (Tr. 148:19-22 (Schult); 254:6-10, 255:1-3 (Helzer); 375:22-25, 376:21-22 (Sydow); 468:4-13 (Chmelka); 932:13-14, 973:4-8 (Abdi); 1035:16-21, 1037:6-11, 1084:21-1085:7 (Naima Mohamed).)  Chmelka began the process of preparing written disciplinary actions for these employees for leaving the line without permission, but had time to prepare only one warning notice before the meal break began at 8:00 p.m. Chmelka sent the employees to the cafeteria so they could take their break and end their fast. (Trial Tr. 468:14-469:17 (Chmelka).)

62.    During and after the meal break on September 18, 2008, a group of Somali Muslim employees engaged in a loud demonstration in the cafeteria in protest of JBS's decision to rescind the break-time agreement. (Tr. 151:18-152:7 (Schult); 255:4-15 (Helzer); 377:9-12, 379:19-23, 412:10-20 (Sydow); 439:21-440:1, 469:18- 470:15 (Chmelka); 810:20-25 (Ibrahim); 934:17-935:3 (Abdi); 1038:14-24 (Naima Mohamed); 1194:14-16 (Adan).)  At the end of the meal break, approximately 70-80 Somali Muslim employees refused to return to work and refused to leave the cafeteria. (Tr. 143:18-144:13, 153:23- 154:10 (Schult); 256:3-4 (Helzer); 471:3-15, 510:17-24 (Chmelka); 1208:4-1209:17 (Adan).)   The Grand Island police were called, and 11 officers, including the Chief of Police, responded to the plant at 9:08 p.m. (Tr. 155:6-13 (Schult);

378:10-13 (Sydow); 627:1-628:2 (Lamken); 989:16-24, 999:18-22, 1001:6-23 (Keiper);

Ex. 26 at 3.)

    63.    Eventually, about 70-80 Somali Muslim employees left the plant that night

rather than return to work as instructed. The Somali Muslim employees who left the

plant that night were terminated the following day for withholding work and violating the

"No Strike/No Lockout" provision of the CBA. (Tr. 157:2-159:6, 173:20-25 (Schult);

380:15-18 (Sydow); 471:3-15 (Chmelka); 628:22-25 (Lamken); 994:24-995:12 (Keiper);

1040:6- 15 (Naima Mohamed); Ex. 22.)

    64.    During the work stoppages that occurred during the week of September

15, both the Muslim and non-Muslim employee groups were informed by JBS and Union

representatives that they were violating the CBA and could be terminated for

withholding work. (Tr. 137:16-20, 173:14-19 (Schult); Ex. 17.)  Neither the Muslim nor

the non-Muslim employees who withheld work on September 15, 16, 17 and 18 were

disciplined or terminated for striking or withholding work, with the exception of those

employees who refused to return to work and instead left the plant following the B-shift

meal break on September 18. (Tr. 158:14-159:6 (Schult); 438:2-13, 455:17-24, 518:14-

19 (Chmelka).)

    65.    On September 15, 2008, the absence of the protesting Muslim employees

required the chain speed to be reduced from 360 to a little over 200 head per hour. That

night, the slaughter-side of the Plant processed only 2366 head, compared to an

average of 2800 head, while the fabrication-side of the Plant processed only 1960 head,

compared to an average of 2800 head. (Tr. 240:23-242:5 (Helzer); 406:11-16 (Sydow);

Ex. 317.) Production was also negatively affected the following day, September 16,

2008, as the Muslim employee protests continued. Chain speed had to be reduced again, and production was short by about 500 head. (Tr. 249:3-13 (Helzer); Ex. 324.) 144.

66.    On September 17, 2008, B shift slaughtered only 676 head, and processed only 22 head of cattle before operations were canceled and the few employees who had reported to work were sent home. (Tr. 413:1-16 (Sydow); Ex. 324.) On September 18, 2008, production numbers for both shifts of slaughter and fabrication were each more than 1000 head below average. (Tr. 413:1-16 (Sydow); Trial Ex. 324.) In an attempt to catch up on production lost earlier in the week, the plant operated Saturday, September 20, 2008, incurring $389,903 in overtime labor expenses. The plant also operated Saturday, September 27, 2008, incurring $428,508 in overtime labor expenses. The plant would not have operated on those two Saturdays but for the work disruptions the week of September 15, 2008. (Tr. 416:21-417:14, 421:1-16 (Sydow); 904:21-905:1 (Omar Mohamed); Trial Ex. 324; Ex. 325.)

## CONCLUSIONS OF LAW

At the close of the EEOC's evidence, JBS moved for judgment on partial findings. Federal Rule of Civil Procedure 52(c) states that "[i]f a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Based on the parties' agreement as reflected in the Final Pretrial Order, the Court permitted the Parties to submit deposition designations and objections after the close of trial. (*See* Filing No. 479 at 12.) The EEOC has submitted its designations and

has been fully heard on its claims. (Tr. 1232:14-23.) During the EEOC's case in chief, JBS presented evidence of its defenses, and the EEOC had an opportunity to cross examine and otherwise challenge JBS's evidence with respect to its defenses. The Court concludes that the EEOC has been fully heard, and that JBS has established its affirmative defenses based on the evidence before the Court. Accordingly, the Court grants JBS's Rule 52 motion and makes the following separately stated conclusions of law as required by Rule 52(a):

## 1. Parties and Jurisdiction

The Court has jurisdiction over Phase I of these proceedings pursuant to Section 707 of Title VII, 42 U.S.C. § 2000e-6, as amended. (Filing Nos. 296, 338; 479 at 2-4.) The EEOC has alleged that JBS violated Title VII by engaging in a pattern or practice of failing to reasonably accommodate the religious practices of Muslim employees at its Grand Island, Nebraska, facility. Specifically, the EEOC claims that JBS failed to (1) allow Muslim employees to take unscheduled breaks to pray; and/or (2) move the meal break during the remainder of Ramadan 2008 (from September 18 through September 30, 2008) to a time that coincided closely with such employees' sunset prayer time. (Order on Final Pretrial Conference for Phase I (Filing No. 479 at 4-5.)

## 2. The EEOC's Prima Facie Case

Title VII of the Civil Rights Act of 1964 provides, in part, that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Title VII, as amended, permits the EEOC to bring actions to prevent

28

unlawful employment practices under two separate sections. *See* 42 U.S.C. §§ 2000e–5 & 2000e–6.   Section 707 of Title VII authorizes the EEOC to sue when it "has reasonable cause to believe that [an employer] is engaged in a pattern or practice" of unlawful discrimination. 42 U.S.C. § 2000e–6(a).  Generally, cases alleging a pattern or practice of discrimination under Section 707 are tried using the model established in *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977).  *See Craik v. Minnesota State Univ. Bd.*, 731 F.2d 465, 469-70 (8th Cir. 1984).

"To establish a prima facie case of pattern-or-practice discrimination, a plaintiff must prove that the employer 'regularly and purposefully,' . . . treated members of the protected group less favorably and that unlawful discrimination was the employer's 'regular procedure or policy.'" *EEOC v. McDonnell Douglas Corp.*, 191 F.3d 948, 951 (8th Cir. 1999) (quoting *Teamsters*, 431 U.S. at 335, 360).  Proof of sporadic or isolated discriminatory acts by the employer are not sufficient, "rather it must be established by a preponderance of the evidence that 'discrimination was the company's standard operating procedure--the regular rather than the unusual practice.'" *Id.* (quoting *Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 875-76 (1984) and *Teamsters*, 431 U.S. at 336).  A plaintiff "need not prove absolute uniformity, but only a 'regular' practice.  Accordingly, 'at the liability stage of a pattern-or-practice trial the focus often will be not on individual . . . decisions but on a pattern of discriminatory decisionmaking.'" *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 4518 (N.D.Cal. 2012) (quoting *Teamsters*, 431 U.S. at 336).  If the EEOC satisfies its initial burden, "the burden then shifts to the employer to defeat the prima facie showing of a pattern or practice by demonstrating that the Government's proof is either inaccurate or

insignificant." *Teamsters*, 431 U .S. at 360. "If an employer fails to rebut the inference that arises from the Government's prima facie case, a trial court may then conclude that a violation has occurred and determine the appropriate remedy." *Id*. at 361.

As noted above, the employee must demonstrate that an employer's practices resulted in unlawful discrimination. *Teamsters*, 431 U.S. at 336–40. The EEOC claims the alleged unlawful discrimination in this case is that JBS had a pattern or practice of failing to provide reasonable religious accommodation to Somali Muslim employees. Title VII makes it unlawful for an employer to "discharge any individual, or otherwise discriminate against any individual with respect to his ... terms, conditions, or privileges of employment, because of such individual's ... religion." 42 U.S.C. § 2000e–2(a)(1). Title VII defines "religion" to include "all aspects of religious observance and practice," unless an employer "demonstrates that he is unable to reasonably accommodate ... an employee's ... religious observance or practice without undue hardship on the ... employer's business." 42 U.S.C. § 2000e(j). In sum, "Title VII requires an employer to reasonably accommodate the religious beliefs of its employees unless the employer can demonstrate that doing so would impose an undue hardship." *Harrell v. Donahue*, 638 F.3d 975, 979 (8th Cir. 2011) (citing 42 U.S.C. § 2000e(j)). To establish a prima facie case of religious discrimination for failure to accommodate, the employee must demonstrate that he or she (1) has a bona fide religious belief that conflicts with an employment requirement, (2) informed the employer of this belief, and (3) was disciplined for failing to comply with the conflicting requirement. *E.g., Jones v. TEK Indus., Inc.*, 319 F.3d 355, 359 (8th Cir.2003); *Wilson v. U.S. W. Commc'ns*, 58 F.3d 1337, 1340 (8th Cir.1995).

In order to satisfy the first element of the prima facie case, the EEOC "must demonstrate both that the belief or practice is religious and that it is sincerely held." *EEOC v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico,* 279 F.3d 49, 56 (1st Cir. 2002) (citations omitted). Based on the evidence presented at trial, the Court concludes that the EEOC demonstrated that the plaintiffs' religious beliefs were at all times genuine and sincerely held.

The second element of a prima facie case of religious discrimination requires a plaintiff to set forth evidence showing that he or she informed the employer of the conflict between the religious beliefs and an employment requirement. *See Johnson v. Angelica Unif. Group, Inc.,* 762 F.2d 671, 673 (8th Cir.1985) (finding that the plaintiff "clearly did not satisfy the notice element of the prima facie requirements" where she did not notify her employer of her inability to work on Holy days until after she had missed twelve days of work). It is undisputed that JBS was aware of the Muslim employees' religious beliefs. While there is conflicting evidence about the consistency of the employees' beliefs, specifically the window in which the employees could pray, the EEOC has shown that Muslims working at the JBS plant in Grand Island in 2007 and 2008 informed JBS management about their religious requirements, specifically the need to complete their five daily prayers.

The final element of the prima facie case requires that the EEOC demonstrate that the employees suffered an adverse employment action for failing to comply with a conflicting employment requirement. *Jones,* 319 F.3d at 359. An employee satisfies this element by demonstrating that the employment requirement was the proximate cause of the employee's adverse employment action. *See Sturgill v. United Parcel*

*Serv., Inc.,* 512 F.3d 1024, 1034 (8th Cir. 2008); *see also Jones,* 319 F.3d at 359 (*prima facie* case established where employee shows his employment ended because he failed to comply with a "conflicting requirement of employment"). The EEOC has presented evidence that Muslim employees suffered adverse consequences because their religious tenets conflicted with employment requirements imposed by JBS, at least with respect to issues arising during Ramadan of 2008.[5]   Accordingly, the Court concludes that the EEOC has presented sufficient evidence to shift the burden to JBS to prove one of its affirmative defenses.[6]

### 3.   Defendant's Burden to Show Undue Hardship

After the EEOC established its prima facie case, the burden shifted to JBS to show that it offered the Muslim employees a reasonable accommodation or could not do so without undue hardship. *See Harrell,* 638 F.3d at 979 (8th Cir. 2011) (citing *Brown v. Gen. Motors Corp. (Brown I),* 601 F.2d 956, 959–60 (8th Cir.1979); *accord, Peterson v. Hewlett–Packard Co.,* 358 F.3d 599, 606 (9th Cir.2004)). Whether a proposed religious accommodation results in undue hardship is decided on a case-by-case basis. *Harrell,* 638 F.3d at 979 (citing *Brown v. Polk Cnty. Iowa,* 61 F.3d 650, 654 (1995)).

An employer may demonstrate undue hardship in two ways. First, it may experience undue hardship if a religious accommodation creates more than a de

---

[5] The Court does not conclude as a matter of law that each of the individual plaintiffs suffered an adverse employment action proximately caused by JBS' employment requirements, and it need not do so at this time. The sole question is whether the EEOC has presented evidence of an adverse employment action sufficient to establish its prima facie case. The Court concludes, for the purposes of this phase of the case, that it has with respect to the incidents in Ramadan 2008.

[6] While the EEOC has met its initial prima facie case of failure to accommodate, the Court makes no finding on whether the EEOC has established a pattern or practice of doing so. Because the Court finds that JBS has proven its affirmative defense of undue hardship, the Court need not address the pattern or practice aspect of the EEOC's claims.

minimis cost to the employer.  *See Transworld Airlines, Inc. v. Hardison*, 432 U.S. 63,

84 (1977). For example, in *Transworld Airlines, Inc. v. Hardison*, the Supreme Court

concluded that requiring an employer to pay additional costs to give one employee time

off constituted an undue hardship.  *Id.*; *see also Cloutier v. Costco Wholesale Corp.*,

390 F.3d 126, 134 (1st Cir. 2004) (stating that cost to an employer may be economic,

such as lost business or the need to hire additional workers, or it may be noneconomic).

Second, an employer may establish undue hardship by showing that providing a

religious accommodation would have caused more than a de minimis imposition on

coworkers.  *See Transworld Airlines*, 432 U.S. at 80–81, 84 (1977) (finding that ignoring

a seniority system would have "deprived [a coworker] of his contractual rights under [a]

collective-bargaining agreement" and that "requir[ing] [an employer] to bear more than a

de minimis cost . . . is an undue hardship"); *Harrell*, 638 F.3d at 980 (8th Cir. 2011)

(noting that "an accommodation creates an undue hardship if it causes more than a de

minimis impact on co-workers" (citing *Brown*, 61 F.3d at 655))).  Although almost any

religious accommodation will inevitably cause some differences in treatment among

employees, "if accommodating an employee's religious beliefs also causes a 'real' and

'actual' imposition on co-workers, . . . . Title VII does not require an employer to make

such an accommodation."  *Harrell*, 638 F.3d at 980 (citing *Trans World Airlines*, 432

U.S. at 81 (1977); *Brown I*, 601 F.2d at 961).

In this case, the parties agreed that the proposed accommodations to the Muslim

prayer requests were for JBS to (1) "allow Muslim employees to take unscheduled

breaks to pray; and/or" (2) "move the meal break during the remainder of Ramadan

2008 (from September 18 through September 30, 2008) to a time that coincided closely

with such employees' sunset prayer time." (Order on Final Pretrial Conference for Phase I (Filing No. 479 at 4-5.)  The Court concludes that JBS has demonstrated that either accommodation would have resulted in undue hardship.

### a.    Unscheduled Prayer Breaks

The first proposed religious accommodation for Muslim employees was for JBS to allow Muslim employees to take unscheduled prayer breaks.  JBS would have been required to accommodate these requests within relatively small windows of time. Specifically, Muslim representatives told JBS that the Muslim employees "have to pray within 10 minutes of sunset and at the most 15 minutes after sunset." (Tr. 316:16- 21, 329:22-330:1, 334:6-15 (Sydow); 452:15-21 (Chmelka); Ex. 16 at 1.)  JBS responded that it could not relieve 200 employees within a 10-minute window because of safety and quality concerns created by such an accommodation. (Tr. 314:5-8, 337:21-339:24 (Sydow); 451:15-452:11 (Chmelka); Ex. 16 at 2.)  In sum, based on the parties' understanding in 2008, unscheduled prayer breaks for Muslim employees would have required extra breaks on a daily basis for hundreds of employees within a small window of time.  The evidence demonstrates that this accommodation would have imposed more than a de minimis burden on JBS, as well as on co-workers.

### i.    Greater than De Minimis Cost to JBS

Unscheduled prayer breaks within the parameters requested by Muslim employees caused more than a de minimis cost to JBS in several ways.  For example, the evidence[7] demonstrated that extra employee breaks could have an adverse effect

---

[7] The undersigned found the JBS management witnesses to be knowledgeable in their fields, and very credible in their testimony.

on food safety.  Safety concerns are "highly relevant in determining whether a proposed accommodation would produce an undue hardship on the employer's business." *EEOC v. Kelly Servs., Inc.*, 598 F.3d 1022, 1033 n. 9 (8th Cir. 2010) (*Draper v. U.S. Pipe & Foundry Co.,* 527 F.2d 515, 521 (6th Cir.1975)).  Testimony established that if the slaughter and fabrication lines were *not* stopped or slowed to accommodate absent workers, remaining workers on the lines would need to work at dangerous speeds.  For example, a slaughter employee trying to cover for an absent coworker might be rushed and unable to keep up with required rotation of sterilized knives between carcasses. (Tr. 260:11-24 (Helzer).)  That could result in cross-contamination, affecting safety of the product.  If a line *were* stopped or slowed, raw meat might be exposed to air and bacteria for a prolonged time, increasing the risk of contamination or adulteration of the product. The evidence demonstrated that such safety and quality concerns would be particularly elevated if JBS were to attempt to allow up to 200 employees to take unscheduled breaks within a short window of time. If increased speed were demanded of employees, their personal safety would also be jeopardized, because employees at the Plant work with heavy, dangerous product and equipment

JBS also demonstrated that unscheduled breaks have a negative impact on operational efficiency.  Because employees must cover for absent coworkers, they must work more quickly and may not be able to trim product to meet specifications or yield standards.  In the event that such standards are not met, JBS could be required to incur overtime expenses and/or risk customer dissatisfaction. (Tr. 261:19-262:3 (Helzer).)

Finally, JBS demonstrated that the costs associated with such extra breaks would have a direct financial impact on JBS.  Testimony showed that one prayer break

35

would result in the equivalent of at least an additional 10-minute break.  (*See e.g.* Tr. 160:7–11 (Schult).) JBS calculated that such downtime would cost the Plant, in labor alone, $100 per minute on the slaughter side, and $225 per minute on the fabrication side. (Tr. 181:23-182:8 (Schult); 258:11-15 (Helzer); 408:13-409:9 (Sydow); Trial Ex. 306.)  JBS calculated the average cost of a 10-minute break at $18,180 per day per plant. (Tr. 187:21-188:12 (Schult); Ex. 316.)  JBS took specific measures to minimize downtime to save money, and routinely coordinated breaks with grade changes or equipment malfunctions. (Tr. 212:16-18, 224:2-16 (Helzer); 293:20-22 (Sydow).)  It is reasonable to conclude, based on the testimony presented, that extra breaks for prayers, within the parameters requested by the Muslim workers, would have created a substantial financial burden on JBS by slowing the production chain and creating or simulating downtime.

Accordingly, JBS demonstrated that attempts to accommodate the Muslim employees' demands would have resulted in food safety and employee safety concerns, and would have impaired JBS's operational efficiency and caused JBS to incur additional expenses.[8]

---

[8] The EEOC argues that JBS should be precluded from asserting undue hardship because JBS later adopted a policy allowing employees to request extra breaks for prayer, and allowing them to be released from the production lines in the order of their requests, as operations permitted.  The Court does not consider JBS's subsequent actions in its analysis.  *See Rehrs v. Iams Co.*, 486 F.3d 353, 358 (8th Cir. 2007) (in disability discrimination case, an employer does not concede that an accommodation is reasonable or nonburdensome by voluntarily adopting it, and to hold otherwise would punish employers for doing more than the law requires); *Wood v. Green*, 323 F.3d 1309, 1314 (11th Cir. 2003) (in ADA failure-to-accommodate case, employer's willingness to grant plaintiff prior indefinite leaves of absence did not make a future indefinite leave of absence reasonable because "prior accommodations do not make an accommodation reasonable.")

ii.    *Greater Than De Minimis Burden on Coworkers*

The evidence demonstrates that unscheduled breaks in the manner proposed by the Muslim employees also would have imposed more than a de minimis burden on non-Muslim co-workers.  Such unscheduled breaks would have required a supervisor, lead worker, trainer, or coworker to fill in for the employee leaving the line.   The substitute, therefore, would not be performing his or her own job while covering for the absent employee.  (Tr. 193:24-194:10 (Schult); 227:6-14 (Helzer); 319:10-18, 390:1-6, 398:12-399:3 (Sydow); 565:16-567:24, 570:4-16, 576:21-577:5 (Prado); 842:12-24, 843:9-844:13 (Ibrahim); 919:18-920:1, 921:6-13, 922:11-13 (Abdi); 1023:2-7, 1072:21-1073:18 (Naima Mohamed); 1159:4-9, 1173:20-25 (Ali); Ex. 4 at 9.)   Non-Muslim employees would be required to work harder, under rigorous or potentially dangerous conditions, in part because they did not share their co-workers' religious beliefs.  *See e.g. Harrell*, 638 F.3d at 981 (concluding that providing a postal worker with Saturdays off would have burdened his coworkers with more weekend work, in part because they did not share the same religious beliefs); *EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 317 (4th Cir. 2008) (stating that an employer is not required to provide an accommodation if doing so would directly and personally impose on other workers); *Bhatia v. Chevron U.S.A.*, 734 F.2d 1382, 1384 (9th Cir. 1984) (finding that there would be a greater than de minimis impact on coworkers if they were required to complete another worker's share of potentially dangerous work).

Testimony also demonstrated that extra breaks could have a negative impact on employee morale.  Co-workers would be likely to conclude that they were forced to work harder and faster to cover for the Muslims taking extra breaks.  *See Firestone*, 515 F.3d

37

at 318 (stating that "feelings of unequal treatment . . . can cause real problems in the workforce," and "it was permissible for [the employer] to consider the rights and perceptions of fairness of other employees when determining whether to provide such an accommodation."); *Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141, 147 (5th Cir. 1982) (concluding that disruption of work routines and a lowering of morale constitutes an undue hardship). Accordingly, the evidence demonstrated that unscheduled breaks in the manner requested by Muslim employees resulted in a greater than de minimis burden on other employees.

### b.    *Mass Meal Break to Accommodate the Maghrib Prayer*

The second proposed accommodation was to move the designated meal break during Ramadan 2008 to a time that coincided closely with the sunset prayer time. JBS officials attempted to accommodate this request by moving the B-shift meal break to coincide with the Maghrib prayer during Ramadan 2008. Specifically, Muslim employees and JBS reached an agreement that for the remainder of Ramadan, the B-shift meal break would be a mass break at 7:45 p.m., rather than the usual rolling meal break. The B shift also was to be shortened by 15 minutes to 7¾ hours.

### i.    *Greater than De Minimis Cost to JBS*

This proposal created several problems. For example, on the slaughter floor, a carcass could remain on the kill floor for up to 45 minutes. If it remained on the kill floor longer than 45 minutes, it had to be classified as "distressed cattle," and would lose about half its value. Testimony established that in a 30-minute mass break, approximately 50-60 head of cattle would be classified as distressed cattle, with consequential financial loss. (Tr. 259:20-260:10, 267:8-23 (Helzer).) On the fabrication

floor, a mass break would result in meat being left out on the tables for up to 30 minutes, allowing prolonged exposure to bacteria.  In contrast, during a normal rolling meal break, tables were cleaned and sanitized, because they were empty of product.  A mass break, like the Muslims' proposed accommodation, would not have permitted such clean-up.  These circumstances demonstrate that the Muslims' proposed mass meal break would have imposed more than a de minimis burden on JBS, resulting in undue hardship.

    *ii.*     *Greater Than De Minimis Burden on Coworkers*

The proposed mass meal break also would have resulted in more than a de minimis burden on non-Muslim employees.  Though mass breaks at the Plant occasionally occurred due to equipment malfunctions, such breaks were unpopular with employees because locker rooms, restrooms and cafeteria facilities were not large enough to accommodate such a large influx of employees. When break times were adjusted to accommodate prayer, non-Muslim employees were also upset that their work periods between breaks were uneven.  Because work at the Plant is heavy, tiring, and takes place in very cold conditions, breaks at uniform periods of time were especially important. (Tr. 249:23–250:2 (Helzer).)  When JBS decided to shorten the B shift to keep the last period of the work day the same length as the other work periods, the non-Muslim employees were also upset and angry, because their work day was being shortened, and they would receive less pay.  The evidence demonstrated that the non-Muslim employees walked off the job in protest, and JBS was forced to cancel B-shift operations because there were not enough employees present to operate.

## CONCLUSION

JBS has established its affirmative defense of undue hardship.  It had shown that a religious accommodation for Muslim employees, within the parameters requested, would have caused more than a de minimis burden on JBS and on its non-Muslim employees.

Accordingly,

IT IS ORDERED:

1.    The oral motion for judgment on partial findings made by Defendant JBS USA, LLC f/k/a JBS Swift & Co. a/k/a Swift Beef Company, is granted;

2.    Judgment is entered in Phase I of this matter in favor of Defendant JBS USA, LLC f/k/a JBS Swift & Co. a/k/a Swift Beef Company, and against Plaintiff Equal Employment Opportunity Commission; and

3.    All pending motions and objections are denied as moot.


Dated this 11th day of October, 2013.

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge