## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 10-cv-02103-PAB-KLM

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

      Plaintiff,

v.

JBS USA, LLC d/b/a JBS SWIFT & COMPANY,

      Defendant.

---

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
## BRIEF IN SUPPORT

---

      Defendant JBS USA, LLC ("JBS"), pursuant to Fed. R. Civ. P. 56, submits this Motion for Summary Judgment and Brief in Support ("Motion").

## INTRODUCTION

      In Phase I of this bifurcated lawsuit, the Equal Employment Opportunity Commission ("EEOC") alleges that JBS engaged in a pattern or practice of (1) denying Somali Muslim employees reasonable religious accommodations for their prayer needs; (2) terminating or disciplining Somali Muslim employees during Ramadan 2008 based on their religion and/or national origin; and (3) retaliating against Somali Muslim employees during Ramadan 2008 for their participation in protected activities.  See Order on Motion to Bifurcate (Doc. 116, "Bifurcation Order") at 13–15.

      Summary judgment is appropriate on all three of the EEOC's pattern or practice claims. As explained below, the EEOC is estopped from relitigating several critical issues underlying its claims, as the United States District Court for the District of Nebraska has already determined in a nearly identical case between these same parties that (1) the EEOC's proposed

accommodations concerning prayer breaks would impose more than *de minimis* burdens on JBS

and its non-Muslim employees and (2) a one-time decision to terminate, *en masse*, a large group

of employees cannot constitute a "pattern or practice" of unlawful discrimination or retaliation.

With the EEOC being collaterally estopped from relitigating these issues, summary judgment

must be entered in JBS's favor.

Even in the absence of collateral estoppel, the undisputed material facts establish that

(1) JBS already provides reasonable religious accommodations for its Muslim employees, and

(2) to the extent that the accommodations provided by JBS are somehow insufficient, the

EEOC's proposed accommodations are both unreasonable and impermissibly burdensome.  In

fact, if the accommodations already provided by JBS are not sufficient to meet the needs of its

Muslim employees, it is apparent – based on the undisputed material facts – that there are *no*

accommodations that will eliminate work-religion conflicts for all (or even most) Muslim

employees and do so without imposing undue hardships on JBS and the non-Muslim members of

its workforce.

The undisputed material facts also demonstrate that JBS made a one-time decision to

suspend and terminate, *en masse*, a group of Somali Muslim employees engaged in an unlawful

work stoppage.  As a matter of law, such a one-time event cannot provide a foundation for the

EEOC's discrimination and retaliation pattern or practice claims because, by their very nature,

pattern or practice claims require evidence of repeated and regular conduct; such claims cannot

be based on isolated or sporadic events.  The EEOC's Phase I pattern or practice claims must be

dismissed.

<u>STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

**A.     The EEOC's Lawsuits in Nebraska and Colorado.**

1.      On August 30, 2010, Plaintiff EEOC filed a lawsuit against JBS in this Court and, on the same date, it filed a lawsuit against JBS in the United States District Court for the District of Nebraska.  EEOC's Complaint (Doc. 1, "Compl."); Ex. H1 (Nebraska Compl.).

2.      In Phase I of this bifurcated lawsuit, the EEOC alleges that JBS has engaged in a pattern or practice of denying religious accommodations to Somali Muslim employees working at JBS's beef plant in Greeley, Colorado.  Bifurcation Order (Doc. 116) at 12–13.

3.      In Phase I of the EEOC's bifurcated lawsuit in Nebraska, the EEOC alleged that JBS engaged in a pattern or practice of denying religious accommodations to Somali Muslim employees working at JBS's beef plant in Grand Island, Nebraska.  Ex. H2 (Nebraska Findings of Fact and Conclusions of Law, "Neb. Findings") at p. 28.

4.      Specifically, in both lawsuits, the EEOC alleges that JBS has failed to provide Somali Muslim employees with religious prayer accommodations by (1) failing to move scheduled breaks to coincide with Muslim prayer times, and (2) failing to provide unscheduled breaks for Somali Muslim employees who want to leave the production line to pray at a required prayer time.  Ex. F1 (EEOC's Supplemental Responses to Defendant's First Set of Interrogatories and Requests for Production of Documents, "EEOC's Supp. Resp.") at 6; Ex. H2 (Neb. Findings) at p. 28.

5.      The EEOC also alleges that JBS engaged in a pattern or practice of discrimination and retaliation when it disciplined and terminated the employment of Somali Muslim employees at the Greeley plant during Ramadan 2008.  Bifurcation Order (Doc. 116) at 14–15.

6.      In the Nebraska lawsuit, the EEOC alleged that JBS engaged in a pattern or practice of discrimination and retaliation when it terminated the employment of Somali Muslim employees at the Grand Island plant during Ramadan 2008.  Ex. H4 (Nebraska Order on Motions for Summary Judgment, "Neb. SJ Order") at 37–41.

7.      The EEOC has referred to the Nebraska lawsuit as "sister litigation" to this lawsuit.  Ex. A23 (Skinner Dep.) at 189:25–190:3.

8.      On April 12, 2013, the Nebraska district court dismissed the EEOC's pattern or practice discrimination and retaliation claims, holding that, as a matter of law, the EEOC could not maintain pattern or practice claims based on a one-time decision to terminate, *en masse*, Somali Muslim workers.  Ex. H4 (Neb. SJ Order) at 37–41.

9.      On October 11, 2013, the Nebraska district court dismissed the EEOC's religious accommodation pattern or practice claim, finding that the EEOC's proposed prayer accommodations would have posed undue hardships on JBS and its non-Muslim employees.  Ex. H2 (Neb. Findings) at pp. 32–39.

10.      On January 27, 2014, the Nebraska district court entered final judgment in favor of JBS on all of the EEOC's Phase I pattern or practice claims.  Ex. H5 (Neb. Final Judgment).

**B.      Greeley Plant Operations.**

11.      There are three shifts at JBS's Greeley plant:  the "A" shift typically operates from 6:00 a.m. to 2:30 p.m.; the "B" shift operates from 3:00 p.m. to 11:30 p.m.; and the "C" shift is a cleaning and sanitation shift that follows the B shift.  Ex. A17 (Ray Dep.) at 45:19–46:1; Ex. A1 (Anderson Dep.) at 58:12–22.  See also Ex. H2 (Neb. Findings) at ¶ 10 (identical facts in Neb. case).

12.    The plant employs approximately 3000 employees, with roughly 1500 employees assigned to A shift and 1500 employees assigned to B shift.  Ex. A23 (Skinner Dep.) at 281:7–12.  See also Ex. H2 (Neb. Findings) at ¶¶ 10, 20 (identical facts in Neb. case).

13.    Work occurs on a production line basis, with a "chain" moving beef in one direction through the slaughter area to a cooler, and then from the cooler through the "fabrication" area and into packaging.  Ex. A16 (Palacios Dep.) at 106:7–112:6; Ex. A18 (Rivera Dep.) at 112:25–114:4.  See also Ex. H2 (Neb. Findings) at ¶ 19 (identical facts in Neb. case).

14.    Slaughter and fabrication employees on both shifts are required to work at a pace that corresponds to the "chain speed," meaning the speed at which the chain moves beef along the production line.  Ex. A4 (Donlon Dep.) at 42:17–43:11.  See also Ex. H2 (Neb. Findings) at ¶ 27 (similar "chain-speed goal[s]" in Neb. case).

15.    USDA regulations set the maximum chain speed in the slaughter area of the plant and, because the plant's operations are interconnected, JBS must correlate the chain speeds in the slaughter and fabrication areas.  Ex. A23 (Skinner Dep.) at 296:8–297:1; Ex. E2 (Skinner Dec.) at ¶ 11(c); Ex. A1 (Anderson Dep.) at 156:19–25.  See also Ex. H2 (Neb. Findings) at ¶ 24 (similar facts in Neb. case).

16.    After cattle are killed in the slaughter area and moved to the cooler, the USDA "grades" the cattle using such recognized terms as "Prime," "Choice," and "Select" beef.  Ex. A12 (Lathrop Dep.) at 81:11–84:7.  See also Ex. H2 (Neb. Findings) at ¶¶ 23, 25 (identical facts in Neb.).

17.    Only one grade of cattle at a time is run through the fabrication area.  Ex. A12 (Lathrop Dep.) at 81:23–82:1.  See also Ex. H2 (Neb. Findings) at ¶ 25 (identical facts in Neb.).

18.     There is a gap in the chain between each grade of cattle, lasting from one to five minutes.  Ex. A12 (Lathrop Dep.) at 81:23–82:20; Ex. A2 (Danley Dep.) at 104:1–5; Ex. A7 (Garcia Dep.) at 102:7–25.  <u>See</u> <u>also</u> Ex. H2 (Neb. Findings) at ¶ 25 (identical facts in Neb.).

19.     The number of grade changes per shift, how long they take, and when they occur, varies every single shift.  Ex. E1 (Donlon Aff.) at ¶ 5; Ex. A2 (Danley Dep.) at 103:17–20; Ex. A7 (Garcia Dep.) at 101:2–14 (estimating number of grade changes per shift varies from 10-20). <u>See</u> <u>also</u> Ex. H2 (Neb. Findings) at ¶ 25 (identical facts in Neb. case).

20.     As the beef moves though the fabrication area of the plant, different "lines" of employees perform different jobs cutting and preparing the beef, and some of the jobs are very physically demanding and difficult.  Ex. A16 (Palacios Dep.) at 106:7–112:6; Ex. B1 (Abade Dep.) at 57:6–10; Ex. B16 (F. Ali Dep.) at 56:5–19.  <u>See</u> <u>also</u> Ex. H2 (Neb. Findings) at ¶¶ 18, 23 (similar facts in Neb. case)

21.     The number of employees assigned to each line varies, with some lines having more employees than others.  Ex. A15 (Mortensen Dep.) at 121:21–23.

22.     In September 2008, an estimated 433 Muslim employees worked on B shift, and several Muslims often worked on the same line.  Ex. A23 (Skinner Dep.) at 250:6–19; Ex. E2 (Skinner Dec.) at ¶ 9(a); Ex. G8 (Sept. 23, 2008 Ray email); Ex. B1 (Abade Dep.) at 56:24–57:1 (four Muslims on his line); Ex. B23 (Bunow Dep.) at 78:1–10 (four Muslims out of seven total employees on line); Ex.B19 (S. Ali Dep.) at 66:17–19 (four Muslims out of ten total employees on line); Ex. B41 (Muse Dep.) at 93:13–15 (five Muslims on her line); Ex. B16 (F. Ali Dep.) at 57:25–58:7 (estimating 10-15 Muslims on her line); Ex. B5 (R. Abdi Dep.) at 97:15–17 (almost 20 Muslims on her line).  <u>See</u> <u>also</u> Ex. H2 (Neb. Findings) at ¶ 20 (similar number of Muslim employees on B shift in Neb. case).

6

23.     After passing through the fabrication area, trimmed and deboned pieces of beef proceed to packaging lines where the meat is bagged, boxed, and readied for shipping.  Ex. A23 (Skinner Dep.) at 295:23–296:7.  See also Ex. H2 (Neb. Findings) at ¶ 23 (identical facts in Neb.).

24.     Production employees must wear safety equipment that may include hard hats, hair nets, ear protection, safety glasses, frocks, gloves, boots, and various metal-mesh guards, such as metal-mesh gloves, arm-guards and aprons.  Ex. B23 (Bunow Dep.) at 82:3–83:16; Ex. B10 (S. Adan Dep.) at 74:21–77:12; Ex. D4 (Ab. Mohamed Dep.) at 49:23–50:3.  See also Ex. H2 (Neb. Findings) at ¶ 18 (identical facts in Neb. case).

25.     Depending on an employee's job, a significant portion of the safety equipment may have to be removed before the employee leaves the production floor, and the equipment must be put back on when the employee returns.  Ex. B16 (F. Ali Dep.) at 54:14–55:7; Ex. B23 (Bunow Dep.) at 82:3–84:2.  See also Ex. H2 (Neb. Findings) at ¶ 18 (identical facts in Neb.).

26.     JBS's employees vary in their estimates as to how long it takes them to remove their safety equipment when leaving the line.  Ex. B12 (N. Aden Dep.) at 132:2–133:3 (1–2 min.); Ex. B42 (Nur Dep.) at 129:8–13 (3–4 min.); Ex. B31 (I. Ibrahim Dep.) at 66:20–67:7 (3–4 min.); Ex. B11 (A. Aden Dep.) at 97:19–98:4 (4–5 min.); Ex. B3 (H. Abdi Dep.) at 66:16–22 (4–5 min.); Ex. D5 (M. I. Mohamed Dep.) 104:6-24 (6–7 min.).

27.      "Crewing" refers to the number of employees needed to do a particular job at a particular chain speed.  Ex. A23 (Skinner Dep.) at 244:8–16.  See also Ex. H2 (Neb. Findings) at ¶ 28 (identical facts in Neb. case).

28.     If the chain speed were to be increased during a shift, JBS would need to increase crewing during the shift.  Ex. E2 (Skinner Dec.) at ¶ 11(a).

7

29.     The goal of "over-crewing" is for the plant to be sufficiently staffed to account for absenteeism, vacations and leaves of absence; it is not meant to account for employees taking unscheduled breaks.  Ex. A23 (Skinner Dep.) at 137:4–138:11, 140:7–14.  See also Ex. H2 (Neb. Findings) at ¶ 28 (identical facts in Neb. case).

30.     Appropriate crewing is important for the safety of employees and the quality of product.  Ex. A18 (Rivera Dep.) at 34:8–12; Ex. E2 (Skinner Dec.) at ¶ 11(b).  See also Ex. H2 (Neb. Findings) at ¶ 18 (identical facts in Neb. case).

31.     Typically, there is one supervisor and one or two team leads per line; the break line, for example, has one supervisor and two team leads supervising 85 employees, and the rib line has one supervisor and one team lead supervising 77 employees.  Ex. E1 (Donlon Aff.) at ¶ 14; Ex. A15 (Mortensen Dep.) 121:24–122:3.

**C.     The Union and The CBA.**

32.     The United Food and Commercial Workers International Union, Local  No. 7 ("Union") is the exclusive bargaining agent for production employees at the Greeley plant. Compl. (Doc. 1) at ¶ 12; Ex. C1 (Gonzalez Dep.) at 10:8–18.

33.     In 2008, the terms and conditions of employment for the plant's production employees were governed by a collective bargaining agreement ("CBA").  Ex. G2 (CBA).

34.     Article 25 of the CBA provided that:

Section 2.  Employees will be granted a rest period of fifteen (15) minutes approximately half way through the first portion of their shift, but, in no event will it be taken earlier than one and one half (1½) hours from the start of the shift nor later than three (3) hours from the start of the shift.

Section 3.  Employees will be allowed a thirty (30) minute lunch period (without pay) at approximately half way through the employee's scheduled work day.

> Section 4.  Employees will be granted a second rest period of fifteen (15) minutes if the day's work schedule exceeds eight (8) hours and twelve (12) minutes. . . .
>
> Section 7.  Employees will not be required to work in excess of three and one half (3½) hours without a meal or rest period unless three and three fourths (3¾) hours complete the workday,

Ex. G2 (CBA) at 26 (internal page number).  See also Ex. H2 (Neb. Findings) at ¶¶ 8–14

(nearly identical CBA provisions in Neb. case).

35.     Article 8 of the CBA prohibits strikes and work stoppages and grants JBS the sole

right to determine the appropriate level of discipline for employees who participate in strikes and

work stoppages.  Ex. G2 (CBA) at 8 (internal page number).  See also Ex. H2 (Neb. Findings) at

¶ 15 (identical CBA provision in Neb. case).

36.     Article 4, Section 2 of the CBA prohibits supervisors from performing bargaining

unit work "except in such situations as instructing an employee, temporarily filling in for

absenteeism or in case of emergency."  Ex. G2 (CBA) at 4 (internal page number).

**D.     Scheduled Breaks.**

37.     During B shift, the first rest break has historically occurred around 6:00 p.m. and

the meal break usually occurs around 9:00 p.m.  Ex. B22 (Bulle Dep.) at 147:1–7.

38.     To save money, rest and meal breaks are always coordinated with a grade change

or mechanical failure, which means the exact timing of the breaks varies.  Ex. E1 (Donlon Aff.)

at ¶ 7; Ex. B29 (Hussein Dep.) at 147:15–25; Ex. A23 (Skinner Dep.) at 92:3–94:12.  See also

Ex. H2 (Neb. Findings) at ¶¶ 26, 30 (identical facts in Neb. case).

39.     At each rest and meal break, employees stop placing beef on the production chain,

resulting in a 15-minute (for a rest break) or 30-minute (for a meal break) product "gap" in the

chain.  Ex. E1 (Donlon Aff.) at ¶ 9; Ex. A18 (Rivera Dep.) at 112:25–114:4.  See also Ex. H2

(Neb. Findings) at ¶ 29 (identical facts in Neb. case).

40.    Employees leave the line to begin their break when the gap in the chain reaches

their position, with employees at the beginning of the production process leaving first and

employees at the end of the process leaving last.  Ex. A18 (Rivera Dep.) at 112:25–114:4.  See

also Ex. H2 (Neb. Findings) at ¶ 29 (identical facts in Neb. case).

41.    These scheduled breaks allow employees to leave the line in a staggered fashion

so that beef is not left unattended on the line; if beef is left on the line while employees are on a

break, it creates food safety issues.  Ex. E1 (Donlon Aff.) at ¶ 9; Ex. A18 (Rivera Dep.) at

112:25–114:4; Ex. A2 (Danley Dep.) at 101:15–102:21; Ex. A10 (Jordan Dep.) at 72:4–21.  See

also Ex. H2 (Neb. Findings) at ¶¶ 29, 31 (noting identical facts in Neb. case, including food

safety issues caused by "mass breaks" that leave beef on the line).

**E.    Unscheduled Breaks and Mass Breaks.**

42.    Employees normally are not allowed to leave the production line without notice or

permission.  Ex. A17 (Ray Dep.) at 55:12–15.  See also Ex. H2 (Neb. Findings) at ¶ 34 (identical

facts in Neb. case).

43.    If an employee experiences a bathroom emergency, however, he or she can leave

the line without permission, due to the food safety issues which may be caused by an accident on

the production floor, as well as concerns for the employee's health.  Ex. A10 (Jordan Dep.) at

29:20–30:3; Ex. A25 (Sunner Dep.) at 46:24–47:6; Ex. A24 (Stolle Dep.) at 95:15–19.

44.    Employees do not need permission to leave their positions on the line in order to

get a drink of water, as there are water fountains near the lines.  Ex. A17 (Ray Dep.) at 55:16–19;

Ex. D6 (M. J. Mohamud Dep.) at 111:23–112:7; Ex. D1 (Aaden Dep.) at 83:16–84:1; Ex. A5 (Espinoza Dep.) at 141:1–6.  Ex. H2 (Neb. Findings) at ¶ 32 (identical facts in Neb. case).

45.    Production employees can request permission to take unscheduled or "extra" breaks to use the restroom, in a non-emergency situation.  Ex. A17 (Ray Dep.) at 52:6–12; Ex. A20 (Schult Dep.) at 33:23–34:7; Ex. D7 (Muhumad Dep.) at 91:24–92:5.  See also Ex. H2 (Neb. Findings) at ¶ 32 (identical facts in Neb. case).

46.    Only a small fraction of employees request extra restroom breaks during any given shift.  Ex. A25 (Sunner Dep.) at 66:1–3; Ex. A26 (Timejardine Dep.) at 32:25–33:7.  See also Ex. H2 (Neb. Findings) at ¶ 33 (identical facts in Neb.).

47.    The time it takes for a bathroom break varies, but JBS supervisor Lisa Rivera estimates that it takes 15 minutes for one of her employees to leave the line and go to the bathroom, while supervisor Rob Anderson estimates it takes his employees 10 minutes.  Ex. A18 (Rivera Dep.) at 38:2–10; Ex. A1 (Anderson Dep.) at 127:9–12.

48.    Supervisors have responded differently to requests for unscheduled breaks, including prayer breaks, and some have been more lenient than others.  Ex. A17 (Ray Dep.) at 52:6–53:4.  See also Ex. H2 (Neb. Findings) at ¶¶ 33, 35 (identical facts in Neb. case).

49.    In contrast to scheduled (*i.e.*, staggered) breaks, mass breaks (which may be called during an equipment malfunction) require all employees to leave the production line at the same time.  Ex. A2 (Danley Dep.) at 101:23–102:14.  See also Ex. H2 (Neb. Findings) at ¶ 31 (identical facts in Neb. case).

50.    Mass breaks cause meat to sit on the line during the break and can allow bacteria to grow.  Ex. A20 (Schult Dep.) at 168:10–19; Ex. A2 (Danley Dep.) 102:10–14; Ex. E1 (Donlon Aff.) at ¶ 11.  See also Ex. H2 (Neb. Findings) at ¶ 31 (identical facts in Neb. case).

51.     During a scheduled (*i.e.*, staggered) break, tables are cleaned and sanitized as they are emptied of product, but a mass break prevents such clean-up from occurring.  Ex. A20 (Schult Dep.) at 168:10–19; Ex. E1 (Donlon Aff.) at ¶ 12.  See also Ex. H2 (Neb. Findings) at ¶ 31 (identical facts in Neb. case).

52.     Mass breaks can also result in cattle not moving off the slaughter floor within a 45-minute USDA time limit, requiring JBS to classify the cattle as "distressed."  Ex. E1 (Donlon Aff.) at ¶ 13.  See also Ex. H2 (Neb. Findings) at ¶ 31 (identical facts in Neb. case).

53.     Beef from distressed cattle is about half as valuable as beef from undistressed cattle.  Ex. E1 (Donlon Aff.) at ¶ 13.  See also Ex. H2 (Neb. Findings) at ¶ 31 (identical facts in Neb. case).

54.     Mass breaks are unpopular with employees because locker rooms, restrooms and cafeteria facilities are not large enough to handle such a large influx of people at once.  Ex. A2 (Danley Dep.) at 101:23–102:7; Ex.A11 (Kitch Dep.) at 32:17–22.  See also Ex. H2 (Neb. Findings) at ¶ 31 (identical facts in Neb. case).

## F.     Variations In Religious Beliefs.

55.     Muslims pray five times a day according to the Muslim prayer calendar.  Ex. D11 (Yakub Dep.) at 31:13–17; Compl. (Doc. 1) ¶ 13.

56.     The five prayers are: morning (Fajr), noon (Dhuhr), afternoon (Asr), sunset (Maghrib), and evening or night (Isha).  Ex. B15 (A. N. Ali Dep.) at 34:18–44:2.  See also Ex. H2 (Neb. Findings) at ¶ 37.

57.     JBS's Muslim employees take different amounts of time to recite their daily prayers, and the amount of time can differ depending upon which prayer is due.  Ex. B15 (A. N. Ali Dep.) at 35:8–13, 37:9–20 (Fajr takes 3–4 minutes; Dhuhr takes 5–6 minutes); Ex. B21

12

(Awale Dep.) at 26:3–9, 27:20–23 (Fajr takes 7 minutes; Dhuhr takes 10 min); Ex. B12 (N. Aden

Dep.) at 36:14–37:1 (Asr takes 5–6 minutes; Maghrib takes 4–5 minutes); Ex. B16 (F. Ali Dep.)

at 28:12–23 (Asr takes 10 minutes; Maghrib takes 7 minutes); Ex. B45 (Salad Dep.) at 49:1–7

(Asr and Maghrib take 10 minutes); Ex. B31 (I. Ibrahim Dep.) at 31:1–22 (Asr and Maghrib take

15–20 minutes).  See also Ex. H2 (Neb. Findings) at ¶ 39.

58.    Ablution (cleansing) is also required in connection with each prayer, and if

ablution is not preserved between prayers, it may take an employee a few additional minutes to

complete ablution along with his or her prayer.  Ex. B45 (Salad Dep.) at 47:11–48:3.  See also

Ex. H2 (Neb. Findings) at ¶ 39.

59.    Depending upon the time of year, prayer times may occur three times in one shift.

Ex. B38 (M. A. Mohamed Dep.) at 95:3–7; Ex. B3 (H. Abdi Dep.) at 23:15–24; Ex. D2 (F. Aden

Dep.) at 38:18–39:2.  See also Ex. H2 (Neb. Findings) at ¶ 36 (identical fact in Neb.).

60.    JBS's Muslim employees have differing beliefs regarding "prayer windows" –

i.e., the length of time that it is permissible to delay praying after a "required" prayer time has

passed – and their beliefs regarding prayer windows can vary depending upon the prayer.  See

Appendix A, attached hereto.  See also Ex. H2 (Neb. Findings) at ¶ 38 (noting similar variations

in beliefs regarding permissible prayer windows).

61.    For the Fajr prayer, beliefs range from no prayer window at all to a 30-minute

prayer window.  See, e.g., Ex. B31 (I. Ibrahim Dep.) at 32:7–18; Ex. B46 (Sanweyne Dep.) at

28:1–16.  See also Appendix A.

62.    For the Dhuhr prayer, beliefs range from no prayer window at all to a 90-minute

prayer window.  See, e.g., Ex. B29 (Hussein Dep.) at 52:23–53:6; Ex. B46 (Sanweyne Dep.) at

28:17–19.  See also Appendix A.

63.    For the Asr prayer, beliefs range from no prayer window at all to a 1-hour prayer window.  See, _e.g._, Ex. B32 (Issa Dep.) at 44:11–14; Ex. B46 (Sanweyne Dep.) at 28:20–22.  See also Appendix A.

64.    For the Maghrib prayer, beliefs range from no prayer window at all to a 2-hour and 15-minute prayer window.  See, _e.g._, Ex. B29 (Hussein Dep.) at 53:14–23; Ex. B46 (Sanweyne Dep.) at 29:2–4.  See also Appendix A.

65.    For the Isha prayer, beliefs range from no prayer window at all to a prayer window lasting 3–5 hours.  See, _e.g._, Ex. B32 (Issa Dep.) at 44:25–45:2; Ex. B4 (M. Abdi Dep.) at 37:3–11.  See also Appendix A.

## G.    EEOC's Proposed Accommodations for Ensuring "Timely" Prayers.

66.    The EEOC is "seeking an accommodation such that the Muslim employees at the Greeley facility can timely pray in accordance with their religious beliefs" and, according to the EEOC, "[t]his can be accomplished either by moving the scheduled break to coincide with the required prayer times or by allowing Muslim employees to leave the line for 10–15 minutes at their required prayer times as an unscheduled break."  Ex. F1 (EEOC's Supp. Resp.) at 6.

### Moving Scheduled Rest and Meal Breaks.

67.    Moving scheduled breaks to coincide with sunset prayers would mean break times would change every day and would change drastically over the course of the year.  Ex. G1 (Ramadan prayer times); Ex. B21 (Awale Dep.) at 32:5–7 (noting that prayer times change daily).

68.    If JBS moved breaks earlier in the shift to coincide with sunset prayer times, on some days JBS would be required by the terms of the CBA to provide a third break, as the

remaining time on the shift after the meal break would exceed three hours and forty-five minutes. Ex. A11 (Kitch Dep.) at 165:15–167:9; Ex. G2 (CBA) at 26 (internal page number).

69.     To optimize efficiency and save money, JBS coordinates scheduled breaks with grade changes, so that a grade change occurs during each scheduled break.  Ex. A23 (Skinner Dep.) at 199:17–25; Ex. E2 (Skinner Dec.) at ¶ 8(a); Ex. E1 (Donlon Aff.) at ¶ 7.  See also Ex. H2 (Neb. Findings) at ¶ 26 (identical facts in Neb. case).

70.     If JBS was required to coordinate scheduled breaks with Muslim prayer times instead of grade changes, some of the grade changes that used to take place during scheduled breaks would necessarily take place during production time (i.e., because scheduled breaks would no longer be coordinated with grade changes, employees would be standing idle on the line during a grade change).  Ex. E2 (Skinner Dec.) at ¶ 8(a).

71.     There can be 10–20 grade changes each shift.  Ex. A7 (Garcia Dep.) at 101:2-14.

72.     Assuming that a grade change takes 3 minutes, and 4 grade changes per day (2 on each shift) would no longer occur during scheduled breaks if those breaks are scheduled to coincide with prayer times (rather than a grade change), the result would be 12 minutes per day of lost production, or additional "downtime," as employees would be standing idle on the line during those 12 minutes.  At a cost of approximately $191 per minute, 12 minutes of downtime equates to $2,292 in lost production per day, or $595,920 annualized, per plant.  Ex. E2 (Skinner Dec.) at ¶ 8(a).  See also Ex. H2 (Neb. Findings) at ¶¶ 25, 26 (similar facts in Neb. case).

73.     If JBS was required to schedule breaks at precise prayer times, JBS would also lose the flexibility to coordinate a break with an equipment malfunction, which would also cost JBS money.  Ex. A23 (Skinner Dep.) at 92:14–93:8.

74.     When a meal break occurs early in a shift, employees get more tired and hungry by the end of the shift.  Ex. A20 (Schult Dep.) at 29:24–31:4; Ex. A13 (Lovell Dep.) at 160:7–25.

75.     Moving the break earlier hurts employee morale, as many employees prefer a late break, leaving less time between the last break and the end of the shift.  Ex. A22 (Shandley Dep.) at 38:15–39:6, 41:3–14.  See also Ex. H2 (Neb. Findings) at p. 39 (identical facts in Neb.).

76.     Some employees take medication during their meal breaks, and moving the break time upsets their medication schedule; during Ramadan 2008, when JBS moved the meal break two hours earlier than usual, these employees became irate.  Ex. C2 (Rodriquez Dep.) at 60:9–22.

**Allowing Unscheduled Breaks for Prayer.**

77.     When a person leaves a line for an unscheduled break, either someone needs to fill in for the absent employee, or the rest of the employees on the line must do the work of the absent employee.  Ex. A20 (Schult Dep.) at 118:9–17; Ex. B47 (Shube Dep.) at 88:13–15; Ex. B39 (M. W. Mohamed Dep.) at 92:4–6; Ex. D4 (A. Mohamed Dep.) at 44:24–45:11.  See also Ex. H2 (Neb. Findings) at p. 37 (identical facts in Neb.).

78.     When employees must do the work of an absent employee, they must work harder and faster and perform more repetitive motions, which increases the risk of injuries, including the risk that employees will cut themselves.  Ex. A2 (Danley Dep.) at 97:11–19; Ex. A18 (Rivera Dep.) at 52:11–53:4.  See also Ex. H2 (Neb. Findings) at ¶ 36 (similar facts in Neb. case).

79.     When employees must do the work of an absent employee, product quality suffers because the quality of the cuts decreases, especially when a line is running a difficult cut (which JBS supervisor Lisa Rivera estimates to be 65% of the time on her line).  Ex. A2 (Danley Dep.)

16

at 92:10–93:9; Ex. A18 (Rivera Dep.) at 55:3–56:19; Ex. A6 (Fritche Dep.) at 166:22–167:3.

See also Ex. H2 (Neb. Findings) at ¶ 36 (similar facts in Neb case.).

80.     When employees leave the line, sometimes meat is stacked for them to process

when they return, and when they hurry to process the stacked meat, quality suffers.  Ex. A2

(Danley Dep.) at 115:23–116:12; Ex. A11 (Kitch Dep.) at 206:11–207:6; Ex. A18 (Rivera Dep.)

at 100:19–25; Ex. B3 (H. Abdi Dep.) at 41:13–42:5; Ex. B20 (Ashkir Dep.) at 174:5–9.  See also

Ex. H2 (Neb. Findings) at ¶ 34 (identical facts in Neb. case).

81.     When employees must do the work of others absent from the line, morale

problems result.  Ex. A15 (Mortensen Dep.) at 66:10–69:2.  See also Ex. H2 (Neb. Findings) at ¶

36 (identical fact in Neb. case).

82.     Muslim employees admit that work becomes more difficult when someone is

absent from the line.  Ex. B42 (Nur Dep.) at 132:17–23; 133:8–13; Ex. B41 (Muse Dep.) at

99:20–23, 100:5–11; Ex. B16 (F. Ali Dep.) at 58:15–19 (admits it is twice as hard); Ex. B35 (S.

Jama Dep.) at 88:11–15; Ex. B3 (H. Abdi Dep.) at 68:11–17; Ex. B6 (Abdulkadir Dep.) at

62:16–23 (causes more pain in shoulders and hands); Ex. B31 (I. Ibrahim Dep.) at 70:21–71:8;

Ex. B23 (Bunow Dep.) at 86:25–87:4; 87:25–88:5; Ex. B20 (Ashkir Dep.) at 46:1–5; Ex. B19 (S.

Ali Dep.) at 105:1–5; Ex. B13 (Ahmed Dep.) at 83:15–23; Ex. B26 (Gurux Dep.) at 63:22–25;

Ex. B39 (M. W. Mohamed Dep.) at 92:4–6; Ex. B8 (N. Abdullahi Dep.) at 63:25–64:2.  See also

Ex. H2 (Neb. Findings) at p. 37 (identical facts in Neb. case).

83.     Employees have complained to Union representatives and JBS management that it

is unsafe when people leave the line because the remaining employees have to do extra work and

can get hurt.  Ex. C2 (Rodriquez Dep.) at 43:21–44:15; Ex. A13 (Lovell Dep.) at 64:6–23.

84.     In some positions, the employees remaining on the line simply cannot do the work of the absent employee, and another person has to fill in; if another person does not fill in, meat falls off the line and onto the floor.  Ex. B1 (Abade Dep.) at 60:5–18; Ex. B44 (Sahal Dep.) at 124:17–25; Ex. A7 (Garcia Dep.) at 111:9–16; Ex. D9 (Oman Dep.) at 59:21–62:3; Ex. B25 (Gelle Dep.) at 104:2–7; Ex. B39 (M. W. Mohamed Dep.) at 95:20–96:3; Ex. B3 (H. Abdi Dep.) at 40:8–10.  See also Ex. H2 (Neb. Findings) at ¶ 34 (similar facts in Neb. case).

85.     When Muslim employees take more unscheduled breaks for prayer, it can lead to non-Muslim employees asking for more unscheduled breaks.  Ex. A14 (Mejia-Madaleno Dep.) at 55:17–56:2; Ex. A19 (Rosalez Dep.) at 62:11–63:2, 168:11–13.

86.     If Muslims rotate off the line to pray, and there are multiple Muslims on the line, the last Muslim rotated off will likely miss his or her prayer time. Ex. B19 (S. Ali Dep.) at 107:19–22; Ex. A26 (Timejardine Dep.) at 94:24–95:6, 139:15–23; Ex. D10 (Omar Dep.) at 33:19–34:4.

87.     According to the EEOC, "[w]ith respect to the requirement that JBS allow Muslim employees to leave the line to pray during an unscheduled break, this must include ensuring that leads, supervisors, and trainers are available to cover while the Muslim employees take their prayer breaks."  Ex. F1 (EEOC's Supp. Resp.) at 6.

88.     Under the CBA, supervisors are prohibited from routinely performing bargaining unit work.  Ex. A11 (Kitch Dep.) at 59:23–60:5; Ex. A14 (Mejia-Madaleno Dep.) at 124:7–12; Ex. G2 (CBA) at 4 (internal page number).

89.     If a supervisor is filling in on the line for an employee on an unscheduled break, it prevents him or her from supervising others on the line.  Ex. A2 (Danley Dep.) at 118:1–22.  See also Ex. H2 (Neb. Findings) at p. 37 (identical facts in Neb. case).

18

90.     In 2008, on B shift, JBS had 56 leads and supervisors and 433 Muslim employees;
if all leads and supervisors filled in for Muslim employees during unscheduled prayer breaks,
and if each Muslim took a 15-minute break to leave the line to pray, and each Muslim required
two prayer breaks per shift, then leads and supervisors would not be doing their own jobs for 50
percent (or 4 hours) of their shift.[1]  Ex. E2 (Skinner Dec.) at ¶ 9(a).

91.     If leads and supervisors performed the work of absent Muslim employees, they
would be doing so at higher wages than JBS pays the Muslim employees to perform such work;
paying supervisors and leads to perform production line work at higher wages would cost an
extra $1,014 per shift, or $527,488 per year per plant.  Ex. E2 (Skinner Dec.) at ¶ 9(c).

92.     According to the EEOC, with respect to unscheduled breaks, JBS must also (1)
"make efforts not to concentrate Muslims on the same line," (2) make sure that employees are
cross-trained on the lines so that additional Muslim employees can leave the line at any given
time," and (3) allow employees "to cover for each other while they leave the line to pray."  Ex.
F1 (EEOC's Supp. Resp.) at 6.

93.     JBS estimates that, in order to avoid concentrations of Muslims on the same line,
a significant number of employees would need to be retrained to perform new jobs on different
lines, at a cost of more than $2 million.  Ex. E2 (Skinner Dec.) at ¶ 10(a).

94.     Training an employee to perform a new job may take several weeks, and JBS
estimates that it costs $5,000 to cross-train one employee to perform one additional job on a line.

---

[1] Notably, if 56 leads and supervisors were used to fill in for 433 Muslim employees taking
staggered prayer breaks, not all Muslim employees would be able to take a prayer break within
their desired prayer windows, as only 56 Muslims could be spelled off the line at a time.  Ex. E2
(Skinner Dec.) at ¶ 9(b).

Ex. E2 (Skinner Dec.) at ¶ 10(b); Ex. A21 (Schult 30(b)(6) Dep.) at 172:13–173:20; Ex. E1 (Donlon Aff.) at ¶ 16.

95.     In 2008, many employees were not cross-trained and were not able to fill in for Muslim employees wanting to take unscheduled prayer breaks.  Ex. A18 (Rivera Dep.) at 53:5–11.

96.     Cross-training does not change the fact that when one employee covers for another employee's unscheduled break, the production floor is still one person short – *i.e.*, the person covering for the absent employee has vacated his own position on the line in order to provide coverage for the absent employee.  Ex. E2 (Skinner Dec.) at  ¶ 10(c).

97.     Article 10, Section 13 of the CBA requires employees who are temporarily assigned to work in a position having a higher pay rate than their regular pay rate to be paid at the higher rate.  Ex. E2 (Skinner Dec.) at  ¶ 10(d); Ex. G2 (CBA) at 12 (internal page number).

98.     There are more than 270 different jobs in the fabrication area of the Greeley plant, with eight different wage rates.  Ex. E2 (Skinner Dec.) at ¶ 10(d); Ex. E1 (Donlon Aff.) at ¶ 15.

99.      JBS does not have a system for tracking each time a "cross-trained" employee covers for another worker on an unscheduled break and performs work in a job position with a higher wage rate, and developing and implementing such a system – if it were even technically feasible – would create an additional expense for JBS.  Ex. E2 (Skinner Dec.) at ¶ 10(d).

100.     Assuming that such a "job tracking" system were implemented, adopting the EEOC's "cross training" proposal would result in increased labor costs, since employees who are temporarily assigned to work in a job position having a higher pay rate would have to be paid at that rate.  Ex. E2 (Skinner Dec.) at ¶ 10(d); Ex. G2 (CBA) at 12 (internal page number).

20

**H.      Religious Accommodations Provided or Offered By JBS.**

101.    JBS allows employees to pray before and after shifts and during scheduled break

times in certain areas of the plant.  Ex. A8 (Gould Dep.) at 215:2–13 (can pray in locker rooms);

Ex. A20 (Schult Dep.) at 113:15–19, 131:14–17 (can pray anywhere outside of production area,

as long as area is safe); Ex. B31 (I. Ibrahim Dep.) at 87:11–18 (prayed in locker room); Ex. B38

(M. A. Mohamed Dep.) at 95:15–18, 99:24–101:5 (prayed in locker rooms and was never told of

areas in plant where prayer is prohibited); Ex. B43 (Ossoble Dep.) at 57:4–6; Ex. B2 (F. Abdi

Dep.) at 100:22–101:1; Ex. B17 (H. Ali Dep.) at 85:5–9; Ex. B15 (A. N. Ali Dep.) at 86:4–87:1

(prayed in locker room); Ex. B12 (N. Aden Dep.) at 44:9–14, 136:17–137:12, 141:20–23; Ex. B8

(Abdullahi Dep.) at 71:21–72:2; Ex. B9 (L. Adan Dep.) at 81:4–13; Ex. B10 (S. Adan Dep.) at

78:12–79:11 (prayed in locker room); Ex. B4 (M. Abdi Dep.) at 80:8–12; Ex. B6 (Abdulkadir

Dep.) at 74:9–15 (prayed in locker room); Ex. B45 (Salad Dep.) at 232:10–233:6; Ex. B29

(Hussein Dep.) at 77:2–9 (prayed before shift and during breaks); Ex. B39 (M. W. Mohamed

Dep.) at 101:24–103:3 (prayed in locker room); Ex. B20 (Ashkir Dep.) at 182:7–183:10 (prayed

in locker room during breaks and before and after shifts); Ex. B16 (F. Ali Dep.) at 39:4–9,

70:14–18; Ex. B3 (H. Abdi Dep.) at 21:23–22:3; Ex. D8 (Mume Dep.) at 72:1–6; Ex. D3 (W.

Farah Dep.) at 18:21–19:2.

102.    JBS also allows Muslim employees to break their fast during Ramadan by

drinking water from the water fountains that are near the production line.  Ex. A17 (Ray Dep.) at

55:16–19; Ex. D6 (M. J. Mohamud Dep.) at 111:23–112:7; Ex. D1 (Aaden Dep.) at 83:16–84:1;

Ex. A5 (Espinoza Dep.) at 141:1–6; Ex. G5 (Meeting notes) at 2.

103.    In 2008, JBS offered Muslim employees the option to transfer to A shift, which would allow Muslims to end their shifts before the time required for sunset prayers.  Ex. A8 (Gould Dep.) at 135:16–136:16; Ex. A20 (Schult Dep.) at 120:12–18.

104.    Prior to Ramadan 2009, JBS designated prayer rooms and created foot baths at the Greeley plant for Muslim employees to use.  Ex. A20 (Schult Dep.) at 116:17-117:8; Ex. D3 (W. Farah Dep.) at 102:17–23; Ex. A13 (Lovell Dep.) at 239:16–19.

**I.    Ramadan 2008 Events.**

105.    In 2008, Ramadan lasted from September 1 through September 30, with the sunset prayer time at the beginning of Ramadan occurring at 7:30 p.m., and the sunset prayer time at the end of the month occurring at 6:42 p.m.  Ex. G1 (Ramadan 2008 Prayer Times).

106.    On Tuesday, September 2, 2008, between 40 and 100 Somali Muslim employees on B shift approached Superintendent Juan Palacios and asked for a break at 7:30 p.m.  Ex. G3 (Email from Palacios); Compl. (Doc. 1) ¶ 29.

107.    Palacios denied their request but advised them to talk to Human Resources the next day.  Ex. G3 (Email from Palacios)

108.    On Wednesday, September 3, 2008, approximately 200 Somali Muslim employees congregated outside the plant before B shift until JBS "figured out something with the break."  Ex. A17 (Ray Dep.) at 98:1–9, 101:3–16, 106:12–16.

109.    Eric Ray, the plant's Human Resources Director, went outside to meet with the Somali Muslim employees, and he asked the crowd to designate a few people to talk to management.  Ex. A17 (Ray Dep.) at 103:19–25.

110.    Thereafter, approximately 5-7 Somali Muslim representatives met with JBS managers inside the plant.  Ex. A17 (Ray Dep.) at 110:5–15; Ex. A8 (Gould Dep.) at 109:16–111:1.

111.    During the meeting, the Somali representatives did not agree as to the amount of time they needed to pray or the appropriate window of time to pray following sunset.  Ex. A17 (Ray Dep.) at 120:4–121:1; Ex. A13 (Lovell Dep.) at 285:3–8.

112.    Nevertheless, JBS agreed to move the meal time that evening from approximately 9:15 p.m. to 7:30 p.m.  Ex. A8 (Gould Dep.) at 117:3–10; Ex. A17 (Ray Dep.) at 121:13–19; Compl. (Doc. 1) at ¶ 30.

113.    On Thursday, September 4, 2008, JBS's head of labor relations, Doug Schult, sent an email to the HR Directors at JBS's beef plants; he sought their input regarding the possibility of sliding breaks to coincide with sunset prayers.  Ex. G4 (Email from Schult) at 1; Ex. A20 (Schult Dep.) at 82:16–84:12.

114.    In his e-mail, Schult noted that in 2007 JBS was told by Somali Muslim representatives in Grand Island, Nebraska that prayers had to be completed within 45 minutes of sunset.  Ex.G4 (Email from Schult) at 1; Ex. A22 (Shandley Dep.) at 32:19–33:10.

115.    That same day, JBS met with the Somali Muslim representatives again and agreed to keep the meal break at 7:30 p.m. on Thursday and Friday.  Ex. A17 (Ray Dep.) at 127:21–128:1.

116.    Many non-Muslim employees were angry with the changed meal time and approximately 200 non-Muslims stayed at their work stations at 7:30 p.m. Thursday evening and refused to leave the line.  Ex. A8 (Gould Dep.) at 169:11–15; Ex. A17 (Ray Dep.) at 130:21–

23

131:5, 143:10–15; Ex. A9 (Hamilton Dep.) at 133:25–134:3; Ex. A20 (Schult Dep.) at 148:16–24.

117.     Many of the non-Muslim employees then left the line at approximately 9:15 p.m., and JBS had to run at a reduced chain speed because of their absence.  Ex. A8 (Gould Dep.) at 175:4–13; Ex. A23 (Skinner Dep.) at 42:3–5; Ex. A17 (Ray Dep.) at  136:3–8.

118.     On Friday, September 5, 2008, approximately 200 non-Muslims gathered outside the plant and indicated they would not return to work until the meal break time was moved back to the "normal time."  Ex. A17 (Ray Dep.) at 140:1–18; Ex. A8 (Gould Dep.) at 182:3–11.

119.     The non-Muslim employees complained that they did not like taking an early meal break, as it made the "back half" of their shift feel longer.  Ex. A17 (Ray Dep.) at 143:10–15; Ex. A27 (Walker Dep.) 75:23–76:12.

120.     Ray attempted to explain to the non-Muslim employees that the reason for moving the break was to accommodate Muslim employees.  Ex. A17 (Ray Dep.) at 146:9–17; Ex. A8 (Gould Dep.) at 169:1–4.

121.     The non-Muslims designated a few people to speak with JBS managers, and the rest of the group went back to work.  Ex. A17 (Ray Dep.) at 147:3–11; Ex. A8 (Gould Dep.) at 184:23–185:25.

122.     In the meeting, the non-Muslim representatives expressed that they felt the Somali Muslim employees had received preferential treatment.  Ex. A17 (Ray Dep.) at  153:1–10; Ex. A8 (Gould Dep.) at 191:25–192:13.

123.     As a compromise, JBS decided to move the meal break to 8:00 p.m.  Ex. A8 (Gould Dep.) at 196:10–197:5; Ex. A17 (Ray Dep.) at 166:20–167:8.

124.     That night, some Muslim employees left the line at 7:30 p.m., despite being told that the meal break was at 8:00 p.m.  Ex. A17 (Ray Dep.) at 172:2–8; Ex. A8 (Gould Dep.) at 202:14–203:17.

125.     At 8:00 p.m., as the meal break started, more employees filtered into the cafeteria; some employees became upset and unruly, and some Muslim employees stood on tables and began shouting.  Ex. A17 (Ray Dep.) at 179:18–180:15; Ex. A27 (Walker Dep.) at 81:14–83:7.

126.     Near the end of the meal break, a large group of Somali Muslim employees left the cafeteria and went outside.  Ex. A17 (Ray Dep.) at 182:6–184:5; Ex. A27 (Walker Dep.) at 86:14-23.

127.     The Somali Muslims gathered outside the plant and stayed there until approximately 11:00 p.m., at which time JBS told them to leave the premises.  Ex. A17 (Ray Dep.) at 190:24–191:17; Ex. A8 (Gould Dep.) at  223:17–225:22.

128.     Due to the disruptions, JBS had to run the plant that day at a reduced chain speed. Ex. A8 (Gould Dep.) at 186:12–20; Ex. A3 (DeGarcia Dep.) at 177:14–23.

129.     On Saturday September 6, Doug Schult, head of beef David Colwell, head of human resources Jack Shandley, plant manager Ron Gould, vice president Sergio Sampaio, and general counsel Chad Hamilton, met and decided to request another meeting with the leaders of the Somali Muslim employees to try to understand the issues in more detail and to convey the impact of the prior week's events on the entire workforce.  Ex. A20 (Schult Dep.) at 73:11–78:6; Ex. A8 (Gould Dep.) at 234:3-19.

130.     JBS had questions about the permissible prayer window after sunset because JBS had been told in 2007, by the Council on American-Islamic Relations, that employees had a 45-

minute window in which to pray and that prayers should take only 10 minutes.  Ex. A20 (Schult

Dep.) at 169:14–170:12; Ex. H2 (Neb. Findings) at ¶ 43.

131.    On Monday morning, September 8, 2008, Somali representatives and Union

representatives met with Gould, Ray, Schult, and other JBS managers.  Ex. G5 (Meeting notes).

132.    In the meeting, JBS confirmed that employees could pray at the plant during

scheduled breaks, and it informed the Somali Muslim representatives that the Somali Muslim

employees who had left the plant on Friday evening were suspended pending further

investigation.  Ex. A8 (Gould Dep.) at 226:23–227:9; Ex. A20 (Schult Dep.) at 94:6–14, 130:21–

131:6.

133.    JBS considered the work stoppage a terminating offense under Article 8 of the

CBA, but wanted the Somali Muslims to return to work.  Ex. A20 (Schult Dep.) at 100:16–

101:14.

134.    On Tuesday morning, September 9, 2008, JBS officials and the Somali

representatives met again to discuss prayer accommodations.  Ex. G5 (Meeting notes) at 2.

135.    JBS asked how many minutes after sunset the employees had as a "window" to

accomplish their prayer, and the Somali representatives would not provide an answer.  Ex. G5

(Meeting notes) at 2; Ex. A20 (Schult Dep.) at 112:10–25.

136.    JBS management left the meeting believing that the Somali Muslims did not

believe in any window after sunset, and that the prayer must occur exactly at sunset.  Ex. A20

(Schult Dep.) at 171:15–18; Ex. A8 (Gould Dep.) at 133:21-134:6.

137.    At the end of the meeting, the Somali representatives and the Union told JBS that

Somali Muslim employees who were not at work were at a nearby park.  Ex. G5 (Meeting notes)

at 3; Ex. A8 (Gould Dep.) at 263:15–21.

26

138.    JBS asked the Union and Somali representatives to talk to the group at the park and tell them to return to work on that day, September 9, 2008, which the Union and Somali representatives agreed to do.  Ex. A8 (Gould Dep.) at 266:6–8, 274:5–12; Ex. A20 (Schult Dep.) at 103:4–12; Ex. C2 (Rodriquez Dep.) at 70:5–72:18.

139.    Thereafter, Schult sent the Union an email confirming that JBS would treat the time lost during the work stoppage as a suspension, if the employees returned to work that evening, but that employees would be terminated if they did not return to work at some point during the shift on September 9, 2008.  Ex. G6 (Email from Schult); Ex. A20 (Schult Dep.) at 105:16–106:9.

140.    Those employees who did not return to work on Tuesday, September 9, were terminated on Wednesday, September 10, 2008, although JBS managers met with some Somali Muslims who had not returned on Tuesday and did allow them to return to work.  Ex. A17 (Ray Dep.) at 281:19–283:7; Ex. A20 (Schult Dep.) at 107:2–12, 107:16–108:5.

141.    The events leading to the mass termination of Somali Muslims at the Greeley plant are nearly identical to the events leading to the mass termination of Somali Muslims at JBS's plant in Grand Island, Nebraska.  Ex. H2 (Neb. Findings) at ¶¶ 48–66.

142.    On September 12, 2008, Schult asked Corporate Controller Heather Skinner to calculate the cost of an additional 10-minute break; she calculated that it would cost $18,180 per day per plant.  Ex. G7 (Email from Skinner); Ex. A23 (Skinner Dep.) at 47:20–48:23.  See also Ex. H2 (Neb. Findings) at ¶ 26 (noting identical figure in Neb. case).

143.    For the month of September 2008, the B shift fabrication department experienced an overall decrease in chain speed efficiency of 15–20 percent.  Ex. A12 (Lathrop Dep.) at 226:4–15; Ex. G9 (Production Reports) at 3.

27

## ARGUMENT

I.    **COLLATERAL ESTOPPEL BARS THE EEOC FROM RELITIGATING ISSUES DECIDED IN THE NEBRASKA CASE.**

Collateral estoppel bars a party from relitigating issues decided in a prior action when:

(1) the issue previously decided is identical [to] the one presented in the [present] action, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

B-S Steel of Kan., Inc. v. Tex. Indus., Inc., 439 F.3d 653, 662 (10th Cir. 2006).[2]  Here, collateral estoppel bars the EEOC from arguing that providing unscheduled breaks for prayer and moving scheduled breaks to sundown are non-burdensome accommodations capable of supporting its Phase I reasonable accommodation claim.  The district court in Nebraska has already determined that – under nearly identical conditions at JBS's Grand Island plant – such proposed accommodations impose more than *de minimis* burdens on JBS and its non-Muslim employees. See Statement of Undisputed Material Facts (hereinafter "Facts"), supra, at ¶ 9.  Collateral estoppel also bars the EEOC from asserting that its pattern or practice discrimination and retaliation claims can be based on a one-time decision to terminate, *en masse*, Somali Muslim workers engaged in a work stoppage.  The district court in Nebraska confronted this issue in relation to the mass termination of Somali Muslim employees at JBS's Grand Island plant, and ruled that, as a matter of law, such a one-time event cannot support a pattern or practice claim. Id. at ¶ 8.  Indeed, with respect to these issues, all four of the requirements for the application of collateral estoppel are met.

---

[2] Collateral estoppel is more accurately called mutual defensive collateral estoppel when it is applied "against the Government to preclude relitigation of the same issue already litigated against the same party in another case involving virtually identical facts."  United States v. Stauffer Chem. Co., 464 U.S. 165, 169 (1984).

The issues decided in Nebraska and identified above are identical to the issues to be decided in this case.  See Tex. Indus., 439 F.3d at 662 (first requirement for application of collateral estoppel is that "the issue previously decided is identical [to] the one presented in the [present] action").  Notably, collateral estoppel does not require "total identity" of the facts in the prior and subsequent litigation.  Restatement (2d) of Judgments § 27, cmt. c. (1980) (collateral estoppel may apply even when "there is a lack of total identity between the particular matter presented in the second action and that presented in the first"); Stauffer Chem. Co., 464 U.S. at 172 (applying collateral estoppel where difference in facts among two cases had "no legal significance").  When determining whether issues in two separate proceedings are the same, a court should examine a number of factors:

> Is there a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first?  Does the new evidence or argument involve application of the same rule of law as that involved in the prior proceeding?  Could pretrial preparation and discovery relating to the matter presented in the first action reasonably be expected to have embraced the matter sought to be presented in the second?  How closely related are the claims involved in the two proceedings?

Tex. Indus., 439 F.3d at 663 (*quoting* Restatement (2d) of Judgments § 27, cmt. c.).

The evidence and arguments in this case substantially overlap and are substantially similar to the evidence and arguments presented in the EEOC's Nebraska case.  In both cases, the EEOC asserts that JBS has failed to provide Somali Muslim employees with religious prayer accommodations by (1) failing to move scheduled break times to coincide with Muslim prayer times, and (2) failing to provide unscheduled breaks for Somali Muslim employees who want to leave the production line to pray at a required prayer time.  See Facts at ¶ 4.  In both cases, JBS has asserted an undue hardship defense, arguing that it has not failed to provide Somali Muslim employees with reasonable prayer accommodations because the accommodations proposed by

29

the EEOC will impose more than *de minimis* burdens on JBS and its non-Muslim employees.
See Facts at ¶ 9; Argument, Section II.A.3–II.B, infra.  These identical allegations and defenses
rely on nearly identical evidence, as the operations at the Greeley and Grand Island beef plants
are almost identical, the number of Muslim employees working at each plant is substantially
similar, the variations in Muslim religious beliefs are the same at both plants, and the evidence
concerning the burdens that would be imposed by the EEOC's proposed accommodations is
virtually identical.  See Facts at ¶¶ 11–20, 22–25, 27, 29–30, 34–35, 38–42, 44–46, 48–60, 69,
72, 75, 77–82, 84, 89, 142.  The arguments and evidence concerning the EEOC's pattern or
practice retaliation and discrimination claims are also virtually identical in both this case and the
Nebraska case.  See Ex. H4 (Neb. SJ Order) at 37–41; Argument, Section III, infra; Ex. H2 (Neb.
Findings) at ¶¶ 48–66; Facts at ¶¶ 105–141.

In addition, the rules of law are substantially the same in both proceedings.  Indeed, there
is no appreciable difference between the law and legal precedent governing this case and the law
and legal precedent applied by the district court in the Nebraska case.  Compare Ex. H2 (Neb.
Findings) at pp. 27–39 and Argument, Section II–III, infra.

Pretrial proceedings and discovery have also overlapped to a substantial degree.  See,
e.g., Ex. A20 (Schult Dep.) at 82:16–83:7 (wherein EEOC's counsel questions JBS management
witness about document produced only in Nebraska case); Ex. H6 (Sampaio Dep.) at 72:10–
73:10 (wherein EEOC attorney William Moench, representing the EEOC in this case but not in
the Nebraska case, attended a deposition in the Nebraska case and questioned the witness about
events occurring at the Greeley plant); Ex. H3 (EEOC Brief in Opposition to Motion for
Summary Judgment in Neb. case) at 98 (noting that EEOC's pre-suit conciliation efforts
involved "both JBS's Greeley and Grand Island plants"), 121–123 (citing Ramadan 2008 events

30

occurring in Greeley as "material facts" in Grand Island case), 158 n.8 (noting with approval that Nebraska district court "has cited decisions in [this] parallel Colorado proceeding" because this case involves "facts, claims, and parties virtually identical to those [in Nebraska]"), 165–66 (arguing that "joint conciliation efforts" conducted by the EEOC for this case and Nebraska case were sufficient to satisfy conditions precedent to filing suit because the "*court in the parallel Colorado proceeding*" already determined that the conciliation efforts were carried out in good faith) (emphasis in original), 185–86 (arguing that mass termination of Somali Muslim employees in Grand Island constituted a "pattern or practice" of disparate treatment "when viewed in the context of Defendant's multiple decisions to terminate eighty or more Somali Muslims at its Greeley, Colorado facility in the prior week *in almost exactly the same circumstances*") (emphasis in original).  As demonstrated above, the EEOC itself has treated the claims in Nebraska and Colorado as closely related, going so far as to file the Complaints in both cases on the same day and refer to the cases as "parallel proceedings" and "sister litigation."  See Facts at ¶¶ 1, 7.  The first requirement for the application of collateral estoppel has been satisfied.

The remaining three requirements for the application of collateral estoppel have also been met:  (1) the district court in Nebraska has entered final judgment on all of the EEOC's Phase I pattern or practice claims,[3] (2) the EEOC is the plaintiff in both actions, and (3) the EEOC had a full and fair opportunity to litigate the issues in the Nebraska action.  See Facts at ¶¶ 8–10.  See also Tex. Indus., 439 F.3d at 662.

---

[3] The EEOC has appealed the Nebraska court's decision to the Eighth Circuit Court of Appeals. The appeal does not render the district court's decision non-final.  See Ruyle v. Cont'l Oil Co., 44 F.3d 837, 846 (10th Cir. 1994) (pendency of appeal does not prevent application of collateral estoppel unless appeal involves a full trial *de novo*).

Accordingly, collateral estoppel bars the EEOC from asserting that its pattern or practice discrimination and retaliation claims can be based on a one-time decision to terminate, *en masse*, Somali Muslim workers.  The Nebraska district court has already addressed the same argument in relation to an identical mass termination of Somali Muslim employees at JBS's Grand Island plant and has ruled that, as a matter of law, such a one-time event *cannot* support a pattern or practice claim.[4]  Facts at ¶ 8.  With relitigation of this issue being collaterally estopped, the EEOC's pattern or practice retaliation and discrimination claims must be dismissed.

Likewise, collateral estoppel bars the EEOC from asserting that providing unscheduled prayer breaks and moving scheduled breaks to or near sundown are non-burdensome accommodations capable of supporting its pattern or practice claim.  The Nebraska district court has already determined that, under circumstances identical to those presented here, such proposed accommodations impose more than *de minimis* burdens on JBS and its non-Muslim employees.  Facts at ¶ 9.  To the extent the EEOC attempts to sustain its reasonable accommodation claim based on these proposed accommodations, the claim must be dismissed.  As noted below, even if the EEOC attempts to base its reasonable accommodation claim on issues that are not collaterally estopped – such as JBS's alleged failure to provide Muslim employees with a place to pray – its claim must still be dismissed.  See Argument, Section II.C, infra.

## II.    THE EEOC'S RELIGIOUS ACCOMMODATION CLAIM FAILS AS A MATTER OF LAW.

The EEOC alleges that JBS engaged in a pattern or practice of:  (1) denying Muslim employees the ability to pray at or near sundown during Ramadan 2008 – which, according to

---

[4] Collateral estoppel bars relitigation of issues of fact *and* issues of law.  See Stauffer  Chem. Co., 464 U.S. at 171.

EMPLOY/1103846.1

the EEOC, could have been accommodated by moving scheduled breaks to "required prayer times" near sundown or by allowing Muslim employees to leave the line on unscheduled breaks "for 10–15 minutes at their required prayer times;" (2) denying Muslim employees unscheduled bathroom breaks (to be used for prayer); (3) denying Muslim employees the ability to take breaks after sundown during Ramadan 2008, so as to end their fasts; and (4) failing to provide Muslim employees with a place to pray, forcing them to pray on bathroom floors.  See Bifurcation Order at 13; Ex. F1 (EEOC's Supp. Resp.) at 6.

As discussed above, collateral estoppel bars the EEOC from relitigating the first three issues, as the Nebraska district court has already determined that requiring JBS to permit unscheduled breaks (whether called prayer breaks or bathroom breaks) imposes more than *de minimis* costs on JBS and its non-Muslim employees, as would requiring JBS to schedule breaks at sundown.  Even if collateral estoppel does not apply, and assuming, *arguendo*, that the EEOC can show that JBS's managers and supervisors responded to accommodation requests in a manner that was sufficiently uniform to be deemed a "pattern or practice," the EEOC cannot show that JBS *unlawfully* denied accommodation requests from its Muslim employees.  See Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 360 (1977) (holding that, in pattern or practice case, plaintiff must show that "*unlawful* discrimination has been a regular procedure or policy followed by an employer") (emphasis added); Bifurcation Order at 13 (noting that in Phase I, issues to be decided include whether "defendant routinely and *unlawfully* denied" accommodation requests) (emphasis added).

An employer's refusal to implement a proposed religious accommodation is only "unlawful" if the employer failed to offer some other reasonable accommodation.  Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 68 (1986) (plaintiff cannot maintain failure to accommodate

33

claim if employer does, in fact, offer a reasonable accommodation).  Even then, failure to

implement the proposed accommodation is only unlawful if (1) the proposed accommodation is,

in fact, reasonable, and (2) the accommodation can be implemented without undue hardship.

EEOC v. Abercrombie & Fitch Stores, Inc., 731 F.3d 1106, 1122 (10th Cir. 2013) (employer

need not provide accommodation that would be unreasonable or that would create undue

hardships).  The EEOC's religious accommodation claim fails because JBS offered reasonable

accommodations for all of the religious needs identified above.  To any extent JBS did not offer

"reasonable" accommodations, the EEOC has not identified any accommodations that are any

more "reasonable" and, in fact, the only accommodations proposed by the EEOC are

unreasonable because they cannot be implemented without imposing undue hardships on JBS

and its non-Muslim employees.

> **A.    JBS Did Not Unlawfully Deny Muslim Employees the Ability to "Timely
> Pray in Accordance With Their Religious Beliefs**."

The EEOC alleges that, in two ways, JBS denied Muslim employees the ability to "timely

pray in accordance with their religious beliefs."  Ex. F1 (EEOC's Supp. Resp.) at 6.  First, JBS

allegedly denied Muslim employees the ability to pray at or near sundown during Ramadan 2008

– which, according to the EEOC, could have been accommodated by moving breaks to "required

prayer times" near sundown or by allowing Muslim employees to leave the line on unscheduled

breaks "for 10-15 minutes at their required prayer times."  See Bifurcation Order at 13; Ex. F1

(EEOC's Supp. Resp.) at 6.  Second, JBS has allegedly denied Muslim employees the ability to

pray at or near other "required prayer times" by denying them unscheduled "bathroom" breaks

(which apparently would be used for prayer).  Bifurcation Order at 13.  These allegations cannot

support the EEOC's reasonable accommodation claim.

      1.      <u>JBS Provided Reasonable Accommodations for Employees to Pray At or
Near Their Required Prayer Times.</u>

As noted above, a plaintiff cannot maintain a failure to accommodate claim if the
employer does, in fact, offer a reasonable accommodation.  Here, JBS *did* provide reasonable
accommodations that allowed Muslim employees to pray "at or near" their "required prayer
times," including at or near sundown during Ramadan 2008.  Specifically, JBS has always
permitted Muslim employees to pray at the plant at least two times during each shift (during
scheduled rest and meal breaks), as well as before and after each shift, and this was specifically
reiterated to Somali Muslim representatives during Ramadan 2008.[5]  Facts ¶¶ 101, 132.

While these four daily prayer opportunities do not necessarily coincide perfectly with
Islamic prayer times or the various "prayer window" beliefs of all Muslim employees on every
day of the year, these scheduled breaks and shift changes occur *reasonably* close to Islamic
prayer times and, given the production constraints at the plant, that is all that JBS is required to
provide.  <u>See</u> <u>Sturgill v. United Parcel Serv., Inc.</u>, 512 F.3d 1024, 1030 (8th Cir. 2008) (not all
conflicts between work and religion need to be eliminated in order for accommodation to be
reasonable because "[w]hat is reasonable depends on the totality of the circumstances and
therefore might, or might not, require [total] elimination of a particular [work-religion]
conflict"); <u>United States v. Albuquerque</u>, 545 F.2d 110, 114 (10th Cir. 1976) ("reasonable
accommodation" is a relative term and reasonableness depends on facts and circumstances of
each case); Ex. I1 (Order in <u>Daud v. Gold'n Plump Poultry, Inc.</u>) at ¶¶ 71–89 (accommodation
allowing Muslim employees to pray during scheduled breaks was reasonable, even though the
breaks would not occur at the ideal time for all Muslim employees).

---

[5] In 2008, JBS also offered Muslim employees the option to transfer to A shift, which would
have allow them to end their shifts before the time required for sunset prayers.  Facts at ¶ 103.

Indeed, given wide variations in Muslim beliefs regarding the time required to perform each prayer and the length of the permissible prayer window for each prayer (see Facts at ¶¶ 57–58, 60–65), allowing employees to pray during regularly scheduled breaks and at shift changes is the *only* reasonable, non-burdensome accommodation possible.  See Argument, Section II.A.2–II.A.3, infra.  In fact, this accommodation *satisfies the EEOC's request for relief – an accommodation that allows Muslim employees to pray at or near their required prayer times.*  See Bifurcation Order at 13.  It is immaterial that such accommodations are not the precise accommodations the EEOC is now seeking – *i.e.*, unrestricted and unscheduled bathroom/prayer breaks or scheduled breaks to coincide with sundown.  See EEOC v. Firestone Fibers & Textiles Co., 515 F.3d 307, 312–13 (4th Cir. 2008) (noting the well-established rule that "the employer need not provide the employee with his or her preferred accommodation"); Lee v. ABF Freight System, Inc., 22 F.3d 1019, 1022 (10th Cir. 1994) ("Title VII does not guarantee . . . that the employee will be given the accommodation of his choice.").

Because JBS has provided Muslim employees with opportunities to pray near "required" prayer times, the EEOC cannot show that JBS engaged in a pattern or practice of denying Muslims the ability to "timely pray in accordance with their religious beliefs."  See Ansonia, 479 U.S. at 68 ("[Title VII] directs that any reasonable accommodation by the employer is sufficient to meet its accommodation obligation" and "[t]hus, where the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end").

2.     The EEOC's Proposed Accommodations Are Unreasonable.

To the extent the EEOC alleges that allowing Muslim employees to pray during scheduled breaks and before and after their shifts is not a "reasonable" accommodation, it cannot show that its proposed accommodations are any more "reasonable."  In fact, the EEOC's

proposed alternative accommodations are *un*reasonable, as they raise problems that are not implicated by JBS's practice of allowing prayers during scheduled breaks and at shift changes.

In particular, allowing Muslim employees to relieve each other for unscheduled prayer breaks is unworkable because, on a production line with multiple Muslim employees, relieving one or two employees at a time necessarily causes some Muslim employees to miss their "required" prayer times. Facts at ¶ 22, 86. Many lines at the plant have four or more Muslim employees working together, with just one supervisor. Id. at ¶¶ 22, 31; Ex. G8 (Sept. 23, 2008 Ray email). If one employee at a time leaves the line to pray, with the supervisor filling in, and each employee takes 15 minutes to leave the line, remove protective equipment, perform ablution, pray, put back on protective equipment, and then return to work on the line (see Facts at ¶¶ 24–26, 47, 57–58), the fourth Muslim on the line will be leaving the line 45 minutes after the initial prayer time. If this Muslim employee believes in anything less than a 45-minute prayer window, this accommodation will not satisfy his or her prayer needs. Indeed, if the *second* Muslim leaving the line believes in anything less than a 15-minute prayer window, he or she will not be able to pray on time. JBS, in fact, has many lines on which several Muslims work together, and many Muslims at the plant believe that prayers must be done at the precise time they are due – *i.e.*, there is *no* prayer window at all. Id. at ¶¶ 22, 60–65; Ex. G8 (Sept. 23, 2008 Ray email). It is, therefore, impossible to articulate any unscheduled prayer break procedure that could reasonably accommodate all, or even most, of JBS's Muslim employees.[6]

---

[6] Staggered rest and meal breaks scheduled to coincide with sundown would be unreasonable for the same reason that unscheduled prayer breaks would be unreasonable – *i.e.*, Muslim employees who cannot begin their breaks at the beginning of the staggered break process will miss their "required" prayer times, unless they happen to believe in a lengthy prayer window. Facts at ¶¶ 22, 86. If the rest or meal breaks were scheduled as mass breaks so that all Muslims could pray

37

If, instead of granting unscheduled prayer breaks, JBS were required to schedule meal breaks or rest breaks to coincide with sundown (either as mass or as staggered breaks), JBS would have to violate the CBA during some portions of the year and/or incur the cost of providing employees with a third (paid) break during the shift.  See Argument, Section II.A.3, infra.  Such accommodations are not reasonable.  Lee, 22 F.3d at 1023 (noting that "Title VII does not require an employer to violate a valid labor agreement to accommodate an employee" and noting that accommodations resulting in lost efficiency and extra costs are not required). See also TWA v. Hardison, 432 U.S. 63, 75 (1977) (noting that reasonableness is a separate inquiry from undue hardship, but the two issues often overlap).

Because the EEOC cannot show that its proposed accommodations are reasonable (and certainly not any more reasonable than the accommodations already provided by JBS), it cannot show that JBS unlawfully denied Muslim employees the ability to "timely pray in accordance with their religious beliefs."  Abercrombie, 731 F.3d at 1122 (no liability for failure to accommodate where employer cannot reasonably accommodate religious needs); Hennagir v. Utah Dep't of Corr., 587 F.3d 1255, 1265 (10th Cir. 2009) (in disability case alleging failure to accommodate, employee must show reasonable accommodations were possible).

3.    The EEOC's Proposed Accommodations Would Impose Undue Hardships on JBS and Its Non-Muslim Employees.

Employers are not required to provide accommodations that create an undue hardship. Abercrombie, 731 F.3d at 1122.  An undue hardship is one that "require[s] [an employer] to bear more than a *de minimis* cost."  TWA, 432 U.S. at 84.  A proposed accommodation that imposes more than a *de minimis* imposition on co-workers is also an undue hardship.  Id. (undue hardship

---

at or near the required prayer time, JBS would be required to endure several undue hardships, rendering the mass breaks unreasonable as well.  See Argument, Section II.A.3, infra.

38

existed where proposed accommodation would have "deprived [a co-worker] of his contractual rights under [a] collective bargaining agreement"); <u>Lee</u>, 22 F.3d at 1023 ("Reasonable accommodation does not mean that 'an employer must deny the shift and job preference of some employees . . . in order to accommodate or prefer the religious needs of others.'"); <u>Eversley v. MBank Dallas</u>, 843 F.2d 172, 176 (5th Cir. 1988) ("An accommodation that would force other employees, against their wishes, to modify their work schedules to accommodate the religious beliefs of the complaining employee would be unreasonable and an undue hardship."); <u>Farah v. A-1 Careers</u>, 2013 U.S. Dist. LEXIS 164930, *21–25 (D. Kan. 2013) (proposed prayer accommodations would have disrupted co-workers, creating an undue hardship). <u>See</u> <u>also</u> Ex. H2 (Neb. Findings) at pp. 32–33 (citing cases). As explored below, the EEOC's proposed accommodations create more than *de minimis* burdens for JBS and its non-Muslim employees.

<p style="text-align:center;">a. *Moving Breaks to Coincide with Sunset Creates Undue Hardships.*</p>

Moving breaks to coincide with sundown would create more than *de minimis* burdens for JBS and its non-Muslim employees. With respect to the burdens on JBS, scheduling rest and meal breaks to coincide with sundown would result in the Greeley plant operating less efficiently. To optimize efficiency and save money, JBS schedules rest and meal breaks to coincide with grade changes, so that a grade change occurs during each scheduled break. Facts at ¶ 69. If JBS were required to schedule break times to coincide with prayer times instead of grade changes, some of the grade changes that used to take place during scheduled breaks would take place during production time (*i.e.*, employees would be standing idly on the line during a grade change). <u>Id.</u> at ¶ 70. Assuming that a grade change takes 3 minutes, and that 4 grade changes that occur per day (2 on each shift) would no longer occur during scheduled breaks if those breaks are scheduled to coincide with prayer times instead, the result is 12 minutes per day

<div style="text-align:center;">39</div>

of lost production, or additional "downtime," as employees would be standing idle on the line

during those 12 minutes.  Id. at ¶ 72. Twelve minutes of downtime, at a cost of approximately

$191 per minute, equates to $2,292 in lost production per day, or $595,920 annualized, per plant.

Id.  If breaks were set for exact times, JBS would also lose the flexibility to coordinate a break

with an equipment malfunction, which would also cost JBS money.  Id. at ¶ 73.  These costs are

more than de minimis.  Lee, 22 F.3d at 1023 (lost efficiency and increased costs that are more

than de minimis are undue hardships).

Additional burdens occur if the sundown breaks are mass breaks.  Mass breaks create

food safety hazards because, when meat is left on the production line during a mass break, work

tables cannot be cleaned and sanitized as they normally would be on a staggered break, and

bacteria can grow on the meat that is left sitting on the line.  Facts at ¶ 49–51; Ex. H2 (Neb.

Findings) at pp. 38–39.  Also, because production completely stops during a mass break, cattle

may stay on the slaughter floor beyond the USDA's 45-minute limit, requiring JBS to classify

the cattle as "distressed."  Facts at ¶ 52.  Beef from distressed cattle is about half as valuable as

beef from undistressed cattle, and this loss in revenue would pose an undeniable hardship on

JBS.  Facts at ¶ 53; Ex. H2 (Neb. Findings) at p. 38.

If JBS were required to schedule meal or rest breaks to coincide with sundown (either as

mass breaks or as staggered breaks), JBS would have to violate the CBA during some portions of

the year and/or incur the cost of providing employees with a third (paid) break during the shift.

For example, on September 30, 2008, the final day of Ramadan, sundown occurred at 6:42 p.m.

Facts at ¶ 105.  If, on that day, JBS had delayed giving employees a scheduled rest break until

6:42 p.m., JBS would have violated the CBA, which requires JBS to grant employees a

scheduled rest break within the first three hours of their shifts.  Id. at ¶ 34.  See also Facts at ¶ 11

(noting that B shift usually lasts from 3:00 p.m. to 11:30 p.m.).  Such an accommodation would create an undue hardship.  Lee, 22 F.3d at 1023 ("Title VII does not require an employer to violate a valid labor agreement to accommodate an employee.").

Alternatively, if JBS had provided a rest break early enough in the shift to comply with the CBA, and then scheduled a meal break to coincide with sunset at 6:42 p.m., JBS would have been required to grant some or all B shift employees a third (paid) break in the latter half of their shift.  Id. at ¶ 34, 68.  This is because the CBA requires JBS to provide a paid rest break to any employee who "work[s] in excess of three and one half (3½) hours without a meal or rest period[,] unless three and three fourths (3¾) hours complete the workday."  Id.  If employees began a 30-minute meal break at 6:42 p.m. and completed it at 7:12 p.m., the employees would have been required to work 4 hours and 18 minutes between their meal break and the end of B shift, and JBS would have been required by the CBA to grant the employees a third (paid) break during that time.  Id.  These third breaks result in lost production time *and* additional wage payments for non-productive break time, both of which constitute undue hardships.  Lee, 22 F.3d at 1023 ("Any cost in efficiency or wage expenditure that is more than *de minimis* constitutes undue hardship.").

With respect to the hardships on non-Muslim employees, early meal breaks cause employees to be more tired and hungry by the end of the shift, and many employees prefer a late break, so as to leave less time between the last break and the end of the shift.  Facts at ¶¶ 74–75; Ex. H2 (Neb. Findings) at p. 39.  Some employees also time their medication to be taken during their meal break, and a meal break that slides to coincide with sunset upsets their medication schedules.  Facts at ¶ 76.  Mass breaks are also unpopular with employees because locker rooms, restrooms and cafeteria facilities are not large enough to handle all of the employees on a shift at

41

once.  Id. at ¶ 54; Ex. H2 (Neb. Findings) at p. 39.  JBS is not required to ignore these issues in

order to accommodate Muslim employees.  Lee, 22 F.3d at 1023 ("Reasonable accommodation

does not mean that 'an employer must deny the shift and job preference of some employees . . .

in order to accommodate or prefer the religious needs of others.'"); Eversley, 843 F.2d at 176

("An accommodation that would force other employees, against their wishes, to modify their

work schedules to accommodate the religious beliefs of the complaining employee would be

unreasonable and an undue hardship."); Brener v. Diagnostic Center Hosp., 671 F.2d 141, 147

(5th Cir. 1982) (cautioning that courts should not underestimate the actual imposition of a

religious accommodation on other employees, or the resulting harm caused by lowered morale.).

Indeed, the "more than *de minimis*" burdens that moving the meal break would impose on

JBS and non-Muslim employees are clearly illustrated by the events of Ramadan 2008.  When

word spread that JBS agreed to move the meal break to 7:30 p.m. for a few days, a large group of

non-Muslim employees refused to work, causing B shift production to run at a substantially

reduced chain speed.  Facts at ¶¶ 116–117.  Moving the meal break substantially disrupted

operations at the plant, lowered morale among non-Muslim workers, and caused JBS to incur

significant costs from lost production.  Moving the breaks on a near daily basis to accommodate

Muslim prayer practices is simply unworkable.

> ### b.  Allowing Hundreds of Employees to Take Breaks At or Near "Required Prayer Times" Creates Undue Hardships.

In 2008, more than 400 Muslim employees worked on B shift, and many of them worked

on a line with several other Muslim employees.  Facts at ¶ 22; Ex. G8 (Sept. 23, 2008 Ray

email).  Allowing all Muslim employees to leave their positions on a daily basis (and as often as

three times per shift) for unscheduled breaks within a small window of time would have created

(and would still create) undue hardships for JBS and its non-Muslim employees.[7]  Facts at ¶¶ 77–100; Ex. H2 (Neb. Findings) at pp. 34–38.

First, unscheduled prayer breaks negatively affect production.  JBS "crews" its shifts by calculating the appropriate number of employees to work on a line at a particular chain speed.  Facts at ¶ 27.  When an employee leaves a line and another employee is not available to fill in, the crewing on the line is disrupted.  Allowing *hundreds* of Muslim employees to leave their lines within a short window of  time would create "a substantial financial burden on JBS by [requiring a] slowing [of] the production chain."  Ex. H2 (Neb. Findings) at p. 36.  See also Lee, 22 F.3d at 1123 ("Any cost in efficiency . . . that is more than *de minimis* constitutes undue hardship."); Mann v. Frank, 7 F.3d 1365, 1370 (8th Cir. 1993) (plaintiff's suggestion that employer just "do without" her would have created a loss in efficiency that was more than *de minimis*).

Second, unscheduled prayer breaks for hundreds of Muslim employees would result in increased safety hazards.  Ex. H2 (Neb. Findings) at 35.  When a person leaves a line for an unscheduled break, either someone must fill in for the absent employee, or the rest of the employees on the line must do the work of the absent employee.  Facts at ¶ 77.  When employees must do the work of an absent employee, they must work harder and faster and perform more repetitive motions (as they are performing their work *and* the absent employee's work), which increases the risk of injuries, including the risk that employees will cut themselves.  Id. at ¶ 78.  Indeed, employees have complained to Union representatives and JBS management that it is

---

[7] To the extent the EEOC suggests JBS should provide an additional break for all employees so that Muslim employees can pray, this would cost a significant amount of money.  JBS has calculated the cost of one additional 10-minute break to be $18,180 per day per plant.  Facts at ¶ 142.  Such a large expense is clearly more than a *de minimis* burden.  Ex. H2 (Neb. Findings) at p. 36.

EMPLOY/1103846.1

unsafe when people leave the line because the remaining employees have to do extra work and

can get injured.  Id. at ¶ 83.  These safety hazards create an undue hardship.  See Draper v. U.S.

Pipe & Foundry Co., 527 F.2d 515, 521 (6th Cir. 1975) ("Safety considerations are highly

relevant in determining whether a proposed accommodation would produce an undue hardship,"

as "Title VII does not require that safety be subordinated to the religious beliefs of an

employee").  See also Bhatia v. Chevron USA, Inc., 734 F.2d 1382, 1384 (9th Cir. 1984) (it is an

undue burden for coworkers to assume another employee's share of hazardous work).

Third, requiring JBS to provide daily unscheduled prayer breaks for hundreds of Muslim

employees would adversely affect product quality.  Ex. H2 (Neb. Findings) at p. 35.  When

employees must do their own work *and* the work of an absent employee, product quality suffers

because, as an employee works faster, the quality of the cuts declines, especially when a line is

running a difficult cut.  Fact at ¶ 79.  If the remaining employees on the line cannot perform all

of the absent employee's work, meat is stacked for the employee to process when he or she

returns; when the returning employee hurries to process the stacked meat, cuts are not made to

specifications and quality suffers.  Id. at ¶ 80; Ex. H2 (Neb. Findings) at p. 35.  With employees

absent from the line, meat may also fall to the floor.  Facts at ¶ 84.  Sacrificing product quality is

an undue hardship.  Ex. H2 (Neb. Findings) at p. 35.

In an attempt to minimize the costs, safety hazards, and product quality problems that

unscheduled prayer breaks create, the EEOC suggests that JBS adopt a number of procedures,

but these suggested procedures would only serve to heighten the burdens imposed on JBS.  For

instance, the EEOC would require that JBS ensure "leads, supervisors, and trainers are available

to cover while the Muslim employees take their prayer breaks."  Facts at ¶ 87.  In 2008, the B

shift had just 56 leads and supervisors to "cover" for 433 Muslim employees.  Id. at ¶ 90.  If all

EMPLOY/1103846.1

the leads and supervisors filled in for Muslim employees during unscheduled prayer breaks, and
if each Muslim took a 15-minute prayer break twice per shift, the result would be leads and
supervisors not performing their own supervisory jobs for 50 percent (or 4 hours) of their shift.
Id.  Requiring supervisors to perform production work creates a more than *de minimis* burden for
JBS, because supervisors cannot perform the work that they are hired (and paid at a premium
rate) to do – supervise.  Id. at ¶ 89–90  Further, the CBA *prohibits* supervisors from routinely
performing bargaining unit work, see id. at ¶ 88, and thus the EEOC's proposed accommodation
would require JBS to violate the CBA.  This, by itself, constitutes an undue hardship.  Lee, 22
F.3d at 1123.

In addition, the leads and supervisors would be performing production work at higher
wages than JBS pays Muslim production employees to perform such work.  Facts at ¶ 91.  The
difference between the average hourly wage of a production worker and a lead is approximately
$1.10/hour, and the difference between the average hourly wage of a production worker and a
supervisor is $7.50/hour.  Ex. E2 (Skinner Dec.) at ¶ 9(c).  If all 56 leads and supervisors filled in
for all 433 Muslim employees during unscheduled prayer breaks, and if each Muslim took a 15-
minute break to leave the line to pray, and each Muslim required two prayer breaks per shift,
then the difference in wages would cost JBS an extra $1,014 per shift, or $527,488 per year per
plant.  Facts at ¶ 91.

According to the EEOC, JBS should also (1) "make efforts not to concentrate Muslims
on the same line," (2) make sure that employees are cross-trained on the lines so that additional
Muslim employees can leave the line at any given time," and (3) allow employees "to cover for
each other while they leave the line to pray."  Facts at ¶ 92.  These requirements would greatly

increase the burdens on JBS.[8]  In order to avoid concentrating Muslims on the same line, a

significant number of employees would need to retrained to perform new jobs on different lines,

at an estimated cost of more than $2 million.  Id. at ¶ 93.  Cross-training employees would also

be financially burdensome, as (1) JBS estimates that it costs $5,000 to cross-train a single

employee to perform a single additional job on a line, and (2) in order to implement the EEOC's

cross-training proposal, JBS would need to develop and implement a "job tracking" system to

track when employees "cover" for Muslim employees in higher paying jobs, and then (3) pay

those employees the higher wages that they are entitled to receive under the CBA.  Id. at ¶ 94,

97–100.  These expenditures are clearly more than *de minimis* burdens.  To the extent this

proposed accommodation would also require JBS to further over-crew its shifts in order to cover

Muslim employees on prayer breaks, the accommodation creates a more than *de minimis* burden

on JBS.  Lee, 22 F.3d 1019 at 1023 (additional labor and wage costs are undue hardships).

      Unscheduled prayer breaks also impose more than *de minimis* burdens on JBS's non-

Muslim employees.  Employees have complained that, when Muslims leave the line to pray,

their work becomes more difficult and more dangerous, and morale suffers.  Facts at ¶¶ 81–83.

These burdens constitute undue hardships.  Firestone, 515 F.3d at 317 (stating that "feelings of

unequal treatment . . . can cause real problems in the workforce" and "it was permissible for

[employers] to consider the rights and perceptions of fairness of other employees when

determining whether to provide such an accommodation."); Bhatia, 734 F.2d at 1384 (9th Cir.

1984) (finding greater than *de minimis* impact on coworkers required to complete another

---

[8] Furthermore, cross-training does not change the fact that when one employee covers for
another's unscheduled break, the production floor is still short by one person – *i.e.*, the person
covering for the absent employee has vacated his own position on the line – which means that
cross-training would not alleviate the production, product quality, and safety problems already
described.  Facts at ¶ 96.

EMPLOY/1103846.1

worker's share of potentially dangerous work); <u>Brener</u>, 671 F.2d at 147 (disruption of work and lowering of morale are undue hardships).

A reasonable, non-burdensome religious accommodation allowing Muslims to "timely pray" (beyond permitting employees to pray during regularly scheduled breaks and at shift changes) is simply unachievable in this case. As the Tenth Circuit Court of Appeals noted in <u>Toledo v. Nobel-Sysco, Inc.</u>, "particular jobs may be completely incompatible with particular religious practices [and] [i]t would be unfair to require employers faced with such irreconcilable conflicts to attempt futilely to resolve them." 892 F.2d 1481, 1489 (10th Cir. 1989).

**B.    JBS Did Not Unlawfully Deny Muslim Employees the Ability to Break Their Fasts During Ramadan 2008.**

The EEOC also alleges that JBS engaged in a pattern or practice of denying Muslim employees the ability to break their fasts after sunset during Ramadan 2008. Bifurcation Order at 13. This aspect of the EEOC's reasonable accommodation claim fails for the same reasons discussed above with respect to an alleged denial of "timely prayer" accommodations: JBS *did* provide Muslim employees with a reasonable accommodation for breaking their fasts, and any other accommodations proposed by the EEOC are unreasonable and create undue hardships.

Muslim employees required only a drink of water in order to break their fasts during Ramadan 2008. Ex. G5 (Meeting Notes) at 2 (noting that Somali Muslims representatives told JBS management that they could "break fast with sip of water"). JBS provided Muslim employees with an accommodation: employees were able to leave their positions on their production lines to get water from the water fountains stationed near the lines. Facts at ¶ 44; Ex. G5 (Meeting Notes) at 2. JBS, therefore, provided a reasonable accommodation to allow

Muslim employees to break theirs fasts.  Abercrombie, 731 F.3d at 1122 (employer may defeat

failure to accommodate claim by showing that it offered a reasonable accommodation).

To the extent the EEOC argues that JBS should have accommodated Muslim employees

by granting them a scheduled rest or meal break, or an unscheduled break, soon after sundown in

order to break their fasts, such an argument must be rejected.  As noted above, these

accommodations – whether proposed to let Muslim employees "timely pray" after sunset or to

break fast soon after sunset – are not reasonable and they cannot be implemented without

imposing more than *de minimis* burdens on JBS and its non-Muslim employees.  See Argument,

Section II.A.2–II.A.3, supra.  Any claim based on an alleged failure to accommodate the need for

Muslim employees to break their fasts must be dismissed.

**C.      JBS Did Not Unlawfully Deny Muslim Employees a Place to Pray.**

At the outset of this case, the EEOC alleged that JBS engaged in a pattern or practice of

denying Muslim employees a place to pray, forcing them to pray on bathroom floors.

Bifurcation Order at 3.  Subsequent discovery has revealed that this allegation simply has no

foundation in fact.  Numerous Muslim employees testified that they prayed, and continue to

pray, in the plant's locker rooms, not on bathroom floors.  Facts at ¶ 101.  JBS managers testified

that Muslim employees were, and are, allowed to pray in any safe place outside of the plant's

production areas.  Id.  In fact, since prior to Ramadan 2009, the Greeley plant has had designated

prayer rooms where Muslim men and women may pray.[9]  Facts at ¶ 104.  Accordingly, JBS has

---

[9] Given that the EEOC is only entitled to equitable and injunctive relief with regard to its Phase I
religious accommodation claim, see Bifurcation Order at 15–16, this fact renders moot any claim
based on an alleged failure to provide a place for Muslims to pray.  See, *e.g.*, City of Los
Angeles v. Lyons, 461 U.S. 95, 111 (1983) (relief is moot if there is no real threat that plaintiff
will be wronged again); Rhodes v. S. Nazarene Univ., 2014 U.S. App. LEXIS 1851, *9 (10th
Cir. 2014) ("[T]he hallmark of a moot case . . . is that the relief sought . . . is no longer needed.").

EMPLOY/1103846.1

provided Muslim employees with reasonable accommodations for their need for space to pray. Abercrombie, 731 F.3d at 1122.

Further, there is no evidence supporting the EEOC's claim that JBS engaged in a pattern or practice of denying Muslim employees an adequate place to pray, or "forcing" employees to pray on bathroom floors. See Teamsters, 431 U.S. at 336 (to establish pattern or practice claim, plaintiff must show "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts;" plaintiff must show that unlawful discrimination has been the employer's "standard operating procedure"). As noted, numerous Muslim employees testified that they were able to pray in the plant's locker rooms and, in fact, JBS managers testified that prayers should *not* have been performed on bathroom floors due to sanitation and food safety concerns. Ex. A8 (Gould Dep.) at 215:2–13; Ex. A20 (Schult Dep.) at 113:15–19, 131:14–17. Thus, to the extent the EEOC continues to pursue a reasonable accommodation claim based on an alleged pattern or practice of denying Muslims a place to pray, the EEOC's claim must be dismissed for failure to show a pattern or practice of unlawful discrimination.

## III.    THE EEOC'S DISCRIMINATION AND RETALIATION CLAIMS FAIL AS A MATTER OF LAW.

The EEOC alleges that JBS engaged in a pattern or practice of unlawful discrimination and retaliation when it suspended and terminated a large group of Somali Muslim employees during Ramadan 2008. Bifurcation Order at 15; Facts at ¶ 132, 139–140. To succeed on a pattern or practice claim, the EEOC must "prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." Teamsters, 431 U.S. at 336. Instead, the EEOC must show that unlawful discrimination and retaliation was "the company's standard operating procedure." Id. The EEOC's discrimination and retaliation claims must be dismissed because

they are based solely on a one-time decision to suspend and terminate, *en masse*, a group of Somali Muslim employees and, as a matter of law, a one-time event cannot provide a basis for a pattern or practice claim.  See Ex. H4 (Neb. SJ Order) at pp. 37–41; Oinonen v. TRX, Inc., 2010 U.S. Dist. LEXIS 9530, *12 (N.D. Tex. Feb. 3, 2010) (mass layoff was a "'one-shot' event " that "cannot constitute a pattern or practice of discrimination"); Sperling v. Hoffman-La-Roche, 924 F. Supp. 1346, 1364 (D.N.J. 1996) (single mass layoff cannot constitute a pattern or practice). See also Teamsters, 431 U.S. at 336 (to prove pattern or practice claim, plaintiff must "prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts").

## CONCLUSION

For all of the foregoing reasons, JBS respectfully requests that this Court dismiss the EEOC's Phase I pattern or practice claims and award JBS such other relief as the Court deems just and appropriate.


Dated this 31st day of March, 2014.

<div style="margin-left:auto">

Respectfully submitted,

*s/Heather Fox Vickles*
W.V. Bernie Siebert
Heather Fox Vickles
SHERMAN & HOWARD L.L.C.
633 17th Street, Suite 3000
Denver, CO  80202
Tele:  303-299-8194
Fax:  303-298-0940
Email:  BSiebert@shermanhoward.com
Email:  HVickles@shermanhoward.com
Attorneys for Defendant JBS USA, LLC

</div>

**CERTIFICATE OF SERVICE (CM/ECF)**

I hereby certify that on this 31ST day of March, 2014, I electronically filed the foregoing
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**
with the Clerk of the Court using the CM/ECF System which will send notification of such filing
to counsel of record, including the following:

| | |
|---|---|
| D. Andrew Winston | Andrew.winston@eeoc.gov |
| Sean Ratliff | sean.ratliff@eeoc.gov |
| Mary Jo O'Neill | Mary.oneill@eeoc.gov |
| Rita Byrnes Kittle | rita.kittle@eeoc.gov |
| Stephanie Struble | stephanie.struble@eeoc.gov |
| William Moench | william.moench@eeoc.gov |
| Iris Halpern | iris.halpern@eeoc.gov |
| Diane King | King@kinggreisen.com |
| Kimberly J. Jones | jones@kinggreisen.com |
| Rajasimha Raghunath | rraghunath@law.du.edu |
| Richard Blundell | rick@rkblaw.net |
| James Chiu | james.y.chiu2008@gmail.com |
| Harry Budisidharta | harry@denverfirm.com |
| Todd McNamara | tjm@18thavelaw.com |
| David Lichtenstein | dave@lichtensteinlaw.com |

*s/ Lynn Zola Howell*