# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 10-cv-02103-PAB-KLM

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

      Plaintiff,

v.

JBS USA, LLC d/b/a JBS SWIFT & COMPANY,

      Defendant.

---

## PLAINTIFF EEOC'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT [ECF 330]

---

Defendant JBS, if nothing else, is consistent in its inconsistencies. First, JBS argues that this Court is bound by another court's decision in Nebraska, because the facts and issues of that case are allegedly "identical" as those here. When EEOC tried to introduce evidence from this case in that case, however, JBS "adamantly refuted[d] that the events in Greely were under the same circumstances" as those in Nebraska. Likewise, JBS argues out of one side of its mouth that allowing Muslim employees to pray at 6:00 p.m. and 9:00 p.m. is a reasonable accommodation because it is close enough to actual prayer times and perfection is not necessary. Then out of the other side of its mouth, JBS faults EEOC's proposed accommodations for failing to perfectly accommodate the Muslim prayer schedule. Next, JBS claims that it cannot provide unscheduled breaks for prayer without undue hardship, but fails to acknowledge that it changed its policy in 2011 to allow these breaks. In short, it appears that Defendant will say whatever serves its purpose. Such disputed issues of fact warrant denial of summary judgment in and of themselves.

In this lawsuit, EEOC has suggested a number of potential accommodations, only two of which are challenged by JBS: (a) adjusting scheduled breaks to more closely align with prayer

times, to the extent allowed by the collective bargaining agreement; and (b) allowing unscheduled breaks for prayer. Neither EEOC nor the Muslim employees have sought a mass break, or a third break. Neither EEOC nor the Muslim employees have asked for an accommodation requiring violation or even modification of the collective bargaining agreement. The EEOC believes it is necessary to move the scheduled break during Ramadan due to the heightened significance of the sundown prayer during Ramadan. But EEOC's proposals leave it to JBS to determine whether to move the break the remainder of the year or allow the Muslim employees to request unscheduled breaks to pray, or some combination of the two.

JBS urges this Court to hold, as a matter of law, that it is reasonable for JBS to make no adjustment whatsoever to accommodate the Muslim employees' religious beliefs and practices, and that its existing policy of allowing employees to pray during scheduled breaks at 6pm and 9pm, is "reasonable," regardless of employees' beliefs about praying at the prescribed times. Reasonableness is a fact-intensive determination, based on the totality of circumstances and not suitable for summary judgment. There are genuine issues of fact as to the reasonableness of JBS' claimed accommodation, particularly given that there are genuine issues of fact as to whether JBS' claimed policy is its actual practice – that is, whether employees were precluded from praying even during scheduled breaks.

JBS also urges the court to hold that the accommodations EEOC proposed pose an undue hardship. First, in making this argument, JBS relies on exaggerated data based on incorrect assumptions. For example, JBS contends that it would have to accommodate four prayers each day, which is not the case. Second, JBS relies solely on the number of Muslim employees on the B shift, which is far greater than the A shift. Indeed, JBS provides no evidence or analysis regarding the A shift, apparently conceding there is no undue burden. Second, although JBS contends that allowing

the employees off the line would pose an undue hardship, it fails to inform this Court that as of July 2011, its official policy is to allow unscheduled breaks for prayer. Importantly, although the policy has been in effect for nearly three years, JBS fails to provide any actual data showing actual effects on production. Instead, JBS relies on speculative estimates, which are unduly inflated. Finally, while JBS argues that the individual employees' beliefs as to how flexible they can be with respect to prayer time prevent reasonable accommodation, in fact, the opposite is true. The more flexibility with respect to prayer means that not all of the Muslim employees must leave the line at the same time. Similarly, although JBS argues that moving the dinner break did not perfectly accommodate all of the Muslim employees, JBS knows that the Muslim employees agreed to follow a uniform practice and all agreed that moving the dinner break to 7:30pm during Ramadan 2008 was an acceptable accommodation.

Finally, there are factual disputes as to the discipline and discharge claim. First and foremost, EEOC's pattern-or-practice claim is not limited to Ramadan 2008, but extends from December 2007 to the present. EEOC has significant statistical and anecdotal evidence to support this claim. Despite this, JBS tries to piecemeal EEOC's claim such that it can argue that a single event cannot constitute a pattern or practice of discrimination. While the Court's Bifurcation Order contemplates separating out the events of Ramadan 2008, summary judgment cannot be granted on only a portion of a claim – a single month out of a seven-year pattern or practice. Rather, the whole claim must be analyzed together.

I. **EEOC'S STATEMENT OF ADDITIONAL RELEVANT FACTS ("PSF")**

A. **JBS Routinely Denied Muslim Employees The Ability To Practice Their Religion.**

1.    From 2008 to the present, Muslim employees have complained that they were not allowed to pray. [Gonzalez Dep. 28:14-29:7 (The union representative assigned to the plant stated "there was a

time that they didn't want them to observe their faith"); Ex. 1, Ex. 2, Ex. 10].

**2.** Numerous employees have been prevented from praying at work, anywhere or anytime, even during scheduled breaks. [Ex. 1, Ex. 2]. Indeed, supervisors have told employees that if they are caught praying again they will be fired or that they should pray at home. [H. Hassan Dep. 69:23-70:6; N. Aden Dep. 70:14-20; F. Ali 73:5-23].

**3.** Further, numerous Muslim employees testified that from 2007 to the present they have been harassed when attempting to pray at work, even during scheduled breaks when, according to JBS, employees are allowed to pray. [See Ex. 1].

**4.** Numerous Muslim employees have been disciplined for praying at the facility. [Jordan Dep. 121:24-122:24; Ex. 3; see Section III of the Brief (pp. 63-70)].

**5.** In 2008, although JBS' policy was that employees were allowed to leave their positions on the line to take restroom breaks, Muslim employees were not allowed to leave their lines to pray. [Danley Dep. 34:20-35:2; Gould Dep. 72:24-74:15; Ex. 4; Ex. 5, p. 9].

**6.** In fact, during Ramadan 2008, JBS monitored the restrooms and employees found praying during unscheduled breaks were disciplined. [Mejia Dep. 55:9-16, 67:18-23; Gonzalez Dep. 54:17-55:4; Gould Dep. 76:18-77:8; Lovell Dep. 72:10-73:6; Ex. 6].

**7.** Mohamed I. Mohamed, a Somali trainer employed from August 2007 through January 2009, testified that he interpreted for Somali employees who were disciplined for using unscheduled breaks to pray, which happened very often throughout his employment. [M.I. Mohamed Dep., 18:25-19:8, 31:4-6, 80:6-22, 158:2-159:12].

**8.** Defendant's HR Manager admits it possible he wrote up multiple Muslim employees each day for praying on unscheduled breaks until the policy was changed. [Lovell Dep. 72:10-73:6].

**9.** In 2009, JBS changed its written policy to allow employees to pray on unscheduled breaks

during Ramadan. [Ex. 7].

**10.**   This policy was limited to Ramadan 2009. [Daubenspeck Dep. 46:15-47:1; 50:18-20].

**11.**   Despite the change in policy, there were Muslim employees who were still not allowed off the line to pray at sundown during Ramadan 2009. [Lovell Dep. 104:7-18; Salah Ali Dep. 161:3-162:12; Ex. 8, ¶ 20].

**12.**   In July 2011, JBS again changed its policy to allow employees to pray on unscheduled breaks throughout the year. [Ex. 9].

**13.**   Thus, until July 2011, with the exception of Ramadan 2009 and Ramadan 2010, employees were not allowed to pray on unscheduled breaks. [PSF 6-12].

**14.**   Despite this change in policy, employees have continued to be denied the ability to pray in accordance with their religious needs. [Ex. 2; Yousuf Dep. 78:25-79:12 (in 2011 told "to do that shit on your own time.")]. As late as December 2011, Muslim employees reported they were not allowed to pray. [Ex. 10 (supervisor says, "no fucking prayer, you need to wait.")].

**15.**   Supervisors have testified that they have not received any training on the company's unscheduled break policy. [Anderson Dep. 104:17-20; S. Garcia 86:1-3; 173:7-9].

**16.**   The Plant Manager did not even know the policy was revised. [Danley Dep. 109:21-110:9].

**17.**   In addition to being denied prayer, employees have also been denied the ability to break their fast during Ramadan. [K. Abdullahi Dep. 91:13-17; Muse Dep. 119:14-18;  F. Abdi Dep. 101:15-102:4, 103:8-15, 104:22-23; Abdulkadir Dep. 94:4-10; Ashkir Dep. 90:7-12].

###   B.  Muslim Employees' Requests For Accommodation

**18.**   From the beginning of their employment, Muslim employees requested to be able to pray at work. These requests were denied. [F. Abdi Dep. 94:25-95:22, 99:6-23].

**19.**   On Tuesday, September 2, 2008, the first working day of Ramadan 2008, after the shift ended,

a group of Muslim employees approached the Superintendent to ask that during Ramadan, the meal break be moved to coincide with sundown so they could break their fasts and pray. [Palacios Dep. 135:22-136:9]. The employees only sought this accommodation for the holy month of Ramadan when the Maghrib prayer takes on heightened significance. [Lovell Dep. 119:10-22, Ex. 28 ¶9].

**20.** The Superintendent directed the Muslim employees to communicate with Human Resources the following day. [Palacios Dep. 139:6-140:6].

**21.** The next day, Wednesday, a group of Muslim employees came early to speak with Human Resources about having the meal break moved to sunset. [Lovell Dep. 84:23-85:4].

**22.** When JBS managers came out to the courtyard shortly before the shift was scheduled to start at 3:15 p.m., they told the Muslim employees to elect a committee to speak with the company during the shift and the Muslim employees complied. [Ray Dep. 109:25-110:7]. Except for the employees on the committee, all of the remaining Muslim employees went to work.

**23.** There was no delay in the start of the shift, and no employee refused to go to work unless the dinner break was changed. [Abshir Hussein Dep. 121:1-5].

**24.** The Muslim Committee explained their religious needs to the company officials and explained that they needed 15 minutes around sunset to be able to break their fast and pray. [Lovell Dep. 121:13-122:7; 124:20-23; Ex. 11, pp. 1-2].

**25.** The Muslim Committee requested that the company move the dinner break to sunset for the remaining 17 days of Ramadan that fell on working days. [Lovell Dep. 119:10-22].

**26.** JBS explained that due to the Collective Bargaining Agreement (CBA), the earliest they could move the break was to 7:30 p.m. and the Muslim Committee agreed that this would be an acceptable accommodation. [Asad Abdi Dep. 74:2-5; Abshir Hussein Dep. 123:9-124:6].

**27.** The company normally held the meal break at 8:30 p.m. or 9 p.m.. Moving the break to 7:30

p.m. makes the meal break more in compliance with the CBA, which states the meal break shall be approximately halfway through the shift. 7:30 p.m. is exactly half way through the shift, which runs from 3:15 p.m. to 11:45 p.m.. [Fritche Dep. 77:20-78:10; Kitch Dep. 53:11-15; ECF 330-94, p. 5].

28.  In addition to moving the meal break, the Committee proposed several alternative ways the company could accommodate the prayer needs of the Muslim employees, including moving the first break to correspond with sunset, or alternatively that they be allowed to take unscheduled breaks at or near sunset. [Asad Abdi Dep. 49:21-50:21; Lovell Dep. 155:17-23, Ex. 28 ¶¶6-8].

29.  The company refused the request that unscheduled breaks be allowed for prayer. [Asad Abdi Dep. 51:4-14; Lovell Dep. 157:9-16].

30.  The Muslim Committee meet with JBS managers several times from Wednesday until the following Tuesday, September 9, 2010. [Lovell Dep. 118:22-25]. The Muslim committee remained cooperative and flexible throughout its negotiations with the company. [Lovell Dep. 158:8-13; Gould Dep. 199:13-18, Ex. 28 ¶¶6-8].

31.  The Muslim Committee never requested that the company change the meal break from a rolling break to a mass break and never requested that Muslim employees receive any extra break. [Daubenspeck Dep. 53:8-10; Lovell Dep. 158:1-4; Ex. 12 at ¶ 1].

32.  The Muslim employees specifically noted that they were not requesting any accommodation that would financially impact the company. [Ex. 13, Lovell Dep. 158:5-7].

33.  On Monday, September 8, 2008, the Muslim employees gave JBS a letter explaining the company had prohibited prayers at the plant and requesting accommodations. [Ex. 13].

34.  After Ramadan 2008, the Muslim employees continued to ask that they be allowed to pray in accordance with their religion. [Lovell Dep. 109:24-110:21; Abdi Dep. 56:3-57:19, 139:22-141:19].

### C.  Lack Of Training

**35.**  Prior to Ramadan 2008, the managers and supervisors at Defendant's Greeley facility were aware that Muslim employees prayed because they had seen them praying around the Plant. [Gould Dep. 84:24-85:7; Danley Dep. 24:21-25:2].

**36.**  Despite the company's knowledge of events that took place in Nebraska during Ramadan 2007, the company took no action to educate its employees in Greeley about the Muslim religion or inform them of the upcoming holy Muslim holiday. [Kitch Dep. 104:23-105:7].

**37.**  Nor did the company take any action to prepare for Ramadan. [Jordan Dep. 52:19-24].

**38.**  Employees and supervisors testified they have had no training on the Muslim religion. [Mejia Dep. 116:23-25; Rivera Dep. 69:20-70:8; Esparza Dep. 57:21-23; E. Garcia 103:9-11].

**39.**  According to Defendant's Director of Human Resources, JBS has no written policy regarding religious accommodation. [Sunner Dep. 87:4-21].

**40.**  Defendant's supervisors testified that they have no idea what time the Muslim employees need to pray. [Anderson Dep. 89:5-11; Kitch Dep. 104:23-105:3].

**41.**  Numerous employees, supervisors, and even the Plant Manager, testified that they have never been provided any training on an employer's duty to accommodate an employee's sincerely held religious belief. [Anderson Dep. 94:8-11; Danley Dep. 131:25-132:2].

**42.**  Defendant's Operations Manager testified he has not had training on religious discrimination. [Jordan Dep. 98:18-99:1; Danley Dep. 87:13-20].

**43.**  Defendant's Plant Manager in 2008 testified he does not recall JBS doing any training on religious discrimination or accommodation and employees similarly state they have not had any such training. [Gould Dep. 57:24-58:11; E. Garcia 101:1-10; 102:6-11].

**44.**  Defendant's HR Manager for the B shift testified that she has never received training on

religious accommodation and does not know if employees are provided any training on religious accommodation or even religious discrimination. [Walker Dep. 71:21-24; 158:1-9; 159:11-15].

**D.  It Is Not An Undue Burden To Accommodate Prayer**

**1.   JBS Can Move the Meal Break to Coincide with Sundown during Ramadan.**

**45.**  On September 3, 2008, following the request by the Muslim employees, JBS moved the meal break to 7:30 p.m. and there were no effects on production and no complaints by any employees in the facility. [Gould Dep. 122:1-9; Lovell Dep. 127:19-23; Kitch Dep. 113:6-14].

**46.**  Although not perfectly timed with sundown, the Muslim employees agreed to this compromise of having the dinner break at 7:30 p.m. [Lovell Dep. 116:19-23; Asad Abdi Dep. 74:2-5].

**47.**  There was no effect on production or cost to JBS to grant this accommodation. [Skinner Dep. 151:19-152:9 (higher production numbers than prior week); 153:17-154:9 (no noticeable effect on production prior to the week ending September 14, 2008)].

**48.**  JBS plans the production schedule at the beginning of each day so the grade changes can be scheduled to occur during the meal break. [Fritche Dep. 82:11-14]. This same process can be done even if the break occurs earlier in the shift. [Fritche Dep. 83:14-21].

**49.**  Nor does this change affect the other employees as it is within the timeframe negotiated through the employees elected union representative. [Fritche Dep. 80:23-81:4; 86:9-21 (as long as meal break is moved within the parameter of the CBA it does not affect the other employees)].

**50.**  When the non-Muslim employees asked to meet with the company about moving the dinner break, the company met separately with the Muslim Committee and the non-Muslim committee. At no time, did the Company bring the two groups together. [Gould Dep. 191:15-18].

**51.**  At no time did the Company tell the non-Muslim group that it had moved the break due to its obligations under the law to accommodate the religious practices of employees. [Ex. 14; Kitch Dep.

114:7-115:17; Mejia Dep. 129:8-23].

52.  Thus, the non-Muslim employees felt that the changed break time was just a matter of

favoritism – the company favoring the Muslim employees. [Rivera Dep. 166:11-167:4].

53.  Although JBS was concerned about the effect that moving the break might have on the other

employees, Defendant's Operations Manager, who was involved in the decision to move the break,

does not recall anything that was done to try to communicate with the non-Muslim employees or

otherwise explain the reason for the change. [Jordan Dep. 55:17-56:4; 57:12-16].

54.  Defendant's Plant Manager admitted that there was not a lot of education to the whole

workforce at the time. [Danley Dep. 110:4-7].

> **2.  Throughout The Year JBS Is Able To Spell Muslim Employees off the Line to Pray During Unscheduled Breaks, Which Has Been The Policy Since July 2011.**

55.  At the Greeley facility, employees are allowed to leave the line to go to the restroom. [Jordan

Dep. 29:20-30:3], generally referred to as unscheduled breaks. [Ray Dep. 50:11-21].

56.  There is no limit on the number of restroom breaks an employee can take. [Fritche Dep. 69:17-

20; Jordan Dep. 100:7-11].

57.  In 2009, JBS changed its policy to allow Muslim employees to pray on unscheduled breaks, but

this was only allowed during Ramadan. [Ex. 7; Daubenspeck Dep. 46:24-47:1; 50:18-20].

58.  Defendant's Director of HR, who issued the policy, was not concerned about any disruptions to

or effect on production in issuing this policy because they spoke with supervisors prior to issuing it

and they were comfortable with the change in policy. [Daubenspeck Dep. 53:15-23].

59.  And, in fact, during Ramadan 2009, allowing Muslim employees to pray on unscheduled

breaks did not affect production. [Daubenspeck Dep. 54:10-19].

60.  Defendant's VP of Human Resources testified that he was not aware of any burden that this

change in policy placed on the company and he received no complaints from any operations people

due to the change in policy. [Daubenspeck Dep. 54:23-55:3]. Further, he testified that he did not

believe he was giving Muslim employees anything extra that other employees were not already

receiving. [Daubenspeck 53:11-14].

**61.** Defendant's Quality Assurance Supervisor, who is responsible for employee and food safety,

testified that since they have allowed employees to leave the line to pray, there have not been any

problems. [Mejia Dep. 41:10-19; 159:22-160:8].

**62.** Defendant's supervisors and General Foreman testified that they can spell the Muslim

employees off the line to pray. [Anderson Dep. 167:24-168:3 ("Q: Do you have any problem

spelling them off the line when they need to pray? A: Absolutely not. Q: Ramadan or any other

time? A. Ramadan or any other time."); S. Garcia Dep. 70:6-14; Mejia Dep. 159:22-160:8; Rivera

Dep. 99:23-100:4].

**63.** JBS always schedules more people to work than are actually necessary to run the lines (over-

crewing). The Greeley plant regularly over-crews at 115-117%. [Fritche Dep. 122:19-23].

**64.** JBS employs Lead employees who are available to fill in for employees on unscheduled breaks.

[S. Garcia Dep. 66:13-15].

**65.** Trainers are also available to fill in for employees who leave the line for unscheduled breaks.

[Esparza Dep. 38:25-39:3; S. Garcia Dep. 66:16-17].

**66.** Supervisors can also fill in during unscheduled breaks. [Danley Dep. 118:1-4].

**67.** Most employees are cross-trained and thus can fill in for others during unscheduled breaks. [S.

Garcia Dep. 54:7-13; Danley Dep. 100:22-101:2; Anderson Dep. 73:22-74:8; 111:25-112:3;

Rodriguez Dep. 93:11-16 (employees are required to know every job on their line); Rivera Dep.

36:18-37:7]. JBS' Plant Manager testified that the company views cross-training employees on

more than one job important and something the company tries to do. [Danley Dep. 100:22-101:2;
Jordan Dep. 36:6-8 (cross-training is "super important" for operations)].

**68.** Depending on the product being run, there may be extra people who are not doing anything or
are doing extra jobs, and those employees are also available to fill in for employees on unscheduled
breaks. [Esparza Dep. 41:15-42:6; 45:14-19; Kitch Dep 42:18-43:9].

**69.** Supervisors can radio other supervisors to find people available to fill in during unscheduled
breaks. [Rivera Dep. 75:25-76:11]. Employees are often available from other lines because not all
the lines are running at full speed. [Rivera Dep. 75:25-78:5 (this can occur all the time, every day)].

**70.** As JBS' supervisor testified, when he needs to spell people off the line, he would replace the
first person leaving the line with a lead, if there were two, he would pull someone from another job.
Then, if more people needed to leave the line, he would put the meat in a combo and hold the
product until the person returned. [Anderson Dep. 118:23-119:16].

**71.** Further, in some areas, it is not necessary to replace the employee who needs to leave the line
because other employees can cover the work of the missing employee. [Anderson Dep. 119:25-
120:2 (boxing); 189:23-190:2 (shipping); S. Garcia 44:20-45:14 (low packer)].

**72.** Using all of these processes – having leads, supervisors, and trainers fill-in, using cross-trained
employees from the same or different lines, and using the over-crew – supervisors have been able to
accommodate the religious needs of their Muslim employees. [Resp. to DSF 72]. Indeed, Supervisor
Rivera testified that although her line consisted of 50% Muslim employees, she did not have any
problems during Ramadan 2010. [Rivera Dep. 164:3-11; 165:15-19].

**73.** JBS' Superintendent testified that the supervisors can work with the employees ahead of time
to handle the breaks and that this helps make it smoother. [Fritche Dep. 74:9-75:5].

**74.** JBS managers say no negative effects on production, food quality, or safety result from letting

Muslim employees pray. [Anderson Dep. 110:2-11; Rivera Dep. 100:19-101:24; 163:20-164:2].

**75.** Since the policy changed to allow unscheduled breaks to pray, Muslim employees have not taken more breaks or longer breaks than non-Muslim employees. [Anderson Dep. 109:13-110:1; S. Garcia Dep. 179:21-23; Mejia Dep. 161:11-14; Danley Dep. 158:24-159:2].

**76.** JBS has failed to adequately train its employees on the unscheduled break policy. [Rosalez Dep. 118:16-18]. Defendant's current Superintendent does not know the policy was changed to allow prayer on unscheduled breaks. [Timejardine Dep. 51:6-16; see also Jordan Dep. 41:2-5]. As a result, many supervisors continue to routinely refuse to allow prayer breaks. [Ex. 2].

**77.** JBS never trained supervisors on how to cross-train their employees – they have just had to figure it out on their own. [S. Garcia Dep. 107:12-15].

**78.** Defendant's Human Resources Director testified that although he tells supervisors about the unscheduled break policy, he does not tell them anything about the Muslim religion, such as why they need prayer breaks or when the prayer breaks occur. [Sunner Dep. 133:8-15].

**79.** JBS has not trained supervisors to work with the employees ahead of time to handle the breaks, which JBS' Superintendent admits would help make the unscheduled breaks run smoother. As a result, only a few supervisors actually do this. [Fritche Dep. 74:9-75:5].

**80.** Other meat processors with the same conveyor-line production facilities have been able to accommodate their Muslim employees. [S. Adan Dep. 147:3-14; 164:2-7; Mire Dep. 44:4-13; Saynab Ali Dep. 38:2-39:2].

**81.** JBS does nothing to ensure that supervisors fairly implement the policy and does not discipline supervisors who deny Muslim employees prayer breaks. [Lovell Dep. 105:18-21; Sunner Dep. 71:6-13 (can't recall ever disciplining a supervisor for refusing to provide breaks)].

**82.** Although JBS' policy requires that restroom breaks take precedence, this need not be the case.

As one supervisor said, she first finds out who has more flexibility to wait. [S. Garcia 65:15-66:9].

**E.  Discriminatory Discipline And Termination Of Somali Muslim Employees**

**83.**  On Thursday, September 4, 2008, the second day the break was at 7:30 p.m. to accommodate the Muslim employees, when the break was called at 7:30 p.m., a group of non-Muslim employees refused to leave their lines in protest of the change in the break time. [Gould Dep. 169:11-18].

**84.**  At 9:15 p.m., a group of non-Muslim employees left their lines engaging in an unauthorized work stoppage. [Ray Dep. 135:7-11; Palacios Dep. 166:16-23, 167:16-168:2].

**85.**  JBS' position is that it does not know which employees engaged in the work stoppage on September 4, 2008, or where they went but admits that it did nothing to prevent this work stoppage from happening even though it knew from the earlier conduct at 7:30, when employees stayed at their work stations during the break, that these same employees were likely to stop working at 9:15. [Jordan Dep. 66:1-15; Kitch Dep. 118:7-25; Gould 169:11-170:14, 171:14-176:4].

**86.**  None of the employees who engaged in the unauthorized work stoppage on September 4, 2008, were disciplined, although this conduct is an offense warranting termination. [Jordan Dep. 67:1-9; Palacios Dep. 165:25-166:9].

**87.**  The following day, Friday September 5, 2008, a group of mainly Latino employees showed up prior to the start of the B shift and refused to start work unless the Company moved the break back to 9:15 p.m. [Danley Dep. 45:19-46:13; Ray Dep. 140:1-8, 140:16-18].

**88.**  On Friday, September 5, 2008, the production floor had to start late because of these employees' protest. [Espinoza Dep. 77:22-78:1; see also Danley Dep. 51:5-7; 52:10-12].

**89.**  None of the employees who refused to start work on time on September 5, 2008, were disciplined. [Lovell Dep. 148:14-17].

**90.**  On Friday, September 5, 2008, JBS reneged on its promise that the evening break would be

held at 7:30 p.m.. [Asad Abdi Dep. 77:18-78:8; Ray Dep. 127:24-128:4, 159:10-15].

91.    On September 5, 2008, shortly before the 7:30 p.m. break was about to begin, Defendant

decided to move the dinner break to 8:00 p.m. [Lovell Dep. 164:5-7; Asad Abdi Dep. 77:18-78:8].

92.    Because of the company's tardy decision, there was inadequate time to alert the employees on

the line about the change in break time. [Lovell Dep. 165:1-8].

93.    Due to the unannounced break time change, there was much confusion in the cafeteria during

the break. [Asad Abdi Dep. 88:11-18; M.M. Abdi Dep. 85:16-86:2].

94.    Defendant's managers told the Muslim employees to leave the plant and escorted them out.

[Walker Dep. 86:24-87:15; 88:16-19; 91:12-92:14].

95.    Several Somali Muslim employees testified that although they were told to leave and escorted

out of the plant, they managed to sneak back in to the plant and resume working that night. [M.M.

Abdi 85:22-86:8; Salah Ali Dep. 198:4-21; N. Aden Dep. 153:21-154:24].

96.    Numerous Latino workers walked out that night. [Espinoza Dep. 69:9-12].

97.    On Friday night, JBS suspended the Muslim employees who had not returned to work after the

meal break, and said they were not allowed to work on Monday. [Gould Dep. 226:28-228:2].

98.    However, on Monday, the Latino workers who had walked out on Friday were allowed to

return to their jobs. [Espinoza Dep. 110:18-21].

99.    On Monday, September 8, 2008, the company informed the Muslim committee that the

Monday suspension had been made into an indefinite suspension, and that the company would

advise the employees when or if they would be allowed to return to work. [Lovell Dep. 256:15-20;

Schult Dep. 94:6-11, 102:11-103:16; Gould Dep. 246:22-247:6].

100.    On Tuesday, September 9, 2008, at approximately 1 p.m., JBS told the Muslim committee that

the suspended employees – all Muslims – would be allowed to return to work, but only if they came

to work that same day. The meeting adjourned at 1:30 p.m., less than two hours before the shift was to begin. [Gould Dep. 258:12-264:25; ECF 330-97].

**101.** The company's usual procedure when imposing a disciplinary suspension is to meet with the employee, explain the reason for the discipline, provide the employee a copy of the disciplinary record, and ask the employee to sign the suspension. [Gould Dep. 63:20-64:12]. It is the company's responsibility to inform the suspended employee when to return to work. [Gould Dep. 262:24-263:14]. The only time JBS has relied on someone else to tell a suspended employee when to return is when JBS has itself tried unsuccessfully the reach the employee. [Gould 285:15-286:21].

**102.** JBS did nothing to communicate directly with the suspended Muslim employees to tell them to return to work, and that they would be fired if they did not. [Gould Dep. 263:15-18, 265:1-7].

**103.** Instead, the company left it up to the union and the Muslim Committee to tell these employees that they were required to return to work that day, and would be fired if they did not. [*Id.*]

**104.** JBS did not provide the union or the Committee with a list of the suspended employees or their contact information. [Asad Abdi Dep. 115:11-16, 116:7-19; Schult Dep. 103:13-16].

**105.** When the union and Muslim Committee arrived at the park where many of the suspended Muslim employees had been gathered, they saw that many of the suspended employees were not there. [Ex. 15, ¶¶ 9, 10].

**106.** The union representative, Fernando Rodriguez, called Eric Ray, the HR Director at the Greeley Plant, to inform the company that not all of the employees were at the park and that the Union was unable to reach all of the employees. Eric Ray responded, "you know what, I don't care. If they return, they get their job. If they don't, they're fired." [Rodriguez Dep. 72:1-18].

**107.** Employees who had not heard in time to return to their positions on Tuesday, attempted to return to their jobs on Wednesday and were terminated. [Farhia Abdi Dep. 330:18-331:18].

**108.** JBS' managers admit that before firing someone who came to work on Wednesday, it would have been important to know if the person was actually informed of the directive to return the prior day. [Danley Dep. 83:5-11]. JBS does not know, however, which, if any, of the terminated employees knew they were supposed to return but chose not to. [Danley Dep. 83:5-11].

**109.** Since Ramadan 2008, JBS has continued to discipline and discharge Somali and/or Black and/or Muslim employees. As reflected in the report of EEOC's expert, who analyzed JBS' personnel data, Black, Somalian, and Muslim employees are 1.8 to 3.2 more likely to be disciplined and/or discharged than other employees, and the disparity is statistically significant. [Ex. 16].

**110.** The union representative testified that Somali employees were disciplined more than non-Somali workers. [Gonzales Dep. 57:5-18].

**111.** Many of the Black, Somali, and/or Muslim employees have testified that they were discriminatorily disciplined or terminated since Ramadan 2008. [see *infra* pp. 63-70].

## II.  PLAINTIFF'S RESPONSE TO DEFENDANT'S UNDISPUTED FACTS ("DSF")

**1.**  Undisputed.

**2.**  Disputed. The EEOC's religious discrimination claims are not limited to Somali Muslims but rather apply to all Muslim employees. [ECF 1].

**3.**  Undisputed.

**4.**  Undisputed that these are two methods the EEOC alleges JBS could utilize to accommodate the prayer practices of its Muslim employees. Disputed that the EEOC insists that JBS move the scheduled breaks throughout the year or that these are the only two potential methods that could be used to accommodate the Muslim employees' need to pray. [ECF 330-092].

**5.**  Disputed that EEOC's pattern-or-practice claims are limited to Ramadan 2008. The EEOC's pattern-or-practice claims cover the time period from December 22, 2007 continuing to the present.

[ECF 1, p. 7]. In its order bifurcating the proceedings, this Court indicated that it may limit the Phase I trial to events related to Ramadan 2008, but the Court did not dismiss any portion of the EEOC's claims in its bifurcation order. [ECF 116, p. 15].

**6.**   Undisputed.

**7.**   Undisputed that on one occasion during a deposition question, an EEOC attorney referred to the Nebraska litigation as "sister litigation" for ease of reference to the deponent.

**8.**   Undisputed that the Nebraska court dismissed EEOC's claim alleging a pattern or practice of *unlawful termination* and retaliation. [ECF-330-105, p. 37-39].

**9.**   Undisputed.

**10.** Disputed. The Nebraska Court certified as final only its October 11, 2013 order, not its summary judgment decision. [ECF 330-106].

**11.** Disputed. While the evidence cited by Defendant supports the times for the shifts at the Nebraska facility, the cited depositions do not support this fact for Greeley. In the cited testimony, Anderson testified that the shift started at 3:15 p.m. or 3:30 p.m. in Greeley, not 3 p.m.. Thus, the facts are not "identical" to the facts in the Nebraska case where the evidence is the shift started at 3 p.m.. [See also Ex. 17 (B shift begins at 3:15 p.m.); Kitch Dep. 47:16-18].

**12.** Disputed as vague as there is no time frame referenced. During the time frame at issue in this case (December 2007 to the present), the number of employees on the B shift varied as the B shift started in the fall of 2007 and was ramping up during the first half of 2008. [Shandley Dep. 19:10-19; Kitch Dep. 103:17-20]. These facts are not identical to the facts in Nebraska.

**13.** Undisputed.

**14.** Undisputed.

**15.** Undisputed.

**16.** Undisputed.

**17.** Undisputed.

**18.** Disputed that this fact is "identical" in Nebraska, where the Court found the grade changes last two to four minutes, not one to five, as in Greeley. [ECF 330-103, ¶25].

**19.** Disputed. Defendant's own referenced testimony shows a disputed fact. The Donlon affidavit states there are from three to ten grade changes per shift. The Garcia deposition states there are 10 to 20 grade changes per shift. In addition, JBS' Fabrication Operations Manager testified that grade changes occur every 20 minutes every day, which amounts to 24 grade changes in an 8-hour shift. [Kitch Dep. 61:7-15]. EEOC also disputes the contention that this fact is "identical" to Nebraska, where the Court found 6-10 grade changes per shift, which is not identical to what any of the three different managers said about frequency of grade changes at Greeley.

**20.** Undisputed.

**21.** Undisputed.

**22.** Disputed that this was the number of Muslims on the B shift throughout September 2008. On September 10, 2008, JBS terminated the employment of 96 Muslim employees but JBS' citations refer to its estimate prior to this mass termination. EEOC also disputes that there were a similar number of Muslim employees on B shift in Nebraska. The Nebraska court found there were 120-130 Somali Muslims on the B Shift in Nebraska. [ECF 330-103, ¶ 20].

**23.** Undisputed.

**24.** Undisputed although the safety equipment worn by employees varies based on the position. [F. Abdi Dep. 69:21-70:6 (only wears a hat and boots, which are not removed to go on break)]. Disputed that this is identical to the facts in Nebraska where the Court found that employees were required to wear all of the safety equipment listed by Defendant. [ECF 330-103, ¶ 18].

**25.** EEOC objects to this fact as vague as to the term "a significant portion." For example, the hard hats, hair nets, and boots are not removed prior to leaving the production floor. [*Id*.; F. Ali Dep. 55:15-19 (only removes her gloves); Abade Dep. 55:12-16; Awale Dep. 55:16-56:2].

**26.** Undisputed that the Muslim employees varied in their estimations, partly because different employees may have different equipment to remove. However, according to Defendant's own supervisors, it only takes 10-15 minutes for the Muslim employees to leave the line, pray, and return. [Rivera Dep. 160:17-19; Schult Dep. 158:7-18].

**27.** Undisputed.

**28.** Disputed. Crewing depends on the amount of increase in chain speed and the position. For example, on the arm line, chain speeds of 335 to 360 have the same crewing for Trim Clod; and crewing for Pull Hanging Tender remains at one person for chain speeds from 325 to 405. [Ex. 18]. And crewing varies based on meat grade. [Esparza Dep. 45:14-19].

**29.** Undisputed concerning the goal of "over-crewing." However, EEOC disputes this fact to the extent it implies that the extra employees are not, in fact, used to help spell employees off the line for unscheduled breaks, including Muslim employees using unscheduled breaks to pray, in accordance with JBS' current policy. [Esparza Dep. 41:15-42:6].

**30.** Undisputed.

**31.** Undisputed that the break line has one supervisor and two team leads and the rib line has one supervisor and one team lead. However, there is also a trainer assigned to these lines who is available to fill in when employees take unscheduled breaks. [Rivera Dep. 94:13-15; Esparza Dep. 20:22-23; 38:25-39:3]. Further, each line differs. [S.Garcia Dep. 51:14-17; 52:24-53:3]. Further, some of the lines are much smaller. For example, the Value-Added Line has only 15 to 20 employees. [S.Garcia Dep. 54:7-9].

**32.** Undisputed.

**33.** Undisputed.

**34.** Undisputed regarding Greeley CBA provision. However, the EEOC disputes that the Nebraska CBA provision is "nearly identical." The Nebraska CBA is much more stringent on when the breaks can occur, requiring that that the first break occur between 5 p.m. and 6 p.m.. [ECF 330-103, ¶ 11]. In Greeley, that break can occur anytime from 4:45 p.m. and 6:15 p.m.. Similarly, in Nebraska, the meal break must occur between 7:30 p.m. and 8:30 p.m.. [*Id.* at ¶ 12]. In Greeley, the meal break can occur anytime between 7:30 p.m. and 10:00 p.m.. [ECF 330-94, p. 5].

**35.** Undisputed, but dispute the implication that this provision of the CBA trumps Title VII. Defendant cannot impose more harsh discipline based on race, religion, or national origin.

**36.** Undisputed.

**37.** Disputed. First, management testified that the breaks were 6:15 p.m. and 8:30 p.m.. [Fritche Dep. 77:20-78:10]. Moreover, the break times varied for different positions on the B shift. [E. Garcia Dep. 105:11-25]. Finally, JBS could and did frequently change the break time. [Rosalez Dep. 70:8-12; Fritche Dep. 78:11-79:5]. In fact, when employees were hired they signed off on a schedule indicating that the break times could vary with the first break between 4:30 and 6:15 and meal break between 8 p.m. and 9:15. [Ex. 24].

**38.** Disputed. The break times are not always coordinated with a grade change or mechanical failure. [Fritche Dep. 81:10-82:3 (coordinated breaks with grade changes when he could – 95% of the time); Hernandez Dep. 58:6-8 (grade changes are not coordinated with breaks)].

**39.** Undisputed.

**40.** Undisputed.

**41.** Disputed. JBS contends that leaving food on the line "creates" food safety issues. But later in its own factual recitation, JBS admits that it sometimes calls mass breaks and leaves food on the line and admits that it only increases the risk. [See DSF 49 and 50; Gould Dep. 214:13-215:1].

**42.** Disputed. Employees can leave the line to get a drink of water or if they have a bathroom emergency. [See DSF 43 and 44]. Further, employees can leave the line without permission if they have not received permission to leave within 10 or 15 minutes of their request to leave the line. [Danley Dep. 33:11-23; Fritche Dep. 148:20-24; Hernandez Dep. 21:6-16].

**43.** Undisputed.

**44.** Disputed. At times in Greeley, permission is required to leave the line to get a drink. [Hernandez Dep. 18:25-19:3]. Numerous employees testified they were not allowed to leave their jobs to get water. [F.Abdi Dep. 101:15-102:4, 103:8-15, 104:22-23; Abdulkadir Dep. 94:4-10; Muse Dep. 119:14-18; Ashkir Dep. 90:7-12]. At least one employee testified there is no water near his line. [Ex. 19, ¶ 20]. Disputed that the facts are identical to Nebraska where the Court found that employees do not need permission to leave the line. [ECF 330-103, ¶32].

**45.** Disputed. Unscheduled breaks are not limited to the use of the restroom. [Fritche Dep. 45:10-24 (unscheduled breaks can be granted for any reason); Rivera Dep. 45:9-16]. Further, disputed that this was identical in Nebraska where the Court found that restroom breaks were for restroom purposes only. [ECF 330-103, ¶33]. Finally, it is undisputed that JBS changed its policy in July 2011 to allow employees to pray on unscheduled breaks. [Ex. 9].

**46.** Disputed. Defendant's supervisor testified that most employees take restroom breaks every day and that she has several employees who take multiple restroom breaks each day. [S.Garcia Dep. 178:20-179:8; see also Hernandez Dep. 54:2-5 (he takes restroom breaks almost every day); Espinoza Dep. 40:7-15; 41:2-4 (some employees take restroom breaks each day); Timejardine Dep.

33:18-34:2 (same); Rodriguez Dep. 96:22-97:1]. Even JBS' Operations Manager testified that 20%

of the employees request extra breaks. [Kitch Dep. 55:19-23]. And, Defendant's HR Director

testified that "there are a lot of bathroom breaks that occur during the course of the day; I mean, a

lot." [Daubenspeck Dep. 52:22-23]. Defendant's characterization of this as a "small fraction" is

misleading. Thus, the facts here are not identical to Nebraska.

**47.** Undisputed.

**48.** Undisputed that some supervisors have responded differently to requests for unscheduled breaks

but disputed to the extent this implies that it was not Defendant's standard operating procedure to

deny unscheduled breaks for prayer. JBS' managers have admitted that its policy until July 2011

was to deny unscheduled breaks for prayer and thus Muslim employees were routinely denied

prayer breaks. [Danley Dep. 34:20-35:2; Gould Dep. 72:24-74:18; PSF 1-14].

**49.** – **54**. Undisputed.[1]

**55.** Undisputed.

**56.** Undisputed.

**57.** Disputed to the extent it implies there is a significant difference in the amount of time it takes

to recite the daily prayers when the employee is at work. Defendant's supervisor testified that her

Muslim employees are gone from 10 to 15 minutes when they leave her line to pray. [Rivera Dep.

160:17-19]. Other supervisors testified that Muslim employees take the same amount of time on

unscheduled breaks as the non-Muslim employees. [Anderson Dep. 109:20-110:1; Esparza Dep.

59:10-16]. Defendant's citations are misleading as some include the time it takes to do the ablution

---

[1] Facts numbered 49-54 are completely irrelevant to this case. Notably, none of JBS' facts indicate
that the Muslim employees requested a mass break and Defendant has cited no evidence of any
request for a mass break from Muslim employees or the EEOC. [PSF 21].

in addition to prayer. [*See e.g.*, Salad Dep. 48:4-13 and I. Ibrahim Dep. 31:1-6]. Mr. Ibrahim

testified that he prays more quickly at work. [I. Ibrahim Dep. 137:14-24].

**58.**   Disputed. Ablution is only required if the person has gone to the restroom, passed gas, or

touched someone of the opposite sex since their last ablution. [Aaden Dep. 50:10-51:1; Abdulkadir

Dep. 26:5-14].  Ablution is not required at the same time as the prayer so employees would often do

ablutions during the scheduled break or prior to work so that at prayer time, they could go and pray

quickly and return to the line. [Asad Abdi Dep. 44:10-17; K.Abdullahi Dep. 42:19-22].

**59.**   Disputed. On the A shift, there are 2 months during the year that no prayer time needs to be

accommodated and there is only one prayer to accommodate for 8 months of the year. For over 11

months of the year, there is only one prayer that falls during the A shift that requires

accommodation. [Ex. 20, see also Esparza Dep. 57:24-58:4 (employees only requested one prayer

break on A shift)]. For the B shift, many Aggrieved Individuals testified that they did not pray either

the Asr or Isha prayer at work and thus did not need accommodation for these prayers (therefore

leaving only one prayer, the Magrib prayer, requiring accommodation). Aaden Dep. 31:16-21 (Isha

and Asr); Asad Abdi Dep. 43:13-15, 206:1-4 (Isha); F. Abdi Dep. 236:1-4 (Asr); K. Abdullahi Dep.

52:1-4 (generally prays Isha after work); N. Abdullahi Dep. 70:16-18 (Isha); F.Aden Dep. 38:21-

39:4 (Isha); N.Aden Dep.: 144:23-24 (Isha); Saynab Ali Dep. 73:11-20 (Isha); H.Ali Dep. 77:4-6;

169:10 (Isha and sometimes Asr); H.Hassan Dep. 80:12-15; 87:2-3 (Isha and sometimes Asr);

F.Ibrahim Dep. 44:3-15 (Isha and Asr); U.Muhumad Dep. 75:20-76:1 (Isha and Asr); Ahmed Abdi

Dep. 51:22-23 (Asr); Salah Ali Dep.: 62:6-8 (Asr); Awale Dep. 95:4-6 (Asr); S. Jama Dep. 31:10-

13 (Asr); M. Mire Dep. 140:6-9 (Asr).

**60.**   Undisputed, however, see Response to DSF 61-65.

**61.**  The EEOC does not dispute that the individual claimants have different views regarding the appropriate prayer windows for the Fajr prayer, but the EEOC has never requested an accommodation for this prayer as it occurs prior to the start of the A shift or is so close to the start of the shift that an accommodation would not be feasible. [Ex. 21].

**62.**  The EEOC does not dispute that the individual claimants have different views about the time allowed for the Dhuhr prayer, but differing views make it easier to spell the employees off the line as there is greater flexibility when not every employee has to leave the line at the same time.

**63.**  The EEOC does not dispute that the individual claimants have different views regarding prayer windows for the Asr prayer, but many of claimants pray the Asr prayer before coming to work and do not require accommodation. [See Response to DSF 59]. Thus, it is easier to accommodate this prayer because so few employees require accommodation.

**64.**  EEOC disputes this fact to the extent that it implies that the claimants asked for prayer accommodations in accordance with these individual beliefs. The claimants agreed to follow a uniform practice with respect to their employment and testified that they would have followed the prayer recommendations of an Imam or other religious leader. [Asad Abdi Dep. 18:22-19:12; N.Abdullahi Dep. 155:20-23]. Indeed, after consulting an Imam, the Muslim Committee agreed to a 7:30 p.m. break time and the company understood that the Muslim employees would abide by this and, in fact, did abide by this when the break was moved to 7:30 p.m.. [Gould Dep. 122:1-9; Lovell Dep. 126:1-6; 127:19-23]. No Muslim employee complained that the 7:30 break was not an adequate accommodation for the Maghrib prayer.

**65.**  The EEOC does not dispute that the individual claimants have different views about a prayer window for the Isha prayer, but many of the claimants testified that they do not pray the Isha prayer at work and instead wait until they go home to pray. [See Response to DSF 59].

**66.** Undisputed.

**67.** Disputed. Although the prayer times change by a few minutes each week, the break time would not have to change each day. For example, this year, Ramadan runs from June 28 to July 28, 2014. During this month, the Magrib prayer changes from 8:34 p.m. to 8:18 p.m., a total of 16 minutes. [Ex. 21]. Allowing 5-7 minutes to say the prayer (they have removed their equipment at the start of the dinner break and any ablutions can be done prior to the prayer), a dinner break from 8:15 to 8:45 would accommodate the Maghrib prayer throughout the month of Ramadan. [Abdulkadir Dep. 27:18-25 (it takes 4 minutes to recite the Maghrib prayer at work)].

**68.** EEOC objects to this fact as it suggests the EEOC requested an accommodation that requires a third break. The EEOC requested that the company either move the scheduled breaks OR allow unscheduled breaks, or a combination of the two. In those months where the company cannot move the scheduled break to accommodate the evening prayer break without violating the CBA, the EEOC requested that JBS allow Muslim employees to pray on unscheduled breaks. [DSF 66]. The Muslim employees never requested an additional break. [Daubenspeck Dep. 53:8-10; Lovell Dep. 213:4-6; Asad Abdi Dep. 60:22-24].

**69.** Disputed. See Resp. to DSF 38.

**70.** Disputed. Just as JBS now plans its production schedule so that grade changes coincide with break times, JBS can plan its production schedule so that grade changes coincide with the different break times. [Fritche Dep. 82:11-14; 83:14-21].

**71.** Undisputed.

**72.** Disputed. JBS plans its production schedule at the beginning of each day. [Fritche Dep. 82:11-14]. Each day, the production schedule varies based on customer orders and thus the grade changes are at different times. [Danley Dep. 103:17-20]. Thus, JBS plans its production schedule so that the

26

scheduled breaks will fall at the same time as a grade change as often as possible. This is not difficult as the grade changes every 20 minutes. [Kitch Dep. 61:7-15]. This same process can be done no matter when the breaks are scheduled. [Fritche Dep. 83:14-21].

**73.** Disputed. Neither the Muslim employees nor the EEOC has ever requested that JBS schedule breaks at the precise prayer times. The Committee, for example, agreed to a break time of 7:30 p.m. for the entire month of Ramadan 2008. [Asad Abdi Dep. 76:8-77:7; Lovell Dep. 126:1-6; 127:19-23]. Further, equipment malfunctions that stop the entire line resulting in a mass break are a rare event. [Danley Dep. 103:11-13]. Thus, in the rare situation where there is an equipment malfunction, and it occurs at a time when a dinner break could be taken under the CBA (between 7:30 p.m. and 10:00 p.m.), the EEOC is not insisting on an extra break.

**74.** Disputed. First, none of the deposition testimony cited by Defendant supports its contention that employees get hungry. Second, EEOC objects that this testimony is hearsay. Third, each of the plants have different break schedules. [Shandley Dep. 24:20-23]. Most other plants have their dinner break earlier than Greeley. [Danley Dep. 151:1-8]. For example, in Nebraska, under the CBA, the meal break must occur between 7:30 p.m. and 8:30 p.m.. [ECF 330-103, ¶12]. Thus, JBS cannot contend that holding the break earlier is difficult for employees when it regularly does so in the other plants. Further, the testimony shows that JBS does, in fact, move the break around based on its own production needs. [Rosalez Dep. 70:8-12; Fritche Dep. 78:11-79:5].

**75.** Disputed. Clearly, not *all* employees were upset by the break being moved. The highest estimate of protesters is approximately 200, which is 13% of the 1500 people on the B shift. [DSF 116,118, 12]. Bob Anderson, a supervisor at JBS, testified that no employees complained to him about the meal break being moved to 7:30 p.m. during Ramadan 2008. [Anderson Dep. 139:20-23]. Indeed, Defendant's HR Manager testified that when they told the Non-Muslims that the break time

would be moved up, they were "fine with that." [Walker Dep. 77:14-18]. Further, moving the break clearly does not hurt the Muslim employees' morale. Finally, moving the break forward results in the break occurring in accordance with the CBA, which was negotiated by the employees themselves, through their elected collective bargaining representative.

**76.** Disputed that moving the break will change employees' medication schedules. Employees are liberally allowed to leave the line to get a drink of water [DSF 44], and can do so to take medication. If an employee needs more than a drink of water to take medication, he or she may take an unscheduled break for that purpose. [Rivera Dep. 45:9-16]. At whatever time the break is scheduled, it will coordinate with someone's medication schedule and not others. Also, the actual break times varied from day to day because JBS regularly moved them to coordinate with grade changes, as allowed under the CBA. [Rosalez Dep. 70:8-12; Fritche Dep. 78:11-79:5]. Thus, no employee could rely on the break corresponding with his or her medication schedule.

**77.** Disputed. Often when employees leave the line, the other employees set the meat aside for the absent employee to complete when he or she returns. [Asad Abdi Dep. 41:13-42:6; Ashkir Dep. 39:14-19; Anderson Dep. 118:3-20; see also DSF 80].

**78.** Disputed. Bob Anderson, a supervisor promoted to General Foreman, testified that he has not had any issues spelling the Muslim employees off the line to pray and, in his experience, allowing Muslim employees to take prayer breaks has not had any impact on the rate or occurrence of injuries. [Anderson Dep. 110:2-11; 167:24-168:3]. Similarly, JBS' Plant Manager testified that although he believes there to be a potential for increased injuries "we haven't tied it back to anything. We haven't done any studies on that." [Danley Dep. 97:11-19]. Further, JBS' Quality Assurance Supervisor, who is responsible for employee safety, testified that she was unaware of any issues with allowing employees to take unscheduled breaks to pray. [Mejia Dep. 41:10-19; 159:22-

160:8]. The union representative testified that he was not aware of any employee injured due a Muslim worker taking a prayer break and if he had, he would have filed a grievance. [Rodriguez Dep. 102:3-13]. Finally, Defendant's General Foreman testified that there has been a decrease in injuries in the more recent years [Timejardine Dep. 125:25-126:3], which includes years since JBS modified its policy in 2011 to allow unscheduled breaks for prayer.

**79.** Disputed. Three supervisors at JBS testified that they had no issues spelling the Muslim employees off the line to pray and, in their experience, allowing Muslim employees to take prayer breaks has not affected production or the quality of the meat. [Anderson Dep. 110:2-11; 167:24-168:3; Rivera Dep. 98:22-99:7; 99:23-100:4; Rosalez Dep. 59:2-13]. And, Bill Danley, Defendant's Plant Manager admitted that there has been no study showing a link between unscheduled breaks and poor product quality. [Danley Dep. 95:7-96:17]. Further, Defendant's General Foreman testified in October 2012, that the quality of product has improved since 2008 and 2009 [Timejardine Dep. 121:7-17], which improvement occurred in years since JBS modified its policy in 2011 to allowed unscheduled breaks for prayer.

**80.** Disputed that when an employee hurries to process stacked meat quality necessarily suffers. First, Defendant's citation to Rivera's testimony is misleading as the next page of her testimony explains that there is only an issue with quality if people leave without permission but if they follow the rules and get permission there is no issue with quality. [Rivera Dep. 100:19-101:24]. Further, Defendant's supervisor testified that quality is not affected and its Operations Manager testified that quality has improved since 2008 even though the policy was changed to allow unscheduled breaks to pray. [Anderson Dep. 110:2-8; Timejardine Dep. 121:7-17].

**81.** Disputed. Defendant's supervisors testified that allowing employees to take unscheduled breaks to pray has not affected their employees. [Rivera Dep. 98:22-99:7; 99:23-100:4; Anderson Dep.

110:2-11; 167:24-168:3; Rosalez Dep. 59:2-13; S. Garcia Dep. 99:24-100:6 (employees are willing to help out their co-workers)]. Further, Defendant's HR Director testified that although he heard "off-the-cuff" comments from employees, no employee has ever formally complained about Muslim employees taking breaks to pray. [Sunner Dep. 64:11-65:5].

**82.** Undisputed that Muslim employees admit that work can become more difficult for the 15 minutes when someone is absent from the line, but this is only if the employee taking a break is not replaced. Generally when someone requests an unscheduled break, they are relieved by a trainer, lead, supervisor, or another employee. [Anderson Dep. 118:23-119:16; see also DSF 80 (sometimes meat is stacked for the employee for when they return)].

**83.** Disputed. Defendant relies on inadmissible hearsay evidence. Additionally, EEOC disputes the implication that it is actually unsafe when people leave the line. [See Resp. to DSF 78); Anderson Dep. 110:2-11]. Further, it is disputed that JBS received actual complaints from employees or the union. JBS' HR Director testified that he has never received any complaints from employees complaining that it is unsafe when people leave the line. [Sunner Dep. 64:11-65:5]. Further, the union representative testified that he never filed a grievance regarding any alleged complaints about unscheduled breaks, and that he was not aware of any injury that occurred due to a Muslim employee taking a prayer break. [Rodriguez Dep. 102:3-13].

**84.** Partially disputed. First, two of Defendant's citations do not support its contention (see e.g. Abade Dep. and Sahal Dep.). It is undisputed that there are a few positions in the Plant where an employee needs a replacement to take an unscheduled break. However, it is not true that meat would fall on the floor when left for the absent employee. If other employees cannot perform the absent employee's job, there are "combos" (cardboard box) available to put the meat in to hold it until the employee returns. [Anderson Dep. 118:3-20; Fritche Dep. 66:21-67:2; 67:24-68:3].

**85.** Disputed. JBS' Plant Manager and HR Director at Greeley testified that they are unaware of an increased number of employees requesting unscheduled breaks since allowing Muslim employees to take unscheduled breaks to pray. [Danley Dep. 159:9-13; Sunner Dep. 66:21-67:6].

**86.** Disputed. This depends on a variety of factors, including the number of employees on the line, whether supervisors, leads, trainers or employees from other lines are available to replace the Muslim employees, whether the employees are in positions where their work can be stacked up for them while they are gone, and the flexibility of the individual's prayer windows. [See PSF 62-69; DSF 60-65]. It varies from line to line how many people can be gone at the same time, and how many people are available to replace employees on prayer or restroom breaks. [*See also* Asad Abdi Dep. 41:1-42:6 (employees were able to relieve each other)].

**87.** Undisputed.

**88.** Undisputed that the CBA prohibits supervisors from "routinely" performing bargaining unit work but dispute that this in any way prevents supervisors from filling in for workers on unscheduled breaks. [Danley Dep. 117:1-5; Anderson Dep. 110:12-20].

**89.** Disputed. Supervisors can and do fill in for absent employees. [Danley Dep. 118:1-4; Anderson Dep. 110:12-20]. Further, the fact that supervisors are filling in does not prevent them from supervising. [Ex. 22, ¶ 4].

**90.** Disputed. First, Defendant's fact is vague as to time. 433 Muslims is an estimate for the first week of September 2008. Prior to that, JBS was ramping up the B shift, and the next week JBS fire 96 of the 433 Muslim employees. Thus, 433 is inaccurate for all of 2008, as JBS asserts in this alleged undisputed fact. Further, Defendant's analysis does not account for trainers and assistant trainers who are available to fill-in for absent employees. [Hernandez Dep. 22:21-23:1]. This analysis also incorrectly assumes that the Lead employees are not doing their regular job when they

fill-in for employees on unscheduled breaks, but filling-in for absent employees is part of the Lead's job duties. [Hernandez Dep. 17:2-25]. Nor does this analysis account for the fact that the usual way employees are replaced when they take restroom breaks is to borrow someone from another position. [Anderson Dep. 118:23-119:16; Danley Dep. 112:12-20].

**91.**  Disputed. JBS pays the supervisor's salary regardless of what job duties the supervisor performs at any given time during the shift. Thus, as Defendant's own witness admits, payroll is not affected when a supervisor fills in for an unscheduled break. [Skinner Dep. v. II 252:17-20].  Again, filling in is part of the Lead's job duties.  [Hernandez Dep. 17:2-25].

**92.**  Undisputed.

**93.**  Disputed. Many employees are cross-trained to work in different positions. Indeed, Defendant's Plant Manager testified that is something the Company regularly does and Defendant's Operations Manager testified that cross-training is "super important" for operations. [Danley Dep. 100:22-101:2; Jordan Dep. 36:6-8; See also Anderson Dep. 73:22-74:8; 110:25-111:3; Rodriguez Dep. 93:11-16 (employees are required to know every job on their line)]. Thus, cross-training on the line is a regular part of the business, not an additional expense.

**94.**  Disputed. This is JBS' estimate to train new employees. [Jordan Dep. 131:23-132:7; Sperandio Dep. 98:22-99:16]. This is not the cost to cross-train employees, who are already trained on the policies and procedures at JBS. [W. Farah Dep. 34:15-35:1 (new employees attend 40 hours of orientation training when they are hired)]. Defendant's supervisor testified that he cross-trains employees on his lines where he is over-staffed and that the number of employees on his line and the amount of time he has are the only factors that impact cross-training. [Morales Dep. 87:10-88:11]. Supervisors are paid bonuses based on the performance of their lines, so if it cost money to

cross-train, Mr. Morales would have lost pay. [Anderson Dep. 80:23-81:22; see also Rivera Dep. 36:18-21 (there are no problems getting people cross-trained)].

95.  Disputed. Doug Jordan, one of JBS' Operations Managers testified that because of Defendant's job-bidding system, which has not changed since 2008, they have quite a few people cross-trained. [Jordan Dep. 37:3-14]. Similarly, Defendant's supervisor testified that he cross-trained employees in 2008. [Morales Dep. 85:21-25].

96.  Disputed. Due to over-crewing, there are employees who are doing "extra" jobs, not working on the production floor, who are available to fill-in for the absent employee. [Danley Dep. 112:12-20; Esparza Dep. 41:15-42:6; Daubenspeck 51:3-15].

97.  Disputed. First, the clear language of the CBA states an employee is only paid the higher wage if they are "qualified" on the position [ECF 330-94, p. 12]. Being "qualified" on a particular position means that a supervisor has determined that you can do the position properly at the chain speed set by the company, and thus receive a raise. [S. Garcia Dep. 130:21-23; Kitch Dep. 62:3-12]. Defendant's managers testified that an employee does not need to be "qualified" for the job to fill in for an unscheduled break. [Kitch Dep. 60:6-18]. Further, the CBA does not state that an employee must be paid a higher rate if temporarily assigned to a higher-paying job for just 15 minutes. [Ex. 23]. Indeed, supervisors have testified that they do borrow employees from other areas to fill in and yet, JBS admits in fact number 99 that it has no system to track paying them a higher wage. [Rivera Dep. 75:25-78:5]. Therefore, it is clear that JBS does not pay higher wages for 15-minute re-assignments to cover unscheduled breaks. [Ex. 22, ¶5].

98.  Undisputed.

**99.** Partially disputed. It is undisputed that JBS does not have such a system. It is disputed that JBS is required to, or does in fact pay higher wages to employees filling in for an unscheduled break. [See Resp. to DSF 97]. Thus, no tracking system is necessary.

**100.** Disputed. [See Resp. to DSF 97 and 99].

**101.** Disputed. Numerous employees have testified that they were told they were not allowed to pray at work at all and were disciplined for praying at the Plant. [Ex. 24, ¶ 12; *infra* Sect. III, pp.63-70].

**102.** Disputed. The majority of the Muslim employees do not believe that drinking water is sufficient to break the fast for Muslim employees. These employees believe that breaking the fast requires the employee to eat an odd number of dates or Sambosa in addition to drinking water. [Aaden Dep. 45:25-46:12 K. Abdullahi Dep. 92:7-22; Muhumad Dep. 99:15-100:6; Ex. 12, ¶2]. Food is not allowed on the production floor. [Gould Dep. 80:13-81:10; Kitch Dep. 77:2-4]. Therefore, employees must take an unscheduled break to break their fast, which is routinely denied. [PSF 1, 11, 14]. Further, numerous employees testified they have been prevented from getting water to break their fast.  [F. Abdi Dep. 101:15-102:4, 103:8-15, 104:22-23; Abdulkadir Dep. 94:4-10; K. Abdullahi Dep. 91:13-17; Muse Dep., 119:14-18; Ashkir Dep. 90:7-12].

**103.** Disputed. Transferring employees to the A shift would violate the CBA. [Schult Dep. 121:19-122:6; Gould Dep. 135:16-136:11]. JBS needed agreement of the union to transfer employees to the A shift and never discussed it with the union. [Schult Dep. 122:25-123:19].

**104.** Disputed. EEOC does not dispute that JBS set up one prayer room almost a year after Ramadan 2008. JBS did not set up multiple prayer rooms as alleged. Defendant's own cites only show that Defendant set up one prayer room sometime during 2009. Further, Defendant's citations do not support the contention that any footbaths were installed prior to Ramadan 2009.

**105.** Undisputed.

**106.** Undisputed, but incomplete. The employees approached Palacios after the shift was completed, so as not to interfere with production. [Palacios Dep. 135:22-136:9].

**107.** Undisputed.

**108.** Disputed. EEOC disputes that that the Muslim employees congregated outside the plant until JBS figured something out with the break. To the contrary, it was not until nearly 7:00 p.m. that JBS decided to move the dinner break to 7:30. [Gould Dep. 122:1-20]. Shortly before the B shift started, JBS managers came outside and suggested the Muslim employees select a committee to speak for them, which the Muslim employees did. All the other Muslim employees went to work at 3:15 p.m. when the shift started, and worked without knowing whether any accommodation would be made. [*Id*.; Ray Dep. 109:25-110:7; Jordan Dep. 54:19-23].

**109.** Undisputed.

**110.** Undisputed.

**111.** Disputed. The Committee agreed that moving the meal break to 7:30 p.m. would be an acceptable accommodation. [Asad Abdi Dep. 76:8-77:7]. Further, the Committee did not disagree about the appropriate window of time to pray following sunset. [*Id*. at 206:12-14]. Matt Lovell, JBS' HR Manager, testified that during the meeting, the Committee members requested 15 minutes to be able to eat a little bit and pray and that they told him there was a 15 minute window to pray. [Lovell Dep. 121:13-122:7; 124:20-23; Ex. 11, pp. 1-3].

**112.** Undisputed

**113.** Undisputed that Mr. Schult sent the email. However, no one from Greeley ever responded to his request, and he already knew that moving the break to 7:30 p.m. was feasible under the CBA and was acceptable to the Muslim employees. [Schult Dep. 84:18-85:12].

**114.** Object that Schult's email is inadmissible hearsay as to what JBS was told by Muslim employees in Nebraska in 2007. Disputed to the extent the fact implies that JBS did not already know that the Muslim Committee in Greeley had said they had a window of 15 minutes to pray after sunset. [Ex. 11, pp. 1-3; Lovell Dep. 124:20-23].

**115.** Undisputed.

**116.** Disputed that many n*on*-Muslim employees were angry. Bob Anderson, a supervisor, testified that no employees complained to him regarding the meal break being moved to 7:30 p.m.. [Anderson Dep. 139:20-140:2]. Alicia Espinoza, a non-Muslim employee, testified that the changed break time did not bother her. [Espinoza Dep. 75:4-6]. Further, it is disputed that 200 non-Muslims stayed at their work stations. Defendant' Operation manager testified that only 40 or 50 employees stayed at their lines. [Kitch Dep. 116:25-117:7].

**117.** Disputed. Emerita Garcia testified that no non-Muslims left the line at 9:15 p.m.. [E. Garcia Dep. 161:17-21]. Defendant's own production records show that the chain speed was not reduced on Thursday, September 4, 2008. [Ex. 25 (average chain speed of 362, the same as the three preceding days)]. Defendant's expert testified that the data does not show there was any effect on production prior to the week of September 14, 2008 when JBS fired 96 Muslim employees. [Skinner Dep. 151:19-152:9 (the company had higher production numbers the week of September 1 than the prior week); *Id.,* 153:17-154:9].

**118.** Disputed that non-Muslim employees refused to return to work until the meal break was moved back. The decision to move the break to 8pm was not made until after 7pm. [Lovell Dep. 164:5-7]. In the meantime, the employees who gathered before the shift selected a committee to meet with the company, and the rest went to work. [Gould Dep. 184:23-185:1; Ray Dep. 143:16-144:1; 147:7-11].

**119.** Dispute the implication that all non-Muslims complained. Alicia Espinoza testified that it did not bother her. [Espinoza Dep. 75:4-6]. Bob Anderson testified that no employees complained to him. [Anderson Dep. 139:20-140:2]. Defendant's HR Manager testified that when the Non-Muslims were told, they were "fine with that." [Walker Dep. 77:14-18].

**120.** Disputed. JBS did not tell the non-Muslim employees that the break was being moved to meet the company's legal obligations to accommodate the Muslims' religion. [Ex. 14; Kitch Dep. 114:7-115:17; Gould Dep. 167:7-12]. Indeed, employees and supervisors testified that they did not know an employer had a duty to accommodate religious practices. [Anderson Dep. 94:8-11; Danley Dep. 131:25-132:2]. Rather, the non-Muslims who complained did so because they felt the company was unfairly favoring the Muslims. [Rivera Dep. 166:11-167:4]

**121.** Undisputed.

**122.** Undisputed.

**123.** Disputed that this was in fact a compromise. The company reneged on its promise that the break would be at 7:30 p.m. the rest of the week and unilaterally decided to move the break to 8 p.m. despite the protest of the Muslim Committee. [Asad Abdi Dep. 77:18-78:5]. The Muslim Committee requested that JBS wait until Monday to move the break so that they would have time to explain the situation to the Muslim employees. [Asad Abdi Dep. 80:19-24]. JBS refused and unilaterally changed the break to 8 p.m. without time to inform the employees of the change. [Id. 78:9-79:1, 80:19-81:3; Lovell Dep. 164:5-11, 165:1-166:1].

**124.** Disputed. Defendant's Operations Manager and Product Manager in 2008 testified that they do not recall any Muslim employees leaving their lines at 7:30 p.m.. [Kitch Dep. 128:1-15; Jordan Dep. 71:14-16]. Regardless, however, any Muslim employees who left the line at 7:30 p.m. did so because they had never been told the break had been moved. [Lovell Dep. 165:1-166:1].

**125.** Disputed that Muslim employees stood on tables and began shouting. Bob Anderson testified that he was present and that the noise level in the cafeteria was "normal to loud" and that he does not recall anyone yelling, banging on the tables, or standing on the tables. [Anderson Dep. 150:6-9; 152:3-9]. Similarly, Chris Kitch testified he was in the cafeteria that night and he did not see any standing on the tables or unruly behavior other than loud talking. [Kitch Dep. 136:25-138:3]. Indeed, in JBS' Position Statement submitted to the EEOC, it described the Muslim employees as engaging in a "lively discussion." [Ex. 5, p. 6].

**126.** Disputed. The Muslim employees left the plant because they were ordered to by JBS management. HR Manager Walker, testified that she told the Muslim employees to leave and that management walked them outside. [Walker Dep. 86:24-87:15; 88:16-19; 91:12-92:14]. Walker testified that some of the Somali employees tried to get back in the building and the company's managers blocked them from coming back in. [Walker Dep. 90:19-21; 103:18-104:1].

**127.** Undisputed that the Muslim employees who were forced by JBS managers to leave the plant, gathered in the parking lot and remained there, willing and able to return to work if allowed by JBS management. Undisputed that around 11 p.m., the employees who were gathered in the parking lot complied with orders from JBS managers that they leave the premises.

**128.** Undisputed that JBS ran the plant at a reduced chain speed after they kicked out a large number of Muslim employees, and refused to allow them to return to work. The work force was also diminished because some non-Muslim employees left the plant. [PSF 96].

**129.** Undisputed that the named people met and asked to meet with the Muslim committee on Monday. Disputed that they sought a meeting with the Muslim committee for the purposes stated, which is self-serving testimony of interested witnesses. One apparent reason JBS sought a meeting

with the Muslim leaders was to convey their decision to change the 1-day suspension for Monday into an indefinite suspension. [PSF 99].

**130.** Disputed. The Muslim Committee had already explained that they believed the permissible window to be 15 minutes and that it would take 15 minutes away from the line. [See Response to DSF 111]. The information from Schult regarding an alleged 45-minute prayer window was known by Schult since 2007 and by individuals in Greeley since his email the prior Thursday [ECF 330-96], and did not present a new issue to be resolved on Monday.

**131.** Undisputed.

**132.** Undisputed. Conveying the indefinite suspension was the main reason to meet. There was no discussion of whether the prayer window was 15 or 45 minutes. [ECF 330-97, p. 1].

**133.** Disputed that there was a work stoppage by Muslim employees on Friday, September 5, 2008. Muslim employees who did not work after the dinner break were ejected by JBS management and not allowed to return to work. [See Resp. to DSF 126]. They remained on the premises, ready and willing to return to work, but were not allowed to do so. [Gould Dep. 228:13-15]. They left the premises when ordered by JBS managers to leave the premises. [Gould Dep. 226:23-227:9; 230:1-4]. Further EEOC disputes that JBS wanted the Somali Muslims to return to work. If JBS wanted the Somali Muslims to return to work, it would have allowed them to return Friday night, when they were in the parking lot waiting to be allowed to return to work. If JBS wanted the Somali Muslim employees to return to work, then on Tuesday, when Eric Ray was told that not all the employees could be informed of the requirement to return that night, he would not have said "you know what, I don't care. If they return, they get their job. If they don't, they're fired." [Rodriguez Dep. 72:8-18]. If JBS wanted the Somali Muslim employees to return to work, it would not have fired those who reported to work on Wednesday. [DSF 140].

134. Undisputed.

135. Disputed.  The Muslim Committee never refused to respond to the company.  [Ex. 15, ¶ 6 ].  In the very next fact, JBS indicates that it did get an answer.  [DSF 136].

136. Disputed.  The prior week, JBS agreed to move the break to 7:30 p.m. and JBS knew that the Muslim employees had accepted this as a sufficient accommodation.  [Resp. to DSF 111].

137. Disputed.  The Muslim Committee never said all employees were at the park. [Ex. 15, ¶ 9]. Further, within a couple of hours following the meeting, the union representative informed the company that not all the employees were present at the park.  [Rodriguez Dep. 71:8-72:18].

138. Undisputed except to the extent it implies that the Union or Somali Muslim workers took responsibility for notifying the employees. [Rodriguez Dep. 77:18-22].

139. Disputed. Fernando Rodriguez testified he was told to tell the employees that if they returned to work "right now," they would not be terminated. [Rodriguez Dep. 70:23-71:12].

140. Partially disputed. EEOC disputes that any Somali employees who did not return on Tuesday were allowed to return to work. JBS' citation to the Schult deposition does not support the fact as stated. Schult states that he does not know if everyone was fired and therefore whether anyone was brought back. [Schult Dep. 108:6-9]. Although Eric Ray testifies that he believes people were brought back, JBS has failed to identify a single individual who was suspended on Friday, and allowed to return to work on Wednesday, without having worked on Tuesday.

141. Disputed. EEOC disputes that the events at the two plants are "nearly identical."  First, Defendant previously stated that it "adamantly refutes" that the events were under the same circumstances. Indeed, there are, in fact, many critical differences between what happened in Greeley and the findings of the Nebraska court, including the following: (a) In Nebraska, the Muslim employees sought a year-round solution for all of the prayers, while in Greeley, the Muslim

employees only sought an accommodation for the Maghrib prayer for 17 days [compare ECF 330-103 ¶¶53 and 54 with PSF 24-25]; (b) Muslim employees in Nebraska refused to work for two days whereas the Muslim employees in Colorado never failed to report to work [compare ECF 330-103 ¶¶55 and 56 with Resp. to DSF 108]; (c) In Nebraska, the non-Muslim employees refused to work and JBS had to cancel the B shift for 2 days, while in Colorado no shifts were canceled [compare ECF 330-103 ¶¶58 and 59 with DSF 121]; (d) in Nebraska, the Muslim employees walked out when JBS changed the break back, but in Greeley, the employees were forced out by JBS management [compare 330-103 ¶¶62 and 63 with Resp. to DSF 126] and (e) JBS suffered significant production losses in Nebraska whereas there were no production losses in Greeley until JBS forced out the Muslim employees. [compare ECF 330-103 ¶¶65 and 66 with Resp. to DSF 117].

**142.** Undisputed that Schult asked Skinner to calculate the cost of an additional break and undisputed that this was her calculation for the cost of a third break for the entire workforce, an irrelevant calculation no such accommodation was requested. [Daubenspeck Dep. 53:8-10].

**143.** Partially Disputed. Undisputed that the B shift fabrication department experienced an overall decrease in chain speed efficiency following the mass suspension of nearly 200 employees who were not allowed to work after the dinner break on Friday, September 5, 2008, or all day on Monday, September 8, 2008, and then termination of 96 Muslim employees on Wednesday September 10, 2008. EEOC disputes that JBS experienced any reduction in chain speed efficiency or negative effect on production prior to the mass suspension and termination of the Somali Muslim employees. [See Resp. to DSF 117]. To the contrary, production was higher during the first week in September than it was the prior week. [Skinner Dep. 151:19-152:9].

## ARGUMENT

A motion for summary judgment may be granted only where there are no genuine issues as

to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P.

56. The test for determining the presence or absence of a genuine issue of material fact is whether

the evidence is such that a reasonable jury could return a verdict for the non-moving party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]he court must draw all reasonable

inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh

the evidence." *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000). Moreover, the

court "must disregard all evidence favorable to the moving party that the jury is not required to

believe." *Id*. at 151. Thus, the Court should look skeptically at any summary judgment motion

grounded on testimony of the movant's own interested witnesses, as Defendant's motion is in this

case. JBS cannot meet its burden; its motion should be denied.

## I.  Defendant Cannot Establish Collateral Estoppel Because It Persuaded The Nebraska Court To Exclude Evidence From Colorado.

Defendant cannot prevail on its collateral estoppel argument because it argued in Nebraska

that the facts in Colorado were too different to be relevant to any determination in the Nebraska

case, and prevailed in having evidence from Colorado excluded from summary judgment and at

trial.  Thus, JBS itself is estopped from now taking the opposite position in this court – that the facts

in Colorado are "nearly identical" to the facts in Nebraska.  Moreover, because the Nebraska court

refused to hear evidence about the Greeley plant, EEOC had no opportunity to fully litigate this case

in Nebraska, which is a necessary element for estoppel.

### A.  Defendant should be judicially estopped from claiming the facts and issues in Colorado are identical to those in Nebraska.

The equitable doctrine of judicial estoppel holds that "where a party assumes a certain

position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter,

simply because his interests have changed, assume a contrary position, especially if it be to the

42

prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)(citation omitted). The doctrine is discrete from both claim preclusion and issue prelusion (collateral estoppel). *Id*. at 748-49. The purpose of judicial estoppel "is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Id*. at 749-50 (internal quotations and citations omitted). Its application is discretionary and is "not reducible to any general formulation of principle." *Id*. at 750 (citation omitted).  Nevertheless, certain factors are often applied: 1) the party's position is clearly inconsistent with an earlier position; 2) the party succeeded in persuading a court to accept the earlier position, such that acceptance of an inconsistent position would give the appearance that one or the other court was misled; and 3) the party seeking to assert an inconsistent position would derive an unfair advantage. *Id*. at 750-51; *see also Johnson v Lindon City Corp.*, 405 F.3d 1065, 1069 (10th Cir. 2005).

Here, all three factors are present. First, in summary judgment briefing in Nebraska, JBS "adamantly refute[d] that the events in Greeley were under 'the same circumstances,'" as those in Nebraska. [Ex. 26, p. 122]. JBS also repeatedly asserted that the facts in Colorado had "no bearing" on the Nebraska lawsuit, that the Nebraska court should not consider what happened in at the Greeley plant, and that this Court's rulings should not apply in Nebraska. [Ex. 26, pp. 47-48, 75, 83, 84 n.20, 103-4, 121-22]. In this Court, Defendant argues the opposite – that the facts in Nebraska and Colorado are "nearly identical," and that the rulings in Nebraska should bind this court [ECF 330, p. 30], positions clearly inconsistent with Defendant's position in Nebraska.

Second, JBS succeeded in convincing the court in Nebraska to not consider evidence from the Greeley facility, and to not rely on this Court's rulings [ECF 330-105, pp. 40; 27-29]. If this Court accepts JBS's position that the issues and facts are sufficiently "identical" to warrant

collateral estoppel, it will appear from the two court decisions that either the Nebraska Court was

misled to believe the cases are dissimilar, or this Court was misled to believe they are identical.

Third, JBS will be unfairly advantaged if allowed to use the Nebraska decision to decide the

Colorado case, when none of the Colorado evidence was considered in the Nebraska case.

Defendant cannot have its cake and eat it too. Having convinced the Nebraska court to

exclude the Colorado facts, Defendant cannot now claim the Nebraska court decided this case.

**B. Even if not judicially estopped, JBS fails to show that the issues and facts in Nebraska are identical to those in Colorado.**

Collateral estoppel is a form of *res judicata* that serves to preclude a party from raising

certain previously-determined issues of fact or law. *Park Lake Res. Ltd. Liab. v. U.S. Dept. of Ag.*,

378 F.3d 1132, 1136 (10th Cir. 2004). Collateral estoppel applies if:

> (1) the issue previously decided is **identical** with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

*Id.* (citations omitted) (emphasis added). "[C]hanges in facts essential to a judgment will render

collateral estoppel inapplicable in a subsequent action raising the same issues." *Montana v. United*

*States,* 440 U.S. 147, 159 (1979). JBS cannot prove the first or fourth prong as a matter of law. To

show that the issues are "identical" for purposes of collateral estoppel, JBS must demonstrate as a

matter of law that the following questions should be answered in the affirmative:

1) Is there a substantial overlap between the evidence or arguments submitted in Nebraska and to be presented here?

2) Is the rule of law the same as that in Nebraska?

3) Could the pretrial preparation and discovery in Nebraska have reasonably been expected to have embraced the matters presented in this case?

44

4)  Are the claims in the two cases closely related?

*See B-S Steel of Kan., Inc. v. Tex. Indus., Inc.,* 439 F.3d 653, 663 (10th Cir. 2006). JBS does not

meet this burden.

    **1.  JBS cannot show substantial overlap in evidence or argument.**

    First, where the Nebraska court expressly refused to consider events and evidence developed

in the Colorado litigation, it cannot be said that the two cases have substantially overlapping

evidence. [ECF 330-105, pp. 39-40]. The Nebraska court's findings focused on the Grand Island

plant, finding that while "JBS corporate office set broad policy for its plants, . . . local issues and

policies were left to each plant." [*See generally* ECF 330-103; *Id*. at ¶6].  Likewise, the court in

Nebraska determined that each plant had separate human resource managers and plant managers.

[*Id*., p. 3, ¶6]. Other key operational differences include:

- The two plants operated under different collective bargaining agreements, which contain significant variations, including (a) larger time windows within which management could move the breaks in Colorado; and (b) express reservation of management's right to establish work hours and schedules in Colorado. [Resp. to DSF 34].[2]

- Staffing levels were different at the two plants. [Shandley Dep. 74:11-15].

- Over-crewing differed, occurring at higher levels in Greeley. [Compare ECF 330-103, p. 10 ¶28 with PSF 63].

    In addition to these differences in operations, the issue of whether an *en masse* termination

can constitute a pattern-or-practice – a key issue in the Nebraska case – is irrelevant in this case

because EEOC is not relying on an *en masse* termination, but rather upon ***a pattern of discipline***

***and discharges extending well beyond Ramadan 2008***. [ECF 1, ¶¶ 45, 46, 56]. Indeed, EEOC's

expert analyzed discharges and discipline occurring at the Greeley plant over a period of more than

four years, showing that workers who were Black, Somali, or Muslim were more likely to be

---

[2] For additional differences between the two CBAs, see Ex. 27.

disciplined or discharged, and that the disparity is statistically significant. [Ex. 16]. By contrast, in the Nebraska case EEOC's allegations were limited to a single *en masse* termination during Ramadan 2008. [ECF 330-102, ¶¶7(d)-(e)].

Another key distinction between the evidence in Colorado and Nebraska is that the decision in Nebraska was premised on transforming a rolling meal break into a mass break at a different time. [ECF 33-103, pp. 38-39] The court in Nebraska therefore considered additional costs, food safety concerns, and employee objections to the overcrowding of common areas associated with mass breaks. [*Id*.] By contrast, the employees in Greeley **never** requested a mass break; rather, they simply wanted the *status quo* rolling break to be moved to an earlier time for the duration of Ramadan. [PSF 24-25, 31]. Nor is EEOC asking for a mass break as a means of accommodation here. [ECF 330-092]. Thus, unlike the mass break accommodation that formed the foundation of the Nebraska decision, the accommodation here required none of the additional costs, food safety concerns, or over-crowding issues associated with changing from a rolling break to a mass break. [PSF 45, 47; ECF 330-103, pp. 38-39].

Additionally, the Nebraska court premised its finding of undue hardship on a shortened work day, resulting in lost pay for coworkers, which is not an issue here. [*See* PSF 45; ECF 330-103, p. 39]. Further, the events during Ramadan 2008 were significantly different at the two plants. [Resp. to DSF 141].  Finally, it is an important distinction that in Nebraska the meal break was never actually moved, whereas in Greeley the meal break was changed to 7:30 p.m. for two days, without any resulting decline in productivity. [PSF 45, 47].  In fact, production outstripped that of the previous week, making any efficiency and cost arguments demonstrably false. [PSF 47].

Thus, there are key differences in the facts that were central to the Nebraska decision.

**2.  Similarity of legal principals is insufficient to show identity of issues.**

EEOC will not contest that the overarching law is similar in the Tenth and Eighth Circuits.
Nevertheless, similar legal principals alone cannot be sufficient to warrant collateral estoppel.
Otherwise, courts would never have to hear subsequent cases against the same party that involve the
same legal principles but different facts.

**3.  Defendant itself argued that it could not anticipate having to defend against
EEOC's Colorado case in the Nebraska litigation.**

In the Nebraska case, Defendant strenuously argued against the inclusion of facts developed
in the Colorado case, expressly asserting that it could not be expected to "reasonably defend the
EEOC's Colorado case." [Ex. 26. p. 104]. Having prevailed on this point, JBS should not be
allowed to now reverse its position and claim that the parties could have anticipated defending the
Colorado case in Nebraska and vice versa. *See* judicial estoppel argument, supra.

Moreover, JBS's reference to two overlapping depositions does not support the proposition
that pretrial proceedings and discovery substantially overlapped. There have been more than 100
depositions in the Colorado litigation alone. The two depositions cited by JBS involved high level
executives who, due to being employed on the corporate level, had relevant evidence for both suits.
The remaining depositions were of local individuals at each respective plant. In this case, the EEOC
did not take the deposition of a single Grand Island employee.

It is also completely irrelevant that EEOC may have referred to the cases as "parallel
proceedings" or "sister litigation." These are merely descriptive terms, which if anything imply that
the cases were treated as distinct and had important contextual differences. They do not show the
parties anticipated overlapping pretrial preparation and discovery.

**4. The claims in Nebraska differed significantly from those here.**

Finally, JBS cannot show identity of issues because the legal claims in Colorado are different from the legal claims in Nebraska in significant ways. In Colorado, EEOC alleges a pattern or practice of discriminatory discipline and discharges, and failure to accommodate that is *continuing* from December 2007 to the present. [ECF 1, ¶¶45-46, 51, 56]. In Nebraska, EEOC alleged only discriminatory discharges, not discipline, and the claim was temporally limited to Ramadan 2008 [ECF 330-102, ¶7].

In sum, even if JBS is not judicially estopped from claiming that the issues are identical in both cases, JBS cannot meet its burden to show that the issues are identical as a matter of law.

**C. EEOC did not have a full and fair opportunity in Nebraska to litigate the circumstances that formed the basis of the Colorado lawsuit.**

Finally, EEOC was not allowed to present evidence from Colorado as part of the Nebraska case. [ECF 330-105]. Thus, EEOC has not had a full and fair opportunity to litigate the claims alleged in Colorado, which defeats Defendant's collateral estoppel argument.

## II. There are Material Fact Issues Regarding EEOC's Accommodation Claims.

Title VII prohibits an employer from discriminating against its employees on the basis of religion. 42 U.S.C. § 2000e-2(a). Besides prohibiting discrimination, Title VII also imposes an affirmative duty for an employer "to reasonably accommodate an employee's . . . religious observance or practice" unless doing so would place an "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). In arriving at a reasonable accommodation the parties each have a duty to cooperate with each other in an attempt to arrive at the accommodation, something akin to the duty to engage in an interactive process under the Americans with Disabilities Act. *See Thomas v. Nat'l Ass'n of Letter Carriers,* 225 F.3d 1149, 1155 (10th Cir. 2000); *Sturgill v.*

48

*UPS, Inc.*, 512 F.3d 1024, 1033 (8th Cir. 2008).

To establish a claim of religious discrimination based on a failure-to-accommodate theory, a plaintiff must prove: 1) he has a bona fide religious belief that conflicts with an employment requirement; 2) he informed his or her employer of this belief; and 3) he was disciplined for failure to comply with the conflicting employment requirement. *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 65-66 (1986); *Thomas*, 225 F.3d at 1155. Once the plaintiff has proven the elements of his prima facie case, "The burden then shifts to the employer to (1) conclusively rebut one or more elements of the plaintiff's prima facie case, (2) show that it offered a reasonable accommodation, or (3) show that it was unable reasonably to accommodate the employee's religious needs without undue hardship." *Thomas*, 225 F.3d at 1156.

In a pattern-or-practice case, the EEOC's "burden is to demonstrate that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 360 (1997).

JBS does not dispute the prima facie case for failure to provide religious accommodation or existence of a pattern or practice. [ECF 330, p. 33]. Instead, JBS argues that allowing Muslim employees to pray during scheduled breaks was a reasonable accommodation, and that EEOC's proposed accommodations are unreasonable or would pose an undue hardship. [*Id.* at pp. 34-47].

JBS's arguments necessarily fail because, according to their own case citations, the "reasonableness" of an accommodation is quintessentially a question of fact best resolved at trial. *United States v. City of Albuquerque*, 545 F.2d 110, 115 (10th Cir. 1976) ("to a very great degree each case turns on its own particular facts and circumstances."). The question of undue hardship is also fact-intensive and dependent upon the particular context of each case. *See Toledo v. Nobel-Sysco, Inc.*, 892 F.2d 1481, 1490 (10th Cir. 1989). In short, reasonableness of accommodation and

49

undue hardship are fact-intensive determinations which require the Court to hear evidence in the

context of trial where it can assess witness character and credibility.

 A. **Genuine issues of material fact preclude the Court from finding as a matter of law that Defendant did not deny Muslim employees an accommodation for prayer.**

 JBS first argues that EEOC cannot proceed with a pattern-or-practice claim for failure to

provide religious accommodation for prayer because (1) JBS allegedly provided a reasonable

accommodation, and (2) EEOC's proposed accommodations are supposedly unreasonable or would

pose an undue burden. Both arguments fail based on disputed material facts.

 1. **JBS failed to provide a reasonable accommodation for prayer.**

 The reasonableness of an accommodation is measured under the totality of the

circumstances, whereby a total elimination of religious conflict, while preferable, may not always

be possible. *See, e.g., Sturgill v UPS, Inc.*, 512 F.3d 1024, 1030 (8th Cir. 2008)*; Albuquerque*, 545

F.2d at 114-15. Here, JBS argues that no change was necessary because Muslims were allowed to

pray during scheduled breaks, which JBS claims were "*reasonably* close" to prescribed prayer

times. [ECF 330, p. 35]. Defendant's argument ignores the evidence and law.

 The first problem is that JBS ignores evidence that Muslim employees were prevented from

praying even on scheduled breaks and others were harangued and harassed when they prayed during

preauthorized breaks. [PSF 1-3]. Defendant's alleged accommodation is meaningless when Muslim

employees are constantly disrupted and harassed when attempting to pray. [*See* Ex. 1]

 Second, while the law does not require perfection, JBS'a purported accommodation was and

is patently unreasonable under the totality of circumstances because it prohibits Muslim employees

from praying until well outside what is considered an acceptable window for the Maghrib prayer.

For example, during Ramadan 2008, which is an integral time period for this lawsuit, the Maghrib

(sunset) prayer varied between 6:42 p.m. and 7:30 p.m., depending on the time of the month. [DSF

105].  The Maghrib prayer is the most important prayer of the day during Ramadan. [Ex. 12, ¶3].

As with every religion, individual followers of Islam have different views about what their religion

requires, but there is no dispute that, for the vast majority of Muslim employees in this case,

anything more than 15 minutes beyond the prescribed prayer time is typically unacceptable. [ECF

330-1]. Indeed, Defendants own summation of the evidence shows that only three of 33 deponents,

saw a window of more than 15 minutes acceptable. [*Id*]. There is no disagreement that the Maghrib

prayer cannot be said before sunset. [ECF 330-097, p. 2]. The scheduled breaks, however, which

Defendant claims are all the accommodation necessary, were at 6:00 p.m. and 9:00 p.m. [DSF 37].

For the entire month of Ramadan 2008, the 6:00 p.m. break was too early for the Maghrib prayer.

[*See* DSF 105]**.**  And being denied permission to pray until the scheduled 9 p.m. break, results in a

delay of from 90 minutes to over 2 hours, an unacceptable delay for all of the Muslim employees

wishing to pray. [*See* ECF 330-1]**.**  Thus, under JBS's own evidence, denying Muslim employees a

prayer break until 9 p.m. was not reasonable because it did nothing to even partially resolve the

conflict between the Muslim employees' religious practices and JBS work rules.

The divergence between JBS's standard break times and the Maghrib prayer are not limited

to Ramadan. Except for the height of summer when sunset can occur as late as 8:30 p.m., JBS's

9:00 p.m. meal break will always be more than a half hour past the time for the Maghrib prayer,

which is unacceptable for the vast majority of Muslims. [*See* Ex. 29; ECF 330-1]. Likewise, the

6:00 p.m. break only falls within a half-hour after the Maghrib prayer time for a few weeks during

February/March and a few days in late October. [See Ex. 29]. Thus, JBS' continued adherence to its

policy of not allowing prayer during unscheduled breaks and it refusal to move scheduled breaks to

more closely align with the Maghrib prayer, constituted a daily pattern or practice of failing to

accommodate the Muslim employees' religious beliefs and practices.

In short, there are genuine issues of fact as to whether it was "reasonable" to forbid Muslim employees from praying, except during the scheduled breaks at 6:00 p.m. and 9:00 p.m., and whether allowing them to pray only during the scheduled breaks at 6:00 p.m. and 9:00 p.m. was, in fact, a "reasonable" accommodation for their religious practices. Thus, the Court must deny summary judgment and await the parties' presentation of their respective evidence at trial.

### 2. Defendant fails to show EEOC's proposed accommodations are unreasonable.

JBS next argues that EEOC's proposed accommodations are unreasonable. [ECF 330, pp. 36-38]. Defendant's argument similarly fails because what is "reasonable" depends on the totality of circumstances which inherently favors weighing the competing evidence and judging the credibility of witnesses first hand. *See, e.g., Sturgill*, 512 F.3d at 1030*; Albuquerque*, 545 F.2d at 114-15. Defendant challenged only two of EEOC proposed accommodations: 1) adjusting scheduled breaks within the contours of the collective bargaining agreement to more closely coincide with the Maghrib prayer, and/or 2) allowing unscheduled breaks for prayer.

EEOC suggests moving scheduled breaks to more closely coincide with the Maghrib prayer time, because the undisputed evidence is that the more closely aligned the break and the prayer time, the more Muslims will be accommodated. [ECF 330-1]. JBS' first argument – that it would have to violate the CBA – is pure fabrication because EEOC's proposal seeks only to change the dinner break within the contours of the CBA. [ECF 39, p. 7]. JBS's second argument – that it would require JBS to provide a third break -- is similarly false. Neither the Muslim employees nor the EEOC have sought a third break. [PSF 31; ECF 330-94]. To be clear, EEOC simply wants JBS to work within the parameters allowed in the CBA to adjust the 6:00 p.m. or 9:00 p.m. break to more closely coincide with the Magbrib prayer, particularly during the holy month of Ramadan

where prayer takes on a heightened importance. [Ex. 12, ¶3]. EEOC is not seeking perfect accommodation of every employee every day. The law does not require perfection; it requires reasonableness, a legal concept JBS acknowledges, but ignores in discussing EEOC's proposed accommodations. [ECF 330, p. 35].

JBS's argument that during some periods, the break cannot coincide with Maghrib without violating the CBA, implicitly recognizes that for much of the year, moving existing breaks would be entirely consistent with the CBA and impose no additional costs. Indeed, the Maghrib prayer time varies during the year between 4:36 p.m. in the dead of winter and 8:33 p.m. during the height of summer. [Ex. 21]. The B shift is from 3:15 to 11:45. [*See* Resp. to DSF 11]. The CBA calls for a 30 minute meal break approximately half way through the scheduled shift. [DSF 34]. A third break is required *only* if the second half of the shift stretches beyond 3.75 hours. [*Id.*]. Thus, the meal break could go as early as 7:30 p.m. without requiring a third break. Indeed, moving the meal break closer to 7:30 is actually more in line with the CBA because the half-way point of the shift is at 7:15, four hours after the 3:15 p.m. start time. In addition, the first break can occur anywhere between 4:45 p.m. and 6:15 p.m. pursuant to the CBA. [*Id*]. Thus, there are only a few weeks per year where moving the time of existing breaks could not fit within the confines of the CBA *and* effectively accommodate the Somali Muslim employees by allowing prayer within 15 minutes of the prescribed time. [See Ex. 30].

Finally, and importantly, JBS implemented this very accommodation during Ramadan 2008. In doing so, the Muslims' religious needs were met, [PSF 45-46], production was actually higher than the previous week, and no additional monetary costs were incurred. [PSF 47]. Thus, under the totality of circumstances this is a reasonable request.

As for the alternate proposed accommodation of allowing unscheduled breaks to pray, we

begin with the reminder that since 2011, Defendant's official policy has been to allow this exact

accommodation.  Thus, Defendant's arguments ring hollow.  Defendant's objections are again

premised entirely upon the notion that every Muslim must be perfectly accommodated within his or

her respective prayer window. [*See* ECF 330, p. 37]. But as JBS well knows and argues for its own

purposes, a reasonable accommodation is dependent on the totality of the circumstances and does

not necessarily have to be one which eliminates all religious conflict. [ECF 330, p. 35 (citing, *e.g.,*

*Sturgill*, 512 F.3d at 1030; *Albuquerque*, 545 F.2d at 114)]. The law does not require rejection of an

imperfect accommodation that allows some Muslim employees to pray on time in favor of an

alleged accommodation which prohibit all the Muslim employees from praying on time, as JBS

argues.  Moreover, Defendant's argument ignores the possibility that the Muslims working on the

line together could work out a solution amongst themselves in which those with more rigid views

about the prescribed prayer time are allowed to break first. Likewise, JBS ignores the testimony of

numerous Muslims who said that if their Imam granted them more flexibility in their prayer times,

they would follow their Imam's advice. [Resp. to DSF 64].

        The list of facts that should be included in the "totality of circumstances" could go on and

on, but the above should suffice to show that the task of assessing the "reasonableness" of

accommodations, whether they be those proposed by JBS or EEOC, is one best left for trial.

### 3.  Defendant fails to demonstrate undue hardship.

        It is the employer's burden to show undue hardship. *Thomas*, 225 F.3d at 1156  An

employer meets that burden if it can show that the proposed accommodation creates more than a de

minimis cost, or significant impact on efficiency, or disrupts a bona fide seniority system. *Trans*

*World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977); *Lee v. ABF Freight Sys., Inc*., 22 F.3d

1019, 1023 (10th Cir.1994); 29 C.F.R. § 1605.2(e)(2). An employer's costs of accommodation

"must mean present undue hardship, as distinguished from anticipated or multiplied hardship."

*Cook v. Chrysler Corp.*, 981 F.2d 336, 339 (8th Cir.1992). The claimed hardship must be more than

merely speculative. *Banks v. Serv. Am. Corp.*, 952 F.Supp. 703, 709 (D. Kan.1996)(citation

omitted); *see also Toledo v. Nobel-Sysco, Inc.*, 892 F.2d 1481, 1492 (10th Cir.1989). In short, an

employer cannot prove undue hardship "by assumption or opinions based on hypothetical facts."

*Farah v. A-1 Careers*, No. 12-2692-SAC 2013 WL 6095118, *8 (D. Kan. 2013) (citing *Brown v.

Polk County, Iowa*, 61 F.3d 650, 655 (8th Cir. 1995). JBS fails to meet its burden in this case

because it relies either on speculation or disputed facts.

### a. JBS fails to show that moving breaks would cause an undue hardship.

JBS first argues that moving the scheduled breaks to coincide more closely with the

Maghrib prayer would affect efficiency by eliminating JBS's ability to schedule breaks to coincide

with grade changes or equipment malfunctions. [ECF 330, pp. 39-40]. First, the argument is

speculative because, with up to 20 grade changes per shift [DSF 71], there is a grade change every

20 minutes or so. [Resp. to DSF 71]. The prayer itself requires only five minutes,[3] which can fall

anytime within the 30 minute dinner break. For example, if prayer time is 8:15 p.m., the dinner

break could begin as early as 7:50 p.m., or as late as 8:10 p.m., without considering a 15-minute

window for the prayer time, which would allow an even larger window for the break to begin as late

as 8:25 p.m.  But if a grade change occurs at 7:45 p.m., shortly before the earliest start time of 7:50

p.m., Swift could wait until the next grade change around 8:05 p.m., to start the break. Thus,

accommodating the prayer time does not preclude coordinating grade changes. Indeed, Defendant's

Superintendent testified that if they knew ahead of time, they could coordinate breaks with both

---

[3] While it takes 10-15 minutes for an employee to leave the line to pray, a prayer on a scheduled break is much faster because the employee need not don and doff his or her equipment or walk from the line to the prayer room and back.

prayer time and grade changes. [PSF 48].

Second, EEOC is not asking that the break be changed to *exact* times, as JBS suggests. [Resp. to DSF 73]. Indeed, JBS itself acknowledges just three pages earlier in its brief that EEOC's request is that Muslims be allowed to pray "at *or near* their required prayer times." [ECF 330, p. 36]. Third, Defendant's own witnesses do not agree that JBS "always" coordinates breaks with grade changes or mechanical failure. [*See* Resp to DSF 38, 69]. Finally, an equipment malfunction is a rare event which may or may not occur at a time when it could be coordinated with a break under the CBA. [Resp. to DSF 73]. Nevertheless, in the rare event of a breakdown, if it occurs at a time when JBS can, under the CBA, take a scheduled break, EEOC does not assert that JBS cannot do so, or must have another scheduled break for prayer time. It may be that Muslim employees cannot be accommodated on that particular day, but the mere possibility of a rare day when accommodation cannot be provided, does not justify denying religious accommodation on all the ordinary days when accommodation can be provided without incurring any expense at all.

JBS's next argument is similarly misguided as it is premised on a request for a "mass break," which EEOC is not requesting, and has never requested in this case. As noted above, this is one of the most significant factual differences between the Colorado and Nebraska cases.

The same can be said of JBS' third argument – that moving breaks would violate the CBA during some portions of the year. EEOC is not asking JBS to violate the CBA. Nor is EEOC asking JBS to schedule a third break. [*See* Resp. to DSF 68, 73]. EEOC is asking that JBS work within the CBA to reach a reasonable accommodation that would allow the Muslim employees to pray at *or near* the time of the Magrib prayer. For most of the year, this can be accomplished by simply moving the traditional 6:00 or 9:00 breaks within the confines allowed by the CBA. [Ex. 30].

Finally, JBS's reliance on coworker inconvenience or morale issues is entirely misplaced

and would undermine the right to religious accommodation in every case. To begin, it is not a defense to a claim under Title VII that other employees, not in the protected class, do not want the protected employees to receive an accommodation. Indeed, the U.S. Supreme Court has expressly recognized the dangers of acquiescing to complaints of other employees: "If relief under Title VII can be denied merely because the majority group of employees, who have not suffered discrimination, will be unhappy about it, there will be little hope of correcting the wrongs to which the Act is directed." *Franks v. Bowman Transp. Co., Inc.*, 424 U.S. 747, 775 (1976) (*citing United States v. Bethlehem Steel Corp.*, 446 F.2d 652, 663 (2d Cir. 1971)).

This basic precept – that complaints of other employees cannot justify discrimination – has also been applied in cases where discrimination takes the form of failure to provide religious accommodation.  In *Brown v. Gen. Motors Corp.*, the court rejected the district court's conclusion that accommodating the plaintiff was impermissible because it "would in effect discriminate against all employees who did not adhere to [the plaintiff's] religion." *Brown*, 601 F.2d 956, 961 (8th Cir. 1979). The court stated, "[s]uch an application of *Hardison* would prove a per se proscription against any and all forms of differential treatment based on religion . . . . Carried to its logical conclusion the [district] court's application of the quoted language [from *Hardison*] would preclude all forms of accommodation and defeat the very purpose behind § 2000e(j)." *Id.* at 961-62. "Differential treatment cannot be equated with privileged treatment." *Id.* at 962; *Harrell v. Donahue*, 638 F.3d 975, 980 (8th Cir. 2011) (religious accommodation invariably creates tension, but "differential treatment alone is not enough to create an undue hardship."). As the Ninth Circuit noted, "[u]ndue hardship means something greater than hardship." *Anderson v. Gen. Dynamics Convair Aerospace Div.*, 589 F.2d 397, 402 (9th Cir. 1978).

The cases cited by JBS all involve a far greater inconvenience to coworkers than those

presented here. Indeed, in all three cases cited by JBS, the proposed accommodation would have required other employees to change shifts or cover entire shifts that they otherwise would not have had to work. *See Lee*, 22 F.3d at 1023; *Eversley v. Mbank Dallas*, 843 F.2d 172, 176 (5th Cir. 1988); *Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141, 144 (5th Cir. 1982). By contrast, the proposed accommodation of moving breaks, within time frames permitted by the CBA, is hardly an imposition. No one would have to work overtime or change shifts. In fact, moving the meal break closer to the middle of the shift actually coincides more closely with the language of the CBA, which was negotiated on behalf of all employees. [*See* DSF 34.]. Thus, there is no undue hardship to employees caused by moving break times.

In short, the minor theoretical inconvenience to some employees caused by a movement of breaks cannot serve to thwart the protections of Title VII. *See e.g. Franks*, 424 U.S. at 775; *Brown*, 601 F.2d at 961-62; *Anderson,* 589 F.2d at 402.

> **b.  *JBS fails to meet its burden to show that allowing Muslim employees to use unscheduled breaks would pose an undue hardship.***

Defendant's argument that it cannot allow prayer on unscheduled breaks without undue hardship is belied by the fact that, since 2011, Defendant's official policy has been to do just that – allow prayer on unscheduled breaks. [PSF 12]. Three supervisors at JBS testified that allowing these breaks has not affected production or the quality of meat. [Resp. to DSF 79-80]. In addition, JBS's operations manager, the quality assurance supervisor, and the general foreman all admit that there is no concrete evidence linking unscheduled breaks with poor product quality or increased injuries. [Resp. to DSF 78-79]. In fact, the evidence is that in recent years, both product quality and safety have significantly improved over what they were in 2008 and 2009, when prayer was not allowed on unscheduled breaks. [*Id.*]. Thus, there are at least genuine issues of fact as to JBS'

highly speculative concerns about production, quality, and safety.

JBS also drastically exaggerates the burden associated with having leads, supervisors, and trainers cover for employees who take an unscheduled break. Because JBS has allowed prayer on unscheduled breaks since 2011, it could have provided actual data based on actual experience.  It has elected instead to provide exaggerated speculation based on false numbers.  For example, there have not been 433 Muslims working the B shift since JBS fired approximately 100 of them in 2008. [PSF 109]. Not all Muslim employees ask for prayer breaks and most who do only ask for the Maghrib prayer. [Resp. to DSF 59].  If supervisors filling in for absent employees were a violation of the CBA, as JBS claims, it would have provided union grievances filed over this regular practice. There are no grievances because the practice does not violate the CBA.

Finally, a careful review of the record evidence Defendant cites for these alleged undue burdens shows all the cost estimates are from one person, Heather Skinner [*See* DSF 90-91]. Skinner's testimony is incredible and directly contradicted by EEOC's industrial engineer expert, Keith Koontz, who challenges (a) Skinner's false assumptions that there are 433 Muslim employees who all require two prayer breaks every single day; (b) her pay differential calculation; and (c) her cost estimates for cross-training employees. [Ex. 31].  As to the alleged pay differential, Skinner herself ultimately admitted there is no payroll cost.  [Resp. to DSF 91]. Her cross-training exaggerations are based on cost of training new employees, not cross-training existing employees, and she ignores JBS' own policy of cross-training its employees. [Resp. to DSF 93 and 94]. Skinner is an interested witness whose discredited testimony cannot form the basis for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150-51 (2000).

JBS's argument that it would be required to pay higher pay rates to employees covering on unscheduled breaks is belied by Defendant's own evidence.  Unscheduled breaks are not used

exclusively for prayer; they are allowed for restroom breaks and other necessary purposes. [Resp. to DSF 45]. If it were true that JBS has to pay higher rates to employees who fill in during unscheduled breaks, then JBS would have been doing that all along for restroom breaks, and would necessarily already have a system for tracking time when individuals filled for unscheduled breaks where the absent employee was paid at a higher rates. JBS would also have payroll records showing that people are actually getting paid higher rates for short time segments. But as Defendant concedes, JBS does nothing to track temporary break coverage in its current system. [DSF 97]. The Court should question why JBS has provided not a single payroll record showing any employee ever paid a higher rate of pay for a short time segment, even though it has always allowed unscheduled restroom breaks and has allowed prayer on unscheduled breaks since 2009. If it were actually true that JBS has to pay higher rates for covering unscheduled breaks, surely there would be payroll evidence of employees actually getting paid a higher rate for short segments. There is no such record because the truth is that JBS is not required to, and does not in fact, pay higher rates to employees who cover for unscheduled breaks. Indeed, the paragraph of the CBA cited by JBS is in a section on employee bidding processes and plainly contemplates temporary assignments at higher rates for periods of days not minutes. [*See* Ex. 23, p. 2-3]. Finally, as discussed above, coworker morale cannot serve as a sufficient basis for an undue hardship, especially where, as here, there is testimony by JBS's own supervisors that allowing unscheduled breaks for prayer has not affected their employees and where there have been no formal complaints about allowing such breaks. [*See* Resp. to DSF 81]. These facts are nothing like the facts in the cases cited by JBS, where the accommodation involved forcing unwilling employees to work overtime to cover entire shifts, *see EEOC v. Firestone*, 515 F.3d 307, 318 (4th Cir. 2008); *Brener*, 671 F.2d at 144, or additional exposure to dangerous conditions they otherwise could have avoided, *see Bhatia v. Chevron U.S.A.,*

60

*Inc.,* 734 F.2d 1382, 1384 (9th Cir. 1984). Here, employees cover for short fifteen-minute periods, something they already do to cover restroom breaks. And importantly, since changing the policy in 2009 to allow prayer on unscheduled breaks, there have been no formal employee complaints about covering for their co-workers or being provided additional cross-training.

The questions of reasonableness of accommodation and undue hardship are fact-intensive, not suitable for summary judgment. There are genuine issues of material fact as to the reasonableness of the proposed accommodations, and as to any alleged hardship. Accordingly, summary judgment must be denied.

### B.  JBS Refused to Allow Muslims to Break their Fasts

#### 1.  Breaking Fast During Ramadan Requires More than Water.

JBS claims Muslim employees required only a drink of water in order to break their fasts during Ramadan 2008, citing a manager's typewritten meeting notes to the effect that Muslim representatives said they could "break fast with sip of water." [ECF 330, p. 47]. The meeting notes, however, are hearsay under Fed.R.Evid. 801. The notes are not a complete transcript of what was said and they are typewritten, indicating they were not made contemporaneously.

Notably, however, handwritten notes from two other JBS managers plainly show the Muslim employees described breaking the fast as including food, water, and prayer. HR Manager Eric Ray's notes state, "break fast @ certain time," and "[d]rink, *eat*," and "prayer." [Ex. 32 (emphasis added)]. HR Supervisor Matthew Lovell's notes of the same meeting state, "only needs 15 min. to *eat a little bit* and pray." [Ex. 11, p. 3 (emphasis supplied)].

Whether a drink of water is sufficient to meet the religious beliefs of the Muslim employees is a matter of the firmly-held religious beliefs of the individual employees, many of whom will testify that they eat something and have a drink of water to break the fast during Ramadan. [*See,*

*e.g.*, Aaden Dep., 45:25-46:12 (a couple of dates or sambusa); K. Abdullahi Dep., 92:7-22 (some dates); Muhumad Dep., 99:15-25 (dates)].

Thus, there is a genuine fact issue as to whether water alone is sufficient to break the fast during Ramadan. Summary judgment on this basis is inappropriate.

### 2. JBS Denied Muslims Access To Water During Ramadan 2008 And After.

JBS claims that Muslim employees were freely allowed to get water to break their fasts during Ramadan 2008. [ECF 330, p. 47]. But employees and managers alike testified that employees may be disciplined or fired for leaving the line without permission. [Muse Dep. 120:22-25; Danley Dep. 104:24-105:6, 156:13-158:4; Esparza Dep. 47:20-48:4].  And sadly, Muslim employees were often denied permission. For example, Farhia Abdi testified that she and others were not allowed to get a drink of water. [Farhia Abdi Dep. 101:15-102:4, 103:8-15]. Wali Abdulkadir testified that he was not allowed to go get water but sometimes did anyway. [Abdulkadir Dep. 94:4-10]. Kadro Abdullahi testified that she was not allowed water or to break his fast. [K. Abdullahi Dep. 91:13-17]. Zahra Muse testified that she was not allowed to drink water, go to the bathroom, or break her fast. [Muse Dep. 119:14-18]. Liban Adan states he was forbidden to take a drink of water while at work on September 5, 2008. [Ex. 33, ¶ 8]. Nidifo Ashkir testified that he was physically assaulted by Superintendent Palacios who kept Ashkir from getting a drink of water to break his fast. [Ashkir Dep. 90:7-12]. Others testified the water fountains were taped or turned off. [K. Abdullahi Dep. 92:7-22; N. Abdullahi Dep. 120:10-121:1, 121:20-122:5; N. Aden Dep. 81:14-20, 159:24-160:1; F. Ali Dep. 98:24-99:17; M.A. Mohamed Dep. 101:21-102:3].

Hence, there are fact questions as to whether Muslim employees had access to water as JBS

claims. Summary judgment on this basis is inappropriate.[4] [5]

### III.    JBS Engaged in a Pattern or Practice of Discipline, Discharge and Retaliation

#### A.    JBS Misstates EEOC's Discrimination and Retaliation Claims, Which Allege Continuing Violations Extending Beyond Ramadan 2008.

At the onset, we note that JBS does not challenge the existence of a *prima facie* case on the claims alleging a pattern or practice of discrimination and retaliation, or seek summary judgment on that basis. Thus, the *prima facie* case is conceded for purposes of summary judgment. Instead, JBS' advances just one argument – that as a matter of law a single event cannot support a pattern-or-practice claim. Defendant's entire argument, however, is grounded on the incorrect assertion that EEOC's claims are based "***solely on a one-time decision*** to suspend and terminate" Somali Muslim employees *en masse*. [*Id.* at pp. 49-50].

EEOC's allegations are ***not*** limited to the events of Ramadan 2008. EEOC's Complaint alleges that since at least December 2007, JBS has engaged and ***continues to engage*** in discrimination and retaliation in violation of Title VII. [ECF 1, pp. 7-8, 9, 11].[6] JBS misinterprets the Bifurcation Order [ECF 116] as limiting EEOC's claims; it does not. Rather, the Bifurcation

---

[4]  In Section II.B, JBS relies on its earlier arguments that EEOC's proposed accommodations are unreasonable and/or cause undue hardship.  EEOC likewise relies on its earlier responses.

[5] JBS' argument II.C is based on the incorrect premise that EEOC alleges JBS engaged in a pattern or practice of denying Muslim employees a place to pray, forcing the employees to pray on bathroom floors. [ECF 330, p. 48]. EEOC's Complaint does not allege a pattern or practice of denying a place to pray [*see* ECF 1], and a place to pray is not among the reasonable accommodations that the EEOC has sought. [*See* ECF 330-92, p. 6, Resp. to Interrog. 11].

[6] There have been seven motions to intervene granted. [ECF 16, 37, 108, 131, 136, 235, 262].  Like the EEOC, many Plaintiff-Intervenors allege that JBS has engaged, and ***continues to engage***, in a pattern or practice of unlawful employment discrimination and/or retaliation in the form of disparate treatment in discipline and discharge. [ECF 17, 40, 61, 109, 132, 137, 236, 263, 286; Ex. 34 ¶¶ 4]. Like the EEOC's claims, Plaintiff-Intervenors' claims extend beyond the events of Ramadan 2008 [*Id.*]. Although Plaintiff-Intervenors are precluded from participating in the Phase I proceedings [ECF 148, 152], their allegations of continuing discriminatory discipline, discharge, and retaliation in complaints filed as recently as August 5, 2013 [ECF 254], further confirm the alleged discrimination and retaliation is ongoing.

Order limits what will be tried in Phase I: "[a]t the present time, the Court finds that the EEOC's retaliation and discriminatory discipline and discharge pattern or practice claims are appropriate for bifurcation only insofar as they are based on the Ramadan 2008 events." [*Id*. at p. 15]. But even the Bifurcation Order is not final on this matter, stating, "[h]owever, the Court may reconsider what issues are appropriately decided during Phase I related to this claim as the claim's scope is clarified through discovery." [*Id*.]. Thus, the Court limited only what would be ***decided*** in Phase I, not what was alleged, and advised that it may reconsider even that limitation.

Discovery has borne out EEOC's allegations of discrimination and retaliation occurring both before and after Ramadan 2008. In particular, EEOC's economics and statistics expert analyzed JBS' own data, spanning from January 1, 2007, through October 11, 2012,[7] and found that JBS employees who are Black and/or Somali and/or Muslim received disciplinary actions (including discharges) from ***2 to 2.5 times*** the rate of other JBS employees, and that the observed disparities are statistically significant. [Ex. 16, ¶¶ 6, Att. 1, pp. 6-8, Att. 2, pp. 6-8].

In addition to the compelling statistical evidence, there is anecdotal evidence of continuing discriminatory discipline, discharge, and retaliation. Numerous aggrieved individuals testified about various acts of discrimination and retaliation to which they were subjected or witnessed before, during, and since the Ramadan 2008 discharges. For instance, **Fardowsa Ali** was suspended and then terminated in 2010 when her supervisor colluded with one of her co-workers in accusing her of sabotaging her own work; Ali had recently complained to HR about her supervisor disparaging her and her religion. [F. Ali Dep., 122:4-125:2, 126:17-21, 128:10-16, 158:3-19]. **Salah Ali** was terminated in 2011 after a supervisor, who had given her permission to leave work due to sickness

_____

[7] The most recent data provided by JBS extends to October 2012 but EEOC anticipates further supplementation by JBS pursuant to the Federal Rules of Civil Procedure.

the day before, told HR the next day that he did not give her permission to leave; the supervisor told

Ali he was going to fire her, saying, "I don't like smart African niggers like you here." [Ex. 35, ¶¶

1, 13, 14]. In 2010 or 2011, **Ahmed Egal** was written up when a battery he was changing on a

forklift fell to the floor; a non-Somali who did the same thing the next day was not disciplined.

[Abdirisaq Mohamed Dep., 53:11-13, 54:4-6, 55:6-8, 56:8-15, 56:20-22, 58:13-15, 59:12-60:3,

65:6-21, 66:5-9, 73:4-7]. Since 2008, **Muna Jama** was suspended in retaliation for complaining

about restroom and prayer breaks, and received a write-up in retaliation for standing up for a co-

worker when a supervisor said bad things about her ("stupid") and Muslims ("I hate these people

and their prayers! Why don't they pray like I do?"). [Ex. 36, ¶¶ 6, 11; M. Jama Dep. 167:12-

168:14]. In April 2008, Supervisor **Blanca Mejia** disciplined a female Muslim employee for

praying in the bathroom. [Mejia Dep. 69:23-72:19; Ex. 37]. **Mohamed I. Mohamed**, a Somali

trainer employed from August 2007 through January 2009, testified that he interpreted for a lot of

Somali employees who were disciplined for using unscheduled breaks to pray; that Superintendent

Juan Palacios and most of the supervisors followed employees into the restroom to see what they

were doing and, if found praying, they were written up; that this happened very often throughout his

employment; and that on the first day of Ramadan 2008, a number of people asked permission to

leave the line to use the restroom, were found praying, and were written up. [M.I. Mohamed Dep.

18:25-19:8, 31:4-6, 80:6-22, 158:2-159:12]. **Layla Gurux** was disciplined in 2008 and 2009,

receiving three written warnings for praying near her work station, three written warnings for taking

restroom breaks without prior approval to avoid urinating on herself, and a write-up for returning

from break one or two minutes late. [Ex. 38, ¶¶ 2, 9; Gurux Dep., 65:9-66:12, 66:16-24, 69:7-18,

70:10-18; Ex. 39]  Non-Somali co-workers were not similarly disciplined for returning from break

more than a minute late or for taking restroom breaks without prior approval. [Ex. 38, ¶9; Gurux

Dep. 71:25-72:10]. **Ahmed Gelle** was disciplined in 2008 for praying on a *scheduled* break. [Ex. 40, ¶¶ 1, 12]. **Abdi Jama** was disciplined in 2008 after he was caught praying in the restroom, and when he asked for a prayer break during Ramadan 2008, he was taken to see the Superintendent, who sent him home early, causing him to lose pay. [Ex. 41, ¶¶ 1, 14, 15]. **Nur Abdullahi** and other Africans were sent to the office and written up in 2008 when they left the line to use the restroom without their supervisor's approval, while non-African employees who left the line without supervisor approval were not disciplined. [Ex. 42, ¶ 6]. These examples are all in addition to the discriminatory discipline and discharges during Ramadan 2008.

At least two aggrieved employees deposed during Phase I discovery, testified about the discrimination each experienced and witnessed at JBS, and then after providing such testimony, each was discharged by JBS. **Saynab Ali** testified about the discrimination he experienced and witnessed while at Swift, including a delay in being qualified on his job, being threatened when he prayed, not being allowed to pray, being unfairly disciplined, and being told he had to work full duty when he was injured. [Ex. 43, ¶¶ 6, 10]. Twelve days later, on November 21, 2012, Ali went to work and was told by Barbara Walker from Human Resources that he had been terminated for "no call, no show." [*Id*. at ¶ 8]. In fact, Ali had called the plant every day since November 6, 2012, during which time JBS would not allow him to work because of medical restrictions. [*Id*.]. **Mohamed Aden Mohamed** testified about discrimination he experienced and witnessed while at Swift, including discriminatory treatment by his supervisor and by Human Resources. [Ex. 44, ¶¶ 2, 5, 7]. Without explanation, Mohamed was suspended eight weeks later, on December 1, 2012, and then terminated, on December 7, 2012. [*Id*. at ¶¶ 6, 8, 9, 10].

The anecdotal evidence is also supported by a union witness who testified that Somali employees were disciplined more than non-Somali workers. [Gonzalez Dep., 6:4-25, 57:5-18].

66

Thus, even though EEOC did not have full discovery regarding the allegations of discrimination and retaliation before and after Ramadan 2008 [*see* Bifurcation Order, ECF 116], there is ample statistical and anecdotal evidence of a pattern or practice of continuing discriminatory/retaliatory discipline and discharge, extending from 2007 to present, as alleged in EEOC's complaint. Accordingly, JBS' Motion, based only on JBS' mischaracterization of EEOC's claims as limited to Ramadan 2008, must be denied.

**B.  EEOC Has Established a *Prima Facie* Case Under *Teamsters*.**

At the initial stage of a pattern-or-practice suit, the plaintiff's burden is to establish that discrimination was "the regular rather than the unusual practice" – essentially a standard operating procedure. *Thiessen v. Gen'l. Elec. Capital Corp.*, 267 F.3d 1095, 1106 (10th Cir. 2001), citing *Int'l. Bhd. of Teamsters,* 431 U.S. at 336.  Plaintiffs may meet the initial burden of showing the existence of the pattern or practice through either statistics, anecdotal evidence, or both.  *Pitre v. W. Elec. Co.*, 843 F.2d 1262, 1267 (10th Cir. 1988). "'The burden then shifts to the employer to defeat the prima facie showing of a pattern or practice by demonstrating that the [plaintiff's] proof is either inaccurate or insignificant.'" *Thiessen*, 267 F.3d at 1106 (quoting *Teamsters*, 431 U.S. at 360)).

Here, the statistical and anecdoctal evidence detailed above, is more than sufficient to meet the prima facie burden of showing a pattern or practice of discriminatory discipline and discharge. Indeed, JBS does not challenge EEOC's prima facie showing, nor make any effort to counter the evidence. Thus, there is ample evidence from which to infer that it was JBS' standard operating procedure to discriminatorily discipline, discharge, and retaliate against Somali Muslim employees from 2007 to present.  Accordingly, summary judgment is inappropriate.

**C.  Under Tenth Circuit Authority, An *En Masse* Termination Can Support a Pattern-or-Practice Claim.**

Although EEOC's claim is not limited to Ramadan 2008 events, as JBS claims, we nevertheless address Defendant's erroneous arguments that the September 10, 2008 discharges are a "one-time event" and cannot provide a basis for a pattern-or-practice claim. JBS' analysis ignores the facts of this case and ignores contrary Tenth Circuit authority.

First, JBS ignores the fact that in 2008 Ramadan did not end on September 10th when JBS fired 96 Muslim employees.  Ramadan continued until September 30th, during which time JBS managers continued to discipline Muslim employees for praying at work. Managers monitored the restrooms and disciplined employees found praying [PSF 6].  HR Manager Lovell testified that it is possible he was writing up multiple people daily. [PSF 8]. Abdi Jama was sent home when he asked for a prayer break during Ramadan 2008. [Ex. 41, ¶¶ 1, 10, 14]. Thus, throughout Ramadan 2008, it was standard operating procedure to discipline Muslim employees for praying.  The suspensions issued on September 5th, and terminations on September 10th were merely part of the ongoing pattern.

Further, according to JBS, each of those disciplinary decisions was a separate decision which was not imposed across the board on all employees or on all Muslim employees. Rather, JBS alleges it made individual decisions regarding each Somali Muslim employee. [DSF 140]. Indeed, according to JBS, on Wednesday, September 10, 2008, when Somali Muslim employees returned to work, they were individually interviewed in the cafeteria by members of JBS management about why they had not returned the day before, and some were allowed to return to work. [ECF 330, p. 27; DSF 140]. Thus, there was no "one-time decision" as JBS claims.

Second, JBS ignores relevant Tenth Circuit authority. In *EEOC v. Sandia Corp.*, 639 F.2d

600 (10th Cir. 1980), the Tenth Circuit upheld the District Court's finding of a pattern or practice of age discrimination where the defendant discharged 810 employees in a mass layoff. *Id.* at 604. In *Sandia,* while the court did not expressly analyze whether a one-time event can form the basis of a pattern-or-practice claim, the court upheld a pattern-or-practice finding based on facts similar to those in this case. Specifically, like the events here, in *Sandia,* all of the terminated employees were issued layoff notices effective the same day.[8] *Id.* As in this case, the defendant in *Sandia* made individual evaluations and decisions. 639 F.2d at 604. And as in this case, some of the defendant's employees slated for termination in *Sandia* were spared. 639 F.2d at 604. If the Ramadan 2008 events are one event, so too is the layoff in *Sandia*.

Third, the three cases on which JBS relies are district court cases from other jurisdictions. The decision from the related case in Nebraska is not determinative in this case for the reasons stated in Section I (pp. 43-49) of this brief. The other two cases, *Sperling v. Hoffman-La Roche, Inc.*, 924 F.Supp. 1346, 1364 (D. N.J. 1996) and *Oinonen v. TRX, Inc.*, 2010 WL 396112, at *4 (N.D. Tex. Feb. 3, 2010), both hold that a mass layoff cannot support a pattern-or-practice claim, and thus conflict with Tenth Circuit authority in *Sandia*. Hence, both are unavailing.

Finally, the Bifurcation Order in this case contemplates a pattern-or-practice claim based on the Ramadan 2008 events. The Court ordered that "the EEOC's retaliation and discriminatory discipline and discharge pattern or practice claims are appropriate for bifurcation insofar as they are based on the Ramadan 2008 events." [ECF 116, p. 15]. The Court would not have so ordered if the Ramadan events cannot provide the predicate for pattern-or-practice claims.

---

[8] Of the employees who were terminated voluntarily in the layoff in *Sandia*, some were granted a reprieve to reach pension vesting anniversaries before March 1974. 639 F.2d at 604.

In sum, EEOC's discrimination and retaliation claim is based on a pattern or practice of discriminatory or retaliatory discipline and discharge, from 2007 to present. It is not limited to Ramadan 2008, which is an entire month of events, not a single event as JBS asserts. Moreover, Defendant's motion is based on district court decisions which conflict with Tenth Circuit authority. Accordingly, Defendant's motion must be denied.

## CONCLUSION

*Don't let the perfect be the enemy of the good*[9]

JBS' contention that it cannot provide the accommodation requested by the EEOC is premised on the concept that if you cannot meet perfection when attempting to accommodate employees' religious beliefs, you are excused from even trying. Essentially, JBS argues that if there are ten things that can be done to accommodate your employees and you can only do five, you should not be required to do any. The law, however, requires reasonableness, not perfection.

Dated:  June 24, 2014

/s Stephanie Struble
STEPHANIE STRUBLE
Senior Trial Attorney
Telephone: 303.866.1381
E-Mail:  stephanie.struble@eeoc.gov

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Denver Field Office
303 East 17th Avenue, Suite 410
Denver, CO  80203
Attorneys for Plaintiff EEOC

---

[9] Voltaire, *La Bégueule*

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 24, 2014, the foregoing was filed with the Court using the ecm-ecf filing system, which will serve the foregoing to the following:

| | |
|---|---|
| W.V. Siebert, Esq. | BSiebert@shermanhoward.com |
| Heather Fox Vickles, Esq. | HVickles@shermanhoward.com |
| Sherman & Howard L.L.C. | BCollazi@Shermanhoward.com |
| Attorneys for Defendant | |

*s/ Stephanie Struble*