IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  10-cv-02103-PAB-KLM

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

　　　　Plaintiff,

and

IRAQ ABADE, et al.,

　　　　Plaintiffs-Intervenors,

v.

JBS USA, LLC, d/b/a JBS Swift & Company,

　　　　Defendant.

_____

**ORDER**
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

This matter is before the Court on Defendant's **Motion for Leave to Disclose Additional Rebuttal Expert Witness** [#304][1] (the "Motion").  The Motion is referred to this Court for disposition [#305].  Plaintiff Equal Employment Opportunity Commission (the "EEOC") filed a Response to the Motion [#315] and Defendant filed a Reply [#320].  After being granted permission by the Court [#324], Defendant filed a Surreply [#325].  The Motion is now fully briefed and ripe for resolution.  The Court has reviewed the Motion, the Response, the Reply, the Surreply, the entire docket, and the applicable law, and is

---

[1]  "[#304]" is an example of the convention I use to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF).  I use this convention throughout this Order.

sufficiently advised in the premises.  For the reasons set forth below, the Motion is **GRANTED in part** and **DENIED in part**.

## I.  Background

### A.    Procedural Background

Defendant owns and operates a meat packing plant in Greeley, Colorado at which a large number of Somali, Muslim, and black persons work.  The EEOC filed this suit alleging that Defendant has discriminated against these workers based on their national origin, religion, and ethnicity.  The EEOC brings several pattern or practice claims alleging discriminatory harassment, disparate treatment, denial of religious accommodation, retaliation, and discipline and discharge.  The EEOC also brings individual claims on behalf of charging parties for failure to accommodate religion, retaliation for requesting accommodation, hostile work environment, and discriminatory discipline and discharge.  The EEOC's claims are based on Sections 706 and 707 of Title VII of the Civil Rights Act of 1964, as amended (the "Act").  Section 706 of the Act permits the EEOC to sue an employer on behalf of persons aggrieved by the employer's alleged unlawful practice. Section 707 of the Act permits the EEOC to sue employers whom it has reasonable cause to believe are engaged in a pattern or practice of unlawful employment discrimination.  42 U.S.C. § 2000e-5(f)(1); 2000e-6; *see also Gen. Tel. Co. of the Northwest, Inc. v. EEOC*, 446 U.S. 318, 324 (1980).

The EEOC's pattern or practice religious accommodation claim alleges that Defendant violated workers' rights to religious accommodation in four ways since at least December 22, 2007: (1) in 2008, it denied Muslim workers the ability to pray at or near

sundown during the holy month of Ramadan; (2) in 2008, it did not allow Muslim workers to break their fast after sundown during Ramadan; (3) it denied Muslim workers bathroom breaks and the ability to pray during those bathroom breaks; and (4) it did not provide Muslim workers a space in which to pray, forcing them to pray on bathroom floors. *Compl.* [#1] at ¶¶ 15-18, 23, 30-39; 44-54. The EEOC also alleges that during Ramadan of 2008, Muslim employees requested that their evening break be moved from 9:15 p.m. to 7:30 p.m. so that they could pray and break their fast within fifteen minutes of sunset. *Id.* at ¶ 29. As alleged, for two days Defendant accommodated this request, but on the third day, a Friday, the break was moved to 8:00 p.m. *Id.* at ¶¶ 30-31. On Friday, management stationed employees at the doors to prevent Muslim workers from leaving the facility at 7:30 p.m. and shut off water fountains or tagged them with red tags and yellow tape, preventing the workers from drinking water at the end of their daily fast or washing up for their prayers. *Id.* at ¶ 32. At 8:00 p.m., management told Muslim employees to leave the facility, but when the employees attempted to re-enter after their breaks, management told them they could not return to work. *Id.* at ¶¶ 37-39. Plaintiff avers that the following Monday Defendant advised the employees' union that those workers who left the plant had engaged in an unauthorized work stoppage and would be placed on an indefinite suspension. *Id.* at ¶ 40. It is further alleged that on Tuesday, Defendant decided to allow these workers to return to work with a final written warning, provided they returned that day. *Id.* at ¶ 41. However, Plaintiff claims that Defendant did not contact each worker to tell him or her about this decision and, therefore, several Muslim employees were terminated for not returning to work on Tuesday. *Id.* at ¶ 42.

The EEOC's pattern or practice hostile work environment claim alleges a variety of

forms of harassment against Defendant's Muslim, Somali, and/or black employees. These employees were allegedly subjected to harassing comments on the basis of their race, national origin, and/or religion. *Id.* at ¶ 19.  Other employees allegedly threw blood, meat, and bones at these employees and called them offensive names.  *Id.* at ¶ 20.  Plaintiff further alleges that Defendant's Muslim employees were harassed when they attempted to pray during scheduled breaks and were discriminatorily denied bathroom breaks.  *Id.* at ¶¶ 20-23.  The bathrooms at Defendant's facility also allegedly bore anti-Muslim, anti-Somali, and anti-black graffiti.  *Id.* at ¶ 21.  In its briefing on its Motion for Bifurcation [#28], the EEOC stated that its theory of Defendant's liability for this harassment is one of employer negligence.  *Reply in Support of Motion for Bifurcation* [#62] at 8.  The EEOC also alleges a retaliation pattern or practice claim, asserting that Muslim workers were retaliated against for requesting religious accommodations.  *Compl.* at ¶¶ 55-59.  It further alleges a discriminatory discipline and discharge claim, alleging that Muslim, Somali, and/or black workers were disciplined or fired because of their religion, national origin, and/or race.[2]  *Id.* at ¶¶ 44-49.

The Intervenors in this lawsuit, who number in excess of two hundred, are former or current workers at Defendant's Greeley plant.  They assert multiple claims against Defendant, including claims based on a pattern or practice of discriminatory treatment because of race, national origin, religion, and/or retaliation, pursuant to 42 U.S.C. § 2000e-

---

[2]  The EEOC also appears to bring a disparate treatment pattern or practice claim separate from the foregoing pattern or practice claims. *See Compl.* [#1] ¶ 46.  However, the EEOC fails to allege a separate cause of action for disparate treatment; instead, briefly mentioning "disparate treatment" as a part of the pattern or practice of discriminatory treatment alleged in the first claim for relief.  *Id.*

2(a).  *See Compl. in Intervention and Jury Demand* [#40] at ¶¶ 61-66 (the "Abdulla Intervenors' Compl."); *Am. Compl. in Intervention and Jury Demand* [#61] at ¶¶ 156-61 (the "Abade Intervenors' Compl."); *Compl. in Intervention and Jury Demand* [#132] at ¶¶ 34-39 (the "Abdi Intervenors' Compl."); *Am. Compl. in Intervention and Jury Demand* [#137] at ¶¶ 52-57 (the "Adan Intervenors' Compl."); *Compl. In Intervention and Jury Demand* [#236] at ¶¶ 51-56 (the "Abdille Intervenors' Compl.").

On August 8, 2011, the District Judge granted in part the EEOC's Motion to Bifurcate the trial, and ordered that the trial will be conducted in two phases.  *Order* [#116] at 18. During Phase I of the trial, the EEOC will present its claim that Defendant engaged in a pattern or practice of denial of religious accommodation, retaliation, and discipline and discharge.  *Id.*  During Phase II, the EEOC may present its pattern or practice claim for hostile work environment, pursue individual damages for its pattern or practice claim presented in Phase I, and pursue individual claims for compensatory and punitive damages.  *Id.*  The individual Intervenors' claims not covered by the EEOC's claims will also be evaluated in Phase II.  *Id.*  The District Judge further granted the EEOC's request to bifurcate discovery.  *Id.* at 17-18.

Subsequently, the Court entered a Scheduling Order governing Phase I.  *See generally Sched. Order* [#128].  Among other things, the Scheduling Order limited the number of expert witnesses to five experts per side.  *Id.* at § 9(d)(2) ("The parties agree to a limit of 5 experts per side.").  The Scheduling Order also set deadlines for disclosure of expert witnesses and related disclosures required pursuant to Fed. R. Civ. P. 26.  *Id.* at § 9(d)(3)-(4).  These deadlines were subsequently amended pursuant to requests from the parties.  *See generally Order* [#195]; *Order* [#202].  Ultimately, affirmative expert

designations were due on November 16, 2012, and rebuttal expert designations were due

on January 2, 2013.  *Minute Order* [#195] at 1; *Minute Order* [#202] at 1.

## B.  The Motion to Strike

On December 24, 2013, Defendant filed its Motion for Leave to Designate Additional

Expert Witnesses, or in the Alternative, to Strike Plaintiff's Expert Witness Keith Koontz

[#230] (the "Motion to Strike").   The Motion to Strike was premised on Defendant's

argument that Plaintiff's February 27, 2013 written discovery responses were the first time

the EEOC disclosed all of the religious accommodations it sought for Muslim employees.

*Order* [#243] at 6.  The Court granted the Motion to Strike in part and denied it in part

holding:

> Here, the Court finds that Plaintiff's late supplemental disclosure of the
> accommodations it seeks from Defendant does not constitute good cause to
> modify the Scheduling Order to allow the parties to designate additional
> expert witnesses.  In the Scheduling Order [#128], Plaintiff anticipated the
> need for "an industrial organizations expert (to opine regarding the
> reasonableness of accommodations)" and Defendant anticipated retaining
> an expert on "industry operations and standards."  *Sched. Order* [#128] at §
> 9(d)(1).  It is clear that both parties understood that they would need expert
> witnesses with regard to these topics.
>
> However, the Court notes that Plaintiff's supplemental discovery responses
> came more than three months after the deadline for designation of affirmative
> experts in this matter and more than a month after the deadline for
> designation of rebuttal experts.  *See Order* [#195] (granting joint motion to
> amend the Scheduling Order and setting November 16, 2012 as the deadline
> for designation of affirmative experts); *Order* [#202] at 1 (granting unopposed
> motion to amend Scheduling Order and setting January 4, 2013 as the
> deadline for designation of rebuttal experts).  As a result, it was impossible
> for Defendant's experts to properly analyze the requested accommodations.
> Therefore, the Court finds that Defendant has shown good cause to modify
> the Scheduling Order to allow Defendant to file a supplemental expert report,
> if needed, to address the accommodations requested by Plaintiff. Such
> supplemental report shall be in addition to Professor Takim's supplemental
> report and shall only be authored by an individual previously designated by
> Defendant as an affirmative expert witness.

*Id.* at 17-18.  On July 18, 2013, the Court held a hearing regarding the Court's Order regarding the Motion to Strike.  *See generally Courtroom Minutes/Minute Entry* [#244].  At that hearing, the Court set deadlines for the parties to supplement certain expert reports and noted that the order did not otherwise impact the discovery cutoff.  *Id.* at 1-2.  On August 1, 2013, Defendant filed an Objection to the Court's finding that it had not established good cause to amend the Scheduling Order to permit Defendant to identify a new expert witness on workplace safety.  *See generally Defendant's Objection to Magistrate Judge's Orders* [#252].  The District Judge has not ruled on the objection.

## C.    The Motion

In its Motion, Defendant requests that the Court amend the Scheduling Order pursuant to Fed. R. Civ. P. 16(b)(4) to allow it to disclose one additional rebuttal expert witness, Robert Donlon ("Donlon").  *Motion* [#304] at 1.  Defendant maintains that Mr. Donlon was disclosed in this case as a Fed. R. Civ. P. 30(b)(6) representative of Defendant, but that disclosing him as a rebuttal expert witness is now necessary because the EEOC  did not disclose its proposed accommodations until February 27, 2013.  *Id.* at 4-5.  In addition, Defendant argues that the EEOC disclosed an additional report from one of its expert witnesses, Mr. Koontz, on November 27, 2013 that was more than double the length of his initial report and includes "new details about the EEOC's proposed accommodations not disclosed before," that "can only be addressed by plant personnel such as Mr. Donlon."  *Id.* at 7.  Defendant further argues that in the Scheduling Order it provided notice that it would retain "experts in rebuttal to experts disclosed by Plaintiff," *Sched. Order* [#128] at  § 9(d)(1), and that Defendant could not have previously known it would need to disclose Mr. Donlon because his rebuttal expert testimony only became

7

necessary when Mr. Koontz's additional expert report was disclosed. *Motion* [#304] at 3, 7, 10. Regarding the factors considered by the Tenth Circuit in *Summers v. Missouri Pac. R.R. Sys.*, 132 F.3d 599 (10th Cir. 1997), Defendant argues: (1) there is no surprise or prejudice to the EEOC because Mr. Donlon was previously disclosed as a fact witness and he would be responding only to issues raised in Mr. Koontz's report; (2) the EEOC can cure any surprise by deposing Mr. Donlon; (3) there is no impact on the trial, as no trial date is set in this case; and (4) there is no bad faith or willfulness because Defendant is simply responding to the EEOC's expert's report. *Id.* at 12-13. Finally, Defendant argues that to approve the EEOC's tactic of waiting to disclose the full scope of its accommodations or Mr. Koontz's opinions until November 2013, would encourage trial by ambush. *Id.* at 14.

In its Response, the EEOC argues that Defendant fails to show good cause for amending the Scheduling Order. *Response* [#315] at 2, 8-12. Specifically, the EEOC argues that it was not required to disclose a detailed description of the accommodations it seeks until after the parties conducted discovery. *Id.* at 4. Accordingly, it maintains that on February 27, 2013, it supplemented its discovery responses to provide a detailed explanation of the accommodations sought. *Id.* 4-5. The EEOC further argues that, contrary to Defendant's assertion that the absence of an impending trial date is the single most important factor for the Court to consider, *Summers* is distinguishable and that, while a trial date has not been set, the Court must consider the other factors discussed in *Smith v. United States*, 834 F.2d 166, 169 (10th Cir. 1987). *Id.* at 8-9. The EEOC maintains that discovery should not be reopened. *Id.* at 9. It further argues that the "EEOC will be prejudiced in terms of time, expense, and effort if JBS is allowed to designate a new proposed expert in excess of the maximum number allowed by the Scheduling Order."

(citing *Gen'l Steel Domestic Sales, LLC v. Chumley*, No. 10-cv-01398-PAB-KLM, 2012 WL 1378536, *6 (D. Colo. Apr. 20, 212)). *Id.* at 10. The EEOC also argues that Defendant "was not diligent in obtaining discovery within the guidelines established by the Court." (emphasis omitted). *Id.* at 11-12. Plaintiff further avers that Defendant's "need for an expert like an industrial engineer was not only foreseeable from the beginning but [Defendant] actually foresaw the need" for one. *Id.* at 12. Finally, EEOC maintains that it is unclear whether Mr. Donlon will provide relevant evidence or whether he is qualified to provide expert testimony. *Id.*

With regard to Defendant's position that Mr. Donlon's testimony is needed because Plaintiff's designation of an industrial engineer to rebut the opinion of a CPA created a "subject area mismatch," the EEOC argues that a rebuttal expert must address the same subject matter identified by the expert he or she is rebutting, but need not use the same methodology as the affirmative expert. *Id.* at 12-14. The EEOC further argues that Koontz's supplement to his report does not set forth any new proposed accommodations and, even if it does provide new information, Defendant is not entitled to an additional expert. *Id.* at 14. Finally, the EEOC distinguishes the case law Defendant relied on in the Motion. *Id.* at 14-15.

In its Reply, Defendant argues that it did not need to designate an industrial engineer by the expert designation deadline because the EEOC had not disclosed its proposed accommodations by the deadline. *Reply* [#320] at 2. Defendant further argues that because the EEOC did not designate an industrial engineer as an affirmative expert, it was unable to designate an industrial engineer as a rebuttal expert. *Id.* Defendant maintains that Mr. Koontz's rebuttal report goes beyond the issues addressed in Ms. Skinner's report.

9

*Id.* Defendant further argues that its hands were tied with regard to the EEOC's failure to provide its proposed accommodations. *Id.* With regard to Ms. Skinner's August 2013 supplement to her report, Defendant argues that she did not offer opinions about operational issues. *Id.* at 3. Defendant further argues that it did not unduly delay because it filed its first motion requesting to designate additional expert witnesses [#230] approximately one month after the EEOC disclosed its proposed accommodations. *Id.* In addition, Defendant argues that it did not unduly delay because the EEOC provided Mr. Koontz's supplemental report less than two weeks before Defendant filed the instant Motion. *Id.* Defendant also spends a significant portion of its Reply arguing about the standard to be applied. *Id.* at 4-9. Finally, Defendant revisits its argument that Mr. Koontz's supplement includes detailed new information about the accommodations Plaintiff seeks and is not merely a response to Ms. Skinner's supplement. *Id.* at 9-10.

In its Surreply, Plaintiff argues the Mr. Koontz's supplement was timely. *Surreply* [#325] at 1-6.

## II. Standard of Review

As an initial matter, numerous courts have noted, and the undersigned agrees, that a "Scheduling Order is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril." *See, e.g.*, *Washington v. Arapahoe Cnty. Dep't of Soc. Servs.*, 197 F.R.D. 439, 441 (D. Colo. 2000) (citations omitted). Scheduling Order deadlines "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b). To demonstrate good cause pursuant to Rule 16, the moving party must "show that it has been diligent in attempting to meet the deadlines, which means it must provide an adequate explanation for any delay." *Strope v. Collins*, 315 F. App'x 57, 61

10

(10th Cir. 1009) (citation omitted); Minter *v. Prime Equip. Co.*, 451 F.3d 1196, 1205 n.4 (10th Cir. 2006).   "Properly construed, 'good cause' means that scheduling deadlines cannot be met despite a party's diligent efforts . . . .   Carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief." *Colo. Visionary Acad. v. Medtronic, Inc.*, 194 F.R.D. 684, 687 (D. Colo. 2000) (internal quotation and citation omitted); *accord Summers v. Mo. Pac. R.R. Sys.*, 132 F.3d 599, 604 (10th Cir. 1997) (holding that "total inflexibility is undesirable" in the context of a motion to adopt a new scheduling order).

The decision to modify the Scheduling Order "is committed to the sound discretion of the trial court." *Smith v. United States*, 834 F.2d 166, 169 (10th Cir. 1987); *see also Anderson v. Seven Falls Co.*, No. 2013 WL 3771300, at *8 (D. Colo. July 18, 2013) ("this court unquestionably has the authority to re-open discovery to allow Plaintiff to designate a rebuttal expert"); *Benton v. Avedon Eng'g, Inc.*, No. 10-cv-01899-RBJ-KLM, 2013 WL 1751886, at *1 (D. Colo. April 23, 2013).[3]   While "the [Scheduling Order] defines a lawsuit's

---

[3]   Defendant argues that the Court should either apply the good cause standard used in *Wilson v. City of Lafayette*, Nos. 07-cv-01844-EWN-KLM and 07-cv-02248-EWN-BNB, 2008 WL 3211288, (D. Colo. Aug. 6, 2008), or should apply the four factors discussed in *Summers v. Missouri Pac. R.R. Sys.*, 132 F.3d 599 (10th Cir. 1997).   *Reply* [#320] at 4.   First, the Court notes that the "good cause standard" applied in *Wilson v. City of Lafayette* was simply an application of the language of Rule 16.   Second, *Rimbert v. Eli Lilly & Co.* states that the *Summers* factors are considered when "reviewing the denial of a party's motion for a new scheduling order to name a previously undisclosed witness." 647 F.3d 1247, 1254 (10th Cir. 2011).   The *Summers* factors have also been applied when determining if a late disclosed expert should be stricken.   *See Jorgensen v. Montgomery*, No. 06-cv-00853-MSK-BNB, 2007 WL 3119549, at *4 (D. Colo. Oct. 19, 2007); *Fuchs v. Sanders*, No. 08-cv-00580-MSK-KLM, 2008 WL 4372414, at *2 (D. Colo. Sept. 22, 2008).   The Court's research reveals that after *Summers*, the Tenth Circuit continued to apply the six factors discussed in *Smith v. United States*, 834 F.2d 166, 169 (10th Cir. 1987), when determining whether a court should reopen discovery.   *See Watson v. Norton*, 10 F. App'x 669, 675 (10th Cir. Mar. 26, 2001).   In addition, after *Summers* this Court has applied the *Smith* test when determining if discovery should be reopened.   *See, e.g., Bituminous Cas. Corp. v. Hartford Cas. Ins. Co.*, No. 12-cv-00043-WYD-KLM, 2014 WL 675816, at *2 (D. Colo. Feb. 21, 2014); *Taylor Moving, LLC v.*

boundaries in the trial court and on appeal, 'total inflexibility is undesirable.'" *Summers*, 132 F.3d at 604 (citations omitted).  However, the Court notes that a scheduling order plays an important role in the management of a case and should not be unnecessarily amended. *Cf. Washington*, 197 F.R.D. at 441 (noting that a "scheduling order is an important tool necessary for the orderly preparation of a case for trial"); *Rent-a-Center, Inc. v. 47 Mamaroneck Ave. Corp.*, 215 F.R.D. 100, 101 (S.D.N.Y. 2003) (stating that "scheduling orders are designed to offer a degree of certainty in pretrial proceedings, ensuring that at some point both the parties and the pleadings will be fixed and the case will proceed").

### III. Analysis

As an initial matter, the Court notes that the Phase I Scheduling Order [#128] was entered on October 27, 2011.  More than two years later, Defendant seeks to increase the number of expert witnesses it may designate, which would create an imbalance in the number of experts and, if the Motion is granted, will likely lead to Plaintiff filing a similar motion.  This could lead to an endless cycle of motions practice and the case will never move forward.  The parties' repeated attempts to amend the Scheduling Order "places the court in the untenable position" of potentially inviting endless motions regarding additional

---

*Voight*, No. 11-cv-01540-WYD-BNB, 2013 WL 2112431, at *3 (D. Colo. May 15, 2013). Here, Defendant seeks to amend the Scheduling Order to allow it to designate one rebuttal expert in excess of the number allowed under the Scheduling Order.  After carefully considering *Summers* and *Smith*, the Court finds that neither are directly on point.  *Wilson* is on point, but does not establish a test separate from Rule 16's good cause standard.  Accordingly, the Court will analyze the Motion applying Rule 16 as it did in *Wilson*.  While the Court applied the *Summers* factors in *Fuchs*, that case is distinguishable because the moving party was not seeking to modify the scheduling order to change the number of experts it could designate.  Instead, the moving party requested an extension of the deadline to designate experts in order to designate an individual previously disclosed as a fact witness to an expert witness.  *See Fuchs*, 2008 WL 4372414, at *2. Here, in contrast, Defendant seeks to designate an additional rebuttal expert witness, which, if allowed, would increase the number of rebuttal experts allowed under the Scheduling Order and create an imbalance in the number of expert witnesses.

discovery the parties purport to need, or disallowing an allegedly important witness to be designated as an expert. *Cf. Pennington Partners, LLC v. Midwest Steel Holding Co.*, 271 F.R.D. 462, 464 (D. Md. 2010). "Courts issue scheduling orders specifically to avoid such dilemmas, and they are intended to be taken seriously." *Id.*

In addition, the Court notes that its Order granting in part and denying in part the Motion to Strike is not dispositive of the issues raised in the instant Motion. *See generally Order* [#243]. With regard to the Motion to Strike, the Court considered a similar argument—whether Defendant was entitled to three additional experts as a result of the information contained in Mr. Koontz's initial report or, alternatively, whether portions of Mr. Koontz's initial report should be stricken. In that circumstance, the Court carefully evaluated Mr. Koontz's initial report and struck portions that the Court found exceeded the bounds of rebuttal opinion. *Id.* at 17-18. The portion of the Court's previous Order that is relevant to the instant Motion is the Court's finding that:

> Plaintiff's late supplemental disclosure of the accommodations it seeks from Defendant does not constitute good cause to modify the Scheduling Order to allow the parties to designate additional expert witnesses. In the Scheduling Order [#128], Plaintiff anticipated the need for "an industrial organizations expert (to opine regarding the reasonableness of accommodations)" and Defendant anticipated retaining an expert on "industry operations and standards." *Sched. Order* [#128] at § 9(d)(1). It is clear that both parties understood that they would need expert witnesses with regard to these topics.

*Id.* at 17-18. Despite finding that the late supplemental disclosure of the accommodations did not constitute good cause, the Court allowed Defendant to disclose supplemental expert reports written by previously designated experts, allowed the parties to conduct discovery regarding those supplemental reports, and allowed Plaintiff to supplement its rebuttal expert reports. *Id.* at 18; *Courtroom Minutes/Minute Order* [#244] at 1-2. This was based on the

13

Court's finding that

> Plaintiff's supplemental discovery responses came more than three months
> after the deadline for designation of affirmative experts in this matter and
> more than a month after the deadline for designation of rebuttal experts. *See
> Order* [#195] (granting joint motion to amend the Scheduling Order and
> setting November 16, 2012 as the deadline for designation of affirmative
> experts); *Order* [#202] at 1 (granting unopposed motion to amend Scheduling
> Order and setting January 4, 2013 as the deadline for designation of rebuttal
> experts).  As a result, it was impossible for Defendant's experts to properly
> analyze the requested accommodations.

*Order* [#243] at 18.  As a result, the Court allowed Defendant to file supplemental expert

reports, if needed, to address the accommodations requested by Plaintiff.  *Id.*

As noted above, "[p]roperly construed, 'good cause' means that scheduling

deadlines cannot be met despite a party's diligent efforts . . . .  Carelessness is not

compatible with a finding of diligence and offers no reason for a grant of relief."  *Colo.*

*Visionary Acad.*, 194 F.R.D. at 687 (internal quotation and citation omitted).   Here,

Defendant argues it could not have anticipated the need for Mr. Donlon's designation as

a rebuttal expert witness, rather than a fact witness, until Plaintiff produced Mr. Knootz's

34-page supplemental report on November 27, 2013.  *Motion* [#304] at 1, 7-8.

According to the Motion, "[b]y the time the November 16, 2012 deadline arrived to

identify affirmative experts . . . the EEOC still had not identified its proposed religious

accommodations."  *Motion* [#304] at 4.  Accordingly Defendant "did what it could . . . by

identifying a JBS accountant to testify about the costs related to the Muslim employees'

2008 work stoppage, and costs associated with hypothetical scenarios of Muslim

employees taking unscheduled breaks to pray."  *Id.*  The Summary of Anticipated Expert

Testimony of Heather Skinner does, as Defendant states, provide calculations of the costs

associated with hypothetical scenarios involving employee breaks.  *See generally Motion,*

14

*Ex. 5* [#304-5] (the "Skinner Report").  On February 27, 2013, the EEOC supplemented its

discovery responses to provide information regarding the accommodations it seeks.  In

response to Interrogatory No. 11, the EEOC stated:

> EEOC is seeking an accommodation such that the Muslim employees at the Greeley facility can timely pray in accordance with their religious beliefs.  This can be accomplished either by moving the scheduled breaks to coincide with the required prayer times or by allowing Muslim employees to leave the line for 10-15 minutes at their required prayer times as an unscheduled break.  It is the EEOC's position that the meal breaks should be moved to coincide with sundown during Ramadan.  With respect to the requirement that JBS allow Muslim employees to leave the line to pray during an unscheduled break, this must include ensuring that leads, supervisors, and trainers are available to cover while the Muslim employees take their prayer breaks.  In addition, JBS must make efforts not to concentrate Muslims on the same lines so that Muslim employees who require prayer breaks at specific times can be spelled off their respective lines at those times and JBS must hold its supervisors accountable for failing to provide unscheduled breaks in a non-discriminatory basis.  Muslim employees should have ready access to a procedure to complain about not being permitted to take required prayer breaks.  JBS also must make sure that employees are cross-trained on the lines so that additional Muslim employees can leave the line at any given time and employees must be allowed to cover for each other while they leave the line to pray and prayer breaks should be given preference over any other unscheduled break.  Supervisors should be trained to encourage employees to anticipate the need for restroom breaks before prayer times so that the need for restroom breaks do[es] not become emergent at the same time as Muslim employees require prayer breaks.  The EEOC is seeking to have employees, supervisors, leads, trainers, and managers adequately trained regarding the prayer needs of the Muslim employees, including the specific prayer times on any given day, as well as the duty of the employee to accommodate the religious needs of the employees.  Employees on the First shift must also be given time off to attend Eid celebrations.  Finally, reference is made to the opinions and recommendations stated in the January 4, 2013 report of Keith Koontz, P.E.

*Motion, Ex. 6* [#304-6] at 3.  In the August 26, 2013 Supplement to Summary of Anticipated

Expert  Testimony  by  Heather  Skinner,  Ms.  Skinner  responded  directly  to  the

accommodations listed in response to Interrogatory No. 11.  *See generally Motion, Ex. 8*

[#304-8] ("Skinner Supplement").  Ms. Skinner provided her opinions regarding the

15

following issues:

- Moving breaks to coincide with prayer times;
- Allowing Muslim employees to leave for 10-15 minute unscheduled breaks, with leads, supervisors, and trainers available to cover for the Muslim employees;
- Not concentrating Muslim employees on the same lines;
- Muslim employees being given a complaint procedure;
- Employees being cross-trained on other lines so Muslim employees can leave the line at any given time and employees covering for each other;
- Prayer breaks being given precedence over other breaks;
- Supervisors being trained to encourage employees to anticipate the need for restroom breaks before prayer times to avoid conflicts with prayer times;
- Training employees, supervisors, leads, trainers, and managers about prayer needs of Muslim employees; and
- First shift employees being given time off to attend Eid celebrations.

*See id.* at 1-4.  The Skinner Supplement also addressed certain issues raised in Mr. Koontz's January 4, 2013 report.  *Id.* at 4-7.

On November 27, 2013, Plaintiff disclosed Mr. Koontz's supplemental report.  *See generally Motion, Ex. 9* [#304-9] (the "Koontz Supplement").  The Koontz Supplement takes each of the points raised in the Skinner Supplement and responds.  *See generally id.* Defendant claims that the Koontz Supplement "provides new details of proposed operational changes not provided before, and new details about the EEOC's proposed accommodations not disclosed before.  *Motion* [#304] at 7.  The Court will examine each of the sections of the Koontz Supplement Defendant attacks in the Motion.

**A.     Pages 6-7**[4]

Defendant argues that "on pp. 5-6, [Koontz] makes new assumptions about the

_____

[4] Throughout the Motion Defendant uses the page numbers found on the bottom right-hand corner of each page of the Koontz Supplement. The Court, however, refers to the page numbers assigned to the document when it was filed on the CM/ECF system.

break times and schedule and cattle grade changes at the plant to argue break times can

be moved to accommodate prayer times as necessary over the course of the year.  This

obviously is not an accounting issue, and can only be addressed by plant personnel such

as Mr. Donlon."  *Id.* at 7.  Defendant appears to believe that when rebutting Ms. Skinner's

opinions as an expert, Mr. Koontz may only address whatever Defendant believes to be

accounting issues.  This raises the question of what is proper rebuttal testimony.

A witness designated as a rebuttal expert witness, is a witness "intended solely to

contradict or rebut evidence on the same subject matter identified" in the expert report of

another party.  Fed. R. Civ. P. 26(a)(2)(C)(ii); *see also Lindner v. Meadow Gold Dairies,*

*Inc.*, 249 F.R.D. 625, 636 (D. Hawaii 2008) (holding that individuals designated only as

rebuttal experts could present limited testimony, could not testify as part of a party's case-

in-chief, and would not be allowed to testify "unless and until" the experts they were

designated to rebut testified at trial); *Johnson v. Grays Harbor Cmty. Hosp.*, No. C06-

5502BHS, 2007 WL 4510313, at *2 (W.D. Wash. Dec. 18, 2007) (finding that experts

designated as rebuttal witnesses would "be permitted only to offer rebuttal testimony at

trial").  Fed. R. Civ. P. 26(a)(2)(D)(ii)

> make[s] clear that a rebuttal expert's testimony must relate to and rebut
> evidence or testimony on the same *subject matter* identified by another party
> under Rule 26(a)(2)(B) or (C). Such evidence is not tied to any particular
> witness; it is tied to whether the party with the affirmative burden has
> presented evidence and/or testimony from a duly disclosed expert on the
> same subject matter as that which will be rebutted by the disclosed rebuttal
> expert.

*Bleck v. City of Alamosa, Colo.*, No. 10-cv-03177-REB-KMT, 2012 WL 695138, at *4 (D.

Colo. March 5, 2012) (citing *Baumann v. Am. Family Mut. Inc. Co.,* 278 F.R.D. 614, 2012

WL 27652, *2 (D. Colo. 2012) and *Morel v. Daimler–Chrisler Corp.,* 259 F.R.D. 17, 21 (D.

17

Puerto Rico 2009)).  This Court has previously approved of the interpretation of the phrase

"same subject matter" found in *TC Sys., Inc. v. Town of Colonie, New York*, 213 F.Supp.2d

171, 180 (N.D.N.Y. 2002).  *See Armstrong v. I-Behavior Inc.*, No. 11-cv-03340-WJM-BNB,

2013 WL 2419794, at *3 (D. Colo. June 3, 2013) ("the Court finds the interpretation of the

phrase "same subject matter" . . . most persuasive.").  The Court summarized *TC Systems*

as follows:

> [P]laintiff's expert used accounting principles to calculate damages caused
> by a public right-of-way.  Defendant's rebuttal expert disputed Plaintiff's
> expert's opinion from an engineering, rather than accounting, perspective.
> Plaintiff claimed that Defendant's rebuttal expert was improperly designated
> as rebuttal testimony because the expert sought to introduce new argument.
>
> The court held that defendant strategically decided to rebut economic and
> accounting expert testimony with practical expertise in engineering and public
> rights-of-way management.  The court concluded that since nothing in the
> Rules or case law prohibited Defendant from such a strategy, it would not
> interfere with a party's strategic decision.    Despite the different
> methodologies applied by the experts, the court found each party addressed
> the same subject matter—i.e., damages associated with the public right-of-
> way.

*Armstrong*, 2013 WL 2419794, at *3 (internal citations omitted).  Accordingly, in *Armstrong*

the Court concluded that the vast majority of the rebuttal testimony offered was within the

same subject matter as the affirmative expert's conclusions regarding economic loss.  *Id.*

at *4.  The Court struck certain portions of the rebuttal testimony that the Court found to be

beyond the scope of the affirmative expert's conclusions.  *Id.*  In addition, the Court granted

the plaintiff leave to reply to any methodology or opinion of the rebuttal expert by filing a

supplemental report from the plaintiff's affirmative expert.  *Id.* at *5.  In so concluding, the

Court cited to *TS Systems* for the idea that it would be fair to allow the plaintiff the

opportunity to rebut that opinion because the plaintiff did not anticipate its need for an

engineer and such failure was excusable.  *Id.*  Based on this analysis, the Court finds that Mr. Koontz may address the accounting issues/loss issues raised in the Skinner Supplement even if he addresses them using a different methodology such as engineering.

Turning to pages 6 and 7 of the Koontz Supplement, Mr. Koontz rebuts Ms. Skinner's calculations of the losses Defendant may suffer if it changed scheduled breaks to coincide with prayer times.  Mr. Koontz attacks Ms. Skinner's underlying assumptions through citation to evidence in the record and his own belief that costs "could arguably be minimized if the first 3-4 minutes of a 10 minute prayer break were scheduled to overlap with the start of a grade change."  *Koontz Supplement* [#304-9] at 7.  In addition he suggests that "if some of the EEOC suggested workstation coverage policies were implemented, the additional cost could be reduced completely."  *Id.*  Such opinions address the same subject matter as Ms. Skinner's opinions and are proper rebuttal testimony.  Mr. Koontz also attacks Ms. Skinner's assumption that the cost estimate must include four prayer breaks per day and offers his opinion that "it appears that in Fabrication there are less than 2 months per year where 2 prayers need to be accommodated on A shift and 2 months where no prayers need to be accommodated on A shift because the 2 prayer times are before 6:00 am or during the lunch break 12:00-12:30."  *Id.*  Again, this is proper rebuttal testimony as Mr. Koontz is simply offering an opinion based on the evidence in the case that rebuts Ms. Skinner's calculations.  Accordingly, the Court finds that this portion of the Koontz Supplement does not establish good cause for allowing Defendant to designate an additional rebuttal expert witness because it is proper rebuttal testimony, not testimony regarding new accommodations or theories as Defendant argues.

B.    **Pages 9-10**

Defendant maintains that on pages 9-10 of the Koontz Supplement, Mr. Koontz "opines that permitting Muslim employees to take unscheduled 10-15 minute breaks is possible, based on other assumptions that are not financially related and can only be responded to by plant personnel." *Motion* [#304] at 7.  Defendant does not clearly identify which statements in this portion of the Koontz Supplement allegedly do not relate to the calculation of potential costs.  Mr. Koontz attacks Ms. Skinner's opinion regarding the feasibility of unscheduled breaks.  The closest he comes to offering something that "can only be responded to by plant personnel," *id.* at 7, is that he suggests that "[t]his specific proposed accommodation could be combined with other options proposed by the EEOC, such as cross-training employees, allowing employees to cover for one another, etc." *Koontz Supplement* [#304-9] at 9.  This is proper rebuttal testimony that Defendant cannot use as a basis to claim that it must designate another expert.  Mr. Koontz is simply attacking Ms. Skinner's calculations by offering a suggestion of how those costs may be inflated because they do not take into consideration the reduction offered through the combination of various accommodations.  Accordingly, the Court finds that this portion of the Koontz Supplement does not establish good cause for allowing Defendant to designate an additional rebuttal expert witness.

C.    **Page 11**

Defendant attacks page 11 of the Koontz Supplement because Mr. Koontz "opines about the amount of training that would be needed to transfer workers to new jobs or cross train them for additional jobs—again, that is not a financial issue, but an operations issue." *Motion* [#304] at 7.  This portion of the Koontz Supplement responds to Ms. Skinner's

statement that the total cost to cross-train Muslim employees would be $5,000 per employee. *Koontz Supplement* [#304-9] at 11. Mr. Koontz attacks Ms. Skinner's underlying assumption that the cost to train a new employee is the same amount it would cost to cross-train an existing employee. *Id.* He states "they would most likely require less training than a new hire since they have been previously trained on similar work tasks." *Id.* As with the other portions of the Koontz Supplement examined above, the Court finds that this is proper rebuttal testimony because Mr. Koontz is using his engineering background to attack an underlying assumption of Ms. Skinner's cost calculation. Accordingly, the Court finds that this portion of the Koontz Supplement does not establish good cause for allowing Defendant to designate an additional rebuttal expert witness because this proper rebuttal testimony.

**D.     Page 12**

Defendant argues that Mr. Koontz "provides new details about the EEOC's proposed accommodation of a complaint system at the plant, which is an operations issue, and then opines about it." *Motion* [#304] at 7. As noted above, in response to Interrogatory No. 11, the EEOC included: "Muslim employees should have ready access to a procedure to complain about not being permitted to take required prayer breaks." *Motion, Ex. 6* [#304-6] at 3. In the Koontz Supplement, Mr. Koontz states that he disagrees with Ms. Skinner's estimate that a complaint system would cost $50,000 because the

> EEOC . . . is actually asking that Muslim employees should have *ready access to* a procedure to complain about not being permitted to take required prayer breaks. The EEOC is not asking for a new procedure requiring additional personnel. Ready access could be something as simple as being able to talk to their current supervisors and managers. The existing supervisors and managers could be further trained to utilize the current complaint systems or JBS could implement a new system that did not require

21

new personnel.

*Koontz Supplement* [#304-9] at 12.  Defendant's position that this is new information about the requested accommodation is incorrect.  Mr. Koontz uses the exact language that was included in the response to Interrogatory No. 11 and then offers some suggestions of more cost effective means by which Defendant could offer the accommodation without hiring a full-time employee at $50,000 per year as suggested by Ms. Skinner.  Accordingly, the Court finds that this portion of the Koontz Supplement does not establish good cause for allowing Defendant to designate an additional rebuttal expert witness because it is proper rebuttal testimony.

**E.      Pages 17-18**

Regarding pages 17-18, Defendant maintains that Koontz "again provides new details about the EEOC's accommodation concerning restroom breaks, and then opines on that, which is an operations issue."  *Motion* [#304] at 7.  Skinner's opinion addressed here responds to the idea that "[p]rayer breaks be given precedence over other breaks."  *Skinner Supplement* [#204-8] at 3.  This portion of the Koontz Supplement responds to Ms. Skinner's opinion that:

> In the event an employee has a "bodily fluids accident" in a production area, the protocol would be to isolate, stop production and clean the affected area. The cost of downtime for fab is $191 per minute.  Assuming this could be done in 10 minutes, the resulting cost of lost production if an accident occurs is $1,910.

*Id.*  Mr. Koontz responds:

> The EEOC is asking that prayer breaks be given preference over other unscheduled breaks.  Ms. Skinner's financial analysis is irrelevant.  The EEOC is not requesting that employees with emergent needs should be denied restroom breaks, so there is no reason to believe that there would be a "bodily fluids accident" resulting from this policy.

*Koontz Supplement* [#304-9] at 17.  This, like the portions of the Koontz Supplement examined above, is a rebuttal opinion that attacks the assumptions underlying Ms. Skinner's calculations.   Accordingly, the Court finds that this portion of the Koontz Supplement does not establish good cause for allowing Defendant to designate an additional rebuttal expert witness because this is proper rebuttal testimony.

## F.   Page 19

Defendant argues that on page 19 of the Koontz Supplement, Mr. Koontz "provides new details about the EEOC's proposed training accommodation, and then opines about that; training is a plant-based operational issue." *Motion* [#304] at 7.  In response to Interrogatory No. 11 the EEOC stated: "Supervisors should be trained to encourage employees to anticipate the need for restroom breaks before prayer times so that the need for restroom breaks do[es] not become emergent at the same time as Muslim employees require prayer breaks."  *Motion, Ex. 6* [#304-6] at 3.  Ms. Skinner opined that

> [i]t is reasonable to assume this would result in increased breaks, compounding the concerns around unscheduled breaks.  Assuming 1,574 employees per shift and 2% take an additional break because Supervisors encourage it, or 31 people, the costs would be lost pay of $74.40 per shift, or $38,688 annualized per plant.

*Skinner Supplement* [#304-8] at 4.  In response, Mr. Koontz suggests that this number is high because training could be incorporated "to highlight the potential abuse of this policy on efficiency targets."  *Koontz Supplement* [#304-9] at 18.  Mr. Koontz added:

> There was insufficient data provided to assess Ms. Skinner's estimate on the additional cost this would create for JBS.  The EEOC is not suggesting that employees be encouraged to take restroom breaks, only to plan them appropriately in order to minimize overlap with the scheduled prayer breaks.

*Id.*  To the extent Defendant argues that this statement in the Koontz Supplement modifies

the EEOC's response to Interrogatory No. 11, it is incorrect.  Ms. Skinner appears to take

the position that training supervisors to encourage employees to be aware of the need for

restroom breaks and to make an effort to take them at times other than prayer times will

result in an increase in the number of restroom breaks, and Mr. Koontz's rebuttal simply

points out that Ms. Skinner has taken her analysis of the cost of the accommodation from

that viewpoint.  Accordingly, the Court finds that this portion of the Koontz Supplement

does not establish good cause for allowing Defendant to designate an additional rebuttal

expert witness because this is proper rebuttal testimony.

**G.    Page 20**

Defendant challenges page 20 of the Koontz Supplement because Mr. Koontz

"provides new detail about the EEOC's proposed 'time off for [Muslim] holiday'

accommodation, and then opines about that.  This also raises operational issues."  *Motion*

[#304] at 7.    In response to Interrogatory No. 11 the EEOC stated:   "Employees on the

First shift must also be given time off to attend Eid celebrations."   *Motion, Ex. 6* [#304-6]

at 3.  Ms. Skinner opined:

> Assuming 50 Muslim employees on A-shift in Greeley at an average wage
> of $14.80/hour and 8 hours of paid time off = $5,920.  This estimate is
> conservative; it does not include taxes or benefits and assumes their
> absence can be covered by overcrew with no impact on efficiency or
> overtime.

*Skinner Supplement* [#304-8] at 4.  Mr. Koontz responded:

> I agree with Ms. Skinner's comments that granting exclusive *paid* time off to
> attend Eid celebrations would create additional costs for JBS.  In my opinion,
> it seems reasonable that covering this (mass) absence of Muslim workers
> using *unpaid* time off could be managed by JBS to minimize the costs.  JBS
> could implement a policy to offer unpaid time off or require the absent
> workers to utilize vacation, personal, or flexible company holiday time for this
> activity.  The Eid schedule is known well in advance, so that JBS could plan

for [it] accordingly.

*Koontz Supplement* [#304-9] at 20 (emphasis in original).  This is appropriate rebuttal testimony because it offers Mr. Koontz's opinion regarding the assumptions that form the basis for Ms. Skinner's calculation.  Accordingly, the Court finds that this portion of the Koontz Supplement does not establish good cause for allowing Defendant to designate an additional rebuttal expert witness because this is proper rebuttal testimony.

## H.    Pages 21-22

Defendant argues that on pages 21-22 of the Koontz Supplement, Mr. Koontz "makes assumptions about the duties of support personnel and then opines about that, which is an operations issue."  *Motion* [#304] at 7.  The Skinner Supplement states that it is responding to an opinion included in Mr. Koontz's original report.  Specifically,

> Koontz section 3.1 responds to Ms. Skinner's section 3 and 4 calculations about the lost wages paid to employees on break and her opinion that they were conservative in part because they did not include the costs of support staff.  Mr. Koontz contends that those costs shouldn't be included, because the support personnel can perform other duties if the direct labor is not working for 15-20 minutes.

*Skinner Supplement* [#304-8] at 4.  Ms. Skinner responds by stating:

> There are areas where support staff work depends on production.  For example, the work performed by Quality Assurance employees will indeed be impacted if production is not running.  Based on Eric Ray's email, there were 28 QA employees on the second shift in Fabrication.  The cost of having them idled for 20 minutes while production stops is $134.40 per shift, or $69,888 annualized.

*Id.* at 4-5.  In response, Mr. Koontz opines:

> The number of Quality Assurance employees upon which Ms. Skinner relies, 28, comes from Mr. Ray's 2008 e-mail.  I would need more information on their job descriptions and work tasks to provide a financial assessment of the $69,888 cost figure cited by Ms. Skinner.  However, there is evidence that the QA employees are not 100% idle at the same time during breaks so the

> true cost would be less than Ms. Skinner's estimate.  Per testimony from QA employee Betty Rosales . . ., QA employees on the B shift have staggered start times and break times that differ from those of the other Fabrication employees.  Some QA employees continue working when Fabrication employees are on break and are not idled when production is stopped for planned and unplanned events.

*Koontz Supplement* [#304-9] at 22.  This is simply an explanation of the methodology Mr. Koontz would employ if he was to reach his own calculation of the cost and a clarification that he does not have enough information to provide his own calculation.  Accordingly, the Court finds that this portion of the Koontz Supplement does not establish good cause for allowing Defendant to designate an additional rebuttal expert witness because this is proper rebuttal testimony.

## I.    Pages 23-27 and 28-31

Finally, Defendant argues that on pages 23-27 and 28-31, Koontz "refers to prior sections about operational changes, notes additional operational issues, and then he suggests an industrial engineering 'Methods Analysis' to determine how to rearrange the plant's work stations, which he opines could be done by Mr. Donlon.  Again, these are plant operations issues that Mr. Donlon should be permitted to rebut."  *Motion* [#304] at 7-8. With regard to the issue discussed on pages 23-27 of the Koontz Supplement, Mr. Koontz is responding to a three paragraph opinion put forward by Ms. Skinner in the Skinner Supplement.  *See Koontz Supplement* [#304-9] at 23-27.  The response to the first two paragraphs, like some of the responses addressed above, questions Ms. Skinner's assumptions and offers Mr. Koontz's interpretations of methods for cutting costs while incorporating proposed accommodations.  *Id.* at 24.

Ms. Skinner's third paragraph states:

> Mr. Koontz does not explain what direct labor employees from departments
> outside of Slaughter and Fabrication could be moved into production, the
> cost of training those employees to perform production jobs (assuming they
> were willing to do this and it was permitted under the collective bargaining
> agreement), who would perform their jobs while they filled in for Muslim
> production employees, and the difference in their wage rates compared to
> the production workers.  With more detail from Mr. Koontz on these points,
> I could provide additional information about the costs associated with this
> plan.

*Skinner Supplement* [#304-8] at 5.  In response to Ms. Skinner's prompt, Koontz discusses

industrial engineering methods Defendant could use to establish the most efficient line

balance while incorporating the proposed accommodations.  *Koontz Supplement* [#304-9]

at 25-27.  Mr. Koontz states that Defendant employs Dave Solis, an Industrial Engineering

Manager, and that Mr. Donlon works under him as an industrial engineer.  *Id.* at 26-27.  Mr.

Koontz further notes that it is his "opinion that if JBS accepts the AppliedSafety +

Ergonomics quote as accurate, it is reasonable to estimate that JBS could complete this

same project internally for approximately $31,250 of [Donlon's] labor."  *Id.* at 27.  Mr.

Koontz also suggests that the cost could be cut by hiring an intern to work under the

supervision of Mr. Solis.  *Id.*

Nowhere in Section 3.2.1 of Mr. Koontz's original report or in the portion of the

Skinner Supplement responding to Section 3.2.1 does either expert discuss an

"AppliedSafety + Ergonomics quote."  *See Motion to Strike, Ex. 2* [#230-2] at 5 (Koontz's

original report); *Skinner Supplement* [#304-8] at 5.  This appears to refer to item 19 in the

list of "documents provided by EEOC for report preparation" found on page 5 of the Koontz

Supplement.  The Court finds that the opinion expressed on pages 25-27 of the Koontz

Supplement goes beyond rebuttal testimony.  While the opinion does respond to Ms.

Skinner's comment that Mr. Koontz did not provide enough detail in his original expert

report to allow Skinner to provide additional information regarding the costs Defendant would bear, this detailed discussion of industrial engineering concepts can not properly be classified as rebuttal opinion testimony.  If Mr. Koontz wanted to express this opinion, he should have expressed it in his original report so Ms. Skinner would have had an opportunity to rebut it.  Instead, he waited to add this detailed analysis in his rebuttal-to-a-rebuttal report, which makes it impossible for Defendant to rebut this opinion.

With regard to the opinion expressed on pages 28-29, this portion of the Koontz Supplement responds to the portion of the Skinner Supplement that rebuts section 3.2.2 of Mr. Koontz's original report.  Specifically, it focuses on Mr. Koontz's opinion that Defendant could "engineer a work flow design."  *See Motion to Strike, Ex. 2* [#230-2] at 5-6 (Koontz's original report); *Skinner Supplement* [#304-8] at 6.  The first paragraph of Mr. Koontz's rebuttal expresses disagreement with Ms. Skinner's opinion and offers an alternative option.  *Koontz Supplement* [#304-9] at 28-29.  Similarly, the third paragraph contradicts a fact on which Ms. Skinner relies.  *Id.* at 29.  The second paragraph states:

> To accommodate the substitution of employees on the line from Fabrication, JBS needs to look at this issue of religious accommodation from the workstation design perspective.  However, such a review will not require another full "Methods Engineering design" of the plant's operation's from the ground up as if it were just opening.  A less technical "Methods Analysis" may now be needed to rearrange the already established work elements of each workstation to accommodate a dynamic line balance that would accommodate the prayer break requirements.  See the previous discussion on this topic in 3.2.B.

*Id.*  Like the section discussed above, this paragraph goes beyond rebuttal opinion testimony in that it does not respond to the opinion expressed by Ms. Skinner in the relevant section of the Skinner Supplement.

Turning to pages 30-31 of the Knootz Supplement, this portion rebuts the section

of the Skinner Supplement that rebutted sections 3.3 and 5.2 of Mr. Koontz's original

report. *Koontz Supplement* [#304-9] at 30.  Ms. Skinner states:

> Industrial Engineering as suggested by Mr. Koontz is beyond my expertise.
> However, a outside IE firm[5] estimated that based on this description, it would
> cost between $200,000 and $250,000 to study how to accomplish this if
> production standards were known and provided for all workstations, and
> $350,000.00 to $400,000.00 otherwise.  As for overcrewing, that is an overall
> number – not every position is overcrewed by that percentage, and actual
> numbers vary by day.  Furthermore, it's difficult to staff critical jobs, let alone
> build an overcrew pool.

*Skinner Supplement* [#204-8] at 7.  Mr. Koontz again discusses the industrial engineers

employed by Defendant and opines that Defendant "appears to have the necessary

expertise on staff and could also temporarily use engineering resources from other plants

so as not [to] be required to engage an outside IE firm and absorb the accompanying

additional cost for the required methods analysis." *Koontz Supplement* [#304-9] at 31.  Mr.

Koontz then suggests that Mr. Donlon and/or an intern working under Mr. Solis may be able

to perform this work.  *Id.*  While the Court found that a similar response was not proper

rebuttal testimony above, here, it is proper rebuttal testimony because it is responding

directly to Ms. Skinner's estimate that employing an outside industrial engineering firm

would cost Defendant up to $400,000.  Mr. Koontz is providing an alternative that, in his

opinion, could decrease the estimate of that cost significantly.

Accordingly, the only portions of the challenged report that the Court finds go beyond

the limits of rebuttal testimony are pages 25-27 and the first full paragraph on page 29 (the

second paragraph of Koontz's Supplement focused on Skinner's rebuttal to Section 3.2.2

---

[5]  Based on Mr. Koontz's response, the Court understands that outside industrial
engineering firm to be AppliedSafety + Ergonomics.

of Koontz's original report).  Defendant argues that it is entitled to designate an additional rebuttal expert to respond to these portions of the Koontz Supplement.  However, the Court has previously held in this case that "Plaintiff's late supplemental disclosure of the accommodations it seeks from Defendant does not constitute good cause to modify the Scheduling Order to allow the parties to designate additional expert witnesses." *Order* [#243] at 17.  Further, the Court also previously found that

> Plaintiff anticipated the need for "an industrial organizations expert (to opine regarding the reasonableness of accommodations)" and Defendant anticipated retaining an expert on "industry operations and standards." *Sched. Order* [#128] at § 9(d)(1).  It is clear that both parties understood that they would need expert witnesses with regard to these topics.

*Id.* at 16-17.

With that in mind, the question is whether the inclusion of these portions of the Koontz Supplement establishes good cause to modify the Scheduling Order to allow Defendant an additional rebuttal witness.  In *Wilson*, the Court allowed the defendant to designate two additional expert witnesses when: (1) the defendant's counsel notified the plaintiffs and the Court at the initial scheduling conference that it might need additional expert witnesses depending on the expert opinions disclosed by the plaintiffs; and (2) the need for the additional expert witnesses could not have been identified until after the plaintiffs produced the expert reports.  *Wilson*, 2008 WL 3211288, at *2.  Here, Defendant does not argue that it forewarned either Plaintiff or the Court that it might need an additional expert witness.  In fact, Defendant noted in the Scheduling Order that it anticipated designating an expert on "industry operations and standards," which is exactly what their proposed additional expert would opine about.  *Sched. Order* [#128] § 9(d)(1). Defendant argues that it saved itself by also stating that it would retain "experts in rebuttal to experts

disclosed by Plaintiff." *Id.*; *Motion* [#304] at 3.   However, that is not the same as

forewarning the Court and Plaintiff that Defendant would seek to increase the number of

experts allowed in the Scheduling Order.   The Court agrees that the present status of

expert reports does not allow Defendant an opportunity to respond to the portions of the

Koontz Supplement that the Court has found go beyond rebuttal opinion testimony.   In

*Armstrong*, the Court struck the relevant portions of the expert's report and allowed

previously-designated experts to file supplemental reports.   2013 WL 2419794, at *5.

Based on the facts of this case, the Court finds that the most just resolution of this issue

is to strike the portions of the Koontz Supplement that the Court identified as improper.

However, there is no need to allow further rebuttal reports.   The parties have already been

given the opportunity to file rebuttals to rebuttals and there is no need for further rebuttal

expert reports.   In addition, the witness Defendant seeks to designate as an additional

rebuttal expert, Mr. Donlon, has already been designated as a Rule 30(b)(6) witness and

may provide factual testimony on Defendant's behalf that responds to the information in the

Koontz Supplement that Defendant argues relates directly to Mr. Donlon's job.

## IV.  Conclusion

For the reasons stated above,

IT IS HEREBY **ORDERED** that the Motion [#304] is **GRANTED in part** and **DENIED
in part**.

IT IS FURTHER **ORDERED** that pages 25-27 and the first full paragraph on page
29 of the Koontz Supplement are **STRICKEN**.  Mr. Koontz is not permitted to testify

regarding those portions of his Supplement at trial.

      Dated:  June 27, 2014                   BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge