IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No.  10-cv-02103-PAB-KLM

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

　　　　Plaintiff,

and

IRAQ ABADE, et al.,

　　　　Plaintiffs-Intervenors,

and

MARYAN ABDULLE, et al.,

　　　　Plaintiffs-Intervenors,

v.

JBS USA, LLC,
d/b/a JBS Swift & Company,

　　　　Defendant.

---

## ORDER

---

　　　　This matter is before the Court on the Motion for Summary Judgment and Brief
in Support [Docket No. 330] filed by defendant JBS USA, LLC ("JBS").  This Court has
subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 1345.

## I.  BACKGROUND

　　　　This case arises out a conflict between JBS and several hundred Muslim
employees at the JBS beef processing facility in Greeley, Colorado (the "Greeley plant"

or the "Greeley facility") who sought accommodation from JBS for their religious beliefs. The conflict reached its height during Ramadan 2008, when employees requested that JBS accommodate their need to leave the production line to pray at or near sundown. The employees and JBS were unable to come to an agreement, leading to the suspension and termination of a large number of Muslim employees. The following facts are undisputed unless otherwise indicated.

### A.  Procedural History

On August 30, 2010, plaintiff Equal Opportunity Employment Commission ("EEOC") filed this case, claiming that JBS discriminated against its Muslim employees on the basis of religion by engaging in a pattern or practice of retaliation, discriminatory discipline and discharge, harassment, and denying its Muslim employees reasonable religious accommodations.  *See* Docket No. 1.

On August 8, 2011, the Court issued an order bifurcating this case.  Docket No. 116 (the "bifurcation order").  The claims before the Court during Phase I are (1) EEOC's claim that JBS engaged in a pattern or practice of denying Muslim employees reasonable religious accommodations (the "religious accommodation claim"), Docket No. 116 at 18, (2) EEOC's retaliation pattern or practice claim, and (3) EEOC's discriminatory discipline and discharge pattern or practice claim, insofar as the latter two claims (collectively, the "retaliation and discrimination claims") are based on the events taking place during Ramadan 2008.  Docket No. 116 at 15.  On March 31, 2014, JBS filed the present motion.  Docket No. 330.  JBS seeks summary judgment on all three of EEOC's Phase I claims.  Docket No. 330 at 1.

### B.  Greeley Plant Employees

#### 1.  *Staffing*

The Greeley plant employs approximately 3000 people.  DSF ¶ 12.[1]  Employees

are placed on one of three shifts: the A shift, which operates from 6:00 a.m. to 2:30

p.m., the B shift, which operates from 3:15 or 3:30 p.m. to 11:30 p.m., and the C shift,

which consists of cleaning and sanitation and follows the B shift.  DSF ¶ 11; R.

Anderson Dep., Docket No. 330-3 at 2, p. 58:14-22.[2]  Roughly 1500 employees are

assigned to the A shift and roughly 1500 employees are assigned to B shift.  DSF ¶ 12.

In the days prior to September 10, 2008, approximately 433 Muslim employees worked

on B shift.  DSF ¶ 22; Resp. to DSF ¶ 22.  The United Food and Commercial Workers

International Union, Local No. 7 (the "union") is the bargaining agent for all production

employees at the Greeley plant.  DSF ¶ 32.

#### 2.  *Muslim Employees' Religious Beliefs*[3]

Muslims customarily pray five times per day.  The Fajr prayer takes place in the

morning, the Dhuhr prayer takes place at noon, the Asr prayer takes place in the

afternoon, the Maghrib prayer takes place at sunset, and the Isha prayer takes place in

---

[1]The Court uses this citation format to refer to specific paragraphs within JBS's statement of undisputed facts.  Citations to "Resp. to DSF" followed by a paragraph number refer to EEOC's response to JBS's statement of undisputed facts.  Citations to "PSF" followed by a paragraph number refer to EEOC's statement of facts.

[2]The parties provide excerpts of deposition testimony from several individuals. However, the parties do not consistently explain, and it is not always apparent from the deposition excerpts, the deponent's role in this case.

[3]Although the parties refer to affected Greeley plant employees both as "Somali Muslim employees" and "Muslim employees," the Court uses the latter term to refer to the class of affected employees.

the evening.  DSF ¶¶ 55-56.  Muslim employees differ in the exact amount of time it takes to perform each prayer, ranging from four minutes to, in some cases, more than ten minutes.  DSF ¶ 57.  During Ramadan, Muslim employees must break their fast with water or food or both after sundown.  PSF ¶ 24; Docket No. 349 at 51-62.  If a Muslim employee has gone to the restroom, passed gas, or touched someone of the opposite sex, ablution or cleansing is also required in connection with each prayer.  DSF ¶ 58; Resp. to DSF ¶ 58.  Ablution may take an employee a few additional minutes if done in conjunction with prayer; however, it can be done at any time prior to prayer, including during a scheduled break or prior to work.  DSF ¶ 58; Resp. to DSF ¶ 58.  Not every Muslim employee has the same belief regarding the length of time within which it is permissible to perform his or her prayers.  DSF ¶ 60.

### C.  Greeley Plant Operations

#### 1.  Production Floor

Carcasses move through the plant via a chain, which carries beef in one direction from the slaughter area to the cooler, through the fabrication area, and then into packaging.  DSF  ¶ 13.  The slaughter area is where the cattle are killed, after which the carcasses are moved into the cooler and assigned a grade, such as "Prime" or "Choice."  DSF ¶ 16.  The fabrication area is where the carcasses are cut into pieces and processed.  DSF ¶ 20.  The fabrication area is organized into multiple lines, each of which is responsible for processing a different aspect of the animal.  J. Palacios Dep., Docket No. 330-18 at 2-3, pp. 106:7-112:7.  For example, there are multiple boning lines, a rib line, an arm line, a break line, a value added line, and a loin line.  *Id.*  Only

one grade of cattle at a time may be run through the fabrication area.  DSF ¶ 17.  After

passing through the fabrication area, the processed beef moves into the packaging

area where it is prepared for shipping.  DSF ¶ 23.

The chain moves beef through the facility at a certain speed (the "chain speed").

DSF ¶ 14.  Although the chain speed can vary, slaughter and fabrication employees are

required to work at a pace that corresponds with the chain speed.  *Id.*  The United

States Department of Agriculture ("USDA") sets the maximum chain speed in the

slaughter area of the plant.  DSF ¶ 15.  Because the plant operates on an assembly

line, JBS is required to correlate the chain speeds in the slaughter and fabrication

areas.  *Id.*  Because only one grade of cattle at a time may be run through the

fabrication area, multiple grade changes occur per shift.  DSF ¶ 19.  The number of

grade changes per shift varies from three to 20.  Resp. to DSF ¶ 19.  A one to five

minute gap in the chain occurs during every grade change.  DSF ¶ 18.

The number of employees assigned to each line varies; several Muslim

employees often work on the same line.  DSF ¶¶ 21-22.  Typically there is one

supervisor and one or two team leads per line.  DSF ¶ 31.  A trainer may also be

assigned to certain lines, who is available to fill in for employees who take unscheduled

breaks.  Resp. to DSF ¶ 31.  For example, the value added line has only 15 to 20

employees, *id.*, whereas the break line has one supervisor and two team leads

supervising 85 employees.  DSF ¶ 31.  The number of employees needed to do a

particular job at a particular chain speed is referred to as "crewing."  DSF ¶ 27.  The

parties agree that proper crewing is important for employee safety and product quality.

DSF ¶ 30.  JBS contends that, in every instance where the chain speed is increased, an

increase in crewing is required.  DSF ¶ 28.  EEOC disputes this, asserting that crewing

varies depending on the increase in chain speed and the position.  "Over-crewing"

refers to over-staffing lines so as to account for absent employees and vacations.  DSF

¶ 29.  The Greeley plant typically over-crews at 115-117%.  PSF ¶ 63.  JBS claims that

over-crewing is not meant to account for employees taking unscheduled breaks,

whereas EEOC asserts that over-crewing is in fact used to help spell employees off the

line for unscheduled breaks.  *Id.*; Resp. to DSF ¶ 29.

Some of the lines in the fabrication area are physically demanding and difficult.

DSF ¶ 20.  Production employees wear a variety of safety equipment depending on

their position, which can include hard hats, hair nets, safety glasses, gloves, boots,

metal-mesh gloves, arm-guards, and aprons.  DSF ¶ 24; Resp. to DSF ¶ 24.

Employees must remove at least some of this safety equipment prior to leaving the

production floor and put it back on before returning to the line.  DSF ¶ 25; Resp. to DSF

¶ 25.  Employees vary in the time it takes them to remove safety equipment when

leaving the line for a break.  DSF ¶ 26.

### 2. Breaks

Pursuant to the collective bargaining agreement (the "CBA") in effect in 2008,

production employees were entitled to two regular breaks during each shift, which were

required to occur within certain windows of time.  The first is a 15-minute rest period

(the "rest break") approximately halfway through the first part of the shift, which can

occur no earlier than one and a half hours from the start of the shift and no later than

three hours from the start of the shift.  DSF ¶ 34.  The second is a 30-minute meal

break approximately halfway through the shift.  *Id.*  Employees were not be required to

6

work more than three and a half hours without a break, unless three and three quarters hours of work would complete the workday.  *Id.*[4]

The general procedure for taking a break was for employees in the slaughter area to stop placing beef on the chain to create either a 15-minute gap for a rest break or a 30-minute gap for a meal break.  DSF ¶ 39.  Employees would begin their break when the gap in the chain reached them, which resulted in employees leaving the line in a staggered fashion – employees nearer the beginning of the line beginning their breaks first, employees nearer the end of the line beginning their breaks last.  DSF ¶¶ 40-41.  JBS staggers rest and meal breaks in such a way so as to avoid leaving beef unattended on the line for extended periods of time, which increases the risk of food safety issues.  *Id.*; Resp. to DSF ¶ 41.  Thus, during regular breaks, tables are cleaned and sanitized.  DSF ¶ 51.

The parties dispute when the rest and meal breaks traditionally took place during the B shift.  JBS claims that the rest break has historically occurred at around 6:00 p.m. and the meal break at around 9:00 p.m.  DSF ¶ 37.  EEOC argues that the timing of the rest and meal breaks varied somewhat more than that, citing, among other things, the deposition testimony of JBS manager Celio Fritche, who stated that the rest break generally occurred at 6:15 p.m., but could vary from 5:00 p.m. to 6:30 p.m., and that the meal break generally occurred between 8:30 p.m. and 9:15 p.m.  C. Fritche Dep, Docket No. 349-69 at 9-10, pp.77:20-78:10.  JBS acknowledges that the timing of the

---

[4]The parties refer to these as "scheduled breaks," which is a slightly misleading label because, as discussed below, the precise timing of the breaks varied somewhat. Thus, the Court will refer to the rest and meal breaks collectively as "regular breaks," rather than "scheduled breaks."

breaks varied somewhat because rest and meal breaks were, to the extent possible, coordinated with a grade change or mechanical failure.  DSF ¶ 38.  EEOC disputes that regular breaks were always coordinated with a grade change.  Resp. to DSF ¶ 19 (citing deposition of JBS team leader, A. Mosqueda Dep., Docket No. 349-76 at 10, p. 58:6-10 ("Q  And they will change the break to coincide with a grade change?  A  No, not really.  Q  Okay.  Why else do they move the break?  A  Pretty much just if the machinery breaks down.").

Unscheduled breaks are a different matter.  Absent regular breaks, employees are allowed to leave the line to get a drink of water or for restroom emergencies.  DSF ¶¶ 43-44.  The parties dispute whether employees must receive permission before leaving the line to get a drink of water.  DSF ¶ 44; Resp. to DSF ¶ 44.  In non-emergency situations, employees may request permission to take unscheduled breaks to use the restroom.  DSF ¶ 45.  Unscheduled bathroom breaks take between ten to 15 minutes.  DSF ¶ 47.  JBS admits, however, that its supervisors responded differently to requests for unscheduled breaks and that some supervisors were more lenient than others.  DSF ¶ 48.  Mr. Fritche testified that, regardless of the reason the employee requests the break, supervisors are trained to grant employees permission to leave the line for an unscheduled break when possible.  C. Fritche Dep., Docket No. 349-69 at 2, p. 45:2-24.  Plant Manager Ron Gould testified that unscheduled breaks were for restroom purposes only, such that using an unscheduled break to pray would be deemed an unauthorized break.  R. Gould Dep., Docket No. 349-73 at 6-7, p.72:24-73:15; *id.* at 8, p. 74:12-18.  Supervisor Billie Danley also testified that unscheduled breaks were for restroom purposes only and, when asked whether praying during

unscheduled restroom breaks would be a violation of JBS's policies, responded, "If you asked to go to the bathroom, you've got to go to the bathroom."  B. Danley Dep., Docket No. 349-64 at 5-6, p.34:20-35:2.

Mass unscheduled breaks require all employees to leave the production line at the same time.  Such breaks are undesirable because they cause beef to be left on the line and do not allow for the cleaning of work areas.  DSF ¶¶ 49-50.  Moreover, per USDA regulations, beef that remains on the slaughter floor for more than 45 minutes must be classified as "distressed," which cuts the value of the meat in half.  DSF ¶¶ 51-53.  Additionally, mass breaks are unpopular with employees because locker rooms, restrooms, and cafeteria facilities are too small to accommodate an entire shift of employees at the same time.  DSF ¶ 54.

### D.  Ramadan 2008

In 2008, Ramadan ran from September 1 through September 30.  DSF ¶ 105. Maghrib prayer times ranged from 7:30 p.m. on September 1 to 6:42 p.m. on September 30.  Docket No. 330-93.  On Tuesday, September 2, between 40 and 100 B shift Muslim employees approached Superintendent Juan Palacios after their shift and requested a 7:30 p.m. break.  DSF ¶ 106; PSF ¶ 19.  EEOC asserts that Muslim employees only requested that this accommodation take place during Ramadan.  JBS disputes this.  PSF ¶ 19; Resp. to PSF ¶ 19.  Mr. Palacios did not grant their request, but advised them to contact the HR department.  DSF ¶ 107.  On Wednesday, September 3, approximately 200 Muslim employees gathered outside the plant before the B shift.  DSF ¶ 108.  Human Resources Director Eric Ray met with the crowd of Muslim employees and asked the employees to select a committee to speak for them.

DSF ¶ 108; Resp. to DSF ¶ 108.  The Muslim employees selected 5 to 7 representatives (the "Muslim employee committee" or the "committee") to meet with Greeley plant management.  DSF ¶ 110.  All other Muslim employees began work at 3:15 p.m. at the start of the B shift.  Resp. to DSF ¶ 108.

JBS claims that the Muslim employee committee could not agree on either the amount of time needed to pray or the appropriate window in which the Maghrib prayer must be performed.  DSF ¶ 111.  EEOC asserts that the committee explained that they required 15 minutes around sunset to pray and break their fast.  PSF ¶ 24.  According to EEOC, the committee did not disagree about the appropriate prayer window; rather, the committee agreed that moving the meal break to 7:30 p.m. for the remainder of Ramadan would be a reasonable accommodation.  Resp. to DSF ¶ 111; PSF ¶ 25; *see also* Asad Abdi Dep., Docket No. 349-48 at 14, p. 77:1-7.  The committee also proposed alternative accommodations, such as moving the rest break to correspond with sunset or allowing unscheduled breaks for prayer.  PSF ¶ 28.  JBS refused to allow unscheduled breaks for prayer.  PSF ¶ 29.  However, at no time did the Muslim employee committee request that the company change the meal break from a rolling break to a mass break or request that Muslim employees be granted an extra break.  PSF ¶ 31.  As a result of this meeting with the committee, JBS agreed to move the meal break from approximately 9:30 p.m. to 7:30 p.m. on that day, Wednesday, September 3.  DSF ¶ 112.

On Thursday, September 4, the Muslim employee committee met with Greeley plant management.  An agreement was reached to keep the meal break at 7:30 p.m. on Thursday and Friday.  DSF ¶ 115.  JBS asserts that many non-Muslim employees were

angry with the change as evidenced by the fact that approximately 200 non-Muslim employees refused to leave the line during the Thursday meal break. DSF ¶ 116. EEOC disputes this, asserting that JBS supervisor Robert Anderson did not recall receiving any complaints from non-Muslim employees, R. Anderson Dep., Docket No. 349-61 at 16-17, p. 139:20-140:2, and that non-Muslim production employee Alicia Espinoza was not bothered by the changed meal time. A. Espinoza Dep., Docket No. 349-67 at 5, p.75:4-6. Moreover, operations manager Chris Kitch testified that perhaps 40 or 50 non-Muslim employees refused to leave the line at the 7:30 meal break. C. Kitch Dep., Docket No. 349-83 at 18, p. 117:4-16.

JBS claims that many non-Muslim employees left the line at 9:15 p.m. – when the meal break normally took place –, which forced JBS to reduce the chain speed to cover for their absences. DSF ¶ 117. The number of non-Muslim employees who left the line is unclear as is whether production was affected. Production employee Emerita Garcia testified that she was not aware of any fellow non-Muslims leaving the line at 9:15 p.m. on Thursday, September 4. E. Garcia Dep., Docket No. 349-70 at 6, p. 161:17-21. JBS's production records show that the Greeley plant had an average chain speed of 362 on September 2, 3, at 4. Docket No. 351 at 1. JBS Corporate Comptroller Heather Skinner testified that the Greeley plant had higher production numbers the week of September 1 than it had the previous week. H. Skinner Dep., Docket No. 349-101 at 2-3, p. 151:19-152:9. Nonetheless, the parties agree that the non-Muslim employees who left the line at 9:15 p.m. engaged in an unauthorized work stoppage, but were not disciplined. PSF ¶¶ 84-86; Resp. to PSF ¶ 84.

On Friday, September 5, approximately 200 non-Muslim employees gathered

outside the plant, indicating that they would refuse to return to work until the meal break was moved back to its normal time.  DSF ¶ 118; PSF ¶ 87.  The non-Muslim employees' primary complaint was that a 7:30 p.m. meal break was too early and made the last half of their shift feel longer.  DSF ¶ 119.  The non-Muslim employees selected representatives to speak on their behalf with Greeley plant management and the rest returned to work, but work on the production floor began late as a result of the protest.  Resp. to DSF ¶ 118; DSF ¶ 121; PSF ¶ 88; *see also* R. Gould Dep., Docket No. 349-73 at 28, p. 185:2-20.  EEOC asserts that none of the employees who refused to start work on time were disciplined.  PSF ¶ 89.  The non-Muslim employee representatives indicated that they felt Muslim employees were receiving preferential treatment.  DSF ¶ 122.  Mr. Ray explained to the non-Muslim employee committee that the break was being moved in an effort to accommodate Muslim employees' religious needs, DSF ¶ 120, but EEOC claims that JBS did not explain that the break was being moved due to its legal obligation to accommodate religious practices.  PSF ¶ 51.  After meeting separately with both the Muslim and non-Muslim employee representatives, JBS decided to move the meal break to 8:00 p.m.  DSF ¶ 123.  Mr. Ray testified that JBS reached this decision in an effort to find a compromise between the requests of both groups.  E. Ray Dep., Docket No. 330-19 at 18, p. 166:21-167:8.  The Muslim employee committee asked that JBS wait until Monday to enact the change, but JBS refused.  Asad Abdi Dep., Docket No. 349-48 at 17-18, p. 80:2-81:23.  The meeting concluded at approximately 7:00 p.m.  PSF ¶ 91; Resp. to PSF ¶ 91.  The Muslim employee committee was then directed to inform Muslim employees of the change, but the committee did not have time to inform all such employees.  PSF ¶ 91.

12

The parties agree that some Muslim employees left the line at 7:30 p.m. that night, but dispute whether they left in defiance of JBS management or because they had not been informed that the meal break would occur at 8:00 p.m.  DSF ¶ 124; Resp. to DSF ¶ 124.  When the 8:00 p.m. meal break started, employees filtered into the cafeteria.  DSF ¶ 125.  Employees were confused as a result of the meal break change.  PSF ¶ 93.  The actions of Muslim employees during this meal break are in dispute.  JBS asserts that some Muslim employees were upset, unruly, and stood on tables shouting.  DSF ¶ 125.  Mr. Anderson was in the cafeteria during the 8:00 p.m. meal break for approximately five minutes and recalls that the noise level was not above average.  B. Anderson Dep., Docket No. 349-61 at 18, p. 150:6-9.  Mr. Kitch testified that Muslim employees were talking loudly, but he witnessed no other unruly behavior.  C. Kitch Dep., Docket No. 349-83 at 22, p. 137:5-25.  JBS asserts that, near the end of the meal break, a large group of Muslim employees refused to return to work and left the cafeteria of their own accord.  DSF  ¶ 126.  EEOC asserts that the Muslim employees who left the plant were ordered to do so by Greeley plant management, but were willing to return to work.  Resp. to DSF ¶ 126; PSF ¶ 94; *see also* B. Walker Dep, Docket No. 349-106 at 4, 86:20-23 ("I just remember the ones that didn't want to go back to work going out into the parking lot.  We had to take them out of the building because they didn't want to go back to work.  They refused.").  Some Muslim employees were able to sneak back into the plant and resume work.  PSF ¶ 95.  However, most Muslim employees gathered in the parking lot and remained there until approximately 11:00 p.m., when management ordered them to leave the property.  DSF ¶ 127.  EEOC asserts that Muslim employees were willing to return to work, but JBS did

13

not allow them to do so.  Resp. to DSF ¶ 128.  JBS suspended those employees who did not return to work on Friday.  PSF ¶ 97.  Numerous Latino workers also left the plant that night, but were allowed to return to work on Monday.  PSF ¶¶ 96, 98.  As a result of these events, the plant was run at a reduced chain speed on September 5.  DSF ¶ 128.

On Saturday, September 6, JBS managers decided to meet with the Muslim employee committee the following Monday.  DSF ¶ 129.  On Monday, September 8, Mr. Gould, Mr. Ray, JBS's head of labor relations Doug Schult, and other JBS managers met with the Muslim employee committee and union representatives.  DSF ¶ 131.  The Greeley plant managers explained to the committee that employees could pray at the plant during scheduled breaks, but informed the committee that Muslim employees who left the plant on Friday evening were suspended indefinitely pending further investigation.  DSF ¶ 132; PSF ¶ 99.  JBS considered the events of Friday evening to be a work stoppage, which was a terminating offense under the CBA.  DSF ¶ 133.  JBS asserts that it wanted Muslim employees to return to work, an assertion which EEOC disputes.  *Id.*; Resp. to DSF ¶ 133.

On Tuesday, September 9, Greeley plant management again met with the Muslim employee committee.  DSF ¶ 134.  JBS claims that the committee refused to provide an answer when asked what an appropriate prayer window would be and, as a result of the meeting, JBS believed that the Maghrib prayer must occur exactly at sunset.  DSF ¶¶ 135, 136.  The committee informed JBS that some of the suspended Muslim employees had congregated in a nearby park.  DSF ¶ 137; Resp. to DSF ¶ 137.  At approximately 1:00 p.m., JBS asked the committee and union representatives to

inform the employees gathered at the park to return to work that afternoon or they would be terminated, which the committee and union representatives agreed to do. DSF ¶ 138; PSF ¶ 100.  JBS did not communicate directly with suspended Muslim employees, PSF ¶¶ 102-103, or provide the committee or the union with a list of suspended employees.  PSF ¶ 104.  EEOC denies that the committee took responsibility for notifying all suspended Muslim employees of JBS's decision, Resp. to DSF ¶ 138, asserting that not all of the suspended employees were gathered at the park.  PSF ¶ 105.  When union representative Fernando Rodriquez informed Mr. Ray of this, Mr. Rodriquez testified that he recalls Mr. Ray responding, "You know what?  I don't care.  If they return, they got their job.  If they don't, they're fired."  F. Rodriquez Dep., Docket No. 349-96 at 4, p. 72:16-18.  Muslim production employee Farhia Abdi testified that she was not informed to return to work until approximately 7:30 p.m. on September 9, but was not aware that she would be fired if she did not return to the plant that night.  F. Abdi Dep., Docket No. 349-49 at 12, p. 330:3-18.

Suspended Muslim employees who did not return to work on September 9 were terminated on Wednesday, September 10.  DSF ¶ 140; PSF ¶ 107.  As a result, 96 Muslim employees were terminated.  Resp. to DSF ¶ 143.  It is unclear whether, before terminating Muslim employees, Greeley management determined whether or not those employees were informed to return to work.  *See* PSF ¶ 108.  JBS claims that Greeley plant management met with some employees who did not return to work on September 9 and allowed them to return to work, but EEOC notes that JBS does not identify any employees for whom that was the case.  *Id.*; Resp. to DSF ¶ 140.

In the month of September, the B shift fabrication department experienced an

overall decrease of 15-20% in chain speed efficiency, DSF ¶ 143, which EEOC claims was caused by the mass suspension of nearly 200 employees on September 5 and the termination of 96 Muslim employees on September 10.  Resp. to DSF ¶ 143.

### E.  Accommodations

EEOC claims that, since 2008, Muslim employees have complained about their inability to pray during work and that JBS has denied Muslim employees' requests to pray at work.  PSF ¶¶ 1, 18, 24.  EEOC contends that JBS has prevented numerous employees from praying at work – even during scheduled breaks – and has harassed, disciplined or threatened to fire those employees caught praying at the Greeley plant.  PSF ¶¶ 2-4; *see, e.g.*, Statement of Liban Adan, Docket No. 349-1 at 38, ¶ 7 ("When I would request a break so I could pray, Patricia and Umberto told me many times that I was not allowed to pray at work."); Charge of Discrimination of Mohamed Bunow, Docket No. 349-1 at 72, ¶ O ("Even during regularly scheduled breaks when the whole line was breaking, I was told I could not pray.  I witnessed managers follow some Muslim employees into restrooms and locker rooms in order to prevent them from praying."); H. Hassan Dep., Docket No. 349-75 at 2, 69:23-25 ("Q  Did a yellow hat ever tell you that you would be fired if you were caught praying?  A  Yes.").  Union representative Juan Gonzalez testified that supervisors would monitor restrooms and explain to employees who were praying in the restroom that such a practice was not permitted, but Mr. Gonzalez was not aware of any Somali workers being sent to "the office" or HR for such violations.  J. Gonzalez Dep., Docket No. 349-72 at 6, p. 55:2-25.  An email from JBS human resources manager Matthew Lovell dated September 12, 2008 states that twelve employees over the last three days were written up for taking

16

unauthorized breaks, including one employee who "admitted that they said they were going to the bathroom but were really going to pray."  Docket No. 349-6; *see also* M. Lovell Dep., Docket No. 349-84 at 3, p. 73:2-6 (testifying that he may have, but does not remember whether he had to continue issuing write-ups to employees who prayed during bathroom breaks).  Mohamed I. Mohamed was employed as a Somali trainer at the Greeley plant and recalls that "[a] lot" of Somali employees were disciplined for praying during unscheduled breaks, including verbal warnings for first time violators and written warnings thereafter.  Mohamed I. Mohamed Dep., Docket No. 349-89 at 5, p. 80:6-22; PSF ¶ 7.  Mr. Gonzalez testified that, on average, more Muslim employees received verbal warnings for not doing their job than non-Muslim employees, but it is not clear from his testimony what time period he is referring to.  J. Gonzalez Dep, Docket No. 349-72 at 7, p. 57:5-18.

In 2009, JBS changed its policy, allowing employees to pray during unscheduled breaks during Ramadan 2009 and 2010.  PSF ¶¶ 9, 13; *see also* Docket No. 349-7. JBS's Director of Human Resources Robert Daubenspeck testified that, when the policy was enacted in 2009, supervisors he spoke with were comfortable that such a policy would not cause disruptions to production and subsequently reported only isolated disruptions.  R. Daubenspeck Dep., Docket No. 349-65 at 7, pp. 53:18-54:25.  He was not aware of any burden this placed upon JBS.  *Id.*  In July 2011, JBS changed its policy to allow employees to pray during unscheduled breaks throughout the year.  PSF ¶ 12.  EEOC asserts that JBS has failed to ensure that supervisors fairly implement the unscheduled break policy, PSF ¶ 81, and that, despite JBS's changes in policy, Muslim employees continue to be denied the ability to pray or break their fast during Ramadan.

17

PSF ¶¶ 11, 14, 17.

JBS contends that it has accommodated and continues to accommodate Muslim employees' religious needs in the following ways:

- Permitting employees to pray before and after shifts and during scheduled break times.  DSF ¶ 101.
- Allowing Muslim employees to break their fast during Ramadan by drinking from water fountains near the production line.  DSF ¶ 102.
- Offering Muslim employees the option to transfer to the A shift. DSF ¶ 103.
- Designating prayer rooms and creating footbaths prior to Ramadan 2009 for Muslim employees to use.  DSF ¶ 104.

EEOC disputes that these accommodations are reasonable.  As a result, EEOC proposes two accommodations that it claims would permit the Greeley plant's Muslim employees to timely pray in accordance with their religious beliefs.  DSF ¶ 66. Specifically, EEOC requests (1) that a regular break be moved to coincide with required prayer times (the "regular break accommodation") or (2) that Muslim employees be permitted to leave the line for ten to fifteen minutes at their required prayer times as an unscheduled break (the "unscheduled break accommodation").  *Id.*[5]

### F.  The Nebraska Case

On August 30, 2010, EEOC filed a case against JBS in the United States District Court for the District of Nebraska (the "Nebraska case"), alleging that JBS violated Title VII in its treatment of employees at its Grand Island, Nebraska plant (the "Grand Island plant").  *EEOC v. JBS USA, LLC*, No. 10-cv-00318-LSC-FG3 (D. Neb. August 30, 2010) (Docket No. 1 at 1).  EEOC brought claims alleging that JBS engaged in a pattern or

---

[5]The parties' factual arguments concerning the reasonableness of JBS's accommodations and EEOC's proposed accommodations are discussed below.

18

practice of unlawfully denying its Muslim employees religious accommodations, unlawfully terminating its Muslim employees on the basis of religion and national origin, and unlawfully retaliating against its Muslim employees because of their requests for religious accommodations and their complaints of denied religious accommodations. *Id.* EEOC's unlawful termination and retaliation claims were based upon the termination of Grand Island plant employees "on or about September 18, 2008." Docket No. 330-102 at 6, ¶ 7(d)-(e).

The Grand Island and Greeley plants operate similarly in many respects; both use a production line, with employees in the slaughter and fabrication areas required to work at the chain speeds. *See* Docket No. 330 at 5, ¶¶ 13-17. The Grand Island plant's A shift runs from 6:00 a.m. to 2:30 p.m., B shift from 3:00 p.m. to 11:30 p.m. Docket No. 330-103 at 5. The Grand Island workforce consisted of between 2800 and 3000 employees, evenly split between the A and B shifts. *Id.* In 2008, slightly fewer than 1500 employees worked on the B shift, 200-300 of whom were Muslim employees. *Id.* at 7. The Grand Island plant typically over-crewed by approximately eight to nine percent. *Id.* at 10. The CBA in effect at the Grand Island plant provided that employees would receive one 15-minute paid rest period per shift, approximately 2.5 hours after the start of each shift, meaning the B shift rest period could occur between 5:00 and 6:00 p.m. *Id.* at 5. The CBA provided that the employees' 30-minute unpaid meal break could occur approximately five hours after the start of the shift, with a 30-minute variance, meaning the B shift meal break could occur between 7:30 and 8:30 p.m. *Id.* The procedure for leaving the line at each rest and meal break is substantially

the same as the procedure in place at the Greeley plant.  *See* Docket No. 330 at 9-10, ¶ 39-41.

On April 15, 2011, the parties to the Nebraska case entered into a bifurcation agreement, which provided that EEOC's pattern or practice claims would be resolved in Phase I and individual claims resolved in Phase II.  Docket No. 330-105 at 2.  The parties filed cross motions for summary judgment on EEOC's Phase I claims.  *Id.* at 1. The court denied both parties' motions for summary judgment on EEOC's religious accommodation claim.  *Id.* at 37.  The court granted JBS summary judgment on EEOC's termination and retaliation claims, ruling that JBS's termination of 80 Muslim employees – the sole basis for such claims – was "a single action in response to the events of September 18, 2008," which was insufficient as a matter of law to establish a pattern or practice of unlawful termination or retaliation.  *Id.* at 39.  The court rejected EEOC's argument that the 80 terminations should be viewed as discrete, individual actions.  *Id.*[6]

EEOC's Phase I religious accommodations were tried to the court in May 2013. Docket No. 330-103 at 1.  EEOC's proposed accommodations were "(1) allow Muslim employees to take unscheduled breaks to pray; and/or (2) move the meal break during the remainder of Ramadan 2008 (from September 18 through September 30, 2008) to a time that coincided closely with such employees' sunset prayer time."  *Id.* at 33-34. The court ruled that EEOC satisfied its initial burden under *Int'l Bhd. of Teamsters v.*

___

[6]The court also rejected EEOC's attempt to rely on evidence of the mass termination that occurred at the Greeley plant, ruling that the Colorado case was still in the discovery phase and that EEOC failed to establish that the events in Greeley "occurred under the same circumstances as the events in Grand Island."  *Id.* at 40.

20

*United States*, 431 U.S. 324 (1977), shifting the burden to JBS to show that both of the

proposed accommodations would create undue hardship.  *Id.* at 32.  The court first

considered unscheduled prayer breaks, finding that such breaks would have to have

taken place within ten to fifteen minutes of sunset and would result in 200 employees

leaving the line within a ten-minute window.  *Id.* at 34.  The court found that

unscheduled prayer breaks would create food safety and operational efficiency issues,

as well as added costs, which resulted in a more than de minimis cost to JBS.  *Id.* at

35-36.  The court also found that such breaks would place a greater than de minimis

burden on non-Muslim co-workers, requiring supervisors to change fill in, causing non-

Muslim employees to work harder, and negatively impacting employee morale.  *Id.* at

37.  The court next considered moving the designated meal break and converting it to a

mass break, finding that such measures would force 50-60 head of cattle to be

classified as "distressed" and create food safety issues, thereby placing a greater than

de minimis burden on JBS.  *Id.* at 38-39.  The court also found that such an

accommodation would cause uneven work periods and shorter work periods for non-

Muslim employees, thereby placing a greater than de minimis burden on non-Muslim

coworkers.  *Id.* at 39.  As a result, the court concluded that JBS established its

affirmative defense of undue hardship and entered judgment on EEOC's Phase I claims

in JBS's favor.  *Id.* at 40.

## II.  STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when

the "movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-50 (1986).  A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc*., 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.  *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

However, "[w]hen, as in this case, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."  *Bausman v. Interstate Brands Corp.,* 252 F.3d 1111, 1115 (10th Cir. 2001) (quoting *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 671 (10th Cir. 1998)) (internal quotation marks omitted).  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)).  The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e).  "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each

22

element essential to the case." *Bausman,* 252 F.3d at 1115 (citing *Hulsey v. Kmart, Inc.,* 43 F.3d 555, 557 (10th Cir.1994)).  "In applying this standard, we view all facts and any reasonable inferences that might be drawn from them in the light most favorable to the nonmoving party." *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994).

## III. ANALYSIS

### A.  Pattern or Practice Claims

Pattern or practice suits originated with § 707 of Title VII, 42 U.S.C. § 2000e-6. The seminal pattern or practice case is *Teamsters*, 431 U.S. at 324, in which the Supreme Court laid out the framework for analyzing claims where the government seeks to remedy an employer's systematic practice of discrimination.  Pattern or practice claims require the EEOC to "prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." *Teamsters*, 431 U.S. at 336.  To recover under a pattern or practice theory, discrimination must be "the company's standard operating procedure[,] the regular rather than the unusual practice." *Id.* Pattern or practice claims can take a number of different forms, depending on the unlawful employment practice in which the EEOC alleges the employer systematically engaged.

"Pattern-or-practice cases differ significantly from the far more common cases involving one or more claims of individualized discrimination" and are typically tried in two or more phases. *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1106 (10th Cir. 2001).  During the first phase, the EEOC must establish a prima facie case of

pattern or practice of discrimination by "demonstrat[ing] that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers." *Teamsters*, 431 U.S. at 360.  If the EEOC carries this burden, the employer may defend against liability by challenging EEOC's proof or providing nondiscriminatory explanations for the procedure.  *Id.* at 360-61.  If the employer fails to carry this burden, "a trial court may then conclude that a violation has occurred and determine" whether prospective relief is appropriate on a class wide basis.  *Id.* at 361.  During this first phase, the EEOC is "not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy" or practice. *Id.* at 360.  Rather, it must establish that such a policy or practice existed.  *Id.*

Individual relief, if sought, is litigated in subsequent phases.  *Id.* at 361.  If the EEOC prevailed in the first phase, each individual worker is entitled to a presumption that "any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy."  *Id.* at 362.  The employer may then rebut this presumption with evidence that the employment decision was made for lawful reasons.  *Id.*  But, if the EEOC does not prevail "during the first stage of a pattern-or-practice trial, [individual plaintiffs] are nevertheless entitled to proceed on their individual claims of discrimination . . . .  Naturally, however, they are left to proceed under the normal *McDonnell Douglas* framework, rather than benefitting from a presumption of discrimination."  *Thiessen*, 267 F.3d at 1106 n.8 (internal citations omitted).

**B.  Collateral Estoppel**

JBS argues that the Nebraska court's rulings estop EEOC from (1) claiming that its proposed accommodations of providing unscheduled breaks for prayer and moving scheduled breaks to sundown are non-burdensome and (2) claiming that the termination and discipline of Muslim workers during Ramadan 2008 constitutes a pattern or practice of retaliation and discrimination.  Docket No. 330 at 28.

Collateral estoppel or issue preclusion can "preclude relitigation of both issues of law and issues of fact if those issues were conclusively determined in a prior action." *United States v. Stauffer Chem. Co.*, 464 U.S. 165, 170-71 (1984).  Mutual defensive collateral estoppel applies where, as here, a defendant seeks to preclude the government from relitigating "the same issue already litigated against the same party in another case involving virtually identical facts."  *Id.* at 169.  In the Tenth Circuit, a party asserting collateral estoppel must satisfy four elements:

> (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

*Estate of True v. C.I.R.*, 390 F.3d 1210, 1232 (10th Cir. 2004).  The parties dispute only the first and fourth elements.

Determining the identity of issues between two cases is largely a fact dependent inquiry.  Generally speaking, "changes in facts essential to a judgment will render collateral estoppel inapplicable in a subsequent action raising the same issues," *Montana v. United States*, 440 U.S. 147, 159 (1979), whereas factual differences which

25

are "of no legal significance whatever in resolving the issue presented in both cases" will not defeat an otherwise satisfactory assertion of collateral estoppel. *Stauffer Chem.*, 464 U.S. at 172.  The Tenth Circuit has suggested, and the parties agree, that a number of considerations may be relevant to the first element, such as:

> Is there a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first?  Does the new evidence or argument involve application of the same rule of law as that involved in the prior proceeding?  Could pretrial preparation and discovery relating to the matter presented in the first action reasonably be expected to have embraced the matter sought to be presented in the second?  How closely related are the claims involved in the two proceedings?

*B-S Steel of Kan., Inc. v. Tex. Indus., Inc.*, 439 F.3d 653, 663 (10th Cir. 2006) (quoting Restatement (Second) of Judgments § 27 cmt. c.).  However, in contrast to the related doctrine of claim preclusion, this element is satisfied only when an issue is "actually and necessarily determined" in a prior proceeding "by a court of competent jurisdiction." *Montana*, 440 U.S. at 153.

With respect to the fourth element, "[t]he inquiry into whether a party had a full and fair opportunity to litigate an issue '[o]ften . . . will focus on whether there were significant procedural limitations in the prior proceeding, whether the party had the incentive to litigate fully the issue, or whether effective litigation was limited by the nature or relationship of the parties.'"  *Murdock v. Ute Indian Tribe of Uintah & Ouray Reservation*, 975 F.2d 683, 689 (10th Cir. 1992) (quoting *Sil-Flo, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1521 (10th Cir. 1990)).

### 1. *EEOC's Proposed Accommodations*

EEOC does not dispute that the accommodations it proposes in this case are

identical to those proposed in the Nebraska case.  *See* Resp. to DSF ¶ 4.  The question

then becomes whether EEOC is collaterally estopped from litigating the issue of

whether those accommodations result in undue hardship.

### a.  Identity of Issues

JBS argues that the evidence relevant to EEOC's proposed accommodations

and JBS's undue hardship defense in both cases is "virtually identical."  Docket No. 330

at 30 (citing JBS's Statement of Undisputed Material Facts).  JBS's argument is

conclusory and makes little attempt to differentiate between those facts material to its

undue hardship defense and those facts that are of no legal significance as is its

burden to do.  Because the undue hardship defense generally turns on "the particular

factual context of each case," *Toledo v. Nobel-Sysco, Inc.*, 892 F.2d 1481, 1490 (10th

Cir. 1989) (quotation omitted), JBS's argument is insufficient to establish this element.

Moreover, EEOC identifies multiple differences between the Greeley and Grand

Island plants that may be essential to the judgment in this case.  First, the parties agree

that over-crewing occurred at higher levels in Colorado.  Docket No. 360 at 14.  JBS

argues that these differences are immaterial because EEOC admits that over-crewing

would not provide enough extra employees to cover for Muslim employees leaving the

line for prayer breaks.  Docket No. 360 at 14 (citing PSF ¶ 72).  JBS misinterprets

EEOC's position.  EEOC asserts that over-crewing is one of several measures that JBS

supervisors could have used to accommodate Muslim employees.  PSF ¶ 72 (citing

Resp. to DSF ¶ 72 (stating that JBS schedules breaks at the same time as grade

changes, which happens approximately every 20 minutes)).  As a result, the fact that

over-crewing alone may not provide enough employees to cover for Muslim employees'

27

prayer breaks does not eliminate the possibility that over-crewing, when combined with other measures, may be sufficient to effectuate the unscheduled break accommodation at the Greeley plant without undue hardship.

Second, there is evidence upon which to conclude that staffing levels differed between the plants.  *See* J. Shandley Dep., Docket No. 349-100 at 4, p. 74:11-23.  Both plants appear to have had roughly 1500 employees on the B shift during 2008, but the Greeley plant B shift appears to have been staffed with a larger percentage of Muslim employees than the Grand Island plant.  *Compare* Docket No. 330 at 6, ¶ 22 ("433 Muslim employees worked on B shift" at Greeley plant), *with* Docket No. 330-103 at 7 (finding that 200-300 Muslim employees worked on the B shift fabrication side at the Grand Island plant).  The Court is not convinced that difference is immaterial to the undue hardship analysis.  JBS points out, for example, that the Nebraska court determined that a rolling or staggered meal break to coincide with sundown would create uneven work periods and upset non-Muslim employees.  Docket No. 360 at 14.  However, a higher percentage of Muslim employees on the Greeley plant B shift may mean a lower percentage of non-Muslim employees upset by uneven work periods, which is not necessarily legally insignificant to the undue hardship analysis.  *Cf. Harrell v. Donahue*, 638 F.3d 975, 980 (8th Cir. 2011) (noting that an accommodation may result in undue hardship "if it causes more than a de minimis impact on co-workers").

Third, EEOC argues that the CBA in operation at the Greeley plant, unlike the Grant Island plant's CBA, had larger time windows in which management could schedule breaks during the B shift.  Docket No. 349 at 45.  For example, the first break could occur between 5:00 p.m. and 6:00 p.m. at the Grand Island plant, but between

28

4:45 p.m. and 6:15 p.m. at the Greeley plant.  Resp. to DSF ¶ 34.  The meal break at the Grand Island plant could take place between 7:30 p.m. and 8:30 p.m., but between 7:30 p.m. and 10:00 p.m. at the Greeley plant.  *Id.*  JBS contends that these differences would not allow it greater flexibility to move the scheduled break near sundown and, as a result, have no bearing on the undue hardship analysis.  Docket No. 360 at 13.  The Court is not convinced.  The possibility of uneven work periods was one the factors the Nebraska court found important in ruling that mass meal breaks placed a greater than de minimis burden on non-Muslim co-workers.  Docket No. 330-103 at 39.  JBS has greater flexibility to adjust break times at the Greeley plant to address this concern of uneven work periods.  JBS had the ability at the Greeley plant to, for example, move the first break to 4:45 p.m. and meal break to 7:30 p.m., which may have resulted in slightly more even work periods.  Moreover, the meal break at the Greeley plant was moved to 7:30 p.m. for two days, and the parties dispute whether the move caused any decline in productivity.  PSF ¶¶ 45, 47.  This bears directly on JBS's claims that the proposed accommodations would negatively impact non-Muslim coworkers.

Fifth, EEOC argues that the Nebraska case was "premised on transforming a rolling meal break into a mass break at a different time," implicating additional costs, food safety concerns, and employee objections to the overcrowding of common areas.  Docket No. 349 at 46.  In contrast, EEOC contends that the Greeley Muslim employees did not request an additional mass break, but instead asked that the normal rolling meal break be moved to an earlier time during Ramadan, which, EEOC argues, would not implicate additional costs, food safety concerns, or overcrowding issues.  *Id.*  JBS argues that the Nebraska court's finding concerning the undue hardship imposed by

29

mass meal breaks is nonetheless relevant to this case where it admits EEOC requests only rolling or staggered breaks, but the Court is not convinced.

It is undisputed that the Nebraska court did not consider evidence concerning the Greeley plant. Docket No. 349 at 45; Docket No. 360 at 15. JBS argues that this fact is immaterial to determining the identity of issues between the two cases because the facts in the two cases are sufficiently identical. However, because the Nebraska court did not consider evidence from this case, it cannot be said that the Nebraska court "actually and necessarily determined" the question of whether the proposed accommodations placed upon JBS an undue hardship at the Greeley plant. *See Montana*, 440 U.S. at 153. As JBS argued in its briefing on its motion for summary judgment in the Nebraska case, "[d]iscovery is ongoing in the Greeley case and, as a result, the Court should not consider events that allegedly occurred at a separate JBS plant as part of the EEOC's pattern or practice case here." Docket No. 349-26 at 104. Although the discovery between the two cases may have overlapped to a limited extent, *see* Docket No. 330 at 30; Docket No. 349 at 47, the "pretrial preparation and discovery relating to" the Nebraska case cannot "reasonably be expected to have embraced" the issues related to issue of undue hardship at the Greeley plant. *See B-S Steel*, 439 F.3d at 663.

Although both cases involve application of the same rule of law and involve claims that are closely related, JBS has failed to establish that the factual differences between this case and the Nebraska case are legally insignificant and the Court further finds that the balance of considerations weighs against finding that the identity of issue element is satisfied. *Cf. Dodge v. Cotter Corp.*, 203 F.3d 1190, 1198 (10th Cir. 2000)

30

("the *Boughton* trial did not resolve whether the same released contaminants in whatever directions or forms or times amounted to negligent conduct as to each *Dodge* plaintiff with a clear indication the parties intended to be bound for all future proceedings by that finding").

### b. Opportunity to Litigate

EEOC argues that it was not permitted to present evidence related to the Greeley plant in the Nebraska case and was therefore denied a full and fair opportunity to litigate the undue hardship issue with respect to the Greeley plant. Docket No. 349 at 48. Because the Nebraska court did not consider evidence related to the Greeley plant – an outcome which JBS appears to have advocated for, *see* Docket No. 349-26 at 104 – and because discovery in this case and the Nebraska case did not take place simultaneously, EEOC's ability to litigate the undue hardship issue with respect to the Greeley plant was significantly limited. *See Murdock*, 975 F.2d at 689. JBS fails to address this argument and, as a result, fails to establish this element.

For the foregoing reasons, the Court cannot conclude that EEOC is collaterally estopped from litigating the issue of undue hardship with respect to its reasonable accommodation claim.

### 2. Retaliation and Discrimination

JBS argues that, because EEOC's retaliation and discrimination claims are based upon a "one-time decision to terminate, *en masse*, Somali Muslim workers," such claims are estopped by the Nebraska court's decision that a one-time event cannot support a pattern or practice claim. Docket No. 330 at 32. EEOC disputes that the

31

termination of Muslim employees at the Greeley plant arose under the same circumstances as the termination of Muslim employees at the Grand Island plant. Resp. to DSF ¶ 141.

### a.  Identity of Issues

JBS makes no meaningful attempt to establish the identity of issues element with respect to these claims.  First, EEOC points out that, unlike the present case, its discrimination claims in the Nebraska case did not allege discriminatory discipline. *Compare* Docket No. 330-102 at 6, ¶ 7(d)-(e), *with* Docket No. 1 at 11.  Thus, it does not appear that the Nebraska court considered whether mass terminations and discipline constituted a pattern or practice of discrimination.  Second, the retaliation and discrimination claims in the Nebraska case are limited to events taking place "on or about September 18, 2008," whereas the retaliation and discrimination claims in Phase I of this case are comprised of events taking place during Ramadan 2008.  *Compare* Docket No. 330-102 at 6, ¶ 7(d)-(e), *with* Docket No. 116 at 15.  JBS's argument that the present claims and the Nebraska case claims cover the exact same time period is therefore incorrect.  Third, the events giving rise to the termination of Muslim employees are different in each case.  JBS appears to have recognized this at one point, arguing to the Nebraska court that EEOC should not be permitted to introduce evidence of events taking place at the Greeley plant.  *See* Docket No. 349-26 at 122 ("JBS adamantly refutes that the events in Greeley were under 'the same circumstances'").  In the Nebraska case, for example, 150 Muslim employees refused to report for work on September 15, 2008 and a large group again refused to report for work on September

32

16.  Docket No. 330-103 at 22.  It appears the Muslim employees returned to work on September 17, but staged a protest in the cafeteria on September 18.  *Id.* at 24-25. The 70-80 Muslim employees who left the plant that night were terminated.  *Id.* at 26. In this case, EEOC asserts that, on September 5, 2008, JBS managers ordered 200 Muslim employees to leave the plant – the Muslim employees did not leave of their own accord.  PSF ¶ 94.  Muslim employees who did not sneak back into the plant were suspended for Monday, September 8, which JBS later turned into an indefinite suspension.  PSF ¶¶ 97, 99.  On Tuesday, September 9, JBS decided that the suspended Muslim employees could return to work; 96 employees who failed to do so were terminated.  PSF ¶¶ 100, 102, 106-107; Resp. to DSF ¶ 143.  Thus, whereas JBS appears to have made a single decision to terminate Muslim employees at the Grand Island plant, EEOC's retaliation and discrimination claims in the present case are based on multiple decisions to discipline and terminate Muslim employees.[7]  JBS does not contend that these factual differences are legally insufficient and the Court finds no reason to so conclude.

As discussed above, the Nebraska court barred evidence of events taking place at the Greeley plant, which means that the Nebraska court cannot have "actually and necessarily determined" the question of whether the events of Ramadan 2008 constituted a pattern or practice of retaliation or discrimination as a matter of law.  *See Montana*, 440 U.S. at 153.  Moreover, JBS does not establish that discovery on the Nebraska claims and Colorado claims overlapped to a significant degree.  JBS has

---

[7]EEOC identifies additional factual differences, none of which JBS refutes. Resp. to DSF ¶ 141.

therefore failed to establish the identity of issues element and, for the reasons discussed above, the full and fair opportunity to litigate element.[8]

This aspect of JBS's motion for summary judgment is denied.

### C.  Religious Accommodation Claim

"Title VII imposes an obligation on the employer 'to reasonably accommodate the religious practices of an employee or prospective employee, unless the employer demonstrates that accommodation would result in undue hardship on the conduct of its business.'" *Thomas v. Nat'l Ass'n of Letter Carriers*, 225 F.3d 1149, 1155 (10th Cir. 2000) (quoting 29 C.F.R. § 1605.2(b)(1), (2)); *see also Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 63 n.1 (1986).  It is the collision between an employee's religious practice and an employer's neutral work policy that implicates a Title VII failure to accommodate claim, when employees are placed in a position "where they must choose between their religious convictions and their job." *EEOC v. Abercombie & Fitch Stores, Inc.*, 731 F.3d 1106, 1120 (10th Cir. 2013), *rev'd on other grounds by* --- U.S. ----, 135 S. Ct. 2028 (2015).

The Tenth Circuit has reinforced that the gravamen of a plaintiff's pattern or practice claim for failure to accommodate is the unlawful nature of the employer's pattern or practice.  *Davoll v. Webb*, 194 F.3d 1116, 1148 (10th Cir. 1999) (citing *Teamsters*, 431 U.S. at 360).[9]  This raises the question of how the *Teamsters* burden

---

[8]The Court need not consider EEOC's remaining arguments on this issue.

[9]"[T]he requirement of employers to provide reasonable accommodations for disabled employees under the [Americans with Disabilities Act ("ADA")] is analogous to Title VII's requirement that employers provide reasonable religious accommodations" and ADA cases are therefore instructive as to "when an employer's duty to provide a

shifting framework applies in a Title VII failure to accommodate case such as this.  In other words, what burden does the EEOC bear in order to establish the unlawfulness of JBS's pattern or practice of accommodating the religious practices of its employees? Few courts appear to have squarely addressed this question and the parties' briefs offer little assistance.[10]

JBS concedes for purposes of the present motion that its conduct related to religious accommodations was a pattern or practice, but disputes that such a pattern or practice was unlawful.  Docket No. 330 at 33.  JBS contends that, in order to carry its burden under *Teamsters*, EEOC must establish that (1) JBS failed to offer a reasonable accommodation, (2) EEOC's proposed accommodation is reasonable, and (2) EEOC's

---

reasonable religious accommodation is triggered under Title VII." *See Abercrombie*, 731 F.3d at 1141; *see also Thomas*, 225 F.3d at 1155 n.5 (comparing 42 U.S.C. § 2000e(j) and § 12112(b)(5)(A) and concluding that both Title VII and the ADA obligate employers to make a reasonable accommodation).

[10]Were this an action for individual relief the *McDonnell Douglas* burden-shifting framework would apply, which requires an employee asserting a religious accommodation claim to establish that "(1) he or she had a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed his or her employer of this belief; and (3) he or she was [disciplined or] fired for failure to comply with the conflicting employment requirement." *Thomas*, 225 F.3d at 1155.  Once the employee establishes a prima facie case, the burden shifts to the employer to "(1) conclusively rebut one or more elements of the plaintiff's prima facie case, (2) show that it offered a reasonable accommodation, or (3) show that it was unable reasonably to accommodate the employee's religious needs without undue hardship." *Id.* at 1156; *see also Abercrombie*, 731 F.3d at 1122.  However, this approach is inapplicable to pattern or practice claims such as this.  *See United States v. N.Y. City Transit Auth.*, 2010 WL 3855191, at *16 (E.D.N.Y. Sep. 28, 2010) (rejecting argument that *McDonnell Douglas* framework applies in pattern or practice religious accommodation case); *see also Thiessen*, 267 F.3d at 1106 ("Pattern-or-practice cases differ significantly from far more common cases involving one or more claims of individualized discrimination."); *Davoll*, 194 F.3d at 1148 (rejecting argument that *McDonnell Douglas* framework applies in ADA pattern or practice case).

proposed accommodation can be implemented without undue hardship to JBS. *Id.* at 33-34; Docket No. 360 at 17 n.4. However, in so arguing, JBS cites only individual rights cases. Docket No. 330 at 33-34 (citing *Ansonia*, 479 U.S. at 66 (deciding whether employee was entitled to individual relief); *Abercrombie*, 731 F.3d at 1122 ("apply[ing] a version of *McDonnell Douglas*'s burden-shifting approach")); Docket No. 360 at 17 n.4 (citing *Thomas*, 225 F.3d at 1155). Moreover, JBS does not provide any authority, and the Court is aware of none, placing the burden of proving the absence of undue hardship on the plaintiff. *Cf.* 42 U.S.C. § 2000e(j) (stating that employer must reasonably accommodate employee's religious believes "unless *an employer demonstrates*" that doing so would cause it undue hardship (emphasis added)).

EEOC appears to take the opposite position. EEOC recites the *McDonnell Douglas* failure-to-accommodate framework, acknowledges that it has the initial burden under *Teamsters* to demonstrate unlawful discrimination, and claims that JBS does not dispute the prima facie case "for failure to provide religious accommodation or existence of a pattern or practice." Docket No. 349 at 49. EEOC's brief does not state whether it believes JBS has conceded the prima facie case under *McDonnell Douglas* or the prima facie case under *Teamsters*, but EEOC apparently believes that the burden of establishing the reasonableness of JBS's accommodations and the unreasonableness of EEOC's proposed accommodations has shifted to JBS. *See* Docket No. 349 at 52 ("Defendant fails to show EEOC's proposed accommodations are unreasonable."). Like JBS, EEOC's position relies upon individual rights cases. *Id.* at 49 (citing *Ansonia* and *Thomas*).

36

Thus, the parties seem to agree that EEOC's religious accommodation claim turns on the question of whether JBS failed to reasonably accommodate the religious practices of its Muslim employees and, if so, whether EEOC's proposed accommodations are reasonable and/or place an undue hardship on JBS.  However, the parties continue to dispute which of these questions EEOC must address as part of its prima facie case.[11]

The importance of the burden shifting approach of *Teamsters* is not necessarily in the identification of discrete elements, but in recognition that plaintiff must prove that "there were reasonable grounds to infer that individual . . . decisions were made in pursuit of the discriminatory policy and to require the employer to come forth with evidence dispelling that inference."  *Teamsters*, 431 U.S. 358-60; *see also Hohider v. United Parcel Service, Inc.*, 574 F.3d 169, 183 (3d Cir. 2009) (noting that *Teamsters* framework, like the *McDonnell Douglas* framework, "provides a means by which courts can assess whether a particular form of statutorily prohibited discrimination exists"); *Davoll*, 194 F.3d at 1148 ("*Teamsters* sets forth a logical and efficient framework for allocating burdens of proof in pattern and practice employment discrimination suits").  "It is Title VII, however, that defines the scope of prohibited discrimination and sets the substantive boundaries within which the method of proof must operate."  *See Hohider*, 574 F.3d at 183.

Title VII states that it is an unlawful employment practice to discriminate against any individual because of that individual's religion.  42 U.S.C. § 2000e-2(a).  Religion,

---

[11]For the reasons discussed below, regardless of where the burden lies, genuine disputes of material fact exist as to both questions.

as Title VII defines the term, "includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." § 2000e(j). As interpreted by the Supreme Court, it is "an unlawful employment practice . . . for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees." *Trans World Airlines v. Hardison*, 432 U.S. 63, 74 (1977); *see also Thomas*, 225 F.3d at 1155 n.6 ("Congress has already determined that a failure to offer a reasonable accommodation . . . *is* unlawful discrimination" (quotations omitted)). "By its very terms the statute directs that any reasonable accommodation by the employer is sufficient to meet its accommodation obligation." *Ansonia*, 479 U.S. at 68. If an employer fails to provide such an accommodation, then it violates the statute unless it demonstrates that it is unable to reasonably accommodate the religious observance and practice of an employee without undue hardship. *Id.*

In an ADA failure to accommodate case, the court in *United States v. City and County of Denver*, 943 F. Supp. 1304, 1309 (D. Colo. 1996), ruled that, under *Teamsters*, plaintiff had the burden of establishing that defendant's policy failed to reasonably accommodate and defendant had the burden of showing that it could not enact a policy that reasonably accommodates without undue hardship. The court ruled that to establish a prima facie case of failure to accommodate under the ADA the government had to show (1) that defendant was a covered entity under the ADA, (2)

that defendant's policy or practice "barring the reassignment of officers with disabilities to vacant positions for which they are qualified is undisputed," and (3) that defendant's policy or practice discriminates against individuals protected by the ADA.  *Id.*  The defendant conceded the first two elements, but argued that the third was unsatisfied because no reasonable accommodation existed, the government's proposed accommodation was unreasonable, and the government's proposed accommodation created undue hardship.  *Id.* at 1310.  Upon finding that the government established that defendant's policy was discriminatory and finding that defendant failed to raise a genuine dispute of material fact as to undue hardship, the court granted summary judgment in the government's favor.  *Id.* at 1312-13.[12]  The Tenth Circuit affirmed the court's use of the *Teamsters* burden-shifting framework.  *See Davoll*, 194 F.3d at 1148.

However, the reasonableness of an employer's accommodations and whether an employee's proposed accommodations result in undue hardship are not the only considerations; a plaintiff must also provide some showing that reasonable accommodation is possible, which typically comes in the form of proposed accommodations.  *See Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 259 (1st Cir. 2001) (interpreting ADA).  The questions of whether a proposed accommodation is reasonable and whether a proposed accommodation creates an undue hardship are

---

[12]In *New York City Transit Auth.*, 2010 WL 3855191, at *17, the court, in a denial of religious accommodation case, ruled that the government could prove a prima facie case under *Teamsters* "by showing that the TA's headwear policies . . . discriminate on the basis of religion."  The court considered defendant's remaining arguments – that defendants offered a reasonable accommodation and that no accommodation could be granted without undue hardship – only after having assumed without deciding that the government satisfied its prima facie case.  *Id.* at *17, *19.

separate and distinct. *See EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 314

(4th Cir. 2008). Thus, when proposing an accommodation, plaintiff must "show not only

that the proposed accommodation would enable her to perform the essential functions

of her job, but also that, at least on the face of things, it is feasible for the employer

under the circumstances." *Reed*, 244 F.3d at 259. This approach to proposed

accommodations has been endorsed by the Supreme Court, which rejected an

argument that statutory words "reasonable accommodation" meant only that a

proposed accommodation was effective and nothing more. *See U.S. Airways, Inc. v.

Barnett*, 535 U.S. 391, 399, 401-02 (2002) (citing *Reed* with approval); *see also White

v. York Int'l Corp.*, 45 F.3d 357, 361 (10th Cir. 1995) (holding that, in ADA failure to

accommodate case, plaintiff must "produce[] evidence sufficient to make a facial

showing that accommodation is possible," at which point "the burden of production

shifts to the employer to present evidence of its inability to accommodate"); *Mason v.

Avaya Commnc'ns, Inc.*, 357 F.3d 1114, 1122 (10th Cir. 2004) (same). Thus, although

there is likely to be considerable evidentiary overlap between the two, the "reasonably

accommodate" and "undue hardship" inquiries are conceptually distinct. *Firestone

Fibers*, 515 F.3d at 314.[13] Although these are individual rights cases, their analysis is

based upon on the statutory duty to accommodate – not on any particular burden-

shifting framework. The statutory duty to accommodate applies with equal force in

individual rights and pattern or practice cases. *See Hohider*, 574 F.3d at 184. Thus,

---

[13]The Court recognizes that these are cases in which individual rights were being
adjudicated. However, their discussion of the statutory duty to accommodate would
appear to apply with equal force to pattern or practice claims.

40

the Court concludes that such cases are applicable to EEOC's accommodation claim.

In light of the foregoing authority, the Court rejects any notion that EEOC bears the burden of proving the absence of undue hardship.  To so conclude, as noted above, would be contrary to Congress' explicit directive that the employer demonstrate undue hardship.  *See* § 2000e(j).  As a result, the Court concludes that, in order to satisfy its burden of showing that JBS engaged in an unlawful pattern or practice of religious discrimination under *Teamsters*, EEOC must raise a genuine dispute of material fact that JBS's policy or practice failed to reasonably accommodate the religious practices of its Muslim employees.  *See Thomas*, 225 F.3d at 1155 n.6.  Assuming EEOC is successful, it must additionally produce some evidence that a policy or practice of reasonable accommodation is possible, such as showing that its proposed accommodations are reasonable on their face.  *See Barrett*, 535 U.S. at 401-02.  At that point, EEOC will have satisfied its prima facie case.  JBS may then avoid liability by establishing that there is no genuine dispute of material fact as to whether reasonably accommodating the religious practices of its Muslim employees in the manner EEOC suggests would cause it undue hardship.  *See Ansonia*, 479 U.S. at 68; *Davoll*, 194 F.3d at 1148.

### 1.  Reasonableness of JBS's Accommodations

An employer has met its obligation to accommodate religious practices "when it demonstrates that it has offered a reasonable accommodation to the employee." *Ansonia*, 479 U.S. at 69.  The Supreme Court has suggested that "bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the

employee's religion and the exigencies of the employer's business." *Id.* (quotations omitted). However, the term "reasonable accommodation" does not lend itself to bright line rules; rather, "[e]ach case necessarily depends upon its own facts and circumstances, and in a sense every case boils down to a determination as to whether the employer has acted reasonably." *United States v. City of Albuquerque*, 545 F.2d 110, 114 (10th Cir. 1976); *see also Ansonia*, 479 U.S. at 69; *see, e.g.*, *City of Albuquerque*, 545 F.2d at 114 (holding that employer sufficiently accommodated employee whose religious beliefs prohibited him from working Saturdays when it was amenable to efforts employee could have made to swap shifts with other employees); *Thomas*, 225 F.3d at 1156 ("[employer] approved all voluntary schedule swaps that Thomas was able to arrange, and imposed no restrictions . . . on Thomas's ability to attempt to arrange further voluntary schedule swaps with other employees"). *But see Smith v. Pyro Min. Co.*, 827 F.2d 1081, 1088 (6th Cir. 1987) (holding that employer encouraging employee to swap shifts did not offer a reasonable accommodation where employee had a sincere religious belief preventing him from working on Sunday and from asking someone to work Sundays for him). As a result, "questions of reasonableness are [ordinarily] best left to the fact finder." *EEOC v. Univ. Mfg. Corp.*, 914 F.2d 71, 73 (5th Cir. 1990).

The Supreme Court in *Ansonia* suggested that, although Title VII does not "impose a duty on the employer to accommodate at all costs," "eliminat[ing] the conflict between employment requirements and religious practices" is sufficient to satisfy an employer's obligations. *See Ansonia*, 479 U.S. at 70. However, circuits differ on

42

whether an accommodation must eliminate any religious conflict in order to be considered reasonable.  The Second, Sixth, Seventh, and Ninth Circuits favor a strict approach, holding that an employer's offered accommodation cannot be considered reasonable unless it "eliminate[s] the conflict between the employment requirement and the religious practice."  *See EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1576 (7th Cir. 1996); *see also Cosme v. Henderson*, 287 F.3d 152, 159 (2d Cir. 2002); *Cooper v. Oak Rubber Co.*, 15 F.3d 1375, 1378 (6th Cir. 1994); *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 615 (9th Cir. 1988).  The Tenth Circuit has acknowledged that some circuits interpret *Ansonia* as holding that "a reasonable accommodation is one that *eliminates* the employee's conflict between his religious practices and work requirements," but does not appear to have decided whether to adopt such an approach.  *Lee v. ABF Freight Sys., Inc.*, 22 F.3d 1019, 1023 n.4 (10th Cir. 1994).  The Eighth and Fourth Circuits favor a less strict approach, noting that, although the elimination of any religious conflict is sufficient to render an accommodation reasonable as a matter of law, total elimination of religious conflict is not necessary in order for an accommodation to be considered reasonable.  *Sturgill v. United Parcel Serv., Inc.*, 512 F.3d 1024, 1031 (8th Cir. 2008) ("*Ansonia* did not hold, indeed did not suggest, that an accommodation, to be reasonable as a matter of law, *must* eliminate any religious conflict"); *see also EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 313 (4th Cir. 2008) (rejecting argument that accommodation must eliminate conflict between religious practice and work requirement in part because, "[if] Congress had wanted to require employers to provide complete accommodation absent undue hardship, it could

43

easily have done so").  The Eighth Circuit reasoned that a rule mandating that employees be given their preferred accommodation is "inconsistent with the intended purpose of Title VII's reasonable accommodation provision, to foster 'bilateral cooperation' in resolving an employee's religion-work conflict." *Sturgill*, 512 F.3d at 1031 (quoting *Ansonia*, 479 U.S. at 69).  The parties favor the approach of the Eighth and Fourth Circuits, *see* Docket No. 330 at 35 (citing *Sturgill*); Docket No. 349 at 50 ("The reasonableness of an accommodation is measured under the totality of the circumstances, whereby a total elimination of religious conflict, while preferable, may not always be possible." (citing *Sturgill*, 512 F.3d at 1030)), and, given the lack of Tenth Circuit authority to the contrary, the Court will follow the parties' preference.  *Cf. Smith v. Midland Brake, Inc., a Div. of Echlin, Inc.*, 180 F.3d 1154, 1177 (10th Cir. 1999) (noting that plaintiff is not entitled to the accommodation of his or her choice, but only to a reasonable accommodation).  As a result, when evaluating the reasonableness of JBS's accommodations, the Court must consider the totality of the circumstances, recognizing that reasonableness "might, or might not, require elimination of a particular, fact-specific conflict." *See Sturgill*, 512 F.3d at 1030.

JBS asserts that Muslim employees' religious beliefs were accommodated because they were permitted to pray before each shift, during regular breaks, and after each shift.  Docket No. 330 at 35.  JBS admits that, although these prayer opportunities are not perfect, they "occur *reasonably* close to Islamic prayer times." *Id.*  However, whether the prayer opportunities JBS provided are sufficiently close to Islamic prayer times so as to amount to a reasonable accommodation is a question best left to the fact

finder and JBS fails to persuade the Court otherwise.  First, JBS argues that Muslim employees' beliefs regarding appropriate prayer times vary, such that allowing them to pray during scheduled breaks and/or before and after their shifts is the only reasonable accommodation.  *Id.* at 36.  EEOC responds that all Muslim employees agree that Maghrib prayer must be said after sunset, which eliminates the utility of the 6:00 p.m. rest break.  Docket No. 349 at 51.  EEOC next argues that Muslim employees' acceptable prayer windows generally vary by no more than 15 minutes and, even in those cases where an employee's acceptable prayer window is 40 minutes, the 9:00 p.m. meal break took place anywhere from 90 minutes to two hours after sunset during Ramadan 2008, creating a conflict for all those Muslim employees wishing to pray.  *Id.* (citing Docket No. 330-1 at 3-4).  JBS rebuts such arguments by contending that allowing employees to pray during regular breaks and shift changes is the only "non-burdensome accommodation," which is an argument more appropriately directed at EEOC's proposed accommodations and, moreover, does not eliminate any genuine dispute as to the reasonableness of JBS's accommodations.  *See* Docket No. 360 at 19.

Second, JBS argues that, in 2008, in an effort to accommodate Muslim employees' religious beliefs, it offered Muslim employees the option to transfer to the A shift.  Docket No. 330 at 35.  EEOC asserts that transferring Muslim employees to the A shift would have created a conflict with the CBA.  Resp. to DSF ¶ 103.  Mr. Schult testified that transfer to the A shift was typically based on seniority and that, if large numbers of Muslim employees wished to move to the day shift, the union would need to approve such a change.  D. Schult Dep., Docket No. 349-99 at 10, p. 123:4-25.  The

45

Court is not convinced, as EEOC appears to assert, that a seniority system renders this accommodation unreasonable. *See Smith*, 180 F.3d at 1170 (noting that, if other employees have contractual or seniority right to a vacant position, it is not considered vacant for purposes of accommodating disabled employee). However, even if all Muslim employees were given the opportunity to transfer to the A shift, the Court cannot conclude, as a matter of law, that praying before, during regular breaks, and after the A shift would constitute a reasonable accommodation with respect to the Fajr, Dhuhr, and Asr prayers.[14]

Third, JBS argues that it accommodated Muslim employees' religious beliefs by allowing Muslim employees to break their fast during Ramadan by drinking from water fountains near the production line. DSF ¶ 102. JBS argues this accommodation was reasonable because Muslim employees required only a drink of water to break their fasts during Ramadan and access to water fountains was readily available. Docket No. 330 at 47-48. EEOC responds that the majority of Muslim employees do not believe that drinking water is sufficient to break their fast. Resp. to DSF ¶ 102. Abdinuur Haji Aaden testified that some Muslims "have a couple of dates, some people bring Sambusa and drink water just to break their fast." A. Aaden Dep., Docket No. 349-45 at 4, p. 46:7-12; *see also* K. Abdullahi Dep., Docket No. 349-52 at 5, p. 92:7-22 ("All we

---

[14]JBS's reliance on the court's order in *Aware Daud et al. v. Gold'n Plump Poultry, Inc.*, No. 06-4013 (JJG) (D. Minn. March, 31, 2009), is misplaced. The court in that case was evaluating objections to the fairness of proposed accommodations agreed to as part of a class action settlement, Docket No. 330-108 at 20, which is of little relevance where, as here, the issue is whether JBS's accommodations are reasonable as a matter of law. Moreover, the reasonableness of an accommodation is a fact specific inquiry and JBS makes no attempt to establish that the accommodations in that case arose under circumstances analogous to this case.

wanted was to eat dates and to drink some water but we were refused to do that."); U. Muhumad Dep., Docket No. 349-91 at 4-5, pp. 99:20-100-13 (discussing breaking fast with water and dates).  As a result, the Court cannot conclude as a matter of law that allowing Muslim employees to break their fasts with water alone was a reasonable accommodation.  Moreover, because food was not allowed on the production floor, Resp. to DSF ¶ 102, Muslim employees who could not break their fast with water would have been required to take a break from the production floor, which, as discussed above, the Court cannot conclude that JBS reasonably accommodated as a matter of law.[15]

The reasonableness of an accommodation can, as JBS points out, be decided in some cases as a matter of law.  For the reasons discussed above, this is not such a case.  This aspect of JBS's motion for summary judgment is therefore denied.[16]

### 2. EEOC's Proposed Accommodations

JBS argues that "failure to implement the proposed accommodation is only unlawful if (1) the proposed accommodation is, in fact, reasonable, and (2) the accommodation can be implemented without undue hardship."  Docket No. 330 at 34 (citing *Abercrombie*, 731 F.3d at 1122).

---

[15]Additionally, there appears to be a dispute of fact as to whether Muslim employees were denied access to water on the production floor during Ramadan 2008 and after.  Resp. to DSF ¶ 102; Docket No. 349 at 62.  Although JBS suggests that the incidents upon which EEOC relies are isolated and insufficient to establish a systemic policy or practice of denying Muslim employees water, the Court cannot so conclude as a matter of law.

[16]EEOC does not allege a pattern or practice of denying Muslim employees a place to pray and does not seek a corresponding accommodation to that effect.  Docket No. 349 at 63 n.5.  Thus, JBS's arguments on this issue are moot.

### a.  Reasonableness

As discussed above, when proposing an accommodation, a plaintiff must "show not only that the proposed accommodation would enable her to perform the essential functions of her job, but also that, at least on the face of things, it is feasible for the employer under the circumstances." *Reed*, 244 F.3d at 259.  As the Supreme Court has indicated, "in ordinary English the word 'reasonable' does not mean 'effective.'  It is the word 'accommodation,' not the word 'reasonable,' that conveys the need for effectiveness." *Barnett*, 535 U.S. at 400.  Thus, "considering an accommodation's impact on both the employer and coworkers, for example, is appropriate when determining [a proposed accommodation's] reasonableness." *Firestone Fibers*, 515 F.3d at 314.

JBS argues that the regular break accommodation is unreasonable because, in order to coordinate meal and rest breaks with sundown, it would have to either schedule breaks in violation of the CBA or incur the cost of providing employees with a third break.  Docket No. 330 at 38.  EEOC responds that the regular break accommodation seeks only to change the timing of the meal break within the contours of the CBA and that EEOC and Muslim employees have never sought to have JBS provide a third break.  Docket No. 349 at 53.  JBS's argument is therefore moot.

The remainder of JBS's arguments on this issue challenge the effectiveness or lack thereof of EEOC's proposed accommodations, which, strictly speaking, does not implicate reasonableness. *See Barnett*, 535 U.S. at 400.  To the extent JBS challenges the effectiveness of EEOC's proposed accommodations, genuine disputes of material

fact exist to preclude summary judgment.

First, the Court understands JBS to argue that EEOC's proposed accommodations are insufficient because they are not as effective at accommodating Muslim employees' religious practices as those accommodations JBS has already put in place.  Docket No. 330 at 36.  JBS later appears to change course, arguing that EEOC's claim that its proposed accommodations are "more" reasonable than JBS's existing policy is incorrect because "[t]he test is not whether there is a 'more' reasonable accommodation, defendant need only provide a reasonable accommodation."  Docket No. 360 at 19.  In any event, none of the cases JBS cites support the proposition that EEOC's proposed accommodations are not reasonable accommodations as a matter of law if they are not more effective than the accommodations JBS has in place.  Moreover, there are outstanding questions of fact as to whether JBS's existing accommodations are, as JBS claims, more effective than EEOC's proposed accommodations.  JBS's argument on this issue is therefore without merit.

To the extent JBS argues that the regular break accommodation would be ineffective because, for example, the regular break accommodation would result in the meal break falling within the Maghrib prayer window for only 10 calendar days during Ramadan 2008, Docket No. 360 at 20, JBS's arguments are inconsistent with its position that its own accommodations need not eliminate all conflict between religious beliefs and employment obligations.  *See Sturgill*, 512 F.3d at 1031.  Moreover, EEOC admits that it is not seeking perfect accommodation and points out that there are only a few weeks per year where moving either the meal break or rest break within the

confines of the CBA would not accommodate Maghrib prayer windows.  Docket No. 349 at 53.

JBS argues that the unscheduled break accommodation would be ineffective because allowing Muslim employees to relieve one another for unscheduled breaks would result in some Muslim employees missing their required prayer times.  Docket No. 330 at 37.  JBS's argument rests on the assumption that Muslim employees relieving one another on the line is the only measure by which the unscheduled break accommodation could be implemented, an assumption which EEOC disputes.  *See, e.g.*, Resp. to DSF ¶ 86.  Moreover, EEOC admits that it is not seeking perfect accommodation for every Muslim employee.  Docket No. 349 at 54.  Imam Ammar Amonette states that he discussed with the Muslim employee committee the prospect of alternating prayers, such that Muslim employees would take short, staggered breaks such that eventually "all would get to break their fast and pray, though not all would get to do that exactly on time every day during Ramadan."  Docket No. 349-28 at 1, ¶ 7.  Imam Amonette states that such an arrangement would allow Muslim employees to meet their religious needs.  *Id.* at 2, ¶ 8.  Thus, the Court cannot conclude that the unscheduled break accommodation is ineffective as a matter of law.

JBS raises no other arguments attacking the facial reasonableness of EEOC's proposed accommodations.  As discussed in greater detail below, genuine disputes of material fact exist as to the feasibility of EEOC's proposed accommodations, which overlap with this reasonableness inquiry.  *See Firestone Fibers*, 515 F.3d at 314.  Thus, the Court concludes that EEOC has raised a genuine dispute of material fact as to the effectiveness and facial reasonableness of its proposed accommodations.

50

### b.  Undue Hardship

Whether a particular accommodation results in an undue hardship to the employer is a determination to be made within "the particular factual context of each case."  *Toledo*, 892 F.2d at 1490.  Nonetheless, "[t]o require an employer 'to bear more than a *de minimis* cost in order to [accommodate an employee's religious beliefs] is an undue hardship.'"  *Lee*, 22 F.3d at 1023 (quoting *Hardison*, 432 U.S. at 84).  "Any cost in efficiency or wage expenditure that is more than de minimis constitutes undue hardship."  *Id.* (quotations omitted).  "The cost of hiring an additional worker or the loss of production that results from not replacing a worker who is unavailable due to a religious conflict can amount to undue hardship."  *Id.*; *see also Beadle v. City of Tampa*, 42 F.3d 633, 636 (11th Cir. 1995) (noting that de minimis costs can entail "not only monetary concerns, but also the employer's burden in conducting its business").  An accommodation may also create an undue hardship "if it causes more than a de minimis impact on co-workers."  *Harrell v. Donahue*, 638 F.3d 975, 980 (8th Cir. 2011).  For example, an employer need not "deny the shift and job preference of some employees, as well as deprive them of their contractual rights, in order to accommodate or prefer the religious needs of others."  *Hardison*, 432 U.S. at 81.  In either case, any asserted hardship "must be 'real' rather than 'speculative'" and cannot therefore be proven by assumptions or "opinions based on hypothetical facts."  *Brown v. Polk Cnty., Iowa*, 61 F.3d 650, 655 (8th Cir. 1995) (collecting cases); *see also Toledo*, 892 F.2d 1490 ("'The employer is on stronger ground when he has attempted various methods of accommodation and can point to hardships that actually resulted.'" (quoting *Draper v.*

51

*U.S. Pipe & Foundry Co.*, 527 F.2d 515, 520 (6th Cir. 1975))).

### i.  Regular Break Accommodation

JBS argues that moving a regular break to coincide with sunset presents several problems.  First, JBS argues that, because it coordinates break times with grade changes, it cannot also coordinate break times with Muslim prayer times.  Docket No. 330 at 39-40; *see also* DSF ¶¶ 69-70.  JBS estimates that, if grade changes do not coincide with break times, it would suffer approximately $595,920 in losses per plant per year.  DSF ¶ 72.  However, the meal break generally occurs at approximately 9:15 p.m., which according to plant management is the result of planning the production schedule so that the regular breaks coincide with grade changes.  *See* C. Fritche Dep., Docket No. 349-69 at 13-14, p. 81:9-82:18.[17]  Thus, a reasonable fact finder could conclude that, if JBS is able to regularly coordinate grade changes with a 9:15 p.m. break, then, with 10-20 grade changes in a shift, a break at approximately 7:30 p.m. could be regularly coordinated with grade changes as well.  Although disputed, there is evidence in the record suggesting that, when JBS moved the meal break to 7:30 p.m. for two days in September 2008, it suffered no appreciable decrease in production.  *See* Gould Dep., Docket No. 349-73 at 15, p. 122:1-16 ("Q  And then on Wednesday the break happened at 7:30, right?  A  Yes.  Q  And there were no particular problems with that; is that right?  A  Not that I recall today.  Q  And you don't recall getting any complaints about it either at that time, do you?  A  Not sitting here that I can

---

[17]JBS argues that Mr. Fritche's testimony could be interpreted as rejecting the suggestion that grade changes, break times, and prayer times can be coordinated. Docket No. 360 at 25.  However, the Court finds that JBS's interpretation of Mr. Fritche's testimony is not the only reasonable one.

remember.").  Also, to the extent JBS argues that it cannot schedule breaks at precise times, EEOC concedes that it is not requesting that JBS schedule regular breaks at precise prayer times; rather, the Muslim employee committee agreed on a 7:30 p.m. regular break for Ramadan 2008.  JBS also contends that, if breaks are required at Muslim prayer times, it would lose flexibility to coordinate a break with an equipment malfunction, DSF ¶ 73; however, equipment malfunctions that shut down the entire line resulting in a mass break are rare, B. Danley Dep., Docket No. 349-64 at 18, p. 103:11-13, so there is some question as to how often such breaks can be coordinated with a grade change or a regular break.  Moreover, EEOC concedes that, in the rare event of a breakdown occurring within an appropriate window under the CBA, the regular break accommodation would not require JBS to schedule the break within the Maghrib prayer window.  Docket No. 349 at 56.

Second, JBS argues that it would be an undue hardship to grant mass breaks, rather than staggered breaks as it normally does.  Docket No. 330 at 40-41.  EEOC responds that it is not requesting a mass break.  Docket No. 349 at 56.  JBS's argument is therefore moot.

Third, JBS argues that moving regular breaks in such a manner would mean that break times would change every day and, on some days, require JBS to provide a third break pursuant to the CBA or to schedule a break in violation of the CBA.  Docket No. 330 at 40-41; DSF ¶¶ 67-68.  EEOC responds that, because the Maghrib prayer takes approximately five minutes, the timing of regular breaks would not have to change every day.  Resp. to DSF ¶ 67.  EEOC contends that it has never requested a third regular break, but that in some months prayer needs could be met by a combination of

53

the regular break accommodation and unscheduled break accommodation.  Resp. to DSF ¶ 68.  EEOC further argues that it is not requesting that JBS violate the CBA, but rather that the regular breaks be moved within the confines of the CBA to allow Muslim employees to pray at or near the Maghrib prayer window.  Docket No. 349 at 56.  To the extent that EEOC's response has not rendered JBS's argument on this issue moot, EEOC has identified a genuine dispute of material fact.

Fourth, JBS takes the position that the regular break accommodation would burden non-Muslim co-workers because an earlier meal break would cause employees to be more tired and hungry by the end of the shift, because many employees prefer a later break, and because moving a break time earlier upsets the medication schedule of some employees.  Docket No. 330 at 41; DSF ¶¶ 74-76.  JBS's argument is somewhat undercut by its earlier argument that it cannot move the meal break to accommodate Muslim prayer times because it requires flexibility to accommodate its own production needs.  Moreover, Mr. Fritche's testimony could be interpreted as stating that break times occurring within the parameters set forth in the CBA do not have a negative effect on employees.  *See* C. Fritche Dep., Docket No. 349-69 at 16, p. 86:7-21.  EEOC also asserts that non-Muslim co-workers' discontent could be at least partially motivated by an erroneous belief that an earlier meal break is a gesture of favoritism to Muslim employees, rather than an effort to comply with JBS's Title VII obligations.  *See* PSF ¶¶ 51-54; *see also Brown*, 61 F.3d at 655 ("Undue hardship requires more than proof of some fellow-worker's grumbling." (quotations omitted)).

For the foregoing reasons, the Court cannot conclude as a matter of law that the regular break accommodation would result in undue hardship to JBS or non-Muslim co-

workers.

## ii.  Unscheduled Break Accommodation

JBS contends that permitting Muslim employees to leave the line to pray during unscheduled breaks would cause several adverse effects.  However, JBS's arguments suffer under the assumption that the unscheduled break accommodation can be enacted through only a single measure, such as by requiring employees on the line to substitute for praying employees or by using over-crewing, leads, and supervisors to fill in for them.  For example, if the accommodation were to be enacted solely by forcing employees on the line to have to work harder and faster to make up for employees on unscheduled prayer breaks, it seems likely that undue hardship would result.  However, JBS does not account for or respond to EEOC's contention that the unscheduled break accommodation can be enacted through a combination of several measures, including use of over-crewing, leads, supervisors, or cross-trained employees to fill in for employees on unscheduled prayer breaks, placement of meat in "combos" or cardboard boxes until the employee returns from a prayer break (on lines where such a practice is appropriate), coordination of unscheduled breaks between supervisors and Muslim employees, coordination of unscheduled breaks between Muslim employees based upon the flexibility of their respective prayer windows, and making efforts not to concentrate Muslim employees on the same lines.  *See, e.g.*, PSF ¶ 72; Resp. to DSF ¶ 86; L. Rivera Dep., Docket No. 349-95 at 18-19, pp. 164:3-165:19; Docket No. 349-28 at 1-2, ¶¶ 7-8. (suggesting that, although alternating unscheduled prayer breaks coordinated among Muslim employees would not allow all employees to pray and break their fast on time every day during Ramadan, such a practice would satisfy their

religious obligations).  EEOC also suggests that burdens associated with enacting this accommodation could be reduced through better training and communication. Supervisors can work with employees ahead of time to manage unscheduled breaks and doing so sometimes makes unscheduled breaks go smoother.  PSF ¶ 73; Resp. to PSF ¶ 73.  However, EEOC contends that JBS has failed to train supervisors on the unscheduled break policy, on how to effectively cross train employees, on working with employees ahead of time to manage unscheduled breaks, and on the Muslim religion generally.  PSF ¶¶ 76-79.

Although JBS contends that no genuine dispute of material fact exists as to the undue hardship in using a single measure to enact this accommodation, JBS provides no persuasive basis to conclude that the same is true when multiple measures are employed collectively.  At trial EEOC will bear the burden of proving that enacting this accommodation by a combination of measures is possible.  However, JBS's failure to address EEOC's theory, by itself, provides a basis for denying summary judgment on the issue of undue hardship created by the unscheduled break accommodation. Nonetheless, the Court will address JBS's individual arguments as they relate to particular measures.

With respect to the burden the unscheduled break accommodation places on JBS, JBS first argues that if hundreds of Muslim employees left the line within a short window of time, JBS would be forced to reduce chain speed.  Docket No. 330 at 43. Mr. Anderson testified that giving employees unscheduled breaks to pray has not resulted in any production problems.  *See* R. Anderson Dep., Docket No. 349-61 at 10,

p. 110:2-111:3.[18]  EEOC asserts that, during Ramadan 2009 and 2010, JBS allowed

prayer during unscheduled breaks without ill effects or undue hardship.[19]  JBS's

Director of Human Resources Robert Daubenspeck testified that, when such a policy

was enacted in 2009, supervisors he spoke with were comfortable that the policy would

not cause disruptions to production.  R. Daubenspeck Dep., Docket No. 349-65 at 7,

pp. 53:18-54:25.  Supervisors reported only isolated disruptions and Mr. Daubenspeck

was not aware of any burden this placed upon JBS.  *Id.*  Supervisor Lisa Rivera testified

that, during Ramadan 2010, half of her line consisted of Muslim employees and, due at

least in part to increases in cross training, she reported no problems getting people off

the line for sundown prayers.  L. Rivera Dep., Docket No. 349-95 at 18-19, pp. 164:3-

165:19.; *see also* R. Anderson Dep., Docket No. 349-61 at 21, p. 167:5-23 (recalling no

---

[18]Although it is not clear what time period Mr. Anderson's testimony refers to, JBS does not argue that the cited testimony is irrelevant or inadmissable for that reason.

[19]The Court recognizes that the fact that an employer has previously provided a requested accommodation does not obligate it "to continue providing such an accommodation."  *See Phelps v. Optima Health, Inc.*, 251 F.3d 21, 26 (1st Cir. 2001); *Rehrs v. Iams Co.*, 486 F.3d 353, 358 (8th Cir. 2007) ("[a]n employer . . . voluntarily assuming the limited burden associated with a temporary accommodation [does not] thereby acknowledge that the burden associated with a permanent accommodation would not be unduly onerous" (quotations omitted)).  To so obligate an employer would be to punish it for doing more than the law requires.  *See Basith v. Cook Cnty.*, 241 F.3d 919, 930 (7th Cir. 2001); *Phelps*, 251 F.3d at 26.  Thus, the Court does not consider JBS's conduct during Ramadan 2009 and 2010 to be a concession on the part of JBS that the unscheduled break accommodation would not be unduly burdensome.  Nonetheless, it is not clear that evidence from the time period during which a temporary accommodation was in place is rendered inadmissible and the Court does not understand JBS to so argue.  *See* Docket No. 360 at 28 n.11.  Thus, the Court will consider evidence from Ramadan 2009 and 2010 in determining whether the proposed accommodation would cause undue hardship, but will not consider JBS to have conceded that such an accommodation imposes no undue hardship.

problems spelling Muslim employees off the line during Ramadan 2009 and 2010).[20]

Moreover, Mr. Daubenspeck testified that the change in policy did not amount to giving

Muslim employees a benefit that other employees were not getting.  R. Daubenspeck

Dep., Docket No. 349-65 at 7, p. 53:11-14.  JBS fails to establish the absence of a

genuine dispute of material fact as to this issue.

Second, JBS argues that when employees leave the line for unscheduled

breaks, other employees must work harder and faster to do the work of absent

employees, resulting in an increased risk of injuries and a decrease in product quality.

Docket No. 330 at 43-44; DSF ¶¶ 77-79.  In some positions, employees on the line

cannot make up for employees on unscheduled breaks such that another person has to

fill in.  DSF ¶ 84.  Mr. Anderson testified that allowing Muslim employees to take prayer

breaks has not affected production, product quality, or the frequency of injuries in areas

that he supervises.  R. Anderson Dep., Docket No. 349-61 at 10, p. 110:2-111:3.

Similarly, Quality Assurance Supervisor Blanca Mejia-Madaleno, who is responsible for

food and employee safety, testified as follows: "Q  Did it cause you any problems

having people leave the line to go pray?  A  No.  Q  . . . were you aware of any

additional safety concerns due to employees leaving the line to pray?  A  No."  B. Mejia-

Madaleno Dep., Docket No. 349-85 at 12, p. 160:2-8.[21]  Mr. Anderson also testified that,

---

[20]The Court need not consider the fact that, since 2011, JBS has adopted a policy similar to the unscheduled break accommodation in resolving this motion.  As a result, the Court takes no position on whether it is appropriate to consider JBS's current policy regarding unscheduled breaks.  *See Phelps*, 251 F.3d at 26.

[21]Although it is not clear what time period Ms. Mejia-Madaleno's testimony refers to, JBS does not argue that the cited testimony is irrelevant or otherwise inadmissible for that reason.

when unscheduled breaks occur, other employees, leads, supervisors, and cross trained employees can step in. R. Anderson Dep., Docket No. 349-61 at 13-14, pp. 118:14-119:19. Moreover, in some, but not all instances, meat can be set aside in "combos" or cardboard boxes until the employee returns, *see id.*, such that not every employee who takes an unscheduled break need be replaced by another employee. *See* PSF ¶ 71. Although there is evidence that food safety issues may arise if too many employees take unscheduled breaks at one time, B. Mejia-Madaleno Dep., Docket No. 349-85 at 12-13, pp. 160:11-161:10, there is a genuine dispute of material fact as to whether the unscheduled break accommodation would create an undue hardship in the form of increased injuries and decreased product quality. [22]

JBS argues that, because the B shift has a high percentage of Muslim employees, it would not be feasible to accommodate unscheduled prayer breaks for all of them. Docket No. 330 at 44-46 For example, JBS argues that, because the B shift in 2008 had 433 Muslim employees and only 56 leads and supervisors, if leads and supervisors were required to fill in for Muslim employees on two unscheduled prayer breaks per shift, leads and supervisors would be filling in for 50 percent of their shift. DSF ¶¶ 90-91. JBS asserts that this would violate the CBA, which prevents supervisors from routinely performing bargaining unit work, take supervisors away from their normal

---

[22]There also appears to be a dispute of fact as to whether, if Muslim employees take unscheduled breaks for prayer, more non-Muslim employees will ask for unscheduled breaks, resulting in an undue hardship on JBS. *Compare* DSF ¶ 85, *with* B. Danley Dep., Docket No. 349-64 at 32, 159:9-13 ("Q . . . since employees have been requesting unscheduled breaks to leave to go pray, has there been an increase in the number of other employees taking unscheduled breaks? A Not that I'm aware of.").

duties, and result in supervisors performing production line work at their supervisor wage rate.  DSF ¶¶ 88, 89, 91.  As discussed above, JBS's argument is premised on the incorrect assumption that supervisors and leads would be the exclusive method by which Muslim employees' prayer breaks could be accommodated.  *But see* L. Rivera Dep., Docket No. 349-95 at 18-19, pp. 164:3-165:19.  EEOC has sufficiently raised a dispute of fact as to the remaining aspects of this argument.  *See* Resp. to DSF ¶¶ 88-91.

JBS argues that it would be an undue hardship to avoid concentrating Muslim employees on the same line because a significant number of employees would need to be retrained, taking several weeks, costing an estimated $2 million, and causing employees temporarily assigned to work in a different position to be assigned a higher pay rate, a difference in wage rates it claims to have no system in place to track. Docket No. 330 at 46; DSF ¶¶ 92-100.  However, cross training is a practice already in place at the Greeley plant and is already relied upon to maintain chain speed whenever a particular line or table is short of personnel on a particular day.  *See* D. Jordan Dep., Docket No. 349-82 at 4-5, pp. 36:6-37:22.  There is also a dispute of fact as to whether a significant number of employees are already cross trained, *see also* L. Rivera Dep., Docket No. 349-95 at 2-3, 36:13-37:7 (explaining that most of the people on the "arm line" were cross trained to do each of the jobs on the "arm line"), and what the cost of such training would be.  *See* Resp. to DSF ¶ 94.  Moreover, it is not clear that the CBA requires an increase in pay when cross trained employees are filling in for employees on unscheduled breaks.  *See* Resp. to DSF ¶ 97.

For the foregoing reasons, a genuine dispute of material fact exists on the issue of whether the unscheduled break accommodation would impose a greater than de minimis burden on JBS.

The Court turns to the question of whether the unscheduled break accommodation would impose a greater than de minimis burden on non-Muslim co-workers.  Although JBS argues that employees doing the work of absent employees must work harder and faster, which increases the risk of injuries, Docket No. 330 at 47; DSF ¶¶ 78, 82, there is evidence in the record to the contrary and employees are already doing so for those employees who take unscheduled breaks to go to the restroom.  Moreover, there is evidence that this is the case only if the employee is not replaced by an over-crewed employee, supervisor, lead, or cross trained employee. *See* Resp. to DSF ¶ 82.  As a result, the Court cannot conclude as a matter of law that the unscheduled break accommodation imposes an undue hardship for that reason. *Cf. George v. Home Depot Inc.*, 2002 WL 31319124, at *4 (5th Cir. Sept. 27, 2002) (unpublished) (noting that Fifth Circuit has found undue hardship when religious accommodation "requires other employees to take on additional duties or change their schedules").

To the extent JBS argues that employees have complained about safety when employees leave the line, DSF ¶ 83, there is evidence that no injury issues have occurred when covering for Muslim employees during unscheduled prayer breaks.  *See* R. Anderson Dep., Docket No. 349-61 at 10, p. 110:2-111:3.  JBS contends that, when employees must do the work of employees who take unscheduled breaks, morale issues result.  DSF ¶ 81.  However, the deposition testimony of Greeley plant

61

employees and supervisors creates a genuine dispute of material fact on this issue. *See, e.g.*, R. Anderson Dep., Docket No. 349-61 at 10, p. 110:2-111:3.  For the above-stated reasons, a genuine dispute of material fact exists as to whether the unscheduled break accommodation creates an undue hardship on non-Muslim co-workers.

JBS's motion for summary judgment on the issue of undue hardship is denied.

### D.  Retaliation and Discrimination Claims

JBS argues that, because EEOC's retaliation and discrimination claims are based upon the "one-time decision to suspend and terminate, *en masse*, a group of Somali Muslim employees" during Ramadan 2008, JBS's conduct does not constitute a pattern or practice of unlawful discrimination.  Docket No. 330 at 49-50.

The parties have two principal disagreements regarding these claims.  First, the parties disagree as to the scope of EEOC's Phase I retaliation and discrimination claims.  EEOC argues that its retaliation and discrimination claims are not limited to the events of Ramadan 2008.  Docket No. 349 at 63-64.  EEOC is correct that its complaint alleges that JBS has engaged in and continues to engage in discriminatory and retaliatory conduct.  *See* Docket No. 1 at 7-8, 9, 11.  However, pursuant to the Court's bifurcation order, EEOC's retaliation and discrimination claims are limited in Phase I "insofar as they are based on the Ramadan 2008 events."  Docket No. 116 at 15.  Although EEOC is not precluded from proceeding on the whole of its retaliation and discrimination claims in Phase II, EEOC's claims in Phase I are limited by the bifurcation order.[23]

---

[23]In attempting to rely on evidence of conduct occurring outside of Ramadan 2008, EEOC seizes upon the portion of the bifurcation order which states, "However,

The question then becomes what evidence can be properly considered in support of EEOC's Phase I retaliation and discrimination claims.  JBS argues that the bifurcation order limited such claims "to the suspension and termination decision resulting from the work stoppage on September 5, 2008; the Bifurcation Order did not permit the EEOC to base its Phase I claims on *all* alleged acts of discrimination or retaliation that occurred during Ramadan 2008."  Docket No. 360 at 35.  The Court disagrees with JBS's interpretation of the bifurcation order.  The Court ruled that "instances of retaliation, discipline, or discharge unrelated to the Ramadan 2008 events are likely to present issue that are too individualized for efficient bifurcation," Docket No. 116 at 15, but the Court did not limit EEOC's Phase I claims to only those events taking place between September 5 and September 10, 2008.  Although it is true that EEOC's complaint describes events taking placing between September 5 and September 10, the complaint also alleges that Tuesday, September 2, 2008 was the first work day of the 2008 Ramadan holiday, Docket No. 1 at 5-7, and EEOC's complaint does not foreclose the possibility that additional acts of retaliation and discrimination related to the mass suspensions and terminations occurred after September 10, 2008 but before the end of Ramadan 2008.  Thus, EEOC's Phase I retaliation and discrimination claims are limited to acts of discrimination or retaliation occurring between September 1 and

the Court may reconsider what issues are appropriately decided during Phase I related to this claim as the claim's scope is clarified through discovery."  Docket No. 116 at 15.  Neither side has filed a motion requesting the Court to reconsider the scope of plaintiff's Phase I retaliation and discrimination claims.  Moreover, EEOC admits that, as a result of the bifurcation order, it did not have access to full discovery regarding JBS's discriminatory and retaliatory conduct before and after Ramadan 2008.  Thus, no basis exists to expand the scope of EEOC's Phase I retaliation and discrimination claims to include conduct occurring outside of Ramadan 2008.

September 30, 2008 to the extent such acts are related to the September 10 mass termination of Muslim employees.  The Court's consideration of evidence in resolving this aspect of JBS's motion is limited accordingly.[24]

The second dispute with respect to this claim is whether JBS's conduct during Ramadan 2008 can be characterized as a "one-time event," insufficient to establish a pattern or practice of discrimination.  *See* Docket No. 349 at 68.  In support of its argument that the suspension and termination of Muslim employees was a one-time, mass action that cannot support a pattern or practice claim, JBS relies upon *Sperling v. Hoffmann-La Roche, Inc.*, 924 F. Supp. 1346 (D.N.J. 1996), *Oinonen v. TRX, Inc.*, 2010 WL 396112 (N.D. Tex. Feb. 3, 2010), and the Nebraska court's order on JBS's motion for summary judgment.  Docket No. 330-105 at 37-41.

In *Sperling*, an employer discharged or demoted 1,100 employees on a single day as part of a reduction in force ("RIF").  924 F. Supp. 1349.  A class action was filed and approximately 500 employees opted in as members of the putative class.  *Id.*  In preparation for the RIF, the employer created a document containing criteria for line managers to select employees for inclusion in the RIF.  *Id.*  Plaintiffs argued that, because the employer knew that age bias existed and uncontrolled termination decisions would result in a disproportionate termination of older employees, the criteria

---

[24]JBS filed a motion requesting leave to challenge the admissibility of the opinions of plaintiff's expert witness, Dr. Mark McNulty.  Docket No. 374.  JBS argues that, because EEOC relies in part on Dr. McNulty's opinions in its response to the motion for summary judgment, the Court should rule on any motion to exclude Dr. McNulty's opinions before ruling on the motion for summary judgment.  Because the Court does not consider Dr. McNulty's opinions in resolving this motion, JBS's argument on this issue is moot.

granted line managers too much discretion to terminate employees based upon conscious or unconscious age bias. *Id.* at 1360. The court rejected plaintiffs' claim for multiple reasons. First, because plaintiffs did not assert that unlawful discrimination was the employer's standard operating procedure, their allegations were more appropriately characterized as a disparate impact claim. *Id.* at 1361-63. The court reasoned that, if plaintiffs' allegations were considered sufficient to sustain a pattern or practice claim, "anytime a company gives managers discretion to make employment decisions that company potentially engages in a pattern or practice of discrimination." *Id.* at 1363. Second, the court noted that the guidelines were used only once and there was no evidence indicating that they would be used in the future. *Id.* at 1364. As a result, the Court concluded that, because the employer's use of the guidelines was a "one-shot event, there is no basis to award classwide prospective injunctive relief – the main reason for bringing a pattern-or-practice claim." *Id.*

In *Oinonen*, plaintiffs were terminated during a single layoff and brought a class action claim alleging a pattern or practice of discrimination. 2010 WL 396112, at *1, *4. The court dismissed plaintiffs' class action claim, in part, because plaintiffs "provided only statistics and conclusory allegations related to a single event, TRX's 2008 layoff. Such a 'one-shot' event cannot constitute a pattern or practice of discrimination." *Id.* (quoting *Sperling*).

In the Nebraska case, the court found *Sperling* and *Oinonen* persuasive and rejected EEOC's argument that the mass termination of 80 Muslims should be viewed as 80 individual decisions to terminate Muslim employees. Docket No. 330-105 at 39.

65

The court further concluded that EEOC failed to demonstrate that the mass terminations were "more than a single event." *Id.* at 41.

Although EEOC disputes that the events of Ramadan 2008 should be characterized as a one-time, *en masse* termination, EEOC relies on *EEOC v. Sandia Corp.*, 639 F.2d 600 (10th Cir. 1980), in support of its argument that a one-time layoff event can give rise to a pattern or practice claim.  In *Sandia*, the EEOC brought a pattern or practice claim based upon an employer's mass layoff and the Tenth Circuit affirmed the trial court's finding in favor of EEOC.  639 F.2d at 604.  However, *Sandia* did not specifically address the question of whether a one-time event can or cannot be considered a pattern or practice.  On the issue of whether the layoff was the result of a discriminatory pattern or practice on the basis of age, EEOC presented statistical evidence, management memoranda indicating the existence of stereotypes regarding older employees, and testimony that the company was concerned with the increasing age of its employees.  *Id.* at 607-08.  The trial court found that "individuals in the 52 to 64 age range were selected for layoff in a pattern which proves that Sandia has engaged in discriminatory conduct." *Id.* at 621.  The Tenth Circuit held that the trial court did not err in applying the *Teamsters* framework and that the trial court's finding of a discriminatory pattern or practice was supported by the evidence.  *Id.* at 623.

Although *Sandia* sustained a pattern or practice claim based upon a mass layoff, the decision appears to have been based in large part on potentially discriminatory conduct and policies that occurred or were in place prior to the layoff.  *See Sandia*, 639 F.2d at 607-08.  As a result, *Sandia* is of limited persuasive value where, as here,

EEOC's claims are limited to Ramadan 2008 and EEOC does not allege that JBS adopted a declared or undeclared discriminatory policy that led to the discriminatory conduct in this case.  *See* Docket No. 330-105 at 39.[25]  The Tenth Circuit does not appear to have explicitly decided the question of whether a one-time mass layoff or mass termination can, without allegations of pre-existing discriminatory policies, give rise to a pattern or practice claim or whether mass employment actions should, as EEOC urges, be viewed as multiple individual discriminatory decisions rather than a single, isolated discriminatory decision.  *See Teamsters*, 431 U.S. at 336.  However, the Court need not decide whether the Tenth Circuit is likely to agree with *Sperling*, *Oinonen*, or the Nebraska court because the evidence in this case does not compel the conclusion that the events of Ramadan 2008 were a "single event" and JBS does not properly raise any other argument challenging EEOC's retaliation and discrimination claims.  *See* Docket No. 330 at 49-50.

The focus of a pattern or practice claim is "on a pattern of discriminatory decisionmaking."  *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 876 (1984).  Here, there is sufficient evidence upon which to conclude that JBS made at least six different discriminatory decisions between September 5 and September 10, 2008, which could lead a factfinder to conclude that discrimination was JBS's standard operating procedure during that time.  First, on the evening of Friday, February 5, 2008,

---

[25]Notably, *Sperling* distinguished *Sandia*, finding that EEOC provided evidence (1) that Sandia took specific steps to remedy the average age of its workforce in the decade prior to the layoff, (2) that age was a factor in Sandia's promotion policy, and (3) that, prior to the layoff, Sandia took steps to hire younger scientists. 924 F. Supp. at 1393-94.

Greeley plant management ordered Muslim employees to leave the plant, despite the fact that Muslim employees were willing to return to work. PSF ¶ 94; Resp. to DSF ¶ 128. Second, that night, JBS made the decision to suspend those Muslim workers who did not return to work on that day for Monday, September 8. PSF ¶ 97. The non-Muslim employees who engaged in an unauthorized work stoppage on Thursday, September 4 were not disciplined, PSF ¶ 84; Resp. to PSF ¶ 84, and JBS elected not to suspend Latino workers who left the plant on the evening of September 5. PSF ¶ 96. Third, prior to its Monday, September 8 meeting with the Muslim employee committee, JBS decided that Muslim employees suspended for Monday, September 8 would instead be suspended indefinitely and communicated its decision to the committee during the Monday, September 8 meeting. *See* PSF ¶ 99. Fourth, after that meeting, but before the Tuesday, September 9 meeting, JBS decided that suspended Muslim employees could return to work that day. PSF ¶ 100. JBS decided that, for those suspended employees who did not return to work on September 9, the suspension would become a termination. *Id.* JBS communicated those decisions to the committee during the Tuesday, September 9 meeting. *Id.* Fifth, despite the fact that JBS has a procedure of meeting individually with suspended employees and informing suspended employees of when to return to work, PSF ¶ 101, JBS decided not to follow that procedure with respect to suspended Muslim employees. PSF ¶¶ 103-104. Sixth, on September 10, JBS terminated 96 Muslim employees, Resp. to DSF ¶ 143, without regard for whether those employees had been informed on September 9 that their suspension had ended. *See* PSF ¶ 108. Unlike *Sperling*, *Oinonen*, and the Nebraska case – all of which characterized the employer's allegedly discriminatory conduct as a

68

"single event" or "one-time occurrence" –, a reasonable factfinder could conclude that the events of Ramadan 2008 consisted of multiple events or occurrences of discrimination on the part of JBS.  *See Thompson v. Weyerhaeuser Co.*, 582 F.3d 1125, 1127 (10th Cir. 2009) (noting that trier of fact must determine existence of discriminatory pattern or practice).[26]  Thus, the authority upon which JBS bases its argument is distinguishable and is therefore an insufficient reason upon which to grant JBS summary judgment on EEOC's Phase I retaliation and discrimination claims.  This aspect of JBS's motion for summary judgment is denied.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that defendant's Motion for Summary Judgment and Brief in Support [Docket No. 330] is **DENIED**.

DATED July 17, 2015.

BY THE COURT:

 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge

---

[26]EEOC asserts that, during Ramadan 2008, Greeley managers monitored restrooms and disciplined employees found praying during unscheduled breaks.  PSF ¶ 6.  Because the Court concludes that JBS has not provided an adequate basis for granting summary judgment in its favor, the Court need not consider whether the additional evidence that EEOC relies upon in support of these claims is sufficiently related to the events leading up to the September 10 mass termination of Muslim employees so as to properly be considered in conjunction with EEOC's Phase I retaliation and discrimination claims.