IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No.  10-cv-02103-PAB-KLM

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

      Plaintiff,

and

IRAQ ABADE, et al.,

      Plaintiffs-Intervenors,

and

MARYAN ABDULLE, et al.,

      Plaintiffs-Intervenors,

v.

JBS USA, LLC, d/b/a JBS Swift & Company,

      Defendant.
_____

## PHASE I FINDINGS OF FACT AND CONCLUSIONS AT LAW
_____

      The Court presided over a 16-day trial to court in Phase I of this discrimination

case, involving pattern or practice claims brought by the United States Equal

Employment Opportunity Commission (the "EEOC") pursuant to Title VII of the Civil

Rights Act of 1964.  Defendant, JBS USA, LLC, d/b/a JBS Swift & Company ("JBS"),

owns a beef processing facility in Greeley, Colorado (the "Greeley plant" or the "Greeley

facility").  From 2007 to 2011, the Greeley plant employed several hundred Muslim

employees who sought accommodation from JBS because of their need to pray during working hours.

On August 8, 2011, the Court issued an order bifurcating this case. Docket No. 116 (the "bifurcation order"). Pursuant to the bifurcation order, the Phase I trial addressed three claims:

1. That JBS engaged in a pattern or practice of unlawfully denying Muslim employees reasonable religious accommodations to pray and break their Ramadan fast from December 2007 through July 2011.

2. That JBS engaged in a pattern or practice of disciplining employees on the basis of their race (black), national origin (Somali), and religion (Muslim) during Ramadan 2008 (September 1-30, 2008).

3. That JBS engaged in a pattern or practice of retaliating against a group of black, Muslim, Somali employees for engaging in protected action in opposition to discrimination during Ramadan 2008.

Docket No. 116; *see also* Docket No. 493 at 1-2 (memorializing the parties' agreement that Phase I would cover the EEOC's "pattern-or-practice failure to accommodate claims through July 2011.").

## I. FINDINGS OF FACT

### A.  Stipulated Facts

The parties have stipulated to the following facts:

1.	At all relevant times, JBS USA, LLC has continuously been doing business in the state of Colorado and has continuously had at least 15 employees.

2.	At all relevant times, Defendant has been an employer engaged in an industry affecting commerce within the meaning of §§ 701 (b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

3.	The United Food and Commercial Workers International Union, Local No. 7 is the exclusive bargaining agent for all production employees employed by JBS at its Greeley, Colorado beef plant as specifically defined in the Collective Bargaining Agreement (the "CBA").

Docket No. 490 at 6-7.

## B.  Findings of Fact From the Trial Evidence

The Court makes the following findings of fact by a preponderance of the evidence.

### 1.  *JBS and the Greeley Beef Plant*

JBS is the largest producer of beef in the world.  It has come to that position through acquisitions of numerous companies and facilities in the agricultural sector, including acquisition of the Greeley plant.

Cattle arrive at the Greeley plant by truck and are unloaded into cattle pens, or yards, where they are weighed and inspected by a United States Department of Agriculture ("USDA") veterinarian.  Once approved by the USDA, the cattle are led up a chute into the slaughter area where they are stunned and killed.  Each carcass is then hung from a chain that moves through the slaughter floor, where employees perform

3

various functions to inspect the carcass and where certain large cuts are made.  The carcass subsequently goes to a "hot box" cooler where it is held for 48 hours.

From the hot box cooler, the carcass is moved into a grading and sales cooler. There the carcass is assigned a grade, such as "Prime," "Certified Angus Beef," "Angus," "Choice," or "Select."  Only one grade of cattle at a time may be run through the fabrication area.  Carcasses can be kept in this cooler for up to five days before they must be processed.  The carcasses are carried out of the cooler attached to a chain.  In fact, the line on which a carcass moves during processing is sometimes referred to as the "chain."

Once carcasses leave the grading and sales cooler, they go to the fabrication area, where the carcasses are cut into smaller pieces and the smaller pieces are processed.  The fabrication area is organized into multiple lines, each of which is responsible for processing a different part of the carcass.  The initial section of the fabrication area is called the "break line."  Large sections of the carcasses are cut off and placed on conveyor belts.  Each conveyor belt has one or more lines of workers who perform specific tasks on different portions of the carcass.[1]  For example, there are boning lines, a rib line, an arm line, a value added line, and a loin line.  Each product must be cut to meet particular specifications.  For example, a particular customer may require a certain amount of fat on the edge of a particular piece of meat, while another customer may require less fat.

---

[1] The lines at the Greeley plant are designated by three-digit numbers.

4

After passing through the fabrication area, the beef moves into the packaging area.  The cuts of meat are placed in plastic bags and sealed.  The bags are placed in boxes that are moved to the shipping department to be shipped out to customers.

 The chain moves beef through the facility at a certain speed (the "chain speed"). Although the chain speed can vary, slaughter and fabrication employees are required to work at a pace that corresponds with the chain speed needed to process the number of carcasses anticipated for that shift.  A problem on one area of the line can affect the operations of the entire plant.  In 2008, the goal at the Greeley plant was to slaughter and process about 5,600 head of cattle daily, which produced about 37,000 boxes of meat for shipping each day.  The USDA sets the maximum chain speed in the slaughter area of the plant.  Because the plant operates on an assembly line, JBS is required to correlate the chain speeds in the slaughter and fabrication areas so that the meat is packaged and shipped before spoiling.  Thus, when staffing falls below the level for the current chain speed, the plant must reduce the chain speed.

Multiple "grade changes" occur per shift because, as noted earlier, only one grade of cattle may be run through the fabrication area at a time.  The number of grade changes per shift varies from three to twenty.  A one to five minute gap in the product on the chain occurs during every grade change.

The management of lines depends on the number of employees on a particular line.  Large lines would be overseen by a supervisor and multiple team leads.  Smaller lines, some with as few as four employees, would have no supervisor and only one team lead.  Typically there is one supervisor and one or two team leads per line.  For example, the value added line has only fifteen to twenty employees, whereas the break

line has one supervisor and two team leads supervising approximately eighty-five employees. Trainers would also be present on certain lines, with their locations varying depending on where employees were being trained. JBS used industrial engineering studies to determine the amount of time taken for tasks on the line and, thereby, the crewing required for a particular chain speed. Under the CBA, the trainers, team leads, and supervisors may fill in for employees who take unscheduled breaks. Ex. A-03 at 5, Art. 4, § 2. The CBA, however, prohibited supervisors from performing bargaining unit work - i.e., production work performed by hourly employees - "except in such situations as instructing an employee, temporarily filling in for absenteeism or in case of emergency." *Id*. This provision prohibited supervisors from routinely filling in for hourly employees.

Processing the meat on the line is physically demanding, as many production employees stand for long periods of time to trim and debone products that may weigh forty pounds or more. The jobs considered physically demanding or that require more skill often were paid a higher hourly rate. Ex. A-03 at 19, App'x A. The CBA required JBS to pay employees overtime for all hours worked in excess of eight hours in a day and all work over forty hours in a week. Ex. A-03 at 6, Art. 6, § 3.

"Crewing" refers to the number of employees needed to do a particular job at a particular chain speed. The number of employees assigned to each line varies. Due to absences and vacations, JBS often assigned an excess number of employees relative to the number of employees necessary for the line to be fully staffed. This excess is known as "over-crewing." The Greeley plant typically over-crewed at 115-117%.

Nevertheless, the fabrication floor was still almost never crewed at capacity. Thus, overcrewing did not lead to excess employees available to fill in for absent employees.

Production employees, i.e., those working in the slaughter and fabrication areas, wear a variety of safety equipment depending on their position, which can include hard hats, hair nets, safety glasses, gloves, boots, metal-mesh gloves, arm-guards, and aprons. Some of this equipment is specific to particular dangers, for example, employees who work with knives are required to wear metal mesh covering certain parts of their body. Employees must remove at least some of this safety equipment before leaving the production floor and put it back on when returning to the line. Employees varied in their estimates of the time it took to remove safety equipment when leaving the line for a break and to replace the equipment before returning to the line. Estimates ranged from thirty seconds to several minutes.

The production side of the plant is kept cool, approximately forty degrees Fahrenheit, to prevent spoilage. Employees wear hats and coats in the production area even during the summer. Surfaces and tools in the fabrication area are periodically sanitized, and there are facilities for employees to sanitize themselves and their boots when entering the production area. Employees are not allowed to eat in the production area and hallways or in the locker rooms and bathrooms.

The quality assurance line is located on the floor below the main production line. Quality assurance's central responsibility is inspecting the meat products to make sure that they conform to specifications. Quality assurance is also responsible for maintaining certain food safety requirements, such as enforcing bans on employees eating outside designated areas and looking for standing water that should be cleaned

up.  Quality assurance frequently inspected the restrooms to look for food, standing water, or cigarette smoking.

Quality assurance employees mark items and areas that need remediation or attention with red tags.  These red tags stick to surfaces and also have a removable portion where one can write down who placed the tag and why.  The removable portion would generally be returned to the quality assurance office.  Employees were trained that a red tag marked closed areas into which employees were not allowed to go (other than the quality assurance worker who placed the tag and his or her supervisor).  Similarly, a red tag placed on a piece of equipment would indicate to employees that they were not to use that equipment.

All employees in the plant wear hard hats with their names inscribed on the front.  The position held by employees determines the color of the hard hat.  The plant superintendents and managers wear green hats.  Supervisors wear blue hats and team leads wear red hats.  Trainers wear orange hats.  New employees wear gold hats and then, after being qualified for a position, graduate to wearing the white hats worn by production employees.  Everyone from quality assurance, regardless of title, wears a yellow hat.  Union employees wear purple hats.[2]  The employees use hat colors as a shorthand way of referring to a person's position.  For example, a quality assurance employee whose name is unknown is referred to as "a yellow hat."

---

[2] Additionally, the rendering employees wear brown hats and maintenance employees wear grey hats.

## 2. Staffing

Employees are placed on one of three shifts: the A shift, which operates from 6:00 a.m. to around 2:30 p.m., the B shift, which operates from approximately 3:30 p.m. to 11:30 p.m., and the C shift, which starts after the B shift and consists of cleaning and sanitation. The processing of carcasses shuts down during the C shift, but the shipping department continues to operate. During the relevant period, the Greeley plant employed approximately 3,400 people. The number of employees working on the A and B production shifts varied, but, during the first week of September 2008, roughly 1,500 employees worked during each production shift, with approximately 900 employees assigned to the fabrication department. The plant's workforce was diverse, with employees from many countries speaking different languages and following different cultural beliefs and practices. The majority of the Greeley plant's employees and the majority of workers on both shifts were Hispanic. Many of the plant's workers did not speak English, instead speaking only Spanish, Somali, or another language.

The Greeley plant did not employ a large number of Muslim employees before 2007. This changed when JBS acquired the Greeley plant through its purchase of Swift & Company in 2007. At that time, the plant had only one production shift. In August or September of 2007, JBS decided to add a second production shift. Doing so required hiring and training a large number of employees to staff the new shift. Many of the newly hired employees were from Greeley's Somali Muslim refugee population. By Ramadan 2008, approximately 433 Muslim employees worked on the B shift.[3] For

---

[3] By contrast, there were fewer than twenty Muslim employees on the A shift in slaughter and fewer than thirty Muslim employees on the A shift in fabrication.

example, in September 2008, about twenty-five out of fifty-four employees on the chuck line were Muslim; twenty-nine out of sixty-one employees in forequarter packaging were Muslim; and twenty-five out of fifty-five employees in hindquarter packaging were Muslim. Ex. A-77 at 2.[4]

At trial, the Court heard from twenty-eight individuals for whom the EEOC seeks relief in Phase I of this case (the "Aggrieved Individuals"). The Aggrieved Individuals are all former or current employees of JBS. Although a few of the Aggrieved Individuals were hired by JBS at the end of 2007, most of them were hired in 2008. The Aggrieved Individuals are all from Somalia, their race is black, and they follow Sunni Islam.

### 3. Union

The Greeley plant is a so-called "closed shop," where the United Food and Commercial Workers International Union, Local No. 7 (the "union") is the exclusive bargaining agent for all production employees.[5] Employees are not enrolled in the union upon hire, but instead must work for thirty days before becoming members of the union. Ex. A-4 at 6, Art. 7, § 2.

The Union also represents the employees at a Butterball turkey processing facility in Colorado and the union's management splits time between the two facilities. The president of the union during Ramadan 2008 was Ernest L. Duran. The union itself

---

[4] Assuming doing so was otherwise permissible, JBS could not prevent Muslim employees concentrating on certain lines because the CBA's bid procedure allows employees to choose, depending on their seniority, the line they worked on.

[5] There are some non-management employees at the plant who are not represented by the union, such as those in the Quality Assurance department. The other limited exceptions are not relevant to the issues in this case.

employed a director, two business managers, and union stewards. Fernando Rodriquez was the director of the union from 1996 to 2013. Juan Carlos Gonzalez and another individual were union representatives. Union employees walk the plant floor during shifts and are available to write up grievances or interact with management on behalf of employees. The union employees are required to write up grievances at the request of union members, regardless of their own judgment about whether a violation has occurred. The three members of the union's day-to-day management during Ramadan 2008 were Latinos who spoke English and Spanish.

The CBA limited union employees' ability to strike. Article 8 of the CBA prohibited strikes and work stoppages during the term of the agreement and granted JBS the sole right to determine the appropriate level of discipline for employees who participated in strikes and work stoppages. Ex. A-03 at 7, Art. 8. The same Article obliged the union to notify and order employees who participated in strikes and work stoppages to return to work. Ex. A-3 at p. 7; Tr. 2989:5-11 (Schult). Specifically, the CBA states that "the Union shall immediately declare publicly that such action is unauthorized and shall promptly order its members to resume their normal duties." Ex. A-03 at 7, Art. 8, § 1.

The CBA also governed certain staffing issues. Article 10 of the CBA required JBS to fill most unionized positions through a bid process, in which the most senior employee who bid on the open position would be awarded the job, provided the person was capable of performing the work. Ex. A-03 at 8-9. Article 10, Section 13 of the CBA provided that JBS could assign employees to other jobs on a temporary basis. Ex. A-03 at 9. When employees were temporarily assigned to a job having a lower pay

rate, the employee had to receive his or her regular rate of pay, unless the temporary assignment was a light-duty assignment due to an off-the-job injury or illness. *Id*. An employee temporarily assigned to a job with a higher pay rate had to receive the higher rate if he or she was qualified for the position. *Id*.

The CBA allowed employees to file union grievances if they experienced prohibited discrimination or harassment. Article 13 of the CBA prohibited both the union and JBS from discriminating against any employee or harassing any employee because of that person's race, color, religion, national origin, age, marital status, veteran's status, or disability. Ex. A-03 at 11-12. Article 13, Section 6 of the CBA contained a provision regarding reasonable religious accommodations. The provision required JBS to provide reasonable religious accommodations when requested by employees, in accordance with Title VII. Employees seeking an accommodation were to "cooperate with the Company and the Union in seeking to identify reasonable alternatives." Ex. A-03 at p. 12.

In 2008, the relationship between JBS management and the union was not cooperative, and the union was filing a large number of grievances.

### 4. Muslim Employees' Religious Beliefs

Muslims customarily pray five times per day. Each prayer has a name corresponding to the time of day it is traditionally said. The Fajr prayer takes place in the morning, the Dhuhr prayer takes place near noon, the Asr prayer takes place in the afternoon, the Maghrib prayer takes place at sunset, and the Isha prayer takes place in the evening. The precise timing of these prayers is determined by the motions of the sun and moon. Accordingly, they vary over time such that, during Ramadan 2008, the

prayer time for the Maghrib prayer moved from 7:30 p.m. on September 1, 2008 to 6:42 p.m. on September 30, 2008 as the sun set earlier. Ex. 244 at 4. The Asr prayer moved from 4:39 p.m. to 4:07 p.m. over the same period. *Id*. Schedules of the prayer times are available at mosques, online, and through various computer applications. The prayer times provided in such schedules are the earliest that the prayers can be said.

The Muslim employees' beliefs varied as to the amount of time after a scheduled prayer time they had to complete that prayer. The period of time available to say a prayer was referred to during the trial as a "prayer window." Of the Muslim employees who testified at trial and expressed an opinion on the subject, twelve believed that the Maghrib prayer must be said when due, eleven said it must be recited between two and fifteen minutes after being due, and two believed that it could be said over fifteen minutes after being due.[6]

Generally, the Somali Muslim employees believe that willfully neglecting or missing prayers is considered a sin against God, for which God determines the consequences, but that, absent willful neglect, divine mercy is possible. As Imam Amonette put it, the key is making an effort to pray on time, as opposed to shirking

_____

[6] Imam Amar Amonette, who in 2008 was Imam of the Colorado Muslim Society in Denver, testified that the Maghrib prayer window in Colorado is approximately one hour and ten minutes due to the length of red twilight visible after the sun disk falls below the horizon. However, this understanding was not reflected in the religious beliefs of the Muslim employees who testified. None of employees who testified said they believed in such a long Maghrib prayer window. Additionally, although the Muslim employees who were asked testified that they would have considered it proper to pray outside of their prayer window if an Imam said it was acceptable, none indicated that they had done so.

one's prayer duties and delaying prayers without a reason. Employees who missed their breaks would typically make up prayers that they missed at a later time, but they felt that doing so was religiously improper, and it would be up to God's mercy to accept such prayers. However, some of JBS's Somali Muslim employees believe it is as great a sin to say a prayer late as it is to skip a prayer altogether. Notwithstanding these differences, the Muslim employees believed that a 7:30 p.m. meal break would have been acceptable for all of Ramadan 2008.

The Muslim employees believed that, before saying a prayer, it was necessary to be "clean." The Muslim employees cleansed themselves by performing a ritual called an ablution. Ablution is unnecessary prior to a prayer if a Muslim has not gone to the restroom, passed gas, or touched someone of the opposite sex since previously performing an ablution. JBS had no policy against praying in the plant prior to work or during a scheduled break, and Muslim employees often said their prayers in the plant's locker rooms and performed ablution in the adjoining restrooms.

Muslim employees differ in the amount of time it takes to perform each prayer, ranging from four minutes to, in some cases, more than ten minutes. Ablution may take an employee a few additional minutes if done in conjunction with prayer; however, it can be done at any time prior to prayer, including during a scheduled break or prior to work. However, most Muslims who worked at JBS agree that, even with ablution, it takes no more than fifteen minutes from the time they leave their lines to the time they return to say the Maghrib. Hicham Timejardine, currently the B Shift Superintendent for the Greeley plant, testified that most Muslim employees leave the line, pray, and return to

the line in ten minutes.  Several Muslim employees testified that they would hurry through their prayers while working in order to finish and return to work quickly.

Fasting is another requirement of the Islamic faith.  The required fast takes place during the holy month of Ramadan, the ninth month of the Islamic lunar calendar.  The fast lasts from dawn until sunset, during which time Muslims must refrain from eating or drinking.  During Ramadan, practicing Muslim employees were required by their beliefs to fast by not eating or drinking from sunrise to sunset.  At sunset, coincident with the Maghrib prayer, Muslims must break their fast with food, water, or both.  Because Ramadan is the holy month in Islam, many Muslims, including the Aggrieved Individuals, generally believe the obligations to fast and pray during Ramadan have greater or heightened spiritual significance.

### 5. Breaks

Pursuant to the CBA in effect in during the relevant period, production employees were entitled to two regular breaks during each shift, which were required to occur within certain windows of time.  Ex. A-03 at 16, Art. 25 § 2.[7]  The CBA called for,

---

[7] Article 25 of the CBA is titled "Meal Periods and Rest Periods" and states:

Section 2.  Employees will be granted a rest period of fifteen (15) minutes approximately half way through the first portion of their shift, but, in no event will it be taken earlier than one and one half (1½) hours from the start of the shift nor later than three (3) hours from the start of the shift . . ..

Section 3.  Employees will be allowed a thirty (30) minute lunch period (without pay) at approximately half way through the employee's scheduled work day.

Section 4.  Employees will be granted a second rest period of fifteen (15) minutes if the day's work schedule exceeds eight (8) hours and twelve

first, a fifteen-minute rest period (the "rest break") approximately halfway through the first part of the shift, which could occur no earlier than one and one-half hours from the start of the shift and no later than three hours from the start of the shift. *Id*. Second, the CBA provided for a thirty-minute meal break approximately halfway through the shift. *Id.* Employees were not required to work more than three and one-half hours without a break unless three and three-quarters hours of work would complete the workday. *Id., § 7.* The parties refer to these as "scheduled breaks," although, as discussed below, the precise timing of the breaks varied somewhat. The limitations in the CBA aside, management had discretion to determine the timing of the scheduled breaks. *Id.*, § 1.

The general procedure for taking a scheduled break was for employees in the slaughter and pre-fabrication[8] areas to stop placing carcasses on the chain to create either a fifteen-minute gap for a rest break or a thirty-minute gap for a meal break. Employees would begin their break when the gap in the chain reached them and they finished working on their last piece of meat. This resulted in employees leaving the line for break in a staggered fashion – slaughter and prefab employees broke before fabrication employees; in the fabrication area, employees nearer the beginning of the

_____

(12) minutes. . . .

Section 7. Employees will not be required to work in excess of three and one-half (3½) hours without a meal or rest period unless three and three-fourths (3¾) hours complete the workday.

Ex. A-03 at 16, Art. 25.

[8] The pre-fabrication area consists roughly of the outbound portion of the grading and sales coolers leading to the break line.

chain began their breaks first, employees nearer the end of the chain began their breaks last. At the end of the break, employees would also return from their break in the same staggered fashion, with the employees who left first returning to work first. For example, if a break was called at 8:00 p.m., the employees at the tail end of the production line would not start their thirty-minute meal break until 8:20 or 8:25 p.m., beginning the meal break just minutes before the first employees to go on break began returning to their lines. Similarly, employees at the end of the production line would not return to the line from the meal break until as late as 8:50 p.m. or 8:55 p.m. JBS staggered rest and meal breaks to avoid leaving beef unattended on the line for extended periods of time, which increases the risk of food safety issues. Additionally, staggered breaks decreased crowding in the break areas and increased the amount of time that the workers were producing because they reduced the amount of time that workers were standing at the line without a piece of meat to process. During scheduled breaks, tables are cleaned and sanitized.

The timing of the rest and meal breaks varied day to day, but were relatively consistent. In general, the first rest break occurred around 6:00 p.m. and the meal break occurred around 9:15 p.m., but the rest break in fact varied between 5:00 p.m. and 6:30 p.m., and the meal break varied between 8:00 p.m. and 9:30 p.m. and occasionally occurred before 8:00 p.m. Although the CBA states that meal breaks occur "approximately half way through the employee's scheduled work day," the meal break on the B shift had been taken much later than this in practice. Ex. A-03 at 16, Art. 25, § 3. JBS presented testimony from employees who stated that they preferred a later meal break, i.e., near 9:15 p.m., because it shortened the final part of the shift

and, as a result, they would be less tired and hungry toward the end of the workday.

The data showed that the majority of rest breaks on B shift were taken between 6:15

p.m. and 6:29 p.m.  All but approximately 1% of rest breaks were taken before 6:29

p.m.  The majority of meal breaks occurred between 8:30 p.m. and 9:14 p.m., with

approximately 30% of meal breaks occurring between 9:00 p.m. and 9:14 p.m.  About

9% of meal breaks were taken after 9:14 p.m.  The timing of the scheduled breaks

varied in part because rest and meal breaks were, to the extent possible, coordinated

with a grade change or taken when a mechanical failure occurred.  But, according to

plant records, the timing of the scheduled breaks did not coincide with a grade change

on approximately 43.3% of occasions between October of 2012 and December of 2016.

### a.  Unscheduled Breaks

Since taking over the Greeley plant, JBS has permitted employees to ask their

supervisors for permission to leave the line while the chain is running, commonly

referred to as an "unscheduled break," a "restroom break," or a "bathroom break."  How

unscheduled breaks are handled changed over time.  Initially, there was no official

policy for such breaks.  The policy that prevailed in the Greeley plant until at least

Ramadan 2009 was that unscheduled breaks were only available for use of the

restroom.  Outside of scheduled breaks, employees were allowed to leave the line to

get a drink of water or for restroom emergencies.  Before leaving the line, employees

were expected to notify their lead, trainer, or supervisor so that someone could fill in for

the employees.  Employees did not generally ask permission before leaving the line to

get a drink of water, which could be done quickly without removing safety equipment.

There was no set limit on the duration of an unscheduled break and no set limit on the

number of unscheduled breaks an employee might take per shift, but the use of such breaks was expected to be reasonable.

Supervisors handled unscheduled break requests with a great deal of discretion. Different supervisors handled requests for breaks differently. Permission to take an unscheduled break also varied day to day based on staffing. Leads, trainers, or supervisors would occasionally take over the duties of a person taking an unscheduled break. Some JBS production employees were cross-trained to do two or more jobs so that if an employee was missing from a particular job, another employee could step in and perform the job for that employee. These strategies simply shifted an employee from one task to another task because the employee had to stop what he or she was otherwise doing to fill in for the employee on break. Supervisors could radio other supervisors to find available employees to fill in during unscheduled breaks, but this solution did not reliably identify available employees trained in the particular job of the employee requesting a break. In some areas, it was not necessary to replace the employee who needed an unscheduled break because other employees could set aside the work of the missing employee by putting that employee's pieces of meat into a cardboard "combo" box for the employee to process when he or she returned.

Until at least Ramadan 2009, a specific request for a prayer break was not allowed by well-understood, but unwritten, plant policy enforced by plant management. Supervisors were told that they were not allowed to grant employees breaks to pray. Supervisors worried that they would be disciplined for allowing employees who asked to

pray to leave the line.[9]  Nonetheless, some supervisors would grant employees

permission to pray when asked, but such supervisors were unusual.

Because Muslim employees frequently sought to pray at times other than the

scheduled breaks and anticipated that prayer requests would be denied, many Muslim

employees requested a restroom or bathroom break when they needed to pray.

Indeed, some supervisors actually advised Muslim employees to request restroom

breaks for their prayer needs.  Several former employees testified that this "don't

ask/don't tell" practice was a double-edged sword.  Certain supervisors – having been

asked for a prayer break in the past or being aware that Muslim employees used

restroom breaks to pray – might deny restroom breaks to Muslim employees both when

they sought to pray and when they needed to use the restroom.  Muslim employees

who worked for certain supervisors were sometimes denied all unscheduled breaks.

JBS enforced its no-prayer break policy by disciplining Muslim employees who

were caught praying while taking unauthorized breaks even when such employees had

received permission to take a break to use the restroom.  Mohamed I. Mohamed ("M. I.

Mohamed"), a trainer, testified that Mr. Palacios and "most of the other supervisors"

would "very often" follow Muslim employees to the restroom to see what they were

doing and then write them up if they were found praying.  Tr. 2120:4-15 (M.I.

Mohamed).  This testimony was corroborated by Mr. Rodriquez.  For example, on April

_____

[9] There was no evidence that a supervisor was actually disciplined for allowing an unscheduled break specifically for prayer, only that supervisors were concerned that they would be disciplined.  *See* Tr. at 956:10-21 (R. Abdi), Tr. at 2236:17-22 (F. Ali), Tr. at 2380:15-2381:12 (A. Abdi).

9, 2008, Mr. Palacios instructed Bianca Rodriguez nee Mejia[10], the Quality Assurance

supervisor, to enter the women's restroom to take away the badge of a Muslim

employee who had left the line and was praying.  Ex. 74.  Mr. M. I. Mohamed testified

that he interpreted for "a lot" of Somali employees who were disciplined for using

unscheduled breaks to pray.  Tr. 1900:12-1901:2, 2119:23-2120:3 (M.I. Mohamed).

Enforcement was, however, sporadic.  Supervisors would not consistently check the

locker rooms for employees praying or discipline employees found praying.  In keeping

the don't ask/don't tell nature of Muslim employees requesting restroom breaks to pray,

most supervisors would look the other way regarding the use of breaks for such

purpose.

Notwithstanding the use of unscheduled breaks to pray, at least during the

relevant time period (December 2007 - July 2011), JBS's Somali Muslim employees

took approximately the same amount of time on unscheduled breaks as non-Muslim

employees.

### b.  Mass Breaks

The JBS plant also sometimes took "mass breaks" due to mechanical problems

or other issues.  During a mass break, the chain stops and all employees leave the

production line at the same time.  Such breaks are undesirable for JBS because they

cause beef to be left on the line and do not allow for the cleaning of work areas.

Moreover, per USDA regulations, beef that remains on the production floor for more

---

[10] Several witnesses changed their names between the events at issue and the
trial.  For these witnesses, the Court will give both names when first referring to them
and thereafter use only their names at the time of the trial.

than forty-five minutes must be classified as "distressed," which reduces the value of the meat.  Although there was some discussion of adding a mass break during Ramadan 2008, this accommodation was never seriously considered by JBS and is not relevant to the issues in the Phase I trial.

### 6.  Hiring, Orientation, and Training

JBS trained new employees in groups, with orientations starting on Mondays.  In 2008, JBS employed two employees responsible for the classroom portion of the training – one Latino trainer who was responsible for teaching in Spanish and Mr. M. I. Mohamed, a black, Somali, Sunni Muslim, who was responsible for teaching in Somali. The two trainers shared orientation duties for English-speaking employees.  These trainers were members of management and reported to HR.

JBS hired Mr. M. I. Mohamed in August 2007.  Mr. M. I. Mohamed began his orientation of new employees by reading through the employee handbook, translating it into Somali.  The orientation also included anti-discrimination training, focused primarily on sexual harassment.  No training about religious accommodations was provided.  Mr. M. I. Mohamed would allow employees to take prayer breaks during his training if he had not fallen behind schedule, but he would decline requests for time to pray if he was behind schedule.  When employees asked Mr. M. I. Mohamed about whether they would be allowed to pray while working on the line, he would tell them that they could pray on their scheduled breaks and to talk to their supervisors about taking unscheduled breaks after they began working on the line.

Initially, Mr. M. I. Mohamed gave orientation about the union, but after a couple of months the union took over this portion of the orientation.  The union steward

explained the role of the union and the grievance process.  While Abdisamed Ahmed was a union steward, he gave the union portion of the training in Somali, but, when he was unavailable, Mr. M. I. Mohamed translated for another union steward.

At least until it issued the revised unscheduled break policy in July 2011, JBS did not provide any training to its workforce about the culture of the Somali Muslim population or their religious beliefs and practices.  At that time, JBS informed supervisors about Muslim beliefs regarding prayer.  There was no such training for other employees.

### 7.   *Procedures for Disciplinary Suspension and Discharge*

JBS's employee handbook in effect in 2008 prescribed the following four-step progressive discipline policy:

> Corrective Counseling [Verbal Warning].  For minor violations, or first offenses, the employee would typically receive a written/verbal warning, which includes an explanation of the violation committed.
>
> Written Warning. Typically after receiving a verbal warning, if the employee has not taken measures to correct the conduct, the employee may receive a written warning which includes an explanation of the violation committed.
>
> Suspension or Final Warning.  Typically after having received a first written warning, a repeat offense by the employee will result in a final written warning which will state the nature of the infraction and may be accompanied by a suspension.
>
> Discharge. Discharge may result from a first time offense if it is deemed serious or blatant by management, or it may occur after an employee accrues previous discipline.

Ex. 242, at 10-11.

Accordingly, JBS's usual procedure when imposing a disciplinary suspension was to meet with the employee, explain the reasons for the discipline, provide the

employee with a copy of the disciplinary record, ask the employee to sign the suspension, and give the employee instructions about how to find out when to return to work.  When JBS suspended an employee "pending investigation," it would generally conduct an investigation regarding the allegations of wrongdoing.  Similarly, before an employee was discharged, JBS usually talked to the employee in order to find out the employee's side of the story.

JBS's employee handbook also contained a policy on absenteeism.  Under that policy:

> failure to report an intended absence (no call) or the failure to properly notify the Company at least 30 minutes prior to an employee's scheduled starting time will count as a "no call/no report" for attendance purposes. Three [3] active no call/no reports in a rolling twelve (12) month period will be cause for termination.

Ex. 242 at 10.  JBS regularly followed this policy in and around 2008.

### 8. Racial Tensions

Racial tensions existed at the Greeley plant before Ramadan 2008.Some JBS supervisors referred to JBS's Somali Muslim employees using various derogatory terms in English and in Spanish.  Mr. Rodriquez recalls instances where some JBS supervisors referred to the Somali employees as the "fucking Somalis."  Muslim employees complained about name calling by co-workers, but JBS managers and supervisors did little to stop or remedy co-workers' conduct.  For example, Abdikarim Ali nee Haji testified that when a co-worker called him a "nigger" and he complained to his supervisor, his supervisor just said "OK."  Muslim employees were sometimes derided when they requested to pray.  After Somali trainer M. I. Mohamed translated complaints

from Somali Muslim employees to B-shift Superintendent Juan Palacios, Mr. Palacios asked him: "What's wrong with your people?"

The plant locker rooms were also the scene of incidents between praying Muslim employees and other employees that, both intentionally and unintentionally, interfered with Muslim employees' prayers. Some praying employees would place their hard hats in front of them while praying to prevent others from walking in front of them. Other employees would step over the hard hats either with or without knowing that doing so was offensive to the Muslim employee. In isolated incidents, other employees would kick the hard hats of praying Muslims or otherwise intentionally interfere with their prayers. For example, Layla Gurux testified that, on September 19, 2008, she was in the middle of praying when Mr. Palacios grabbed her hijab and told her that JBS employees were "not here to exercise" and that "if you ever do this exercise again, you will get fired. This is America. We are here to work; we are not here to exercise." Tr. 2040:7-22 (L. Gurux). Mr. Palacios then wrote up Ms. Gurux for an "unauthorized break." Ex. C-77. However, most of the time Muslims could pray in locker rooms on authorized breaks without interference.

### C. JBS's Awareness of Prayer Issues Before Ramadan 2008

During Ramadan 2007, JBS's Muslim employees at its Grand Island, Nebraska beef plant raised the issue of prayer breaks with management. Approximately 100 Muslim employees at the Grand Island beef plant walked off the job to protest the plant's alleged refusal to provide an extra break for the sunset prayer. Doug Schult, JBS's head of labor relations, researched Muslim religious practices and looked for ways to accommodate them. Ultimately, JBS did move the meal break at the Grand

25

Island plant to coincide with sundown for some parts of 2007, but it did not otherwise make accommodations at its Grand Island plant or other plants.

Before Ramadan 2008, Greeley plant managers knew that the Muslim employees prayed at work because JBS's Somali Muslim employees had regularly made prayer break requests since JBS began hiring them. Also JBS's management employees regularly saw employees praying around the plant.

Notwithstanding the general awareness of Islamic prayer practices, JBS's managers and supervisors did not anticipate issues arising at the Greeley plant during Ramadan 2008. No prayer issues arose at the Greeley plant during Ramadan 2007. Mr. Timejardine, a non-Somali Muslim supervisor, testified that he did not anticipate any prayer-related issues before the events of Ramadan 2008. The union also did not anticipate any Ramadan-related issues in 2008 and was surprised when they arose.

### D.  Ramadan 2008

In 2008, Ramadan ran from September 1 through September 30. Maghrib prayer times ranged from 7:30 p.m. on September 1 to 6:42 p.m. on September 30. The events of the first week of Ramadan in 2008 played a central role in the trial and are explained day by day below.

### 1.  Monday, September 1, 2008

The first of the month was Memorial Day and the plant was closed for the holiday.

### 2.   Tuesday, September 2, 2008

The rest break started at 6:31 p.m.  Ex. A-36.  The meal break started at 9:00 p.m.  *Id*.  The line stopped for the night at 11:39 p.m.  *Id*.

Approximately ten Somali Muslim employees were issued written discipline for leaving their lines to pray and break their fast.

After the B shift, some Muslim employees met in the cafeteria to discuss how to seek a prayer accommodation.  After discussing the issue, between forty and 100 Muslim employees approached Mr. Palacios and requested a 7:30 p.m. break during Ramadan.  Mr. Palacios told them that he did not have the authority to grant their request and advised them to contact the HR department the next day.

### 3.   Wednesday, September 3, 2008

At 1:36 a.m., Mr. Palacios sent an email to Ronald Gould (the plant's general manager), Eric Ray (the plant's Human Resources Director), and other plant managers claiming that there had been an "uprising" of Somalis at the fabrication office and that the group told him that "we had to give them [a] break at 7:30."  Ex. A-07.

Between 2:00 p.m. and 2:30 p.m., approximately one hour before the start of the B shift, approximately 200 Somali Muslim employees gathered at the plant parking lot to speak with JBS Human Resources and request that the meal break be moved to coincide with the time they needed to break their fast and pray.

JBS managers, including Mr. Ray, went outside to meet the group.  Mr. Rodriquez from the union was also present.  On Mr. Schult's advice, Mr. Ray asked the employees to select a committee to speak for them.  The Muslim employees selected seven representatives (the "Muslim committee" or "the committee") to meet with

27

Greeley plant management. The committee consisted of Abdi Rizak Abdi, Abshir Hussein, Mohamed W. Mohamed, Abdullahi Abdirahman, Ali Abukar, Ahmed Mohamed, and Asad Abdi. All other Muslim employees began work on time at 3:15 p.m., the start of the B shift. Work proceeded as normal, without any slowdown of the chain.

The Muslim committee met with JBS managers. Mr. Ray was present for the meeting, along with Mr. Gould, a human resources supervisor, and Chris Kitch, one of the plant's operations managers. A Union representative, Juan Carlos Gonzales, was also present for the meeting, as was a Somali interpreter. The committee explained that Muslim employees typically fast all day during Ramadan and need to break their fasts and pray around sunset. The committee provided JBS with a prayer schedule for the month of Ramadan. JBS managers explained that, due to the collective bargaining agreement, the earliest they could move the meal break was 7:30 p.m. Mr. Gould stated that the employees needed to do their jobs. The committee suggested that some employees might not work unless there was a resolution. Mr. Gould explained that the workforce was very diverse, with workers having many religions and that the non-Muslims needed to be considered as well. However, Mr. Gould stated that the company would move the meal break to 7:30 p.m. for that day while it considered a solution. The committee agreed to the time of the break and agreed to inform the employees that the meal break was moved. The parties planned to meet again the following day.

The fifteen-minute rest break was called at 5:34 p.m. The meal break was called at 7:30 p.m., and the workers in the coolers stopped adding product to the chain. Ex.

A-36.  Some employees improperly left their stations at 7:30 p.m. even though the break in product on the chain had not yet reached their positions.  JBS did not write down these employees' names or discipline them.

During the first week of Ramadan 2008, Mr. Palacios instructed Ms. Rodriguez to monitor the restrooms for employees misusing their breaks, including Muslim employees taking prayer breaks.  Matt Lovell, the B shift human resources manager, also asked her to do so.  Ms. Rodriguez monitored the restrooms for such activity during the first week of Ramadan 2008.

The B shift ended at 11:30 p.m.  Ex. A-36.  JBS received few complaints on Wednesday night about the earlier meal time.

### 4.   Thursday, September 4, 2008

On Thursday, September 4, the Muslim committee consulted with Imam Amonette at the Colorado Muslim Society in Denver regarding their negotiations with JBS.  The committee explained to him that the employees wanted to be able to break their fasts and pray the Maghrib at sunset, without shutting down the production floor.  The committee appreciated that it may not have been possible for every Muslim employee to break his or her fast and pray on time every day during Ramadan.  Imam Amonette encouraged the Muslim committee to work with JBS managers to find a compromise that worked for both sides.  The Muslim committee and Imam Amonette discussed various strategies that might allow Muslim employees to pray and break their fasts during Ramadan that also took JBS's production needs into account.  Imam Amonette assured the Muslim committee that all the options discussed were acceptable compromises that would allow them to meet their religious needs.

29

At 1:00 p.m. on Thursday, September 4, the Muslim employee committee met with Greeley plant management. The sides agreed to keep the meal break at 7:30 p.m. for Thursday and Friday.[11] The rest break was called at 5:30 p.m.

Many non-Muslim employees were angry about the change in the meal time. The meal break was called at 7:25 p.m. Ex. A-36. After the meal break began, many non-Muslim employees refused to leave the line and, instead, remained standing at their stations even though production had stopped and there was no work to perform. Managers told these employees that it was their meal break and they needed to go to the cafeteria then if they wanted to eat, but these employees still refused to leave the line. Production started back up after the meal break. About the time that the meal break normally took place, 9:15 p.m., many non-Muslim employees left the line.

JBS management knew in advance that many non-Muslim employees were planning to leave the line in this way to protest the unfairness to them of changing the meal break. The lack of employees on the line forced JBS to reduce the chain speed to cover for the absences. Mr. Gould acknowledged that non-Muslim employees leaving the line at 9:15 p.m. constituted an unauthorized work stoppage. However, JBS did not attempt to determine who had left the line and did not discipline any of the employees for doing so.

The line was stopped at 11:26 p.m. Ex. A-36.

---

[11] JBS management considered allowing Muslim employees to switch to the A shift to avoid the sunset prayer window, but few, if any, Muslim employees switched to the A shift. Under the union contract, transfers to the A shift depended on seniority and required one year of service with JBS, presenting an obstacle to recently hired Somali Muslim workers who wished to transfer. Ex. A-4 at 9, Art. 10, § 5.

### 5. Friday, September 5, 2008

On Friday, September 5, approximately 200 non-Muslim employees gathered outside the plant before the start of the B shift and indicated that they refused to work until the meal break was moved back to its normal time. JBS managers told the employees to select representatives. They did so and the rest of the employees returned to work. The non-Muslim employees did not return to the production floor by the start time for the shift and, as a result, work on the production floor began late. JBS had to run the chain at reduced speed. JBS did not attempt to determine which employees returned to the line late and none of the employees were disciplined.

That afternoon, JBS management met separately with the Muslim committee and the non-Muslim employee representatives. Mr. Rodriquez, the union's director, refused to participate in the meetings with the Muslim committee, but he did participate in meetings with the non-Muslim employee representatives where he was joined by Juan Carlos Gonzalez. The non-Muslim employees' primary complaint was that a 7:30 p.m. meal break was too early, resulting in employees becoming tired and hungry, and made the last half of their shift feel longer. The non-Muslim employee representatives indicated that they thought the Muslim employees were receiving preferential treatment. Mr. Ray explained to the non-Muslim employee committee that the break was being moved in an effort to accommodate Muslim employees' religious needs.

JBS management then met with the Muslim committee. The Muslim committee proposed moving the rest break to correspond with sunset or allowing unscheduled breaks for prayer. The committee offered to have the Muslim employees punch out for prayer breaks. After meeting separately with both the Muslim and non-Muslim

employee representatives, JBS decided at approximately 7:10 p.m. to move the meal break to 8:00 p.m. JBS reached this decision in an effort to find a compromise between the requests of both groups.

JBS management told the Muslim committee that it needed to inform the employees that the meal break time had been changed. The Muslim committee members refused to do so. Committee members said they would lose face because the company had broken its promise to have a 7:30 p.m. meal break and they could not face their co-workers. They also said that there was not enough time to communicate with the production employees. Ron Gould radioed the plant floor, ordering that supervisors be posted to inform any employees that leaving the line at 7:30 p.m. would constitute an unauthorized break. Some Muslim committee members went to the floor to tell employees about the change in meal break time.

Not all employees were notified of the change in the meal break time before 7:30 p.m. At 7:30 p.m., some employees left the line before the chain stopped, including both Muslim and non-Muslim employees. JBS management stopped some of the employees attempting to enter the cafeteria at that time and most, but not all, of those employees returned to their lines. Approximately fifteen employees went to break at 7:30 p.m. and did not return to their lines to wait for the later meal break.

Whether JBS taped off water fountains in the plant and closed the locker rooms to prevent Muslim employees from breaking their fasts and praying some time between 7:10 p.m. and 7:30 p.m. was a subject of dispute during the trial. The EEOC presented testimony from witnesses that red QA tape was placed on water fountains in many areas of the plant and also was placed across the entrance to the men's locker room.

32

Farhia Abdi testified that she was instructed by her QA supervisor, Ms. Rodriguez, to tape off the water fountains, including those outside the cafeteria. Additionally, the committee's grievance letter, discussed below, states that a "few minutes before fasting breaking time the management shutdown water drinking fountains in the production floor." Ex. 3 at 1, ¶ 3. JBS presented contrary testimony that the drinking fountains and locker rooms were not taped off. Ms. Rodriguez testified that she was not instructed to tape off the water fountains and did not tell any of her QA subordinates to do so. Additionally, JBS witnesses testified that there were no drinking fountains located in the areas where Muslim employees said that they encountered taped off drinking fountains. For example, Oliva Delgado testified that there are no drinking fountains inside the cafeteria, only a machine that dispenses water as part of the soda fountain.

In resolving these contradictory accounts, the Court finds credible those witnesses who testified that they entered or prayed in the men's locker room at that time without impediment and those witnesses who testified that water fountains have never been located in areas that certain EEOC witnesses stated were taped off. Tr. 241:24-242:2 (Gould); 1273:24-1274:5 (Ossoble); 2107:20-24 (M. I. Mohamed); 2602:21-2603:15 (Ray); 2854:23-2855:3 (Gonzalez); 3714:9-13 (A. Jama). The Court also finds the testimony of Asad Abdi on this issue to be credible. As a member of the Muslim committee, he investigated allegations that water fountains were blocked or taped off on Friday night and concluded that it was a rumor that became "exaggerated" in the retelling. Tr. 2434:3-14, 2455:19-25 (A. Abdi). Moreover, JBS was permissive in allowing employees to leave the line to drink water. It is not plausible that, some time after 7:10 p.m., JBS had the motive or logistical ability to tape off water fountains and a

locker room to deter workers from taking an early break, especially given that any employees leaving the line early would discover the taped off fountains and locker room after having done what JBS was supposedly trying to deter, i.e., leaving the line.

There was significant dispute between the parties at trial about whether employees were forced to leave the plant by JBS management or whether they walked out as part of a work stoppage or wildcat strike in violation of the CBA. The EEOC presented a large number of witnesses who testified that they were in the cafeteria between 8:00 p.m. and 8:30 p.m. and saw JBS managers blocking the doors to the plant to prevent them from returning to work and then ordering the Muslim workers to leave the plant. JBS, on the other hand, presented many witnesses who testified that approximately 200 Muslim employees refused to return to work, despite supervisors encouraging them to do so, and eventually walked out of the plant.

In order to determine what actually happened, the Court considers the testimony of the union representatives, Juan Carlos Gonzalez and Fernando Rodriguez. Mr. Gonzalez was on the Fabrication floor at 7:30 p.m. He observed that some Muslim employees started leaving the line before the chain stopped. He instructed them to return to the line. He then went to the cafeteria. He observed that the lockers were not blocked. In the cafeteria, he noticed that many Muslim employees there were angry and demanded that the break time be changed. They did not want to return to work. Both company representatives and Mr. Gonzalez advised them to return to work since the consequence of not doing so could be termination. Mr. Gonzalez did not notice any managers preventing employees from returning to work. In fact, he observed some employees who did return to the line. Moreover, he heard no managers telling the

34

Muslim employees to leave the plant. A leader of the Muslim employees then told the disgruntled Muslim employees to leave and a large group walked outside. The leader tried to prevent fellow Muslim employees from returning to their lines since he wanted them to leave. Union representative Fernando Rodriguez testified that he received a call that evening from Mr. Gonzalez, wherein Mr. Gonzalez said that the plant went crazy and the Somalis walked off their jobs. Mr. Rodriguez stated that, in subsequent discussions with JBS and the Muslim committee, there was no dispute that the workers walked out that night. Mr. Gonzalez and Mr. Rodriguez had no incentive to misrepresent the cafeteria incident and its repercussions. If anything, the opposite was true. The Court finds the testimony of Mr. Gonzalez and Mr. Rodriguez regarding the cafeteria incident to be credible and finds the testimony of those witnesses who said that the company blocked the doors to the fabrication floor and ordered or otherwise caused the Muslim workers to leave the plant to be incredible.

The meal break began at 7:58 p.m. Ex. A-36. Thereafter, employees began to gather in the cafeteria. A number of JBS managers, including Eric Ray and Chris Kitch, were present in the cafeteria. These managers stood near the doors leading to the production floor and observed. Initially, the noise level was above average and there was no unruly behavior.

Both Somali Muslim employees and non-Muslim employees in the cafeteria were upset and frustrated. Absuir Hussein, a member of the Muslim committee, spoke loudly with other Muslim employees. A few Muslim employees stood on tables. HR managers urged them to get down from the tables, which they did. There was shouting. The managers attempted to calm things down.

After a large group of Muslim employees left the plant in protest, other Muslim employees remained in the cafeteria.  Some time after 8:30 p.m., JBS managers began telling employees remaining in the cafeteria that, if they were not going back to work, they would have to leave the cafeteria.[12]  The Muslim employees remaining in the cafeteria left the cafeteria and walked toward the tunnel leading to the parking lot.

After leaving the plant, the employees who walked out gathered in the plant parking lot across the street.

Ron Gould called 911 twice.  At 8:44 p.m., he reported that gunshots had been fired.  At 8:51 p.m., he called and reported a "walkout of east Africans" and that windows were being broken.  *Id*. at 4.  Later, plant security called 911 and also reported that windows were being broken.  The police and sheriffs who responded to the plant found no evidence that gunshots had been fired or that employees had broken windows at the plant.  Officer Wade Corliss, who was present in the parking lot, testified that, while many of the employees were upset and arguing with each other, he did not witness any violent behavior.

JBS escorted a number of Somali Muslim employees into the plant to retrieve their personal belongings.  The Muslim employees remained in the parking lot until approximately 11:00 p.m., when JBS management ordered them to leave the property.  The employees then left the parking lot before the shift ended.

Mr. Schult decided to suspend the Muslim employees who had not returned to work.  JBS management told supervisors to make a list of their workers who did not

_____

[12] As noted above, the meal break was taken as a rolling break.  Thus, the time that employees needed to return to their lines varied.

continue working after the meal break. These lists were collected at the end of the shift by Mr. Ray. The employee ID cards of those on the lists were disabled, preventing those employees from entering the plant. The lists of employees, who were later suspended, included at least two non-Muslim employees, Norman Peterson and Diega Koronto. *See* Ex. 62 at 47, 51.

After running at a reduced chain speed following the meal break, the line was stopped at 11:00 p.m. Ex. A-36.

At a Somali grocery store in Greeley, Muhammed "Kaise" Egal, a local Somali businessman and founder of a charitable organization supporting Somali migrants, overheard a discussion of events at the plant that night. He learned that members of the Muslim committee were at a restaurant in Greeley owned by Aziz Dhies. Mr. Dhies, like Mr. Egal, was not a JBS employee, but participated in subsequent events and translated at meetings with JBS management. Mr. Egal went to the restaurant and met the committee to offer his help. Mr. Egal, Mr. Dhies, and the committee decided to gather information over the weekend to determine what had occurred and to formulate a plan to negotiate with JBS.

### 6. Saturday, September 6, 2008

Mr. Egal, Abdullahi Ablirahman, and Asad Abdi met with and interviewed certain JBS Muslim employees at the mosque in Greeley. On Saturday, they separately interviewed approximately seven to ten JBS employees about what had happened at the plant over the past week and their work situation generally.

Meanwhile, JBS managers and the company's attorneys met to discuss the events of the previous day. They considered the cafeteria walkout to be a work stoppage, which was a breach of Article 8 of the CBA. Such a breach was subject to discretionary discipline and not subject to arbitration. *See* Ex. A-03 at 7, Art. 8, § 2. They decided to meet with the Muslim committee the following Monday.

### 7. Sunday, September 7, 2008

Mr. Egal, Mr. Ablirahman, and Mr. Abdi interviewed approximately five to seven additional JBS Muslim employees at the mosque in Greeley. That night, some members of the Muslim committee,[13] along with Mr. Egal and Mr. Dheis, met at Mr. Dheis' apartment and drafted a letter that they planned to present to JBS management the next day.

### 8. Monday, September 8, 2008

In the morning, the Muslim committee went to Lincoln Park in downtown Greeley to speak with Muslim employees gathered there. After JBS called them, the committee, Mr. Dhies, and Mr. Egal traveled to the plant.

Around 11:00 a.m., the committee, Mr. Dhies, and Mr. Egal met with Greeley plant management in a small conference room on the first floor. Mr. Gould told the committee that the employees who did not return to their lines after the meal break would be suspended for one day, but that they could return to work. Mr. Egal, speaking for the committee, told JBS management that the committee had a letter listing issues that it wanted to discuss and that resolving those issues could help the company avoid

---

[13] Mr. Egal testified that at least Aziz Dheis, Asad Abdi, Abshir Hussein, Abdullahi Ablirahman, Ali Maalim, and Ali Ali were present.

future problems there and at other JBS plants.  JBS management then asked to take a break and move to a different location.

During the break, Mr. Ray told Mr. Gould that the employees should be indefinitely suspended pending the company's decision, rather than suspended for one day.  JBS also confirmed with the union that the union was willing to allow JBS to negotiate with non-employees, i.e., Kaise Egal and Aziz Dhies.

The group reconvened, with the addition of Mr. Schult, in a larger conference room upstairs.  During the meeting, the committee presented its letter to JBS management.

The letter outlined several complaints of discrimination and provided recommendations to JBS management on how to alleviate problems at the Greeley plant.  Ex. 3.  The letter specifically requested that JBS "accommodate Muslims to perform their religious rights reasonably, without hindering the financial end result of the company."  *Id*. at 2.  The letter included a section titled "What Happened Friday, September 5, 2008," which was a summary of information provided to the committee by Somali Muslim employees.  The section did not state that JBS forced any Muslim employees to leave the plant on Friday night.

In response to the claim that JBS employees were not allowed to pray in the plant, JBS management explained that employees could pray at the plant during scheduled breaks.  JBS management also asked for more information about the grievances listed in the letter, but the Muslim committee demurred, saying that they

could not provide the specifics for legal reasons.[14]  JBS management, contrary to Mr. Gould's earlier statement, told the committee that the Muslim employees were suspended indefinitely pending investigation and asked who to contact for further communication.  The committee told JBS to call Aziz Dhies.  The committee informed JBS that some of the suspended Muslim employees had congregated in Lincoln Park.  JBS management told the committee that they would make a decision on discipline by the next day.

Before the start of the B shift, some Muslim employees came to the plant for their shifts.  Those employees who were listed as having not returned to the line after the meal break on Friday were turned away.  However, some Muslim employees who had returned to work after the meal break on Friday were allowed to resume work.

Around 4:00 p.m., the Muslim committee and Mr. Egal returned to Lincoln Park to speak with the Muslim employees who were gathered there.  They told the employees that they were indefinitely suspended.

### 9.  Tuesday, September 9, 2008

In the morning, the Muslim committee and Mr. Egal again met with the suspended employees gathered at Lincoln Park.  There were approximately 100 people at the park, a much smaller crowd than the previous day.

Around 11:00 a.m., Greeley plant management met with the Muslim committee.  Mr. Rodriquez from the union joined this meeting.  At the beginning of the meeting, Mr.

--------

[14] Although this rationale was not communicated to JBS, the committee had not received permission to share the employees' identities and the committee was concerned about retaliation against individual employees.

Gould informed the Muslim committee of JBS's final decision about discipline: that, if the employees who left the plant returned to work at any point during the B shift that day, they would not be terminated and would only receive a one and one-half day suspension without pay. The Muslim representatives argued that a one and one-half day suspension was too harsh because Muslim employees had a "legitimate complaint." Mr. Rodriquez was surprised and pleased that JBS was allowing employees who participated in the walkout an opportunity to return to work. He had feared that all the employees who participated in the walkout on Friday would be terminated. The parties also discussed potential accommodations. JBS told the Muslim committee that the meal break would continue to be at 8:00 p.m. for the rest of Ramadan.

In the afternoon, JBS asked the committee and union representatives to inform the employees gathered at the park to return to work that afternoon or they would be terminated, which the committee and union representatives agreed to do. JBS did not communicate directly with the suspended Muslim employees or provide the committee or the union with a list of suspended employees. Rather, it appears that JBS management assumed that the committee could and would do so. The evidence does not show that the committee took responsibility for notifying all suspended Muslim employees of JBS's decision. The meeting broke up around 2:00 p.m.

At 3:43 p.m., Mr. Schult sent Mr. Rodriquez an email confirming that JBS would treat the time lost during the work stoppage as a suspension if the employees returned to work that evening, but that employees would be terminated if they did not return to work at some point during the B shift that night. Ex. 5. In his response, Mr. Rodriquez

disagreed that an employee's failure to return to work on Tuesday would mean that the employee "continued a work stoppage." *Id*.

After the meeting, the Muslim committee, including Mr. Egal, met in the plant's parking lot and discussed the situation generally and what they should say to the employees gathered at the park. The committee reached the park around 4:00 p.m. Less than half the number of people from that morning remained in the park. The committee and Mr. Rodriquez announced JBS's decision to allow the employees to return to work if they did so that day. It was, however, apparent to the committee and Mr. Rodriquez that their message was only reaching a limited number of the suspended employees. Mr. Egal spoke to Mr. Rodriquez and asked him to call JBS and let Mr. Ray know that there was no way for them to get all the employees back to the plant that day. Mr. Rodriquez did so, calling Eric Ray. Mr. Ray simply said, "I don't care. If they return they get their job, if they don't they're fired." Some of the employees who participated in the walkout returned during the B shift on Tuesday after learning of JBS's offer at the park. Many suspended employees were not informed that they had to return to work that night to keep their jobs.

### 10. Wednesday, September 10, 2008

Suspended Muslim employees who did not return to work on September 9 were officially terminated on Wednesday, September 10. In total, ninety-six Muslim employees were terminated.

Terminated employees who came to the plant for the B shift were handed a form stating that they were "terminated for violating Article 8 of the Collective Bargaining Agreement," which relates to walkouts. *See, e.g.*, Ex. B-94. Early in the process, after

42

one employee reacted angrily and caused a disruption upon being told he was terminated, plant management told the remaining employees that they were terminated en masse and directed them to leave.

### 11. Remainder of September 2008

The union filed grievances on behalf of all the employees terminated on September 10, 2008. Some Somali Muslim employees were returned to work through the grievance process, including Safiya Mohamed who was absent from work on Friday and did not participate in the walkout.

In the month of September, the B shift fabrication department experienced an overall decrease of 15-20% in chain speed efficiency.

Greeley managers continued to monitor restrooms and discipline employees found praying during unscheduled breaks. Numerous employees were disciplined. Exs. 6, 8, 40-41, 44, 45-47, 49, 51, 58-59. For example, in a September 12, 2008 email to Mr. Ray, Mr. Lovell reported that all five employees written up for unauthorized breaks that day were disciplined, bringing the total to twelve for the previous three days. Ex. 9. Several employees said that they were going to pray or break their fast. *Id*. Mr. Lovell also stated that some employees who were denied a prayer break then asked for a bathroom break in order to be allowed to leave within fifteen minutes. *Id*. On September 16, 2008, Mr. Lovell sent a similar email stating that eight employees were written up for unauthorized breaks that day. Ex. 64.

Many Muslim employees were disciplined during Ramadan 2008 for "unauthorized breaks" where employees were found praying when the line was running. For example, on September 11, 2008, Ms. Fardowsa Ali was suspended without pay as

a result of discipline she received while trying to pray.  She was, however, reinstated and paid for the time she was suspended; her suspension was reduced to a verbal warning.  Ex. 53.

### E.   October 2008 to July 2011

In the period after the events of Ramadan 2008 until July 2011, the great majority of Muslim employees remained on the B shift.  During this period, JBS management met with Muslim leaders and community members to better understand the Muslim workers' concerns.[15]  As a result of these meetings, JBS made some changes at the plant to accommodate Muslim practices that are not directly relevant to the claims at issue, such as designating and furnishing a prayer room and installing foot baths, which Muslim employees could use in performing their ablution.  Muslim representatives also renewed their request to be allowed to use unscheduled breaks to pray.[16]

---

[15] The representatives who JBS met with to discuss accommodations changed over time; thus, the "Muslim leadership" referenced by Mr. Schult is not the same as the Muslim committee, but acted in a similar role.  *See also, e.g.*, Tr. at 1720:8-1723:9 (R. Daubenspeck) (discussing the role of members of the East African Community Center in helping JBS develop and implement the 2009 Guidelines for Ramadan 2009 and 2010).

[16]  Doug Schult testified as the JBS corporate representative pursuant to Fed. R. Civ. P. 30(b)(6) as follows:

Q. And out of the discussions between the committee representing the Muslim employees and JBS, JBS in 2009 began allowing the request of a restroom – or the request to use a restroom break for the purposes of prayer?

A. Yes. The Muslim leadership in 2009 said that the only thing that they wanted, and they understood they couldn't all go to break at the same time, was to be able to ask to go pray and that would resolve the issue.

In 2009, Ramadan took place from August 22 through September 19. Ex. 244 at 6. In 2010, Ramadan took place from August 11 through September 9. *Id*. at 8. JBS did not move the meal break during Ramadan 2009 and 2010, and the evidence did not show that any meal breaks were taken near sunset during either Ramadan. *See* Ex. 276L. However, in anticipation of Ramadan 2009, on August 10, 2009, JBS's national HR distributed Guidelines for Unscheduled Work Breaks (the "2009 Guidelines") that purported to "confirm the practice already in place" in JBS's beef plants. Ex. 81 at 1. The 2009 Guidelines stated that employees could request restroom breaks and that supervisors were to exercise their discretion in granting such breaks so that employees leaving the line would not interfere with production. *Id*. Additionally, the 2009 Guidelines stated that employees could leave the line without permission only to "prevent an accident or unreasonable discomfort." *Id*. The 2009 Guidelines specifically identified the "Holy Month of Ramadan" as a time during which "requests for prayer breaks outside of regularly scheduled break periods" would be "granted in the order requests are received and as operations permit." *Id*. Restroom breaks were given priority over prayer breaks. *Id*. The 2009 Guidelines included a series of examples of how supervisors should handle particular situations. *Id*. at 2-3.[17]

---

Tr. at 720:14-21.

[17] According to Juriana Sperandio, the Director of HR for JBS's beef business from 2007 to March 24, 2017, the unwritten policy when she took over allowed employees to take unscheduled breaks for reasons beyond bathroom breaks, including prayer. She did not, however, know how this unwritten corporate policy was actually applied. Ms. Sperandio testified that allowing Muslim employees to pray was important to JBS because it kept the employees happy, which was important for employee retention. Ms. Sperandio testified that this unwritten policy was codified in 2009 as a

JBS distributed the 2009 Guidelines to supervisors and included training on the 2009 Guidelines in meetings with supervisors before Ramadan in 2009 and 2010. At least during the month of Ramadan in 2009 and 2010, the JBS supervisors generally allowed prayer breaks in accordance with the 2009 Guidelines. Otherwise, Muslim employees continued to be denied unscheduled breaks to pray between Ramadan 2008 and July 2011.

In July 2011, JBS issued a revised policy permitting prayer breaks that was not limited to Ramadan (the "2011 Guidelines"). *See* Ex. A-87. Although the EEOC and the Aggrieved Employees allege the Muslim employees continued to be denied reasonable accommodations under the revised policy, those issues are beyond the scope of Phase I. *See* Docket No. 493 at 1-2.

Both sets of Guidelines were formulated with input from Muslim employees and community members, and JBS worked with the Muslim community members to implement the 2009 Guidelines. JBS managers testified that, other than some hiccups early in the implementation of the 2009 Guidelines, they were unaware of production or safety problems created by the 2009 and 2011 Guidelines.

---

written policy issued to JBS managers and supervisors. The 2009 Guidelines referred specifically to allowing prayer breaks during Ramadan 2009 but, according to Ms. Sperandio, the policy was meant to continue to apply throughout the year. Ex. 81. By contrast, John Daubenspeck, JBS's Vice President of Human Resources from October 2008 until May 1, 2011, testified that the written 2009 Guidelines were new and limited to Ramadan. As discussed below, the Court finds that Mr. Daubenspeck's testimony reflects the actual practice that prevailed in the Greeley plant. *See also* Tr. at 717:18-25 (D. Schult as 30(b)(6) witness) (testifying that employees could not make a request to go pray until 2009).

## F.   Statistical Evidence

The EEOC and JBS each presented expert testimony regarding statistical analysis of JBS human resources' records.

The EEOC called Dr. Mark McNulty to discuss two reports he prepared about discipline rates among JBS employees.  The first report was based on personnel actions by JBS from January 2007 to April 13, 2009.  The data reflected disciplinary terminations[18] and included the name, race, and birth date of each employee.  Dr. McNulty used January 1 birth dates as a proxy for Somali national origin[19] and a list of common Muslim names as a proxy for Muslim religious affiliation.  He analyzed the data to determine whether there was a statistically significant correlation between workplace discipline and black race, Muslim religion, and Somali national origin.  For each category, Dr. McNulty found a statistically significant correlation between discipline and the protected category.  He also found that employees who matched all three categories were significantly more likely than other employees to face discipline.  After the EEOC received additional data from JBS, Dr. McNulty prepared his second report.

---

[18] Only one of 683 disciplinary actions in the data was something other than a termination, namely, a demotion.  The Court refers to "termination" generally for such disciplinary action.  There were five bases for termination reported in the data: attendance, low productivity, tardiness, unsatisfactory performance, and violation of a policy or misconduct.

[19] A significant percentage of JBS' Somali employees listed their birthdays on January 1 of a given year.  This coincidence results from the immigration process.  Many Somalis do not keep track of and lack documentation of their birth dates.  During the immigration process, immigrants lacking known birth dates are regularly given January 1 as their official birth dates.  Immigrants are also able to change their names during the immigration process, and several of the witnesses have done so, as indicated.

The additional data consisted of information about employees who were terminated by JBS from January 2007 to October 2012. Using the combined data, Dr. McNulty again found a statistically significant correlation between each protected category and the combination of the three categories and disciplinary termination.

JBS presented the testimony of Dr. Michael P. Ward to rebut Dr. McNulty's report. Dr. Ward prepared two reports. His first report used a method similar to Dr. McNulty's, but excluded the ninety-six terminations from Ramadan 2008. Dr. Ward's primary criticism of Dr. McNulty's analysis was Dr. McNulty's inclusion of the Ramadan 2008 terminations. Dr. Ward testified that the Ramadan 2008 terminations should be excluded as outliers since those terminations were distinct from the other data. Dr. McNulty responded to this particular criticism by running his same analysis excluding the Ramadan 2008 terminations. He found a statistically significant correlation to black race, Muslim names, and the combination of protected characteristics, but not January 1 birthdates.

Dr. Ward's other criticisms of Dr. McNulty's analysis were that (1) Asian employees represented an outlier group who should have been excluded from the analysis and (2) a "hazard" analysis would more appropriately model the data. Dr. Ward testified that Asian employees were outliers because they had lower incidences of disciplinary terminations than other employees. The Court rejects this approach because it does not appear consistent with accepted statistical practices. Moreover, Dr. Ward failed to provide a convincing explanation that Asian employees constituted an "outlier group" that should be excluded from the analysis.

Dr. Ward's second report utilized a hazard model, also known as a "failure time analysis." Dr. Ward acknowledged that such analysis was typically used in the age discrimination context and that it was unusual to apply such an analysis to situations like this. Dr. McNulty criticized this approach as a secondary tool to be utilized in specific circumstances where a straightforward statistical analysis could not be performed and that it suffered from a bias because it assumes that all employment will end in failure, i.e, termination. The Court finds that Dr. Ward's hazard model analysis warrants little if any weight because it is a specialized tool that does not appear relevant to the situation here.

The Court finds that the statistical evidence shows that black, Somali, and Muslim employees were more likely than other employees to be terminated by JBS. The Court addresses whether the evidence shows that this correlation stemmed from a pattern or practice of discrimination below.

## II. CONCLUSIONS OF LAW

### A.  Pattern or Practice Claims

The Phase I trial addressed three pattern or practice claims, asserting that JBS (1) denied Muslim employees reasonable religious accommodations to pray and break their Ramadan fast from December 2007 through July 2011; (2) disciplined employees on the basis of their race (black), national origin (Somali), and religion (Muslim) during Ramadan 2008; and (3) retaliated against a group of black, Muslim, Somali employees for engaging in protected action in opposition to discrimination during Ramadan 2008. Docket No. 116; *see also* Docket No. 493 at 1-2.

Pattern or practice suits originated with § 707 of Title VII, 42 U.S.C. § 2000e-6. The seminal pattern or practice case is *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977), in which the Supreme Court laid out the framework for analyzing claims where the government seeks to remedy an employer's systematic practice of discrimination. The term "pattern or practice" is "not intended as a term of art, and the words reflect only their usual meaning." *Id*. at 336 n.16. Pattern or practice claims require the EEOC to "prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." *Teamsters*, 431 U.S. at 336. Nevertheless, the EEOC "need not prove absolute uniformity" of treatment, *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 518 (N.D. Cal. 2012); it need only establish by a preponderance of the evidence that discrimination or retaliation was the "company's standard operating procedure[,] the regular rather than the unusual practice." *Teamsters*, 431 U.S. at 336. A pattern or practice may consist of "a company repeatedly and regularly engag[ing] in acts prohibited by the statute." *Id*. at 336 n.16 (quoting 110 Cong. Rec. 14270 (1964)).

"Pattern-or-practice cases differ significantly from the far more common cases involving one or more claims of individualized discrimination" and are typically tried in two or more phases. *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1106 (10th Cir. 2001). During the first phase, the EEOC must establish a prima facie case of pattern or practice of discrimination by "demonstrat[ing] that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers." *Teamsters*, 431 U.S. at 360. During this first phase, the EEOC is "not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the

employer's discriminatory policy" or practice.  *Id.* at 360.  Rather, it must establish that such a policy or practice existed.  *Id.*  In determining whether there is a pattern or practice, the Court may consider the evidence on a cumulative basis.  *Pitre v. W. Elec. Co., Inc.*, 843 F.2d 1262, 1268 (10th Cir. 1988).[20]  The EEOC may meet its burden by presenting direct or circumstantial evidence of discrimination or retaliation.  *Id.* at 1268-1270.  Although statistics may be useful to show differences in treatment and to establish a pattern or practice, they are clearly not required."  *Id.* at 1267; *United States v. City of New York*, 631 F. Supp. 2d 419, 425 (S.D.N.Y 2009) ("anecdotal evidence alone can suffice").  The EEOC is not required to show that all of JBS's decisions were part of the discriminatory pattern or practice; a pattern or practice simply "create[s] a greater likelihood that any single decision was a component of the overall pattern."  *Teamsters*, 431 U.S. at 359 n.45.

If the EEOC carries its burden, the employer may defend against liability by challenging EEOC's proof or providing nondiscriminatory explanations for the procedure.  *Teamsters*, 431 U.S. at 360-61.  An employer may "defeat the prima facie showing of a pattern or practice by demonstrating that the Government's proof is either inaccurate or insignificant."  *Id.* at 360; *see also EEOC v. Sandia Corp.*, 639 F.2d 600, 621-22 (10th Cir. 1980) (discussing *Teamsters*).  Where an employer seeks to show that an apparently discriminatory effect of its decisions is not due to an improper

---

[20] *Pitre* is a class action pattern or practice case, rather than a government-initiated pattern or practice claim.  Nonetheless, courts have applied the same evidentiary burdens to both types of action.  *See, e.g., Galloway v. Islands Mech. Contractor, Inc.*, 2013 WL 163811, at *2-*3 (D.V.I. Jan. 14, 2013) (discussing the evolution of pattern or practice as a method of proof).

motive, "the employer's burden is to provide a nondiscriminatory explanation for the apparently discriminatory result." *Teamsters*, 431 U.S. at 360 n.46. An employer cannot, however, defeat the EEOC's prima facie case by merely rebutting individual instances of discrimination. *Boykin v. Georgia-Pacific Corp.*, 706 F.2d 1384, 1393 (5th Cir. 1983). If the employer fails to carry its burden, "a trial court may then conclude that a violation has occurred and determine the appropriate remedy." *Teamsters*, 431 U.S. at 361; *Thiessen*, 267 F.3d at 1106. Even when the employer offers an explanation, the "record as a whole is certainly the final test of sufficiency of the evidence." *Sandia Corp.*, 639 F.2d at 623.

### B. Religious Accommodations From December 2007 through July 2011[21]

"Title VII imposes an obligation on the employer 'to reasonably accommodate the religious practices of an employee or prospective employee, unless the employer demonstrates that accommodation would result in undue hardship on the conduct of its business.'" *Thomas v. Nat'l Ass'n of Letter Carriers*, 225 F.3d 1149, 1155 (10th Cir. 2000) (quoting 29 C.F.R. § 1605.2(b)(1), (2)); *see also Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 63 n.1 (1986).[22] The term "religion" encompasses "all aspects

---

[21] JBS argues that the EEOC's religious accommodation claim is barred based on the outcome of the Nebraska litigation. *See EEOC v. JBS USA, LLC*, No. 8:10-cv-00318-LSC-FG3, 2013 WL 6621026 (D. Neb. Oct. 11, 2013). The Court rejects these arguments for the same reasons set forth in its summary judgment order, *EEOC v. JBS USA, LLC*, 115 F. Supp. 3d 1203, 1220-24 (D. Colo. 2015), and because JBS did not put on evidence during the Phase I trial showing that the circumstances in the two cases were sufficiently similar such that collateral estoppel would be appropriate.

[22] Were this an action for individual relief the *McDonnell Douglas* burden-shifting framework would apply, which requires an employee asserting a religious accommodation claim to establish that "(1) he or she had a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed his or her

of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate . . . [a] religious observance or practice without undue hardship." 42 U.S.C. § 2000e(j). The reasonableness of an employer's accommodations and whether an employee's proposed accommodations result in undue hardship are not the only considerations; a plaintiff must also provide some showing that reasonable accommodation is possible, which typically comes in the form of proposed accommodations. *See Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 259 (1st Cir. 2001) (interpreting ADA). The questions of whether a proposed accommodation is reasonable and whether a proposed accommodation creates an undue hardship are separate and distinct. *See EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 314 (4th Cir. 2008). Thus, when proposing an accommodation, a plaintiff must "show not only that the proposed accommodation would enable her to perform the essential functions of her job, but also that, at least on the face of things, it is feasible for the employer under the circumstances." *Reed*, 244 F.3d at 259. This approach to proposed accommodations

---

employer of this belief; and (3) he or she was [disciplined or] fired for failure to comply with the conflicting employment requirement." *Thomas*, 225 F.3d at 1155. Once the employee establishes a prima facie case, the burden shifts to the employer to "(1) conclusively rebut one or more elements of the plaintiff's prima facie case, (2) show that it offered a reasonable accommodation, or (3) show that it was unable reasonably to accommodate the employee's religious needs without undue hardship." *Id.* at 1156. However, this approach is inapplicable to pattern or practice claims such as this. *See United States v. N.Y. City Transit Auth.*, 2010 WL 3855191, at *16 (E.D.N.Y. Sep. 28, 2010) (rejecting argument that *McDonnell Douglas* framework applies in pattern or practice religious accommodation case); *see also Thiessen*, 267 F.3d at 1106 ("Pattern-or-practice cases differ significantly from the far more common cases involving one or more claims of individualized discrimination."); *Davoll v. Webb*, 194 F.3d 1116, 1148 (10th Cir. 1999) (rejecting argument that *McDonnell Douglas* framework applies in ADA pattern or practice case).

has been endorsed by the Supreme Court, which rejected an argument that the words "reasonable accommodation" meant only that a proposed accommodation was effective and nothing more. *See U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 399, 401-02 (2002) (citing *Reed* with approval); *see also White v. York Int'l Corp.*, 45 F.3d 357, 361 (10th Cir. 1995) (holding that, in ADA failure to accommodate case, plaintiff must "produce[] evidence sufficient to make a facial showing that accommodation is possible," at which point "the burden of production shifts to the employer to present evidence of its inability to accommodate"); *Mason v. Avaya Commnc'ns, Inc.*, 357 F.3d 1114, 1122 (10th Cir. 2004) (same). Thus, although there is likely to be considerable evidentiary overlap between the two, the "reasonably accommodate" and "undue hardship" inquiries are conceptually distinct. *Firestone Fibers*, 515 F.3d at 314. The Tenth Circuit has reinforced that the gravamen of a plaintiff's pattern or practice claim for failure to accommodate is the unlawful nature of the employer's pattern or practice. *Davoll*, 194 F.3d at 1148 (citing *Teamsters*, 431 U.S. at 360).[23]

### 1. Freestanding Claim Issue

As an initial matter, the Court addresses JBS's argument that the EEOC's religious accommodation claim is a "freestanding" claim for religious accommodation that is not viable after *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028,

---

[23] *Davoll* involves claims under the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, instead of Title VII. *Davoll*, 194 F.3d at 1124. Nonetheless, the two statutory schemes involve the same or similar standards. *See id.* at 1147 ("Title I of the ADA adopts the powers, remedies, and procedures set forth in Title VII." (citing 42 U.S.C. § 12117(a))); *see also Thomas*, 225 F.3d at 1155 n.5 (comparing 42 U.S.C. § 2000e(j) and § 12112(b)(5)(A) and concluding that both Title VII and the ADA obligate employers to make a reasonable accommodation).

2032-33 (2015), and should be dismissed.  The defendant in *Abercrombie* operated a line of retail clothing stores.  135 S. Ct. at 2031.  The defendant required its in-store employees to abide by a "Look Policy," which prohibited employees from wearing certain clothing – including "caps" – that were inconsistent with the "look" the company wanted to adopt.  *Id*.  The EEOC filed a complaint alleging that the defendant refused to hire a female Muslim applicant because she wore a religious headscarf that conflicted with the defendant's Look Policy.  *Id*.  The EEOC prevailed at trial, but the Tenth Circuit vacated the jury verdict, holding that, because the Muslim applicant never informed the company that she wore a headscarf for religious reasons and that she needed an accommodation, the defendant lacked "actual knowledge" of her need for a religious accommodation and, therefore, could not be liable for violating Title VII.  *EEOC v. Abercrombie & Fitch Stores, Inc.*, 731 F.3d 1106, 1143 (10th Cir. 2013).

The Supreme Court reversed.  It held that an employer who does not have "actual knowledge" confirming a person's need for a religious accommodation may still violate the statute if the person's need for an accommodation – "confirmed or otherwise" – is a "motivating factor" for an adverse employment action.  *Abercrombie*, 135 S. Ct. at 2033.  The Supreme Court explained that a "disparate treatment" claim and a "disparate impact" claim are "the only causes of action under Title VII."  *Id*. at 2032.  The statute's disparate treatment provision makes it unlawful "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion."  *Id*. at 2031 (quoting 42 U.S.C.

§ 2000e-2(a)(1)). The words "because of" in the provision "imports, at a minimum, the traditional standard of but-for causation." *Id.* at 2032 (citations omitted). "Title VII relaxes this standard, however, to prohibit even making a protected characteristic a 'motivating factor' in an employment decision, . . . [but] does not impose a knowledge requirement." *Id.* (quoting 42 U.S.C. § 2000e-2(m)). Therefore, the Supreme Court concluded that "the rule for disparate-treatment claims based on a failure to accommodate a religious practice is straightforward: An employer may not make an applicant's religious practice, confirmed or otherwise, a factor in employment decisions." *Id.* at 2033.

Since the *Abercrombie* decision, several courts – including another judge in this district – have dismissed so-called "freestanding" accommodation claims that are not tied to an adverse employment action. *See, e.g., EEOC v. JetStream Ground Serv., Inc.*, 134 F. Supp. 3d 1298, 1324-26 (D. Colo. 2015), *reconsideration denied*, No. 13-cv-02340-CMA-KMT, 2016 WL 879625, at *3-*5 (D. Colo. Mar. 8, 2016); *Walker v. Indian River Transp. Co.*, 2017 WL 388921, at *7 (M.D. Fla. Jan. 27, 2017), *aff'd*, No. 17-10501, 2018 WL 3602926 (11th Cir. July 27, 2018) (unpublished) (granting summary judgment to employer on a Title VII claim alleging failure to provide a religious accommodation based, in part, on the lack of an adverse employment action).

In *JetStream*, the court dismissed several claims brought by the EEOC on behalf of a female Muslim employee, including a religious accommodation claim based on the defendant's alleged refusal to allow the employee to wear a skirt and headscarf while working. *JetStream*, 134 F. Supp. 3d at 1324-26. The court explained that a plaintiff

asserting a failure to accommodate claim must show "that (1) she had a bona fide religious belief that conflicted with an employment requirement; and (2) her need for an accommodation was a motivating factor in the employer's decision to take an adverse employment action against her." *Id*. at 1318. The court dismissed the accommodation claim because the EEOC failed to present any evidence showing the woman had suffered an adverse employment action. *Id*. at 1324-26.[24]

The Court agrees with the *JetStream* court that freestanding religious accommodation claims are not viable in light of *Abercrombie*. The Court, however, disagrees with JBS that the EEOC's pattern or practice claims are freestanding. The EEOC claims that JBS denied prayer accommodations to Muslim employees by suspending and terminating Muslim employees for using unscheduled breaks to pray and when it suspended and terminated certain Muslim employees on September 10, 2008. *See, e.g.*, Docket No. 349 at 4, ¶¶ 2-5; Docket No. 605 at 162-163. Suspensions and terminations are adverse employment actions under Tenth Circuit precedent. *See Hillig v. Rumsfeld*, 381 F.3d 1028, 1032 (10th Cir. 2004). In fact, the "longstanding rule . . . has been to liberally define the phrase adverse employment action" and not limit the term to "monetary losses in the form of wages or benefits." *Id*.

---

[24] The *JetStream* court also rejected two additional arguments raised by the EEOC in a motion for reconsideration: (1) that a failure to accommodate is itself an adverse employment action sufficient to support a claim for relief, and (2) that Title VII accommodation claims are analogous to "freestanding" accommodation claims arising under the Americans with Disabilities Act ("ADA"). *JetStream*, 2016 WL 879625 at *3-*5; *but see Toledo v. Nobel-Sysco, Inc.*, 892 F.2d 1481, 1488 (10th Cir. 1989) (rejecting an argument that later compromises after an accommodation is initially denied can constitute reasonable accommodations because "Title VII would provide employees no protection until after the fact, an important consideration given the impact a suspension, termination, or rejection may have on an individual's life.").

(internal quotation marks and alterations omitted).  The term "adverse employment action" includes those acts that "constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," but the term is not limited to such acts.  *Id*. at 1032-33 (citations omitted).  In determining whether an action is materially adverse, the Tenth Circuit takes a case-by-case approach and requires that the action "be materially adverse to the employee's job status," and "allow[s] a plaintiff to show materiality other than by showing a tangible employment action."  *Id*. at 1033 (emphasis, citations, and internal quotation marks omitted).  Under these standards, the EEOC claims presuppose adverse employment actions at least insofar as Muslim employees were suspended or terminated.  Additionally, the EEOC has tied its pattern or practice claims to such actions by claiming that JBS's suspensions and terminations of Muslim employees were part of a pattern or practice of denying prayer accommodations sought by Muslim employees, namely, moving the meal break to better coincide with sundown and using unscheduled breaks to pray.  *See, e.g.,* Docket No. 349 at 65.  However, the EEOC cannot show a pattern or practice of denying religious accommodation unless it can also show that at least one employee suffered an adverse employment action in relation to a discriminatory pattern or practice.  *Cf. Teamsters*, 431 U.S. at 358 ("The importance of *McDonnell Douglas* lies . . . in its recognition of the general principle that *any* Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that *an employment decision* was based on a discriminatory criterion illegal under the Act." (emphasis

added)); *Jetstream,* 134 F. Supp. 3d at 1326 (dismissing claims for individual relief where the employee failed to show an adverse employment action). Accordingly, the Court focuses its discussion below on whether the Muslim employees' "need for an accommodation was a motivating factor" in a pattern or practice by JBS resulting in an adverse employment action. *Abercrombie*, 135 S. Ct. at 2032.

### 2. *Reasonableness*

As the Supreme Court has indicated, "in ordinary English the word 'reasonable' does not mean 'effective.' It is the word 'accommodation,' not the word 'reasonable,' that conveys the need for effectiveness." *Barnett*, 535 U.S. at 400. The term "reasonable accommodation" does not lend itself to bright line rules; rather, "[e]ach case necessarily depends upon its own facts and circumstances, and in a sense every case boils down to a determination as to whether the employer has acted reasonably." *United States v. City of Albuquerque*, 545 F.2d 110, 114 (10th Cir. 1976); *see also Ansonia*, 479 U.S. at 69; *see, e.g.*, *City of Albuquerque*, 545 F.2d at 114 (holding that employer sufficiently accommodated employee whose religious beliefs prohibited him from working Saturdays when it was amenable to efforts employee could have made to swap shifts with other employees); *Thomas*, 225 F.3d at 1156 ("[employer] approved all voluntary schedule swaps that Thomas was able to arrange, and imposed no restrictions . . . on Thomas's ability to attempt to arrange further voluntary schedule swaps with other employees"); *but see Smith v. Pyro Min. Co.*, 827 F.2d 1081, 1088 (6th Cir. 1987) (holding that employer encouraging employee to swap shifts did not offer a reasonable accommodation where employee had a sincere religious belief preventing

him from working on Sunday and from asking someone to work Sundays for him). As a result, "questions of reasonableness are [ordinarily] best left to the fact finder." *EEOC v. Univ. Mfg. Corp.*, 914 F.2d 71, 73 (5th Cir. 1990). "[C]onsidering an accommodation's impact on both the employer and coworkers, for example, is appropriate when determining [a proposed accommodation's] reasonableness." *Firestone Fibers*, 515 F.3d at 314.

The Supreme Court in *Ansonia* held that, although Title VII does not "impose a duty on the employer to accommodate at all costs," "eliminat[ing] the conflict between employment requirements and religious practices" is sufficient to satisfy an employer's obligations. *Ansonia*, 479 U.S. at 70. The Supreme Court has suggested that "bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business." *Id.* at 69 (quotations omitted). Circuits differ, however, on whether an accommodation must eliminate any religious conflict in order to be considered reasonable. The Second, Sixth, Seventh, and Ninth Circuits favor a strict approach, holding that an employer's offered accommodation cannot be considered reasonable unless it "eliminate[s] the conflict between the employment requirement and the religious practice." *See EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1576 (7th Cir. 1996); *see also Cosme v. Henderson*, 287 F.3d 152, 159 (2d Cir. 2002); *Cooper v. Oak Rubber Co.*, 15 F.3d 1375, 1378 (6th Cir. 1994); *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 615 (9th Cir. 1988). The Tenth Circuit has acknowledged that some circuits interpret *Ansonia* as holding that "a reasonable accommodation is one that *eliminates* the employee's

conflict between his religious practices and work requirements," but it does not appear to have decided whether to adopt such an approach. *Lee v. ABF Freight Sys., Inc.*, 22 F.3d 1019, 1023 n.4 (10th Cir. 1994). The Eighth and Fourth Circuits favor a less strict approach, noting that, although the elimination of any religious conflict is sufficient to render an accommodation reasonable as a matter of law, total elimination of religious conflict is not necessary in order for an accommodation to be considered reasonable. *Sturgill v. United Parcel Serv., Inc.*, 512 F.3d 1024, 1031 (8th Cir. 2008) ("*Ansonia* did not hold, indeed did not suggest, that an accommodation, to be reasonable as a matter of law, *must* eliminate any religious conflict"); *see also EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 313 (4th Cir. 2008) (rejecting argument that accommodation must eliminate conflict between religious practice and work requirement in part because, "[if] Congress had wanted to require employers to provide complete accommodation absent undue hardship, it could easily have done so"). The Eighth Circuit reasoned that a rule mandating that employees be given their preferred accommodation is "inconsistent with the intended purpose of Title VII's reasonable accommodation provision, to foster 'bilateral cooperation' in resolving an employee's religion-work conflict." *Sturgill*, 512 F.3d at 1031 (quoting *Ansonia*, 479 U.S. at 69).

The parties take contrasting position on whether complete elimination of conflict is necessary, with JBS favoring the strict interpretation and the EEOC arguing that complete elimination of conflict is unnecessary for an accommodation to be reasonable. JBS argues that a "reasonable accommodation is one that eliminates the conflict between a person's religious practices and work requirements" and that this requirement is spelled out in the EEOC's own compliance manual. Docket No. 548 at 7

(citing EEOC Compliance Manual, § 12.IV.A ("An accommodation is not 'reasonable' if it merely lessens rather than eliminates the conflict between religion and work.")).  The EEOC argues that, notwithstanding the guidance in its Compliance Manual, the less strict approach is more appropriate here.

The Court finds that the less strict approach is appropriate.  Although the parties agreed to move the meal time to 7:30 p.m. for only the first week, the Muslim committee sought group accommodations for the whole of Ramadan 2008.  This accommodation was accepted by all or almost all of the Muslim employees.  JBS's preferred approach, which would have the Court look beyond what the employees as a represented group were willing to accept as an accommodation to the particular beliefs of individual employees, is unworkable and inappropriate where the employees were requesting accommodation as a group based on their shared religious identity.  *See Firestone Fibers & Textiles Co.*, 515 F.3d at 313 ("Religion does not exist in a vacuum in the workplace.  Rather, it coexists, both with intensely secular arrangements such as collective bargaining agreements and with the intensely secular pressures of the marketplace.").  Adopting an approach that would allow an individual's beliefs to render a collectively advanced compromise unreasonable would be inconsistent with Title VII calling for an "interactive process" to determine a reasonable accommodation.  *Thomas*, 225 F.3d at 1156-57.  As a result, when evaluating the reasonableness of JBS's accommodations, the Court must consider the totality of the circumstances, recognizing that reasonableness "might, or might not, require elimination of a particular, fact-specific conflict."  *See Sturgill*, 512 F.3d at 1030.

**a. Whether JBS Provided Reasonable Accommodations**

An employer has met its obligation to accommodate religious practices "when it demonstrates that it has offered a reasonable accommodation to the employee." *Ansonia*, 479 U.S. at 69. Under Title VII, an employee is entitled to a reasonable accommodation, not the accommodation that he or she prefers. *Sturgill*, 512 F. 3d at 1031; *see also Ansonia*, 479 U.S. at 68-69 (an employer may choose the accommodation, so long as the chosen accommodation is reasonable). Nevertheless, although absolute accommodation is not required for an accommodation to be reasonable, *Sturgill*, 512 F.3d at 1032, an employer is not free to "choose an unreasonable form of accommodation over a reasonable one." *EEOC v. Universal Mfg. Corp.,* 914 F.2d 71, 73-74 (5th Cir. 1990).

Under the less strict standard, JBS claims that it provided reasonable accommodations by allowing employees to pray inside the plant during scheduled breaks, allowing extra breaks for prayer, and moving the meal times. While the Court finds that JBS's actions did not constitute a reasonable accommodation within the meaning of Title VII for the whole period at issue for this claim, from December 2007 until July 2011, the Court finds that JBS has shown that it provided reasonable accommodations during some time periods.

With respect to scheduled breaks, the Court finds that JBS offered a reasonable accommodation only when it moved the scheduled breaks to coordinate closely with Muslim prayer schedules. Allowing employees just to pray on scheduled breaks did little to accommodate Muslim employees' religious beliefs requiring prayer at times that

fell during their shifts on a consistent basis. While the scheduled breaks would, on occasion, coordinate with prayer times due to the prayer time's variance throughout the year, such a coincidence was exceptional when scheduled breaks were taken at the traditional times during the period at issue. *See* Ex. 244. In particular, sunset in Greeley, and the corresponding window for the Magrib prayer at the plant, occurs after 8:00 p.m. from mid-May to mid-August each year, with the latest sunsets occurring at 8:34 p.m. in late June. Ex. 244 at 1-8. Further, prayer is considered particularly important during Ramadan, but the evidence presented did not show that the meal break ever corresponded with sunset during Ramadan 2009 or 2010.[25]

Nonetheless, the Court finds that JBS did provide a reasonable accommodation when it moved the start of the meal break to 7:30 p.m. on September 3 and 4, 2008. Although this break time did not accommodate every Muslim employee's individual religious beliefs, it was negotiated and accepted by the Muslim committee on behalf of the plant's Muslim employees and was, in the totality of the circumstances, a reasonable accommodation. *See Sturgill*, 512 F.3d at 1030. On the other hand, the Court does not find that JBS's moving the meal break to 8:00 p.m. for the rest of Ramadan 2008 constituted a reasonable accommodation. JBS portrays an 8:00 p.m. meal time as a reasonable compromise. *See, e.g.*, Docket No. 604 at 26, ¶ 141. While this argument is relevant to whether JBS was motivated by discriminatory animus, as

---

[25] As discussed above, JBS did not move the meal times at the Greeley plant during Ramadan 2009 and 2010, but during those periods the 2009 Guidelines were in effect and Muslim employees could request unscheduled prayer breaks. Further, there was no evidence that the Muslim committee continued to request that the meal break be moved to coincide with sunset after the 2009 Guidelines were adopted.

discussed below, with an 8:00 p.m. meal time, even the first Muslim employees off the line for break would have had to wait at least thirty minutes after sunset to break their fast and say the Maghrib prayer during Ramadan 2008. *See* Ex. 244 at 4. Moreover, the Muslim committee opposed an 8:00 p.m. meal break as inconsistent with their religious beliefs. In the totality of the circumstances, the 8:00 p.m. meal break implemented by JBS on September 5, 2008 and for the remainder of Ramadan 2008 was not a reasonable accommodation.

With respect to allowing unscheduled breaks for prayer, the Court finds that JBS has shown that it had a policy of offering reasonable accommodation during Ramadan 2009 and 2010 when it allowed Muslim employees to use unscheduled breaks to pray under the 2009 Guidelines. The ability to ask to pray on unscheduled breaks was requested by Muslim representatives and, while this accommodation may not have allowed all Muslim employees to pray during their preferred prayer window, in the totality of the circumstances, it constituted a reasonable accommodation. While, in Phase II, the factfinder will address the claims of individual plaintiffs that they were denied prayer breaks notwithstanding the 2009 and 2011 Guidelines, the evidence presented at the Phase I trial showed that JBS implemented a policy in 2009 allowing for the use of unscheduled breaks to pray during Ramadan, subject to supervisory discretion and with preference given to restroom breaks.

Other than Ramadan 2009 and 2010, the Court has found that JBS maintained a policy that unscheduled breaks could only be taken as bathroom breaks. As discussed above, the Court finds JBS's claims that the 2009 Guidelines applied outside of

Ramadan not to be credible based on the language of the policy itself and testimony to the contrary.

### b. Reasonableness of the EEOC's Proposed Accommodations

The EEOC proposed three accommodations that it argues are reasonable and would not create an undue hardship for JBS:

> (a) that prayer breaks be allowed in a manner similar to bathroom or "unscheduled" breaks; (b) that regular or "scheduled" break times be adjusted, within the parameters of the Collective Bargaining Agreement ("CBA"), to coincide with prayer times, particularly for the Maghrib prayer during Ramadan; or (c) a combination of both items (a) and (b).

Docket No. 605 at 2; *see also* Docket No. 349 at 1-2.

When proposing an accommodation, a plaintiff must "show not only that the proposed accommodation would enable her to perform the essential functions of her job, but also that, at least on the face of things, it is feasible for the employer under the circumstances." *Reed*, 244 F.3d at 259.

The Court finds that the EEOC has met its burden to show that its proposed accommodations are reasonable. Moving the meal break earlier in the day would have allowed many Muslim employees to pray during or sufficiently near the appropriate prayer window. The Muslim committee had proposed a specific time for the meal break as acceptable and it was within JBS's power under the CBA to move the meal break to that time without providing an additional break. Likewise, allowing unscheduled prayer breaks, even on a rolling basis to allow for limited reduction in staffing on the line, would have allowed Muslim employees to pray during or near the appropriate prayer window and was advanced by the committee as an acceptable accommodation.

### 3. Undue Hardship

Whether a particular accommodation results in an undue hardship to the employer is a determination to be made within "the particular factual context of each case." *Toledo*, 892 F.2d at 1490. Nonetheless, "[t]o require an employer 'to bear more than a *de minimis* cost in order to [accommodate an employee's religious beliefs] is an undue hardship.'" *Lee*, 22 F.3d at 1023 (quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977) ("*Hardison*")). "Any cost in efficiency or wage expenditure that is more than de minimis constitutes undue hardship." *Id.* (quotations omitted). "The cost of hiring an additional worker or the loss of production that results from not replacing a worker who is unavailable due to a religious conflict can amount to undue hardship." *Id.*; *see also Beadle v. City of Tampa*, 42 F.3d 633, 636 (11th Cir. 1995) (noting that de minimis costs can entail "not only monetary concerns, but also the employer's burden in conducting its business"). An accommodation may also create an undue hardship "if it causes more than a de minimis impact on co-workers." *Harrell v. Donahue*, 638 F.3d 975, 980 (8th Cir. 2011). For example, an employer need not "deny the shift and job preference of some employees, as well as deprive them of their contractual rights, in order to accommodate or prefer the religious needs of others." *Hardison*, 432 U.S. at 81. In either case, any asserted hardship "must be 'real' rather than 'speculative'" and cannot therefore be proven by assumptions or "opinions based on hypothetical facts." *Brown v. Polk Cty., Iowa*, 61 F.3d 650, 655 (8th Cir. 1995) (collecting cases); *see also Toledo*, 892 F.2d at 1490 ("'The employer is on stronger ground when he has attempted various methods of accommodation and can point to hardships that actually

resulted.'" (quoting *Draper v. U.S. Pipe & Foundry Co.*, 527 F.2d 515, 520 (6th Cir. 1975))).  As the Tenth Circuit noted in *Toledo,* "particular jobs may be completely incompatible with particular religious practices [and] [i]t would be unfair to require employers faced with such irreconcilable conflicts to attempt futilely to resolve them." 892 F.2d at 1489.

With respect to moving the meal break to better coincide with sunset, JBS acknowledged that it had the power under the CBA to set the meal break at 7:30 p.m. during Ramadan 2008 without having to offer an additional paid rest break to all employees.[26]  JBS's undue hardship argument is, instead, based on the impact that moving the meal break had on non-Muslim employees and the resulting unrest.  Docket No. 604 at 51, ¶ 281; *see also Lee*, 22 F.3d at 1023 (holding that "allocating another driver to perform [the plaintiff's] duty" constituted an undue burden); *Farah v. A-1 Careers*, 2013 WL 6095118, at *9 (D. Kan. Nov. 20, 2013) (finding that allowing a Muslim employee to pray in the space otherwise used by a co-worker as her workspace would constitute an undue hardship by disrupting work).  JBS presented testimony that, when a meal break occurs early in a shift, employees get more tired and hungry by the end of the shift.  Further, JBS presented testimony that moving the break earlier hurt non-Muslim employee morale because many employees prefer a late break, which leaves less time between the last break and the end of the shift, making the end of the

---

[26] JBS also argues that moving the meal break would create efficiency losses for various reasons.  Docket No. 604 at 49-51.  Because the Court finds that the disruption to co-workers constitutes an undue hardship, the Court does not address these arguments or the EEOC proposal to combine changes to the meal break with unscheduled prayer breaks.

shift seem shorter.  JBS presented related testimony that some employees were simply upset by the change to the longstanding practice of a 9:00 p.m. or 9:15 p.m. meal break.  Moreover, some witnesses believed that non-Muslim employees' morale suffered because they viewed an earlier break as favoritism toward Muslim employees. This last rationale presents a difficult issue because, as the EEOC notes, any discriminatory animus harbored by non-Muslim employees does not represent a valid basis to deny an accommodation to Muslim employees.  *See English v. Colorado Dep't of Corr.,* 248 F.3d 1002, 1011 (10th Cir. 2001) ("[U]nder certain circumstances, a defendant may be held liable for a subordinate employee's prejudice even if the manager lacked discriminatory intent." (citing *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1231-32 (10th Cir. 2000); *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999); *Willis v. Marion County Auditor's Office*, 118 F.3d 542, 548 (7th Cir. 1997).

The evidence showed that, during Ramadan 2008, when JBS moved the meal break to 7:30 p.m., it had a significant impact on overall employee morale.  The 9:15 p.m. meal break had been in place since JBS restarted the B shift and was well accepted by the employees.  Moreover, moving the meal break to 7:30 p.m. was not a minor change.  It was an hour and forty-five minutes earlier than before.  To put this in perspective, had this been a company's day shift and if lunch was normally at noon, the lunch break would have been moved to 10:15 a.m.  The dramatic change in the meal break caused employee unrest that disrupted JBS's operations and threatened to continue if the meal break was not moved back.  *See Farah*, 2013 WL 6095118, at *8

("Disruption is thus a valid factor in determining undue hardship."); EEOC Compliance Manual, § 12-IV.B.4 ("Undue hardship requires more than proof that some co-workers complained; a showing of undue hardship based on co-worker interests generally requires evidence that the accommodation would actually infringe on the rights of co-workers or cause disruption of work.") (issued July 22, 2008). The fact that the non-Muslim employees, when confronted with the changed meal time, perceived the move as conflicting with their expectations and adverse to their work routine provides strong evidence that it created an undue hardship to JBS. *See Toledo*, 892 F.2d 1490. Although it is possible that the non-Muslim employees' objections to moving the meal time were motivated in small part by discriminatory animus, the Court finds that the non-Muslim employees' predominant objections to moving the meal break were based on non-discriminatory reasons, i.e., the desire to maintain the established meal time and for a shorter post-meal work period resulting in less hunger and tiredness at the end of the workday. *See Burns v. Southern Pacific Transp. Co.*, 589 F.2d 403, 407 (9th Cir. 1978) ("[U]ndue hardship requires . . . actual imposition on co-workers or disruption of the work routine."). Further, while there was limited evidence about the likely effect of moving the meal time on non-Muslim co-workers outside of Ramadan 2008, the Court finds that moving the meal time to coincide with sunset throughout the year would have had a similar effect on employee morale and expectations as observed during Ramadan 2008. Moving the scheduled breaks continuously throughout the year would have been an imposition on the non-Muslim employees' well-settled expectations and disruptive of their established work routines in the same way as moving the meal break for a limited time was during Ramadan 2008. Moreover, as discussed above, sunset

occurs after 8:30 p.m. for only a limited portion of the year.  *See* Ex. 244.  Thus, the

times that an earlier meal break could coincide with sunset without varying significantly

from the predominant meal break times are limited. The Court finds that JBS has shown

that moving the meal break to coincide with sunset would have constituted an undue

hardship during the relevant period.

With respect to allowing unscheduled prayer breaks, JBS argues that allowing

workers to leave the line for any period would result in a corresponding decrease in

production (including product quality) and safety concerns.  There is a common sense

appeal to the idea that allowing employees to leave their stations even for a short

period would result in reduced production.  The evidence presented during the Phase I

trial, however, provided only speculative support for the proposition that the plant's

overall productivity would be reduced by allowing unscheduled prayer breaks or that

doing so would otherwise create an undue hardship on JBS or non-praying coworkers.

*See Brown*, 61 F.3d at 655.  Although some witnesses referred anecdotally to instances

where they believed employees leaving the line created production issues,[27] the

preponderance of the evidence showed that allowing unscheduled prayer breaks would

not have more than a de minimis effect on productivity or safety.  In particular, when

questioned about the effect of the 2009 and 2011 policies allowing such unscheduled

prayer breaks,[28] JBS management witnesses did not identify any actual effect on

---

[27] Many such anecdotes involved employees leaving the line without permission or taking unreasonably long breaks, which are not contemplated by the EEOC's proposed accommodation.

[28] The fact that these policies were implemented does not itself show that such policies would not create an undue hardship.  *See, e.g., Rehrs v. Iams Co.*, 486 F.3d

production or otherwise testify that allowing unscheduled prayer breaks has ever reduced the plant's overall productivity or safety. Throughout the trial, JBS demonstrated that it predicts, tracks, and accounts for worker productivity and worker safety in great detail. *See, e.g.*, Ex. B-13; Exs. F39-F50. Against this background, JBS's failure to adduce evidence of an actual, as opposed to a hypothetical, effect on productivity and safety from allowing unscheduled breaks for prayer in addition to restroom use, combined with JBS management's testimony that they were aware of no actual effects on productivity or safety, supports a conclusion that there is no such impact or, at least, that any impact is de minimis.[29] See *Toledo*, 892 F.2d at 1490.

The other arguments raised by JBS suffer from the same lack of concrete evidence and, at best, raise a speculative inference or posit hypothetical "costs" that only exist if certain assumptions are made. For example, JBS hypothesized that it would incur certain labor and overtime costs and that non-Muslim employees would

---

353, 358 (8th Cir. 2007) (holding that an employer does not concede that an accommodation is reasonable or non-burdensome by voluntarily adopting a policy); *Wood v. Green*, 323 F.3d 1309, 1314 (11th Cir. 2003) (holding that an employer's willingness to grant prior leaves of absence did not make a future indefinite leave of absence reasonable because "prior accommodations do not make an accommodation reasonable"); *Riley v. Weyerhaeuser Paper Co.*, 898 F. Supp. 324, 329 (W.D.N.C. 1995) ("A particular accommodation is not necessarily reasonable, and thus federally mandated, simply because the [employer] elects to establish it as a matter of policy."). Nonetheless, the effects of policies that are implemented is relevant to show whether such a policy creates an undue hardship. *See, e.g., Toledo*, 892 F.2d 1490; *Brown*, 61 F.3d at 655.

[29] JBS's argument that the data it collects does not lend itself to such an analysis is unpersuasive. *See* Docket No. 604 at 62. JBS did not present testimony supporting a credible explanation for why this is so when, during both Ramadan 2009 and 2010, JBS allowed prayer breaks that were denied during the preceding and succeeding time periods during which conditions in the plant would have been otherwise analogous.

take additional breaks based on a sense of unfairness.  *See* Docket No. 604 at 82-85.

The Court finds such inferences speculative.  *See Toledo*, 892 F.2d at 1492 (rejecting

arguments of increased risk as speculative and holding that the employer did not carry

its burden when it "failed to show that accommodation . . . without undue hardship was

impossible.").

### 4. Pattern of Adverse Action Motivated By Need for Accommodation

JBS argues that the EEOC has presented insufficient evidence to show that its

actions were part of a discriminatory pattern or practice to deny reasonable

accommodations and that, instead, JBS has shown that its actions were supported by

non-discriminatory justifications, such as the walkout.  JBS also maintains that the

EEOC did not show that any employees suffered adverse employment actions as a

result of a pattern or practice of denying accommodations.  The Court will first discuss

JBS's discipline of employees who walked out and then separately discuss JBS's policy

and practice regarding unscheduled prayer breaks.

### a. Walkout-Related Discipline

With respect to the ninety-six Somali Muslim employees terminated on

September 10, 2008, there is no question that such employees suffered an adverse

employment action.  The question is whether the EEOC has shown that their

terminations were part of a pattern or practice motivated by a desire to deny religious

accommodations.  The Court finds that the EEOC has not shown that the terminations

on September 10, 2008 and related suspensions and disciplinary letters were motivated

by a desire to deny religious accommodations to such employees.  As noted above, on

September 5, 2008, a large group of Muslim employees walked out of work and other employees remaining in the cafeteria refused to return to work, thereby engaging in a work stoppage. The CBA prohibited work stoppages, and JBS had discretion to discipline such employees, including termination. Ex. A-03 at 7, Art. 8. The walkout on September 5, 2008 provided a legitimate, non-discriminatory ground for the employees to be suspended or terminated by JBS. *See Swann v. Roadway Express, Inc.*, 2004 WL 1166651, at *10 (M.D.N.C. May 14, 2004) (employer had legitimate, non-discriminatory reason for termination when employee violated union contract by walking off job without permission); *Williamson v. Lear Corp.*, 2005 WL 3555920, at *7 (E.D. Mich. Dec. 28, 2005), *aff'd*, 183 F. App'x 497 (6th Cir. 2006) (finding that employer articulated legitimate, non-discriminatory reason for discharge where employee was absent in violation of employer's policies and the CBA). Although the Ramadan 2008 terminations disproportionately affected Muslims, the Court finds that the EEOC has not shown that suspending or terminating employees for the work stoppage was motivated by a desire on the part of JBS to deny such employees a religious accommodation. Rather than deny the committee's initial request, JBS made the dramatic decision to move the meal break up one hour and forty-five minutes to accommodate the Muslim workers' Ramadan prayer schedule and kept that schedule for two days until a significant work disruption by non-Muslim employees occurred. The Court finds that JBS's motivations for disciplining the employees who walked out and terminating those who did not return to work on Tuesday were related to the walkout, rather than a desire to avoid giving such employees a religious accommodation. The evidence showed that a disciplinary suspension was given to any employee identified

as leaving the plant on September 5, including at least two non-Muslim employees. 2

2562:14-2564:2 (Ray); Ex. 62 at p. 51 (Norman Peterson) and 47 (Diega Koronto).

Moreover, even though over 100 Muslim employees staged a walkout, JBS did not

revert to the traditional meal break, but rather moved the meal break thirty minutes

later. While this compromise may not have accommodated the Muslim employees'

prayer schedule as well as a 7:30 p.m. meal break did, it does not display a motive to

deny accommodation. Further, despite the Ramadan 2008 terminations, Muslim

employees continued to make up a significant percentage of JBS's B shift workforce.

Had JBS been motivated by a desire to avoid employing Muslim employees who sought

religious accommodations, it could have terminated all those who walked out. Instead,

it allowed the majority of such employees to return to work.

### b.  Unscheduled Prayer Breaks

Turning to events not related to the walkout, the Court examines whether the

EEOC has shown that JBS engaged in a pattern or practice of denying religious

accommodations resulting in adverse employment actions. As discussed above, at this

stage, the EEOC need only show that an unlawful, discriminatory policy or practice

existed. *Teamsters*, 431 U.S. at 360. The EEOC is not required to show that every

individual for whom it will ultimately seek relief suffered an adverse action as a result of

such a policy or practice. *Id*.; *Davoll ,*194 F.3d at 1148 (citing *Coe v. Yellow Freight*

*Sys., Inc.*, 646 F.2d 444, 449 n.1 (10th Cir. 1981)); *United States v. City & Cty. of*

*Denver*, 943 F. Supp. 1304, 1309 (D. Colo. 1996) ("In seeking to protect the public's

interest, it is sufficient that the government show specific evidence of company

discrimination regarding some of the employees that it seeks to represent, and that a broad-based policy of employment discrimination existed." (quoting *Coe*, 646 F.2d at 449 n.1)).

JBS was aware that many of its Muslim employees needed breaks at or near sunset to pray or break their fast and, at times, used unscheduled breaks to do so. As discussed above, the Court finds that JBS had a policy of prohibiting unscheduled breaks to pray during the period between late 2008 and July 2011, with the exception of Ramadan 2009 and 2010, when the policy implemented in 2009 applied. In relation to this policy, JBS managers and supervisors disciplined Muslim employees found praying at work outside of scheduled breaks. Although some employees were able to pray by asking for a bathroom break,[30] such a policy over the extended time period constitutes a

---

[30] As explained by the Tenth Circuit in *Pitre*, the fact that certain individuals were not subjected to discriminatory treatment does nothing to absolve an employer from liability where other employees were victimized by a discriminatory policy or practice:

> [A]n employer is not immunized from liability simply because some males received detriments before or contemporaneously with a Title VII plaintiff or because other protected classes received benefits instead of a Title VII plaintiff. *See United States v. Lee Way Motor Freight, Inc.*, 625 F.2d 918, 950 (10th Cir. 1979). "It is clear beyond cavil that the obligation imposed by Title VII is to provide an equal opportunity for [all] . . ., without regard to whether members of the applicant's [sex] are already proportionately represented in the work force." *Furnco Constr. Co. v. Waters*, 438 U.S. 567, 579 . . . (1978). Similarly, that a member of a protected class was hired or promoted in place of a Title VII plaintiff has repeatedly been held insufficient to insulate the employer from liability. *Cockrham v. South Central Bell Telephone Co.*, 695 F.2d 143, 145 (5th Cir. 1983); *Peters v. Lieuallen*, 693 F.2d 966, 970 (9th Cir. 1982); *DeLesstine v. Fort Wayne State Hosp.*, 682 F.2d 130, 132-33 (7th Cir. [1982]) . . . ; *Lee Way Motor Freight*, 625 F.2d at 950. A statistical showing that a higher percentage of female applicants are hired than male has also been held unavailing. *Catlett* [*v. Missouri Highway & Transp. Comm'n*, 828 F.2d 1260, 1266 (8th Cir. 1987)]. "[I]rrespective of the form taken by the discriminatory practice,

76

pattern or practice that was "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." *Teamsters*, 431 U.S. at 336.  Although enforcement waxed and waned and some employees were not disciplined when caught praying on unscheduled breaks, this does not prevent the evidence from showing that "such a policy existed." *Id*.  Additionally, the Court finds that a motivating factor behind JBS's practice of disciplining employees for using unscheduled breaks to pray was to deny them a reasonable religious accommodation.  *See Abercrombie*, 135 S. Ct. at 2033 ("[A]n employer who acts with the motive of avoiding accommodation may violate Title VII even if he has no more than an unsubstantiated suspicion that accommodation would be needed.").  Even where supervisors granted Muslim employees a bathroom break, i.e. the supervisors determined in their discretion that it was possible to allow the employees to leave the line, such employees were still subject to discipline if caught praying on such an "unauthorized break."[31]  The Court has found that unscheduled

---

an employer's treatment of other members of the plaintiffs' group can be 'of little comfort to the victims of . . . discrimination.'" *Connecticut v. Teal*, 457 U.S. 440, 455 . . . (1982) (quoting *Teamsters*, 431 U.S. at 342[]). Thus, a showing that some similarly situated males were demoted at the same time as Pitre, or a showing that more women than men were actually promoted, does not preclude the district court from finding a statutory violation.

*Pitre*, 843 F.2d at 1272-73.

[31] Mr. Gould testified:

Q.  …Are you saying [employees] were allowed to pray on the bathroom breaks?

A.  They were not allowed to take a break to pray.  It was for restroom breaks only.

prayer breaks were a reasonable accommodation and JBS has not shown that they constituted an undue hardship.

The remaining question then is whether the EEOC has shown that any employees suffered a materially adverse employment action as a result of JBS's policy of denying unscheduled prayer breaks. The evidence at trial included three employees who may have been suspended or terminated[32] for using an unscheduled break to pray: Ms. Fardowsa Ali, Mr. Ahmed Hussein, and an unidentified Muslim employee who was praying in the locker room. *See Hillig*, 381 F.3d at 1032-33 (holding that termination or loss of pay is an adverse employment action).

On September 11, 2008, Ms. Ali was suspended without pay for taking an "unauthorized break," which she testified was taken in order to pray. Ex. 8; Tr. 2225:17-2226:3 (F. Ali). Ms. Ali challenged the discipline[33] and, on September 24,

---

Q. If employees asked for a restroom break and then went to the locker room and used that break time to pray, that would have been a violation of the bathroom policy you are talking about at JBS; is that correct?

A. Yes.

Q. And an employee who asked to go to the bathroom and was then found praying would be given a warning for taking an unauthorized break?

A. Yes.

Tr. 147:25-148:12 (R. Gould); *see also* Tr. at 151:22-152:10 (R. Gould) (while general manager of the Greeley plant, he instructed managers to discipline employees after they finished praying on unscheduled breaks).

[32] The EEOC does not argue constructive termination.

[33] The means by which Ms. Ali challenged her suspension are unclear because Ms. Ali, as a quality assurance employee, was not a member of the union.

2008, she was "brought back to work" and "paid for the suspension." Ex. 53. Her discipline was reduced to a verbal warning. *Id*. The Court finds that Ms. Ali did not suffer a materially adverse employment action because Ms. Ali's suspension was remitted and she was paid her wages. *See Espinoza v. Dep't of Corr.*, No. 10-cv-00548-CMA-KLM, 2011 WL 5024826, at *6 (D. Colo. Oct. 21, 2011), *aff'd*, 509 F. App'x 724 (10th Cir. 2013) (finding no adverse action where discipline was "removed from Plaintiff's file at Step II of the grievance process" and the employee did not suffer a loss of wages (citing *Deflon v. Danka Corp. Inc.*, 1 F. App'x 807, 819 (10th Cir. 2001) (unpublished); *Green v. Clovis Mun. Schs.*, 2000 WL 177414, at *2 (10th Cir. Feb. 16, 2000)); *cf. White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789, 803 (6th Cir. 2004) (holding that an "election to challenge this decision through an internal grievance process does not render the decision not actionable under Title VII," but reaffirming that a "suspension *with* pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse employment action.), *aff'd sub nom. Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

Mr. Hussein was suspended on September 20, 2008 in part for taking unscheduled breaks. Ex. 51. Notwithstanding the evidence that praying employees were disciplined for an "unscheduled break" or "unauthorized break" when they were found praying while the line was running, Tr. 2863:23-2866:24 (J. Gonzales), that was not the case with Mr. Hussein. Rather, the record of his personnel action states that he "always [came] late back to the line." Ex. 51. Thus, the Court does not find that his suspension was motivated by a desire to deny religious accommodations.

On April 9, 2008, Mr. Palacios asked Ms. Rodriguez to enter the women's locker room and get the badge from an unidentified Muslim employee who was praying.  Ex. 74.  Ms. Rodriguez's contemporaneous statement about the incident records that it involved "miss using [sic] of company breaks."  *Id*.  Ms. Rodriguez explained at trial that this referred to "walking off without permission."  Tr. 775:22-776:1 (B. Rodriguez).  In addition to this non-discriminatory justification, Ms. Rodriguez testified that Mr. Palacios wanted the woman's badge taken because the woman was rude and hostile to another quality assurance employee.  Although the taking of a badge could be a prelude to termination, it is unclear what, if any, discipline was ultimately imposed on the unidentified employee.  Therefore, the Court finds that this incident does not demonstrate a discriminatory adverse employment action.

Moving beyond suspensions and terminations, the EEOC argues that, "[i]n the failure-to-accommodate context, courts have recognized that the threats of discipline or discharge amount to adverse employment actions."  Docket No. 605 at 162 (citing *Burns v. S. Pac. Transp. Co.*, 589 F.2d 403, 405 (9th Cir. 1978); *Bushouse v. Local Union 2209*, 164 F. Supp. 2d 1066 (N.D. Ind. 2001).  The Tenth Circuit has held that a "reprimand, however, will only constitute an adverse employment action if it adversely affects the terms and conditions of the plaintiff's employment – for example, if it affects the likelihood that the plaintiff will be terminated, undermines the plaintiff's current position, or affects the plaintiff's future employment opportunities."  *Medina v. Income Support Div., New Mexico*, 413 F.3d 1131, 1137 (10th Cir. 2005) (citing *Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1104 (10th Cir. 1998)); *see also Lewis v.*

*Denver Fire Dep't*, No. 09-cv-0004-RBJ-MJW, 2011 WL 6841530, at *5 (D. Colo. Dec. 29, 2011) ("A written reprimand generally is insufficient to constitute an adverse employment action." (citations omitted)).  In this connection, the EEOC notes that many Muslim employees received verbal and written warnings and argues that, "in light of JBS's progressive discipline policy, the discipline. . . . amounts to a threat of future adverse action, up to and including discharge."  Docket No. 605 at 163.  It is clear that in the retaliation context certain threats of future adverse action can constitute a materially adverse employment action because of the standard adopted for such claims by the Supreme Court in *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68 (adopting a standard for materially adverse action in the retaliation context under which "a plaintiff must show that . . . the challenged action . . . might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." (internal quotation marks omitted)).  The Tenth Circuit has, however, "never expressly held that an unrealized threat of termination, without more, constitutes an adverse employment action" under the standard that it applies to non-retaliation Title VII claims.  *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1268 (10th Cir. 2005) (affirming that an unrealized threat did not constitute an adverse employment action); *see also Mirzai v. State of New Mexico Gen. Servs. Dep't*, 506 F. Supp. 2d 767, 782-86 (D.N.M. 2007) (discussing Tenth Circuit cases and concluding that the issuance of the letter of reprimand, imposition of a corrective action plan, and disagreeable treatment did not constitute materially adverse employment actions because there was not evidence that they "had some adverse effect on [the plaintiff's] employment status").  The EEOC presented numerous

instances of employees given verbal or written warnings for "unauthorized breaks" that other evidence indicated may have been in relation to prayer. *See,* Tr. 2863:23-2866:24 (J. Gonzales); *see, e.g.*, Ex. 6-7, 9, 40-41, 43-45, 48-51, 58-59, 64.[34] The personnel records for such discipline, which were provided to the employees, did indicate that further discipline could lead to termination. *See, e.g.*, Ex. 6 ("Any further occurrences will lead to further disciplinary action up to termination.") But, in spite of JBS's progressive discipline policy, there was no evidence that any such reprimanded employees were ultimately suspended or terminated as a result of such verbal or written warnings.

Therefore, lacking evidence that any employee suffered a detriment to "compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion" in relation to discipline imposed for unscheduled prayer breaks, the Court concludes that the EEOC has failed to prove its claim that JBS's policy constituted an unlawful pattern or practice of discrimination. 42 U.S.C. § 2000e-2(a)(1). Accordingly, the Court will enter judgment for JBS on the EEOC's Phase I pattern or practice claim for denial of reasonable religious accommodations.

### C. Pattern or Practice of Discriminatory Discipline during Ramadan 2008

The EEOC claims that JBS engaged in a pattern-or-practice of disciplining and discharging black Somali Muslim employees more often than non-black, non-Somali,

---

[34] Notably, many of the personnel action records for such discipline state that the employees left the line or their stations without permission, which is a non-discriminatory basis for discipline. *See, e.g.*, Ex. 6-7, 9, 40-41, 43-45, 48, 58. Other employees were disciplined for returning late from otherwise authorized breaks, but this is also a non-discriminatory basis for discipline. *See, e.g.*, Ex. 10, 46-47.

non-Muslim employees during Ramadan 2008. The focus of analysis for such a claim is "on a pattern of discriminatory decisionmaking." *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 876 (1984); *see also Teamsters*, 431 U.S. at 335.

### 1. Prima Facie Case of a Pattern or Practice of Discrimination

One well-recognized means of establishing discrimination is to show that employees in the protected class were treated less favorably or more harshly than employees outside the protected class. *Kendrick*, 220 F.3d at 1232. The EEOC may demonstrate that JBS's disciplinary decisions were based on race, national origin, or religion through either direct or circumstantial evidence. *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1249 (10th Cir. 2002). "Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption." *Hall v. United States DOL*, 476 F.3d 847, 854 (10th Cir. 2007); *Tuffa v. Flight Servs. & Sys., Inc.*, 78 F. Supp. 3d 1351, 1356 (D. Colo. 2015). Evidence of discriminatory decisions may take the form of "existing policy which itself constitutes discrimination or oral or written statements on the part of a defendant showing a discriminatory motivation." *Tuffa*, 78 F. Supp. 3d at 1356 (quoting *Cuenca v. Univ. of Kansas*, 101 F. App'x 782, 788 (10th Cir. 2004) (unpublished)). Although it is not required to prove a pattern-or-practice claim, statistical evidence may be combined with "historical, individual, or circumstantial evidence" to establish discriminatory intent. *Pitre*, 843 F.2d at 1267. "Statistical analyses have served and will continue to serve an important role in cases in which the existence of discrimination is a disputed issue." *Teamsters*, 431 U.S. at 339 (internal quotation marks omitted). Ultimately, "all of the evidence, statistical and nonstatistical,

tending to establish a prima facie case should be assessed on a cumulative basis." *Pitre*, 843 F. 2d at 1268 (quoting *EEOC v. Am. Nat'l Bank*, 652 F.2d 1176, 1189 (4th Cir. 1981)).

The EEOC argues that the September 10, 2008 terminations were discriminatory because black Somali Muslim employees were treated more severely than others, while JBS claims that the evidence is insufficient to make out a prima facie case. The Court finds that the statistical evidence presented, in combination with the other circumstantial evidence (e.g., that Muslim employees' use of unscheduled breaks to pray was targeted for discipline), is sufficient for the Court to infer a pattern or practice of discriminatory discipline on the basis of black race and Muslim religion during Ramadan 2008. *See Pitre*, 843 F.2d at 1267. The Court, however, finds that the EEOC has not shown a prima facie case that there is a pattern or practice of discrimination on the basis of Somali national origin. The non-statistical circumstantial evidence of prejudice and discrimination was tied to race and religion. While national origin undoubtably played a role in cultural tensions at the Greeley plant in 2008, there was little, if any, evidence linking discipline or harassment in the Greeley plant to anything particular to Somali nationals as a protected class apart from their black race or Muslim religion.[35] In particular, the Court finds that the weaker statistical correlation between Somali national origin (using the January 1 birth date proxy) indicates that any pattern or practice of discrimination was on account of such employees' other protected characteristics. The

---

[35] While there was evidence that JBS employed Muslims who were not black, namely, Mr. Timejardine, there was no evidence that any Somalis employed by JBS were not black.

statistical evidence shows less of a correlation between Somali nationality and discipline than the other protected characteristics.  It is reasonable to infer based on the circumstantial evidence that, to the extent discrimination occurred, black race and Muslim religion were the basis for any pattern or practice of discrimination, not Somali national origin.

## 2.  *JBS's Nondiscriminatory Explanation*

JBS argues that, even if black Muslim employees were disproportionately terminated during Ramadan 2008, JBS has shown that its decisions were based on legitimate, non-discriminatory reasons, principally the walkout.  *See Teamsters*, 431 U.S. at 360 n.46.   By contrast, the EEOC argues that JBS's explanations are a pretext for discrimination.  "Pretext exists when an employer does not honestly represent its reasons for terminating an employee."  *Miller v. Eby Realty Group LLC,* 396 F.3d 1105, 1111 (10th Cir. 2005).  Generally, a plaintiff can show pretext in one of three ways: (1) with evidence that the defendant's stated reason for the adverse employment action was false, (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances, or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff.  *Kendrick v. Penske Transp. Servs.*, Inc., 220 F.3d 1220, 1230 (10th Cir. 2000);  *Richardson v. Topeka Metro. Transit Auth.*, 987 F. Supp. 887, 891-892 (D. Kan. 1997)  ("[t]he Tenth Circuit has stated that 'in a disparate treatment case, pretext may be shown by reference to other similarly situated non-minority employees receiving

disparate discipline.'" (quoting *Elmore v. Capstan, Inc.*, 58 F.3d 525, 530 (10th Cir. 1995)).[36]  In this connection, the EEOC argues that pretext is shown by (1) JBS falsely claiming the Muslim employees engaged in a work stoppage, (2) JBS acting contrary to its unwritten policies and practices, and (3) JBS deviating from its written policies and practices.  Docket No. 605 at 136-39.

The Court rejects the EEOC's first argument because, as discussed above, the Court finds that the employees engaged in a work stoppage.  With respect to the second and third arguments, the Court finds that JBS's departures from its written and unwritten practices and procedures in relation to discipline and contacting employees do not show that the suspensions and terminations were a pretext for discrimination. JBS found itself in a very unusual situation the first week of Ramadan.  While the 2007 issues at the Grand Island plant, in hindsight, foreshadowed possible Ramadan-related accommodation issues in Greeley, JBS management, the union, and Muslims in management positions were taken by surprise when a large group of Muslim employees asked, on September 2, 2008, that the meal time be moved.  After the Muslim committee was formed, it implied that Muslim employees may stop work and made other demands as reflected by the committee's September 8, 2008 letter.  All the more unusual, the committee was acting independently of the union despite the Greeley plant being a closed shop.  JBS's reaction, however, was not to tell the

_____

[36] If direct evidence is established, a plaintiff need not prove pretext because "[d]irect evidence demonstrates on its face that the employment decision was reached for discriminatory reasons."  *Danville*, 292 F.3d at 1249.  The EEOC did not present direct evidence showing that JBS's reasons for the September 10, 2008 terminations were based on discriminatory reasons or a facially discriminatory policy.

committee to negotiate through the union. Rather, it was to get permission from the union to talk to the committee and then, the first day it met with the committee, to make the decision to move the meal time up by approximately one hour and forty-five minutes. Instead of demonstrating pretext and animus, on September 3 and 4, JBS demonstrated a willingness to work with the committee to accommodate the Muslim employees' prayer needs during Ramadan.

The Greeley workforce was multi-cultural, however, and the situation at the plant grew more complicated. On Thursday, September 4, many non-Muslim employees refused to leave the line for the 7:30 p.m. meal break and instead left the line at the usual meal time of 9:15 p.m. The Court finds that JBS's failure to discipline these employees is not evidence of animus towards Muslim employees, but rather reflects JBS's attempt not to make a potentially serious counter-demonstration worse. In this regard, JBS was looking at the bigger picture of trying to gain acceptance of the significantly earlier meal time. The fact that JBS did not discipline Muslim workers between September 3 and 5 who left the line at 7:30 p.m. without waiting for the line to stop is consistent with this approach. These departures from normal practices do not reflect animus against Muslim employees or favoritism towards non-Muslim employees. *See Kendrick*, 220 F.3d at 1232 ("Differences in treatment that are trivial or accidental or explained by a nondiscriminatory motive will not sustain a claim of pretext." (citing *EEOC v. Flasher Co.*, 986 F.2d 1312, 1319 (10th Cir. 1992))).

The EEOC also points to departures from JBS's normal procedures for investigation after an employee is suspended and to JBS's failure to follow its progressive discipline procedures. Docket No. 600 at 7-8. The Court finds these

departures are explained by the nature of the walkout.  As noted by Mr. Rodriguez, in negotiations with JBS after September 5, there was no question about Muslim employees having walked off the job in violation of the CBA.  The only question, in terms of imposing discipline, was who walked out.  JBS made mistakes in some cases about who walked out and who did not, which were later rectified in the grievance process, but the Court does not find that its motivation for the departures was based on religious or racial animus, but rather on the confusion and frustration of dealing with a chaotic work stoppage.

The EEOC argues that JBS's failure to communicate its decisions regarding discipline, in particular its decision that anyone who returned to work on September 9 could keep his or her job, is evidence of pretext.  There is no question that the fortuity of who heard about the offer to go back to work on September 9 and who did not hear caused terrible unfairness.  But the EEOC has failed to show that the motivation for JBS's poor communication was pretext for discrimination.  JBS had reason to believe that the Muslim committee and union were in communication with the suspended employees.  The Muslim committee continued to meet with JBS after the walkout, claiming to represent the Muslim employees who were subject to discipline.  The Muslim committee indicated to JBS that it would pass information to the suspended employees at Lincoln Park.  Moreover, union representatives attended these meetings. The union represented the employees subject to discipline and was the presumed conduit for communication between labor and management.  See Ex. A-61 ("Should you have any questions we would suggest you contact your union representative as outlined in Article 12 of the Collective Bargaining Agreement.").  The CBA called for the

union to communicate with striking employees and order them to return to work. Ex. A-03 at 7, Art. 8, § 1. Although Mr. Rodriquez called Mr. Ray to tell him that efforts to inform suspended employees of the offer to go to work on September 9 would not reach all employees, the Court finds that Mr. Ray's response ("I don't care") reflects his unwillingness to modify the company's offer at the last minute, rather than animus.

In hindsight, it would have been better for JBS to have had more explicit conversations with the committee and the union about their ability to inform the suspended employees of the discipline they faced and of their one-time opportunity to avoid termination by showing up at some point during the September 9 shift. Had JBS done so, it could have fashioned a more fair and more effective strategy to communicate this important information. However, as the Tenth Circuit noted in *Flasher Co.*,

> Title VII does *not* make unexplained differences in treatment per se illegal nor does it make inconsistent or irrational employment practices illegal. It prohibits only intentional discrimination *based upon* an employee's protected class characteristics.
>
> Human relationships are inherently complex. Large employers must deal with a multitude of employment decisions, involving different employees, different supervisors, different time periods, and an incredible array of facts that will inevitably differ even among seemingly similar situations. The law does not require, nor could it ever realistically require, employers to treat all of their employees all of the time in all matters with absolute, antiseptic, hindsight equality.
>
> What the law does require is that an employer not discriminate against an employee on the basis of the employee's protected class characteristics.

*Flasher Co.*, 986 F.2d at 1319. During Ramadan 2008, JBS was faced with just such a complex, evolving situation. JBS took inconsistent actions and made some bad decisions that ultimately disadvantaged certain Muslim employees. Nevertheless, the

Court does not draw an inference of discrimination based on those actions because the evidence, as a whole, does not indicate that JBS was motivated by bias as opposed to other factors, such as JBS management's credible and legitimate concern about work stoppages. *Id*. at 1319-20 ("It is error to assume . . . that differential treatment between a minority employee and a non-minority employee that is not explained by the employer in terms of a rational, predetermined business policy *must* be based on illegal discrimination because of an employee's protected class characteristics."). Thus, because the EEOC has not shown that JBS's adverse employment actions during Ramadan 2008 were motivated by discriminatory animus, the Court will enter judgment in favor of JBS on the EEOC's Phase I pattern-or-practice discriminatory discipline claim.

### D.   Pattern or Practice of Retaliation for Protected Activity During Ramadan 2008

Under Title VII it is unlawful to discriminate against an individual "because he has opposed any practice made an unlawful employment practice by this subchapter . . . ." 42 U.S.C. § 2000e-3(a). To demonstrate that JBS engaged in a pattern or practice of retaliation against Somali Muslim employees, the EEOC must show that JBS engaged in a pattern or practice of retaliatory conduct. *See EEOC v. Pitre, Inc.*, 908 F. Supp. 2d 1165, 1172 (D.N.M. 2012) (for purposes of *Teamsters* pattern-or-practice claims, retaliation is treated as disparate treatment).[37] The EEOC meets its burden by showing

---

[37] In order to prove unlawful retaliation, an individual employee must show (1) that the employee engaged in protected activity; (2) the employee suffered a materially adverse action either after or contemporaneous with his or her protected activity; and (3) the employer would not have taken the adverse action but for the employee's protected activity. *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 347 (2013);

that JBS engaged in a pattern or practice of materially adverse employment actions against employees because of such employees' activity protected under Title VII.  *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59, 67-69 (2006); *Pinkerton v. Colo. DOT*, 563 F.3d 1052, 1064 (10th Cir. 2009); *see also EEOC v. Glob. Horizons, Inc.*, 7 F. Supp. 3d 1053, 1063 (D. Haw. 2014) (applying traditional retaliation framework to pattern or practice claims).  A plaintiff must establish that the protected activity was a but-for cause of the adverse action.  *Univ. of Tex. S.W. Med. Ctr.,* 570 U.S. at 360.

### 1.  Engaging in a Protected Activity

Protected activity under Title VII includes opposition to a discriminatory practice, as well as request for, or complaint at the denial of, a religious accommodation. *Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1205 (10th Cir. 2000); *see Lewis v. N.Y. City Transit Auth.*, 12 F. Supp. 3d 418, 449 (E.D.N.Y. 2014) (accommodation request and complaints are protected activity).  Thus, requesting a reasonable religious accommodation is protected activity under Title VII that may support a retaliation claim. *Creusere v. Board of Educ. of City School Dist. of City of Cincinnati*, 88 F. App'x 813, 821 (6th Cir. 2003) (unpublished); *Lewis*, 12 F. Supp. 3d at 449 ("Both protesting a discriminatory employment practice and requesting an accommodation constitute protected activities.").

To succeed on a retaliation claim, a plaintiff need only have a reasonable good faith belief that his or her activities are protected - Title VII does not require proof of the

_____

*Hart v. UPS Freight*, No. 15-cv-01441-RPM, 2017 WL 3058026, at *5 (D. Colo. July 19, 2017), *aff'd sub nom. Palmer v. UPS Freight*, 715 F. App'x 863 (10th Cir. 2018).

underlying claim. *Crumpacker v. Kan. Dep't of Human Res.*, 338 F.3d 1163, 1172 (10th Cir. 2003). In other words, even if an underlying violation of Title VII is not found, so long as the plaintiff had at least a "mistaken good faith belief that Title VII has been violated," the retaliation claim remains. *Robbins v. Jefferson County Sch. Dist. R-1*, 186 F.3d 1253, 1258 (10th Cir. 1999); *Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1205 n.4 (10th Cir. 2000) (citing *Robbins*, 186 F.3d at 1258 ).

The Court finds that the EEOC has shown that JBS's Muslim employees engaged in protected activity during Ramadan 2008. Both the meeting with Mr. Palacios on September 2, 2008 and the request to JBS's HR staff on September 3, 2008 constituted protected activity. *See Foster v. Mt. Coal Co., LLC*, 830 F.3d 1178, 1188 (10th Cir. 2016) ("We have treated requests for reasonable accommodation as protected activity under the ADA." (citing *Jones v. UPS, Inc.*, 502 F.3d 1176, 1194 (10th Cir. 2007)).

### 2. *Whether Muslim Employees Suffered Materially Adverse Actions*

In the context of retaliation, the phrase "materially adverse" refers to an action that is "likely to dissuade employees" from engaging in protected activity. *Burlington Northern & Santa Fe Ry. Co.*, 548 U.S. at 70. Disciplinary action, suspension, discharge, and co-worker hostility are all materially adverse actions under *Burlington Northern* and its progeny. *Id*. at 72 (suspension); *Bertsch v. Overstock.com*, 684 F.3d 1023, 1029 (10th Cir. 2012) (discipline); *Proctor v. UPS*, 502 F.3d 1200, 1208 (10th Cir. 2007) (termination); *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1265 (10th Cir. 1998) (co-worker hostility).

The Court finds that JBS took several actions against its black Somali Muslim employees that were materially adverse in the retaliation context, including discipline (particularly through increased monitoring of praying during unscheduled breaks), suspensions, and termination.  Each of these actions seems likely to dissuade such employees from requesting an accommodation or reporting discrimination.

### 3.  Causal Connection to Protected Activity

Any adverse action standing alone is inherently suspect if taken within six weeks of protected activity.  *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004).  At the prima facie stage, the Court may infer causal connection from close temporal proximity alone, i.e., when the materially adverse action follows closely after the protected activity.  *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999).

The discipline and suspensions at issue in Phase I all necessarily occurred within six weeks of the protected activity, namely, the September 2, 2008 accommodation request, because this Phase I claim is limited to September 2008.  The Court declines to infer, however, that the discipline imposed during Ramadan 2008 in relation to unscheduled prayer breaks was part of a pattern or practice of retaliation causally connected to the requests for an accommodation made during Ramadan 2008.  As discussed above, JBS's policy of forbidding unscheduled prayer breaks was in place before Ramadan 2008.  Indeed, approximately ten Muslim employees were disciplined for such breaks on September 2, 2008 before the group requests for an accommodation were made.  Although JBS stepped up enforcement against unscheduled prayer breaks during Ramadan 2008, the Court finds that, in light of JBS's

preexisting policy, the coincidence in timing does not support an inference that discipline for unscheduled prayer breaks during Ramadan 2008 was part of a pattern or practice of retaliation. *See Meiners*, 359 F.3d at 1232 (holding that an alleged pattern of conduct of the same type but that "occur[red] four months apart . . . [did] not support an inference of a causal connection" to a request for accommodation).

### 4. JBS's Non-retaliatory Explanation and Pretext

The same standards for assessing nondiscriminatory explanation and pretext that apply in the disparate treatment apply to retaliation claims. *Wells v. Colo. DOT*, 325 F.3d 1205, 1212, 1217-1219 (10th Cir. 2003); *Pinkerton v. Colo. DOT*, 563 F.3d 1052, 1065 (10th Cir. 2009); *see also Morales v. United States Postal Serv.*, 12 F. Supp. 2d 1144, 1148-49 (D. Kan. 1998) (citing weakness and implausibilities in the defendant's proffered justification for discharging the plaintiff, along with four-day window between protected activity and adverse action, as sufficient evidence to withstand summary judgment). Although evidence of close temporal proximity is relevant, it is insufficient standing alone to show that a nondiscriminatory explanation is a pretext for retaliation. *See Pastran*, 210 F.3d at 1206 (citing *Conner v. Schnuck Mkts., Inc.*, 121 F.3d 1390, 1397 (10th Cir. 1997); *Anderson*, 181 F.3d at 1180).

With respect to the walkout-related discipline, the Court finds that the work stoppage presents a legitimate, non-discriminatory justification for the work stoppage-related discipline and that the EEOC has failed to show that such justification was a pretext for prohibited conduct. *See Elmore*, 58 F.3d at 530. Rather than retaliating against the Muslim employees for requesting an accommodation, JBS engaged in an

interactive process to determine and implement an accommodation by moving the meal break and entering into discussions with the Muslim committee. Although JBS ultimately imposed a compromise unacceptable to the Muslim committee, and one which did not constitute a reasonable accommodation, the work stoppage in reaction to the change in meal time provided a legitimate reason to discipline such employees and a non-retaliatory explanation for JBS's subsequent discipline. Even after the September 10, 2018 terminations, JBS worked with Muslim leaders to determine appropriate accommodations, resulting in the 2009 Guidelines, showing a lack of animus in relation to requests for accommodations. Because the Court finds that JBS disciplined employees for engaging in a work stoppage, the Court does not conclude that JBS sought to retaliate for the Muslim employees' accommodation requests. Accordingly, the Court finds that the EEOC has not shown that JBS engaged in a pattern or practice of retaliation with respect to the events of Ramadan 2008 and will enter judgment in favor of JBS on the EEOC's Phase I retaliation pattern-or-practice claim.

## III.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that plaintiff Equal Employment Opportunity Commission's Phase I pattern or practice claims are dismissed.

DATED September 24, 2018.

BY THE COURT:

 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge
